UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

DAVID E. KAPLAN, ROXY D. SULLIVAN,
LINDSEY RANKIN, MICHAEL S. ALLEN,
GARY W. MUENSTERMAN, and CHI-PIN
HSU, Individually and on Behalf of All Others
Similarly Situated,

Plaintiffs,

- against -

S.A.C. CAPITAL ADVISORS, L.P., S.A.C.
CAPITAL ADVISORS, INC., CR INTRINSIC
INVESTORS, LLC, STEVEN A. COHEN,
MATHEW MARTOMA, and SIDNEY
GILMAN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

12 CV 9350

**JURY TRIAL DEMANDED**

**ECF CASE**



DEC 2 1 2012

# CLASS ACTION COMPLAINT

Ethan D. Wohl
Krista T. Rosen
**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004

*Attorneys for Plaintiffs and
the Proposed Class*

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE .........................................................................................6

PARTIES .............................................................................................................................6

A.     Plaintiffs .................................................................................................................6

B.     Defendants .............................................................................................................7

SUBSTANTIVE ALLEGATIONS ....................................................................................8

A.     Background Regarding Elan and Bapineuzumab ...............................................8

B.     Background Regarding SAC Capital, CR Intrinsic and Martoma .....................10

C.     Gilman and His Work on the Bapi Clinical Trials .............................................13

D.     SAC Capital's Communications with Gilman and Accumulation of a $365
       Million Position in Elan ADRs in 2006-2008 ...................................................16

E.     The Adverse Clinical Trial Results and SAC Capital's Resulting Sales and Short
       Sales of Elan and Wyeth ...................................................................................21

F.     Elan Discloses the Adverse Clinical Trial Results ...........................................26

G.     Defendants' Profits from their Insider Trading Conspiracy ..............................26

CONTEMPORANEOUS PURCHASES AND SALES....................................................27

LOSS CAUSATION..........................................................................................................27

CLASS ACTION ALLEGATIONS ..................................................................................27

CLAIMS FOR RELIEF ....................................................................................................30

FIRST CLAIM – For Violations of Section 20A of the Exchange Act (Against All
       Defendants) ........................................................................................................30

SECOND CLAIM – For Violations of Section 10(b) of the Exchange Act and SEC Rule
       10b-5 (Against All Defendants)..........................................................................31

THIRD CLAIM – For Violations of Section 20(a) of the Exchange Act (Against the
       Control Defendants)............................................................................................33

PRAYER FOR RELIEF ....................................................................................................34

DEMAND FOR TRIAL BY JURY ...................................................................................34

Plaintiffs David E. Kaplan, Roxy D. Sullivan, Lindsey Rankin, Michael S. Allen, Gary W. Muensterman and Chi-Pin Hsu (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Class Action Complaint against the above-named defendants (collectively, "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, the review of Court filings in related actions, media reports, filings with the Securities and Exchange Commission ("SEC"), trading records, press releases, and other publicly-available information.

## NATURE OF THE ACTION

1.      This is a securities class action arising from the most profitable insider trading conspiracy ever uncovered.  Through unlawful use of material, nonpublic information, Defendants gained at least $276 million in profits and losses avoided, including $220 million from trades in the American Depositary Receipts ("ADRs") of Elan Corporation, plc ("Elan") and related options.

2.      This action is brought on behalf of all investors who purchased or otherwise acquired Elan ADRs and call options, and/or sold put options, contemporaneously with Defendants' unlawful trades, from July 21, 2008 through and including 4:00 pm EDT on July 29, 2008 (the "Class Period"), pursuant to Sections 20A, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78t-1, 78j(b) and 78t(a).

3.      The conspiracy set forth herein is the subject of a pending criminal prosecution, *United States v. Martoma*, No. 12-mj-2985 (the "Criminal Action"), and an SEC enforcement action, *SEC v. CR Intrinsic Investors, LLC*, No. 12-cv-8466 (the "SEC Action"), both filed in this District in November 2012.

4.     As described in the complaints in such actions (respectively, the "Criminal Complaint" and "SEC Complaint"), Defendant S.A.C. Capital Advisors, L.P. ("SAC LP"), together with its affiliates (collectively, "SAC Capital" or the "Fund"), illegally traded in Elan ADRs and options ahead of a negative announcement made on July 29, 2008 (the "July 29 Announcement") regarding disappointing clinical trial results for bapineuzumab (AAB-001) ("bapi"), an Alzheimer's disease treatment that was the focus of Elan's drug development efforts.

5.     Bapi was recognized by investors as crucial to Elan's future, and the July 29 Announcement, made after the close of the market, drove a 41.8% decline in the value of Elan ADRs in trading after hours on July 29 and the following day.

6.     Prior to the July 29 Announcement, the clinical trial results (the "Inside Information") had been secretly disclosed to an SAC Capital portfolio manager, Defendant Mathew Martoma ("Martoma"), by Defendant Sidney Gilman ("Gilman"), the medical doctor who chaired the Safety Monitoring Committee (the "SMC") overseeing the bapi clinical trial on behalf of Elan. Martoma is the defendant in the Criminal Action and is also a defendant in the SEC Action.  In November 2012, Gilman entered into a nonprosecution agreement with the U.S. Department of Justice ("DOJ") which required him to serve as a cooperating witness, and he consented to a judgment against him in the SEC Action requiring him to disgorge over $200,000, representing the profits from his unlawful conduct.

7.     As detailed below, Martoma discussed bapi with Gilman numerous times between 2006 and July 2008.  Gilman received approximately $1,000 per hour for these consultations. During their discussions, Gilman provided Martoma with material nonpublic information concerning the ongoing bapi clinical trials.  Over this period, SAC Capital increased its ownership of Elan ADRs from zero to over 10.5 million ADRs, worth more than $365 million.

SAC Capital also acquired a similarly large long position in Wyeth, a New Jersey-based pharmaceutical company, which was co-developing bapi with Elan.  By June 30, 2008, SAC Capital's positions in Wyeth and Elan represented its second and fifth largest positions out of the more than 1,200 companies in which it was then invested.

8.     SAC Capital's trades were directly supervised by Defendant Steven A. Cohen ("Cohen"), its founder, Chief Executive Officer and Chief Investment Officer, and Cohen based his approval of the trades on his direct communications with Martoma.

9.     Cohen approved SAC Capital's acquisition and retention of its massive position in Elan over the objections of other, more experienced SAC fund managers, despite Martoma's junior position and lack of track record.  Martoma had joined SAC Capital in 2006, shortly before his consultations with Gilman began and SAC Capital opened its position in Elan. Illustrating his lack of proven performance as a portfolio manager both before and after the insider trading detailed herein, when Martoma was later terminated in 2010, an officer of the Fund described him as a "one trick pony with Elan."

10.     A majority of SAC Capital's Elan holdings were acquired through Defendant CR Intrinsic Investors, LLC ("CR Intrinsic"), the Fund subsidiary that directly employed Martoma. According to news reports, CR Intrinsic was long considered the "crown jewel" of SAC Capital, and in 2008, Cohen had much of his personal net worth, estimated at $8.8 billion, invested with CR Intrinsic.

11.     On June 17, 2008, Elan and Wyeth released top-line (summary) results from the Phase 2 clinical trial of bapineuzumab (the "June 17 Announcement").  The market reacted positively, with Elan ADRs rising 10.7% after the announcement.  Martoma reaffirmed his

positive outlook on Elan after the June 17 Announcement, predicting on June 30 that, after detailed trial results were to be released a month later, "I think stock breaks $40."

12.     According to the SEC Complaint, Gilman learned in late June 2008 that he would be presenting the results of the bapi clinical trials at the International Conference on Alzheimer's Disease ("ICAD"), a widely-anticipated event to be held in Chicago on July 29, 2008.  In the weeks before ICAD, Gilman learned the complete safety and efficacy results for the trials.

13.     On Thursday, July 17, 2008, Gilman briefed Martoma in detail and provided him an encrypted presentation of the full trial results.

14.     On the morning of Sunday, July 20, 2008, Martoma emailed Cohen to say that he would like to speak with him and that "[i]t's important."  Thereafter, they spoke for nearly 20 minutes.

15.     While ***no new public information had been disclosed regarding bapi since the June 17 Announcement***, and only three weeks had passed since Martoma's bullish statements regarding Elan's target price, SAC Capital's head trader, identified in news reports as Phillipp Villhauer ("Villhauer"), began aggressively selling the Fund's positions in both Elan and Wyeth the following day.  Over the seven trading days leading up to the July 29 Announcement, SAC Capital liquidated its entire positions in Elan and Wyeth, worth $365 million and $335 million, respectively.

16.     In addition, SAC Capital opened large short positions in both Elan and Wyeth toward the end of the same seven day period.

17.     Villhauer's emails reflect that he actively concealed the sales from both the market and others at the Fund, excepting Cohen and Martoma.  On July 21, he emailed Martoma regarding the sales, stating that "obviously no one knows except me[,] you and [Cohen]."

Villhauer later reported to Cohen that "[w]e executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and SAC LP] at an avg price of 34.21. This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access."

18.     In total, by causing SAC Capital to both liquidate its long positions in Elan and Wyeth and establish short positions in the companies during the seven trading days before the July 29 Announcement, when the Inside Information became public knowledge, Cohen, Martoma and Villhauer permitted SAC Capital to avoid $194 million in losses from their long positions and secure a $75 million profit from their short positions upon disclosure of the Inside Information.

19.     In addition, as a result of trading on the Inside Information, the SAC Defendants further gained profits and avoided losses totaling an additional approximately $150 million two days later, on August 1, 2008, after other adverse information concerning Elan was disclosed to the market.

20.     Martoma received a $9.3 million bonus for 2008, a significant portion of which was attributable to the illegal profits that SAC Capital had generated in the Elan and Wyeth short sales in late July.  He was subsequently unsuccessful as a portfolio manager, and was terminated by SAC Capital in 2010.

21.     The insider trading detailed herein fits a pattern and practice of illegal use of inside information at CR Intrinsic and SAC Capital: Martoma is the third CR Intrinsic portfolio manager to be charged with insider trading, and the fifth SAC Capital employee to be charged with insider trading in the past two years.

## JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 20A, 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78t-1, 78j(b) and 78t(a), and this Court therefore has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  During the Class Period, Elan ADRs traded on the New York Stock Exchange ("NYSE"), which is located in this District.  In addition, the expert firm that facilitated communications between Martoma and Gilman is based in this District and SAC Capital maintains an office in this District at 510 Madison Avenue, New York, New York. According to the SEC Complaint, Martoma and Gilman used SAC Capital's Manhattan office in furtherance of the fraudulent scheme set forth herein.

24.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone and data communications and the facilities of the national securities markets.

## PARTIES

### A.     Plaintiffs

25.     Plaintiff David E. Kaplan first invested in Elan in 1998 and, as set forth in his accompanying certification, purchased Elan ADRs during the Class Period, contemporaneously with the insider trades by SAC Capital (the "SAC Insider Trades").

26.     Plaintiff Roxy D. Sullivan first invested in Elan in 2005 and, as set forth in her certification, purchased Elan ADRs during the Class Period, contemporaneously with the SAC Insider Trades.

27.     Plaintiff Lindsey Rankin first invested in Elan in 2002 and, as set forth in his certification, purchased Elan ADRs during the Class Period, contemporaneously with the SAC Insider Trades.

28.     Plaintiff Michael S. Allen first invested in Elan in 2003 and, as set forth in his certification, purchased call options and sold put options on Elan ADRs during the Class Period, contemporaneously with the SAC Insider Trades.

29.     Plaintiff Gary W. Muensterman first invested in Elan in or about 1999 and, as set forth in his certification, purchased Elan ADRs during the Class Period, contemporaneously with the SAC Insider Trades.

30.     Plaintiff Chi-Pin Hsu first invested in Elan in 2001 and, as set forth in his certification, purchased Elan ADRs during the Class Period, contemporaneously with the SAC Insider Trades.

**B.      Defendants**

31.     Defendant SAC LP is a Delaware limited partnership with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut.  SAC LP is an investment adviser registered with the SEC, CRD No. 161111.  SAC LP has disclosed that it received a Wells notice from the SEC on or about November 20, 2012 relating to insider trading in advance of the July 29 Announcement.

32.     Defendant S.A.C. Capital Advisors, Inc. ("SAC Inc.") is a Delaware corporation with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut.  SAC Inc. is the general partner of SAC LP and is identified as a control person of SAC LP in SAC LP's Form ADV, filed with the SEC.

33.     Defendant CR Intrinsic is a Delaware limited liability company with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut.  CR Intrinsic is a wholly-

owned subsidiary of SAC LP, and according to SAC LP's Form ADV, SAC LP is a control person with respect to CR Intrinsic.

34.     Defendant Cohen is a Connecticut resident and the founder, Chief Executive Office and Chief Investment Officer of SAC Capital, which began operations in 1992. According to SAC LP's Form ADV, Cohen is a control person with respect to SAC LP.  Cohen is identified as "Portfolio Manager A" in the SEC Complaint and as the "Hedge Fund Owner" in the Criminal Complaint.

35.     Defendant Martoma is a Florida resident who was employed by CR Intrinsic between 2006 and 2010 as a portfolio manager or analyst.  Martoma is named as the defendant in the Criminal Complaint and is also named as a defendant in the SEC Complaint.

36.     Defendant Gilman is a Michigan resident and, until his resignation on or about November 27, 2012, was the William J. Herdman Distinguished University Professor of Neurology at the University of Michigan Medical School.  Gilman is identified in the Criminal Complaint as the "Cooperating Witness" or "CW" and is named as a defendant in the SEC Complaint.

37.     The defendants identified in paragraphs 31 to 35 above are referred to herein as the "SAC Defendants."

38.     The defendants identified in paragraphs 31 to 34 above are referred to herein as the "Control Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     Background Regarding Elan and Bapineuzumab

39.     Elan is an Irish public limited company with its principal executive offices in Dublin, Ireland.  Elan's principal research and development facilities are located in the United States.

40.     Elan was incorporated as a private limited company in Ireland in December 1969 and became a public limited company in January 1984.  It has reported with the SEC as a foreign issuer since at least 1996.

41.     Elan's Ordinary Shares trade on the Irish Stock Exchange, and its American Depositary Shares, evidenced by ADRs, trade on the NYSE under the symbol "ELN."

42.     Elan undertook research and clinical trials of bapi for the treatment of Alzheimer's disease jointly with Wyeth, a New Jersey-based pharmaceutical company that was acquired by Pfizer Inc. in 2009.

43.     Clinical trials, divided into three phases involving progressively greater numbers of test subjects, are a central part of the process of new drug review and approval required by the U.S. Food and Drug Administration.

44.     In 2006, data from a Phase 1 study of bapineuzumab showed promise, and Elan and Wyeth initiated two Phase 2 studies.

45.     Prior to the completion of the Phase 2 studies, in May 2007, Elan and Wyeth announced the decision to initiate Phase 3 studies, which proceeded concurrently with the Phase 2 studies in 2008.  Elan's investment in bapi was enormous; its research and development budget increased by 20% in 2007 (to $260.4 million), "primarily due to increased expenses associated with the progression of our Alzheimer's disease programs, particularly the move of AAB-001 [bapi] into Phase 3 clinical trials and the move of ELND005 into Phase 2 clinical trials during 2007."

46.     As of 2008, Elan was heavily reliant on the continued success of a single drug, *Tysabri*, which after being approved in the U.S. in 2004 had been temporarily suspended in 2005

and 2006 due safety concerns, and Elan's future prospects depended on the success of drugs in its development pipeline, particularly bapi.

47.     In its 2007 annual report on Form 20-F, filed February 28, 2008, Elan emphasized the importance of bapi (referenced by the identifier AAB-001), cautioning as its first-listed risk factor that "*if our Phase 2 and 3 clinical trials for AAB-001 are not successful and we do not successfully develop and commercialize additional products, we will be materially and adversely affected.*"  (Emphasis in original.)

48.     The market shared the view that bapi was crucial to Elan's future.  A July 28, 2008 analyst report from Cowan and Co., for example, stated that "we estimate that Elan's current $15.9B valuation implies approximately $7-8B+ in bapineuzumab sales by 2015."

**B.     Background Regarding SAC Capital,
          CR Intrinsic and Martoma**

49.     SAC Capital was founded by Defendant Steven A. Cohen in 1992 and according to the most recent published information, has over $16 billion in assets under management, making it among the largest 25 U.S. hedge funds.

50.     SAC Capital's investments cover a broad spectrum of international long/short equity, fixed income, statistical arbitrage, credit, commodities and options.

51.     SAC Capital's investment strategy relies heavily on collecting market information.  As explained in a 2010 *Vanity Fair* profile of Cohen – one of two interviews that had then ever been granted by him – in the late 1990s, "Cohen became renowned in trading circles as a voracious gatherer of market information."  According to a recent *New York Times* article, "Cohen and his staff are known for relentlessly digging for information about publicly traded companies to form a 'mosaic,' building a complete picture of the company's prospects that gives the firm an edge over other investors."

52.     A series of criminal prosecutions and SEC enforcement actions naming former SAC Capital portfolio managers in 2011 and 2012 have established that a part of the "mosaic" has been illegal inside information.

53.     In February 2011, Noah Freeman, a former SAC Capital portfolio manager, was indicted and pled guilty to insider trading and conspiracy charges, admitting he traded on illegal tips about publicly-traded technology companies.  He subsequently testified at the trial of his tipper, an expert network firm consultant, that he had committed insider trading on at least 18 occasions, including while employed at SAC Capital.  The consultant was convicted and sentenced to four years in prison.

54.     Also in February 2011, Donald Longueuil ("Longueuil"), a portfolio manager at Defendant CR Intrinsic, was indicted and in April 2011 pled guilty to an insider trading conspiracy that spanned his tenure at SAC Capital.  Longueuil was recorded telling a cooperating witness how, after reading a November 2010 *Wall Street Journal* article about the government's probe, he destroyed two hard drives and a flash drive with pliers and placed them in four Manhattan garbage trucks to dispose of the evidence.  Longueuil is now serving a two-and-a-half year prison sentence.

55.     In April 2011, Jonathan Hollander, an analyst at Defendant CR Intrinsic, was sued by the SEC for insider trading and settled the charges against him in May 2011, agreeing to pay more than $220,000.

56.     In February 2012, Jon Horvath ("Horvath"), a technology analyst at SAC Capital subsidiary Sigma Capital Management ("Sigma"), was indicted for insider trading and in September 2012, pled guilty and admitted to receiving confidential financial information about technology companies Dell Inc. ("Dell") and Nvidia Corp. while employed at SAC Capital.  At

his plea allocution, Horvath stated that he knowingly obtained material nonpublic information from public company insiders and that "[i]n each instance I provided the information to the [SAC Capital] portfolio manager I worked for and we executed trades in the stocks based on that information."

57.     The portfolio manager for whom Horvath worked was Michael Steinberg ("Steinberg"), who was placed on leave by SAC Capital in 2012 after he was implicated by Horvath and identified by prosecutors as an unindicted co-conspirator.

58.     In one August 26, 2008 email – roughly one month after the Elan insider trades detailed herein – Horvath provided detailed financial results for Dell to Steinberg in an email, explaining "I have a 2nd hand read from someone at the company . . . .  Please keep to yourself as obviously not well known."  Steinberg responded: "Yes normally we would never divulge data like this, so please be discreet.  Thanks."

59.     Steinberg has been employed by SAC Capital for fifteen years as a portfolio manager and, as described by the *New York Times*, "[h]e joined in 1997, when it was just Mr. Cohen and several dozen traders; for years, he sat near Mr. Cohen on the trading floor and the two grew close."

60.     Defendant Martoma is therefore the fifth former SAC Capital fund manager and third employee of Defendant CR Intrinsic to be indicted or charged by the SEC with insider trading in the past two years.  Each of the others has admitted his guilt.

61.     The widespread use of illegal inside information at SAC Capital reflects Cohen's own tolerant attitude towards the practice.  According to news reports, when questioned at a deposition in 2011 in *Fairfax Financial Holdings Ltd. v. SAC Capital Management LLC*, No. L-2032-06 (N.J. Super. Ct.), Cohen called the rules governing insider trading "vague," and when

asked whether it was "legal or illegal to trade on material nonpublic information," he stated that "[i]t depends on the circumstance."

62.    Cohen also stated that he did not expect SAC Capital employees to always adhere to the Fund's compliance manual, explaining "[s]ee, we don't operate our firm in absolutes," and "[w]hen I look at this manual, I see guidelines."

63.    Martoma joined SAC Capital in 2006, after working at a smaller hedge fund in Boston.  He received his B.A. in biomedicine, ethics and public policy from Duke University in 1995 and worked at the National Human Genome Research Institute after college.  He later received an MBA from Stanford University.

64.    For 2008, Martoma received a bonus of over $9.3 million that included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain other SAC Capital portfolios.

65.    Martoma's success with Elan in 2008 contrasts sharply with his later performance at SAC Capital.  Martoma received no bonus in 2009, and was fired in 2010.  In a 2010 email suggesting that Martoma be fired, an SAC Capital officer commented that Martoma had been a "one trick pony with Elan."

**C.    Gilman and His Work on the Bapi Clinical Trials**

66.    Defendant Gilman is a leading neurologist and expert on Alzheimer's disease. Until he resigned in late November 2012 after the filing of the Criminal and SEC Complaints, he was the William J. Herdman Distinguished University Professor of Neurology at the University of Michigan.  He was also the Director of the Michigan Alzheimer's Disease Research Center, has authored or co-authored over 200 peer-reviewed papers, and has received numerous awards in his field.

67.     Gilman became affiliated with the Gerson Lehrman Group, Inc. ("GLG"), a leading expert network firm, in 2002, serving as a member of GLG's Scientific Advisory Board, and according to news reports and the SEC and Criminal Complaints, was later introduced to Martoma through GLG in 2006.

68.     Gilman served as Chair of the Safety Monitoring Committee (the SMC) for bapi Phase 1, Phase 2 and Phase 3 clinical trials starting in 2003 and continuing until at least 2011. Gilman was paid approximately $79,000 by Elan for his work on the SMC in 2007 and 2008.

69.     By the time Gilman was introduced to Martoma, Gilman's ongoing relationship with Elan and Wyeth and access to non-public safety data was therefore well-known publicly and known to Martoma.

70.     As Chair of the bapineuzumab SMC, Gilman had continuing access to material nonpublic information concerning the Phase 2 trials of bapi.  In addition, Gilman agreed to present the Phase 2 trial results on behalf of Elan and Wyeth at ICAD, a widely-anticipated Alzheimer's disease conference scheduled to be held on July 29, 2008.  To perform this function, Gilman was given access to the full Phase 2 trial results approximately two weeks prior to the July 29 Announcement.

71.     By virtue of his roles in the clinical trial, and in accordance with the terms of his contract with Elan, Gilman owed Elan a duty to hold in strict confidence all information he learned in connection with his participation in the clinical trial and to use such information only for Elan's benefit.  According to the SEC Complaint, the consulting agreement between Elan and Gilman provided that "[a]ny and all information which Elan may disclose to Consultant under this Agreement will be considered confidential . . . ."  In addition, the SMC Operating Guidelines, to which Gilman was subject, provided that "strict confidentiality will be maintained

by all the SMC members in accordance with written agreements" with Elan.  Elan and its

Alzheimer's disease development partners placed a great deal of confidence in Gilman.  From

2001 to 2003, Gilman was Chair of the Elan/Wyeth SMC for the Phase 2 clinical trials of

AN1792 for Alzheimer's disease, and from 2008 to 2010, Gilman was Chair of the

Elan/Transition Therapeutics SMC for the Phase 2 clinical trials of Scyllo-Inositol for

Alzheimer's disease.  From 2010 and continuing until at least 2011, Gilman was also Chair of

the Pfizer SMC for the Phase 1 clinical trial of AAB-003, another drug being developed to treat

Alzheimer's disease.

72.     Gilman also received training on the conduct prohibited by the federal securities

laws from GLG, the expert network firm that introduced him to Martoma, which repeatedly

reminded Gilman not to share nonpublic information with clients.  Emails sent to Gilman by

GLG also listed bapi as a topic that Gilman was "not allowed to discuss."

73.     Martoma was also placed on notice by GLG that bapi was a prohibited topic in his

consultations with Gilman.  According to the Criminal Complaint, an email dated June 25, 2008

from GLG to Martoma confirming a consultation that Martoma had requested with Gilman

stated that experts "participating in clinical trials may not discuss the patient experience or trial

results not yet in the public domain" and specifically stated that Gilman was "unable to discuss"

bapi due to his involvement in its clinical trials.

74.     Prior to the indictment of Martoma in November 2012, the DOJ entered into a

nonprosecution agreement with Gilman in exchange for his cooperation, and he is identified in

the Criminal Complaint as the "Cooperating Witness" or "CW."  Gilman is also a named

defendant in the SEC Complaint and on November 16, 2012 consented to entry of a judgment

against him, which provided for payment of disgorgement of profits and interest in the amount of

$234,868, as well as an injunction against further violations of the securities laws.

**D.   SAC Capital's Communications with
       Gilman and Accumulation of a $365
       Million Position in Elan ADRs in 2006-2008**

75.    Martoma was introduced to Gilman through paid consultations arranged by GLG.

Between 2006 and mid-2008, Gilman participated in 42 consultations with Martoma and was

paid approximately $1,000 per hour.

76.    Starting in 2006 or 2007, Gilman provided Martoma with material nonpublic

information concerning the bapi Phase 2 trial.  As a member of the SMC, Gilman received

periodic updates from Elan concerning safety data for the ongoing trial.  Among other

communications, in advance of SMC meetings, Elan sent Gilman PowerPoint presentations that

included dosage information and information concerning side-effects that patients in the Phase 2

trial were experiencing.

77.    Starting in 2006, Gilman contacted Martoma after SMC meetings to report to

Martoma what he had learned during the meetings.  During these calls, Gilman discussed the

PowerPoint presentations and provided Martoma with his perspective on the data.  Gilman's

consultations with Martoma frequently occurred later the same day or shortly after Gilman had

attended an SMC meeting.  Among other meetings, Gilman had consultations with Martoma on

November 22, 2006 (the day after an SMC meeting), February 9, 2007 (also the day after an

SMC meeting), October 9, 2007 (later in the day following an SMC meeting), and March 18,

2008 (also hours after an SMC meeting).

78.    Martoma and Gilman coordinated their expert network consultations around

scheduled SMC meetings.  For example, on August 23, 2007, Gilman advised Martoma that

"[t]he SMC teleconference will be postponed until the following week. Should we postpone our

planned teleconferences until a more definitive date has been established?"  When the SMC meeting was not rescheduled as expected, Gilman emailed Martoma on September 5, 2007 to report that the SMC meeting had still not been scheduled and noted to Martoma, "you may want to postpone [our scheduled conference call] until there is more to discuss."  Gilman next consulted with Martoma through GLG on October 9, 2007 – hours after the next SMC meeting.

79.     Among other communications in which Gilman conveyed nonpublic information regarding the Phase 2 trial to Martoma, Gilman sent Martoma an email on April 30, 2008, which he labeled "For Your Eyes Only" and "High Priority," in which he discussed in detail the dropout rate for the bapi clinical trial and referred to how many patients took bapi during each round of the trial.  The figures used in the email (including certain mathematical errors discussed by Gilman) were taken directly from a slide in the Elan-prepared PowerPoint presentation used at the March 18, 2008 SMC meeting.

80.     Martoma and Gilman also took steps to conceal the true subject of their conversations from GLG.  For example, when Martoma scheduled a consultation with Gilman three hours after the March 18, 2008 SMC meeting, Martoma reported to GLG that the purpose of the call was "Follow-up with Dr. Gilman: AAN Abstract Preview," even though Martoma and Gilman discussed the bapi Phase 2 trial during the consultation.  Later, in advance of a consultation that Gilman's personal calendar noted was to discuss side-effects that the Phase 2 trial was finding in patients taking bapi, Gilman emailed Martoma and asked him to set up a consultation with GLG, suggesting that Martoma tell GLG that the consultation was to discuss a drug to treat Parkinson's disease.  A consultation in late June regarding ICAD referenced Multiple Sclerosis ("MS"), a disease unrelated to bapi.

- 17 -

81.     During the period of Martoma's consultations with Gilman, CR Intrinsic, SAC LP and Sigma established very large long positions in Elan and Wyeth securities.  As reflected in the following chart, as of June 30, 2006, SAC Capital had no holdings in Elan.  By the start of trading on July 21, 2008, SAC Capital held over 10.5 million Elan ADRs, worth more than $365 million:



Source: Form 13-F filings of S.A.C. Capital Advisors, LLC, CR Intrinsic Investors, LLC and Sigma Capital Management, LLC.

82.     The Elan and Wyeth positions held by CR Intrinsic and SAC LP were held primarily in portfolios controlled by Martoma and Cohen, respectively.  Martoma included Elan and Wyeth as "long ideas" in his weekly portfolio updates circulated between January 1, 2008 and early July 2008 to Cohen, among others, and listed the release of the bapi Phase 2 trial results as an "[u]pcoming catalyst."

83.     Martoma and Cohen maintained their bullish positions in Elan and Wyeth even though there was significant dissent within SAC Capital on the wisdom of doing so.  In March and April 2008, two analysts at CR Intrinsic repeatedly sent emails to Cohen advocating against the Elan and Wyeth positions and suggesting trading strategies designed to hedge them.

84.     For example, on March 26, 2008, one of these analysts sent Cohen an email with the subject line "ELN, (important, please read) negative reads from company and other buysiders" and listed several reasons why the analyst was concerned with the Elan position. Cohen forwarded the email to Martoma, who responded, "I read the message. Nothing worrisome here.  Let me know when you are free to discuss in detail."  Martoma and Cohen made no changes to their holdings despite the analysts' concerns.  In fact, after the June 17 Announcement, Cohen indicated he would no longer consider any investment ideas in Elan or Wyeth from the two CR Intrinsic analysts who had previously raised their concerns.

85.     Elan and Wyeth released summary, top-line results of the Phase 2 trial on June 17, 2008 – the June 17 Announcement.  The market reacted positively and the trading price of Elan ADRs and Wyeth stock rose, more than 10% and 4%, respectively.

86.     Martoma maintained his positive outlook on Elan after the June 17 Announcement.  In a June 30, 2008 email, sent when Elan ADRs were trading at approximately $35, Martoma told Cohen that he intended to add further to the Elan position, saying, "I think stock breaks $40" following the announcement of full Phase 2 trial results, scheduled for one month later, on July 29.

87.     In late June 2008, Gilman learned that he likely would be selected to present the Phase 2 trial results at ICAD on July 29.  After finding out about his selection, Gilman sent an email to Martoma with the subject line "Some news" and told Martoma to "[p]lease set up [a GLG] conversation re MS."  Martoma then requested that his secretary contact GLG to arrange a consultation with Gilman "on MS therapies . . . ."  During this consultation – purportedly about Multiple Sclerosis – a disease treated by Elan's principal marketed drug, *Tysabri*, but with no

connection to bapi – Gilman informed Martoma that he would be the presenter of the final Phase 2 clinical trial results at ICAD on July 29.

88.     After being named as the presenter, Gilman arranged to travel to Elan's offices on July 15 and 16, 2008, so that he could learn the full results of the Phase 2 trial.

89.     Thereafter, in the weeks leading up to the July 29 Announcement, Gilman had several telephone calls with Martoma during which he provided Martoma with material nonpublic information regarding both the safety and efficacy results for the Phase 2 trial.  For example, on Friday, July 11, 2008, Gilman participated in an SMC meeting in which the safety results for the completed Phase 2 trial as a whole were discussed.  Two days later, on Sunday, July 13, Gilman spoke with Martoma for more than 1 hour and 40 minutes.  During this call, Gilman provided confidential information to Martoma concerning the completed Phase 2 trial safety results.

90.     Towards the end of the July 13 call, Martoma and Gilman each created Outlook calendar entries reflecting that they intended to speak again on July 17, 2008 – the day after Gilman returned from his scheduled meetings with Elan.

91.     On July 15, 2008, Elan flew Gilman to San Francisco by private jet to participate in two days of meetings concerning the Phase 2 trial safety and efficacy results.  This was the first time that Gilman had seen data on the efficacy of bapi, rather than simply safety data.  The efficacy data were significantly less favorable than the market expected following the June 17 Announcement.

92.     On July 17, 2008, after Gilman returned to Michigan, an Elan executive sent Gilman an updated ICAD PowerPoint presentation in an email labeled "Confidential, Do Not Distribute."  The 24-page PowerPoint included summaries of the detailed efficacy results and

safety results for the Phase 2 trial as well as additional commentary on how Elan and Wyeth were interpreting the data.

93.     Later in the afternoon of July 17, 2008, Gilman and Martoma had another lengthy phone call during which Gilman provided Martoma with confidential information regarding the detailed results of the Phase 2 trial, including all the information contained in the PowerPoint presentation.  To conduct this call, Martoma left SAC Capital's New York office mid-afternoon and traveled to his home in Greenwich, Connecticut.  He then called Gilman from his home at 4:15 pm.  Unlike prior consultations, this call was not arranged through or reported to GLG.

94.     Shortly after this call, Gilman sent the PowerPoint presentation to Martoma. Martoma subsequently called Gilman to request the password needed to open the encrypted file, which Gilman provided.

95.     Gilman and Martoma continued to communicate after their July 17 conversation in the days leading up to the July 29 Announcement.  In addition to three short calls on July 18, Martoma and Gilman had a 39-minute conversation on July 22, a 23-minute conversation on July 24, and an approximately 11-minute conversation on July 28.

E.     **The Adverse Clinical Trial Results and SAC Capital's
       Resulting Sales and Short Sales of Elan and Wyeth**

96.     The detailed safety and efficacy results of the Phase 2 clinical trial fell well short of market expectations.  The efficacy data showed that Alzheimer's disease symptoms in patients taking the drug consistently got worse over time, as opposed to stabilizing or improving.  While a particular subset of trial participants taking the drug got worse at a somewhat slower rate than patients taking a placebo, the data raised significant questions about whether the difference was simply a matter of chance rather than proof that the drug worked.

97.     A PiperJaffray analyst report issued the day after presentation of the Phase 2 results on July 29, for example, removed bapi sales from its model and lowered its price target to $15 from $25, concluding that the "Phase II bapineuzumab data fall short of expectations" and "Based on data presented (and omitted), we are more doubtful than optimistic regarding bapineuzumab's prospects."  Similarly, Brean Murray Carret & Co. noted that the "[i]mbalance, lack of dose response, and post hoc analysis keep us suspicious of the drug efficacy," cautioned that "the new data should dramatically decrease Elan's market value," and reiterated its "sell" rating.

98.     On the morning of Sunday, July 20, 2008 – nine days before the Phase 2 results were scheduled to be released and three days after his receipt of the confidential data from Gilman – Martoma emailed Cohen "[i]s there a good time to catch up with you this morning? It's important."  Cohen replied a short time later with his cell phone number, and Cohen and Martoma then spoke by phone at around 9:45 a.m. for approximately 20 minutes.

99.     The following day, Monday, July 21, 2008, Villhauer, Cohen's head trader, began selling Elan and Wyeth securities held in the CR Intrinsic and SAC LP portfolios that Martoma and Cohen controlled.  Before the market opened on July 21, 2008, these portfolios held over 10.5 million Elan ADRs worth more than $365 million and over 7.1 million Wyeth shares worth more than $335 million, for a total position of over $700 million.

100.     At Cohen's direction, the trades that Villhauer executed in Elan and Wyeth securities between July 21 and July 29, 2008 were kept confidential even within SAC Capital. At the end of the day on Monday, July 21, Villhauer reported to Martoma that he had sold 1.5 million Elan ADRs that day, and "obviously no one knows except you me and [Cohen]."

101.    Martoma also urged Cohen and Villhauer to sell the Elan securities in the CR Intrinsic and SAC LP portfolios quickly.  On July 22, ten minutes after Villhauer called Martoma, Martoma sent Cohen an instant message at 1:22:34 p.m. saying, "would do more today if possible[,]" suggesting that Cohen sell more Elan ADRs.  At 1:22:50 p.m., Cohen responded, in relevant part, "we are done on 2.3 [million] today" for a "total 3.8 [million] in 2 days." Martoma replied, "my sense is today-thurs are best days so if possible to do more, would do so." After receiving Martoma's message, Cohen sold over an additional 2.2 million Elan ADRs on July 22.

102.    On Sunday, July 27, 2008, Villhauer reported to Cohen on his selling efforts in Elan over the prior week: "We executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and SAC LP] at an avg price of 34.21. This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access."

103.    Having sold out the Fund's entire long position in Elan, SAC Capital next sold short approximately 4.5 million additional Elan ADRs on July 28-29, 2008, prior to the July 29 Announcement.  SAC Capital thereby made a major bet that the price of Elan ADRs would decline in the near future.

104.    In total, between July 21, 2008 and July 29, 2008, SAC Capital sold over 15 million Elan ADRs for gross proceeds of over $500 million.  The trading by SAC Capital in Elan securities constituted over 20% of the reported trading volume in the seven days prior to the July 29 Announcement.

105.    In addition, between July 21, 2008 and July 29, 2008, SAC Capital sold over 10.4 million shares of Wyeth for gross proceeds of more than $460 million, including over 6.1 million

Wyeth shares worth more than $270 million during the day of the July 29 Announcement.  As a result of these sales, the CR Intrinsic and SAC LP portfolios had a zero balance in Wyeth stock during the trading day on July 29, 2008, but continued to place short sales of Wyeth stock that day.  By the close of the market on July 29, 2008, the CR Intrinsic and SAC LP portfolios had a combined short position of approximately 3.3 million Wyeth shares.

106.     The following chart sets forth SAC Capital's holdings of Elan ADRs on a quarterly basis through June 30, 2008, at the start of trading on July 21, and on July 29, immediately prior to the July 29 Announcement:



Source:  Form 13-F filings of S.A.C. Capital Advisors, LLC, CR Intrinsic Investors, LLC and Sigma Capital Management, LLC.

107.     CR Intrinsic and SAC LP also made options trades that bet on the price of Elan ADRs declining.  For example, on July 28 and July 29, the CR Intrinsic and SAC LP portfolios purchased over $1 million of Elan put options with strike prices below the Elan ADR price on those trading days.

108.    The scale and speed of SAC Capital's reversal of position on Elan and Wyeth –
all in the seven trading days following the 20 minute telephone conversation between Cohen and
Martoma on July 20 – is striking.

109.    As of the start of trading on July 21, before Villhauer began selling, SAC
Capital's long positions in Wyeth and Elan represented its **second** and **fourth** largest positions,
respectively – out of the more than 1,200 companies in which it was then invested.[1]

110.    SAC Capital's bet on Elan also represented the largest investment of *any* hedge
fund in Elan.

111.    By the time that the bapi Phase 2 clinical trial results were announced seven
trading days later, however, SAC Capital's complete reversal of position and bets on the *decline*
of Elan ADRs and Wyeth shares were large enough to rank among its 20 biggest publicly-
reported positions, out of more than 1,200 disclosed investments.

112.    The massive short position that SAC Capital acquired on July 28-29 reflected an
extraordinary level of confidence that Elan's trading price would decline in the near future.  Had
Elan's trading price reached $40 – as Martoma had predicted less than a month earlier – the Fund
would have suffered a loss of more than $28,000,000.

113.    Cohen's sudden decision on July 20-21 to sell out of both Elan and Wyeth and
then bet against them massively is all the more inexplicable – absent his reliance on inside
information provided by Gilman to Martoma a few days earlier – in light of the fact that the
principal shared venture between the two companies was bapi and ***there had been no new public
information disclosed about bapi for over a month***.

---

[1]  These calculations are based on reported holdings as of June 30, 2008, reflecting the combined Form
13-F reports of SAC LP, CR Intrinsic, and Sigma, filed August 14, 2008.

**F.    Elan Discloses the Adverse Clinical Trial Results**

114.    On July 29, 2008, after the close of U.S. securities markets, Gilman presented the results of the Phase 2 trial at ICAD, and Elan and Wyeth issued a press release summarizing the results.  As noted above, the market's reaction to the newly-disclosed safety and efficacy data was strongly negative.

115.    In after hours trading following disclosure of the trial results on July 29, and in trading the following day, Elan's ADR price fell 41.8% from its close on July 29.

**G.    Defendants' Profits from their Insider Trading Conspiracy**

116.    As a result of the trades that were entered into during the period between Martoma's conversation with Gilman on July 17, 2008 and the July 29 Announcement, CR Intrinsic and SAC LP portfolios in which Martoma and Cohen had trading authority achieved profits and avoided losses of over $276 million upon disclosure of the Inside Information, as follows:

| Description | Elan | Wyeth |
|-------------|------|-------|
| Profits from Short Sales | $59.2 million | $16 million |
| Profits from Option Trades | $6.6 million | N/A |
| Losses Avoided | $154.2 million | $40 million |
| Total Unlawful Gain | $220 million | $56 million |

117.    In addition, as a direct result of their misappropriation of and trades based on the Inside Information, the SAC Defendants further gained profits and avoided losses suffered by other Elan investors on August 1, 2008, following the disclosure of two confirmed cases of progressive multifocal leukoencephalopathy ("PML") in MS patients treated with *Tysabri*.  Disclosure of the PML cases drove a 50.5% decline in the trading price of Elan ADRs, and based on the pre-July 29 sales and the short positions in place as of July 29, the SAC Defendants avoided losses and gained profits on August 1 totaling an additional approximately $150 million.

118.    At the end of 2008, Martoma received a bonus of over $9.3 million that included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain SAC LP portfolios.

119.    Gilman received over $100,000 from GLG for his consultations with Martoma and others at SAC Capital.

## CONTEMPORANEOUS PURCHASES AND SALES

120.    Plaintiffs purchased Elan ADRs and call options thereon and sold put options on Elan ADRs contemporaneously (within the meaning of Sections 20A and 10(b) of the Exchange Act, 15 U.S.C. §§ 78t-1 and 78j(b)), with the SAC Defendants' long and short sales of Elan ADRs, purchases of put options, and sales of call options, if any.

## LOSS CAUSATION

121.    The SAC Defendants traded during the Class Period while in possession of material, nonpublic information.  Later, when the information became publicly known, the price of Elan ADRs and related options declined sharply as a result of such disclosure.

122.    As a result of their purchases of Elan ADRs and call options and sales of put options on Elan ADRs during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons who (i) purchased or otherwise acquired Elan ADRs and call options, or (ii) sold or otherwise disposed of put options on Elan ADRs during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, the employees, officers and directors of the Fund during the

Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

124.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Elan ADRs were actively traded on the NYSE, over 400,000,000 ADRs were then outstanding, and the total volume of ADR trades during the Class Period was more than 66,000,000.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Elan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, as complained of herein.

126.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

127.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

       (b)      whether Gilman supplied the Inside Information to the SAC Defendants and whether the SAC Defendants traded Elan ADRs while in possession of material, nonpublic information concerning Elan;

       (c)      whether the Control Defendants exercised control over Martoma within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and whether such defendants are entitled to assert the defense of good faith;

       (d)      whether the Inside Information was material; and

       (e)      the amount by which Plaintiffs were damaged and Defendants profited and avoided losses as a result of the securities law violations alleged herein.

128.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impractical for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

129.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

       (a)      Defendants failed to disclose material, nonpublic information during the Class Period;

       (b)      the omissions were material;

       (c)      Elan securities traded in an efficient market;

       (d)      Elan's ADRs and options were liquid and traded with moderate to heavy volume during the Class Period;

(e)      Elan traded on the NYSE; and

(f)      Plaintiffs and other members of the Class purchased and/or sold the applicable Elan securities between the time Defendants failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

130.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### For Violations of Section 20A of the Exchange Act
### (Against All Defendants)

131.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 130 as if fully set forth herein.

132.    This Claim is brought against all Defendants under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

133.    The information provided by Gilman to Martoma concerning the Phase 2 bapi trials was, in each case, material and nonpublic.  In addition, the information was, in each case, considered highly confidential by Elan and the SMC.

134.    Gilman provided the Inside Information to Martoma in breach of the duty of confidentiality arising from the fiduciary relationship or similar relationship of trust and confidence that Gilman owed to Elan, its shareholders, and the SMC, and did so with the expectation of receiving – and did receive – a benefit therefrom.

135.    Martoma knew, recklessly disregarded, or should have known, that Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the Inside Information confidential.

136.     Martoma provided the Inside Information that he received from Gilman to the other SAC Defendants named herein and other persons employed by SAC Capital with the expectation of a benefit from doing so, and he knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

137.     By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

138.     Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

139.     Plaintiffs contemporaneously purchased and sold securities of the same class as those sold and purchased by the SAC Defendants.

140.     By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Class for the SAC Insider Trades pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

### SECOND CLAIM
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

141.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 140 as if fully set forth herein.

142.     This Claim is brought against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

143.     The information provided by Gilman to Martoma concerning the Phase 2 bapi trials was, in each case, material and nonpublic.  In addition, the information was, in each case, considered confidential by Elan and the SMC.

144.     Gilman provided the Inside Information to Martoma in breach of the duty of confidentiality arising from the fiduciary relationship or similar relationship of trust and confidence that Gilman owed to Elan, its shareholders, and the SMC, and did so with the expectation of receiving – and did receive – a benefit therefrom.

145.     Martoma knew, recklessly disregarded, or should have known, that Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the Inside Information confidential.

146.     Martoma provided the Inside Information that he received from Gilman to the other SAC Defendants named herein and other persons employed by SAC Capital with the expectation of a benefit from doing so, and he knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

147.     By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

148.    Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

149.    Plaintiffs purchased and sold securities of Elan contemporaneously with the SAC Defendants' sales and purchases.

150.    By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Class for the SAC Insider Trades pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

**THIRD CLAIM**
**For Violations of Section 20(a) of the Exchange Act**
**(Against the Control Defendants)**

151.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 150 as if fully set forth herein.

152.    This Claim is brought against SAC LP, SAC Inc., CR Intrinsic and Cohen for control person liability under Section 20(a) of the Exchange Act.

153.    Pursuant to Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

154.    Each of the Control Defendants controlled Martoma by virtue of their function or status and each of the Control Defendants in fact exercised control over Martoma in connection with the SAC Insider Trades.

155.    The Control Defendants did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by (i) permitting the SAC Insider Trades to occur with actual knowledge or reckless disregard for whether the persons trading on behalf of the Fund possessed material, nonpublic information, or (ii) failing to adequately supervise Martoma in connection with his acquisition of the Inside Information and trading thereon.

156.    By virtue of the foregoing, the Control Defendants are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to Plaintiffs and the Class with the Defendants liable under the First and Second Claims above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

- 34 -

Dated:   New York, New York
   December 21, 2012

          **WOHL & FRUCHTER LLP**

       By: _Ethan Wohl_____
         Ethan D. Wohl
         Krista T. Rosen
       570 Lexington Avenue, 16th Floor
       New York, New York 10022
       Telephone: (212) 758-4000
       Facsimile: (212) 758-4004

       *Attorneys for Plaintiffs and*
       *the Proposed Class*

## CERTIFICATION OF DAVID E. KAPLAN PURSUANT TO THE
## PRIVATE SECURITIES LITIGATION REFORM ACT

I, David E. Kaplan, hereby declare as follows:

1.     I have reviewed the foregoing complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and have authorized its filing.

2.     I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     The attached Schedule A lists all of my purchases and sales in Elan securities during the applicable class period.

5.     During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6.     I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

       I declare under penalty of perjury that the foregoing is true and correct.

       Executed on this 20th day of December 2012 at Washington, D.C.

                                          _____
                                          DAVID E. KAPLAN

**Schedule A**
**David E. Kaplan (ELN) -- July 21, 2008 to July 29, 2008**

| Date | Transaction | Quantity | ADR Price |
|------|-------------|----------|-----------|
| 7/22/2008 | Buy | 10,000 | $32.15 |
| 7/22/2008 | Buy | 10,000 | $33.14 |
| 7/24/2008 | Sell | 8,900 | $35.75 |
| 7/24/2008 | Sell | 1,100 | $35.76 |
| 7/24/2008 | Sell | 10,000 | $35.22 |
| 7/25/2008 | Buy | 10,000 | $34.15 |
| 7/25/2008 | Buy | 10,000 | $34.55 |
| 7/28/2008 | Buy | 10,000 | $33.70 |
| 7/28/2008 | Sell | 10,000 | $34.85 |
| 7/28/2008 | Buy | 10,000 | $33.53 |
| 7/28/2008 | Buy | 9,000 | $33.93 |
| 7/28/2008 | Buy | 10,000 | $34.02 |
| 7/29/2008 | Buy | 300 | $32.47 |
| 7/29/2008 | Buy | 775 | $32.45 |
| 7/29/2008 | Buy | 2,075 | $32.46 |
| 7/29/2008 | Buy | 2,450 | $32.49 |
| 7/29/2008 | Buy | 3,450 | $32.48 |
| 7/29/2008 | Buy | 4,413 | $32.59 |

**CERTIFICATION OF ROXY D. SULLIVAN PURSUANT TO THE
PRIVATE SECURITIES LITIGATION REFORM ACT**

I, Roxy D. Sullivan, hereby declare as follows:

1.      I have reviewed the foregoing complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and have authorized its filing.

2.      I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The attached Schedule A lists all of my purchases and sales in Elan securities during the applicable class period.

5.      During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

        I declare under penalty of perjury that the foregoing is true and correct.

        Executed on this _20_ day of December 2012 at Indianapolis, Indiana.

                                        _Roxy D. Sullivan_
                                        ROXY D. SULLIVAN

**Schedule A**
**Roxy D. Sullivan (ELN) -- July 21, 2008 to July 29, 2008**

| Date | Transaction | Quantity | ADR Price |
|------|-------------|----------|-----------|
| 7/29/2008 | Buy | 11,400 | $32.06 |

## CERTIFICATION OF LINDSEY RANKIN PURSUANT TO THE
## PRIVATE SECURITIES LITIGATION REFORM ACT

I, Lindsey Rankin, hereby declare as follows:

1. I have reviewed the foregoing complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and have authorized its filing.

2. I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The attached Schedule A lists all of my purchases and sales in Elan securities during the applicable class period.

5. During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30 day of December 2012 at Lexington, Michigan.

LINDSEY RANKIN

## Schedule A
### Lindsey Rankin (ELN) -- July 21, 2008 to July 29, 2008

| Date | Transaction | Quantity | ADR Price |
|------|-------------|----------|-----------|
| 7/28/2008 | Buy | 2,500 | $31.80 |
| 7/28/2008 | Buy | 800 | $31.79 |
| 7/28/2008 | Buy | 300 | $31.81 |
| 7/28/2008 | Buy | 6400 | $31.82 |
| 7/28/2008 | Buy | 5000 | $31.91 |

## CERTIFICATION OF MICHAEL S. ALLEN PURSUANT TO THE
## PRIVATE SECURITIES LITIGATION REFORM ACT

I, Michael S. Allen, hereby declare as follows:

1.    I have reviewed the foregoing complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and have authorized its filing.

2.    I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The attached Schedule A lists all of my purchases and sales in Elan securities during the applicable class period.

5.    During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6.    I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⟨20⟩ day of December 2012 at North Haven, Connecticut.

_____
MICHAEL S. ALLEN

**Schedule A**
**Michael S. Allen (ELN) -- July 21, 2008 to July 29, 2008**

| Date | Security | Transaction | Quantity | Price |
|------|----------|-------------|----------|-------|
| 7/22/2008 | August 2008 $30 Puts | Sell | 100 | $150.00 |
| 7/24/2008 | August 2008 $25 Calls | Buy | 100 | $810.00 |
| 7/25/2008 | January 2009 $15 Calls | Sell | 300 | $1,850.00 |
| 7/25/2008 | August 2008 $25 Calls | Buy | 200 | $885.00 |
| 7/25/2008 | January 2009 $20 Calls | Buy | 195 | $1,456.67 |
| 7/28/2008 | January 2009 $20 Calls | Buy | 55 | $1,520.00 |
| 7/28/2008 | August 2008 $25 Calls | Buy | 300 | $808.33 |

## CERTIFICATION OF GARY W. MUENSTERMAN PURSUANT TO THE PRIVATE SECURITIES LITIGATION REFORM ACT

I, Gary W. Muensterman, hereby declare as follows:

1. I have reviewed the foregoing complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and have authorized its filing.

2. I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The attached Schedule A lists all of my purchases and sales in Elan securities during the applicable class period.

5. During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20ᵀᴴ day of December 2012 at Henrico, Virginia.

_____
GARY W. MUENSTERMAN

**Schedule A**
**Gary W. Muensterman (ELN) -- July 21, 2008 to July 29, 2008**

| Date | Transaction | Quantity | ADR Price |
|------|-------------|----------|-----------|
| 7/24/2008 | Buy | 10,000 | $31.70 |

**CERTIFICATION OF CHI-PIN (VINCENT) HSU PURSUANT TO THE
PRIVATE SECURITIES LITIGATION REFORM ACT**

I, Chi-Pin (Vincent) Hsu, hereby declare as follows:

1.  I have reviewed the foregoing complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and have authorized its filing.

2.  I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  The attached Schedule A lists all of my purchases and sales in Elan securities during the applicable class period.

5.  During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6.  I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _20_ day of December 2012 at Northbrook, Illinois.

CHI-PIN (VINCENT) HSU

**Schedule A**
**Chi-Pin (Vincent) Hsu (ELN) -- July 21, 2008 to July 29, 2008**

| Date | Transaction | Quantity | ADR Price |
|------|-------------|----------|-----------|
| 7/22/2008 | Buy | 400 | $33.97 |
| 7/22/2008 | Buy | 400 | $34.02 |
| 7/22/2008 | Buy | 200 | $33.96 |
| 7/22/2008 | Buy | 7,800 | $34.00 |
| 7/22/2008 | Buy | 1,200 | $33.99 |
| 7/23/2008 | Buy | 500 | $34.25 |
| 7/23/2008 | Buy | 3,440 | $34.26 |
| 7/23/2008 | Buy | 1,800 | $34.24 |
| 7/23/2008 | Buy | 5,000 | $34.27 |
| 7/24/2008 | Buy | 9,100 | $31.90 |