UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
DAVID E. KAPLAN, ROXY D. SULLIVAN,
LINDSEY RANKIN, MICHAEL S. ALLEN, GARY
W. MUENSTERMAN, and CHI-PIN HSU,
Individually and on Behalf of All Others Similarly
Situated,

                    Plaintiffs,

          - against -

S.A.C. CAPITAL ADVISORS, L.P., S.A.C.
CAPITAL ADVISORS, INC., CR INTRINSIC
INVESTORS, LLC, CR INTRINSIC
INVESTMENTS, LLC, S.A.C. CAPITAL
ADVISORS, LLC, S.A.C. CAPITAL ASSOCIATES,
LLC, S.A.C. INTERNATIONAL EQUITIES, LLC,
S.A.C. SELECT FUND, LLC, STEVEN A. COHEN,
MATHEW MARTOMA, and SIDNEY GILMAN,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 12 Civ. 9350 (VM)


**JURY TRIAL DEMANDED**


**ECF CASE**


## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Ethan D. Wohl
**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000

Marc I. Gross
**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

*Attorneys for Plaintiffs and Co-Lead
Counsel for the Proposed Class*

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE ........................................................................................8

PARTIES ............................................................................................................................9

A.    Plaintiffs .................................................................................................................9

B.    Defendants .............................................................................................................9

SUBSTANTIVE ALLEGATIONS ..................................................................................12

A.    Background Regarding Elan and the Bapineuzumab Clinical Trials ..................12

B.    Background Regarding SAC, CR Intrinsic and Martoma ...................................14

C.    Gilman and His Role in the Bapi Clinical Trials ................................................16

D.    SAC Accumulates a $366 Million Position in Elan ADRs in 2006-2008 While
    Receiving Inside Information from Gilman..........................................................18

E.    The Disappointing Clinical Trial Results and SAC's Resulting Long and Short
    Sales of Elan and Wyeth.....................................................................................25

F.    Elan and Gilman Disclose the Disappointing, Ambiguous Clinical Trial Results,
    Prompting a Sell-off of Elan ADRs and Divergent Views of Bapi's Potential...................30

    1.    The Reported Bapi Phase 2 Results Were Confusing and Ambiguous ......................31

    2.    Gilman's Weak 13 Minute Presentation Further Contributed to Market
        Uncertainty............................................................................................32

    3.    The Complex, Ambiguous Nature of the Publicly Disclosed Phase 2
        Results Prompted Widely Divergent Analyst and Expert Assessments of
        Bapi's Potential....................................................................................34

G.    The July 31 PML Disclosure ..............................................................................38

H.    SAC's Insider Trading Caused It to Avoid Losses and Gain Profits as a Result
    of the August 1, 2008 Elan Price Decline...........................................................38

    1.    As of August 1, SAC Retained an Informational Advantage over Public
        Investors as a Result of Receiving the Inside Information ...........................38

    2.    SAC's Avoidance of Losses and Profits Gained on August 1 Can Be
        Traced with Reasonable Certainty to Its Illegal Insider Trading.................39

I.    SAC and Cohen Had a Duty to Prevent Misuse of Nonpublic Information and
    the Pattern of Widespread Insider Trading at SAC Demonstrates that They
    Violated this Duty...............................................................................................40

1. The Control Defendants Had a Duty to Prevent Misuse of Nonpublic Information ...........................................................................................40

2. Since 2009, Eleven SAC Employees Have Been Charged with, Admitted, or Been Implicated by Co-Conspirators in, Insider Trading While at SAC ...............41

    (a)   Noah Freeman ............................................................................................41

    (b)   Donald Longueuil ......................................................................................48

    (c)   Jonathan Hollander ...................................................................................48

    (d)   Jon Horvath ...............................................................................................49

    (e)   Michael Steinberg ....................................................................................50

    (f)   Gabriel Plotkin .........................................................................................51

    (g)   Ron Dennis ................................................................................................51

    (h)   Wesley Wang ............................................................................................53

    (i)   Dipak Patel ...............................................................................................55

    (j)   Richard Choo-Beng (C.B.) Lee .................................................................56

    (k)   Mathew Martoma ......................................................................................56

    (l)   Summary of SAC Employees Who Have Been Charged with, Admitted, or Been Implicated in, Insider Trading While at SAC ...................57

    (m)  Additional Pending Investigations ...........................................................57

3. The Large Number of SAC Employees Charged with Insider Trading Contrasts Sharply with the Absence of Such Charges Against Peer Funds ...............58

4. Cohen Created a Culture That Has Encouraged Insider Trading, and He Himself Has Previously Engaged in Insider Trading ...................................................58

    (a)   Background Regarding Cohen's Testimony about Insider Trading in the *Fairfax* Litigation ...........................................................................58

    (b)   Cohen Disclaimed Specific Knowledge of SAC's Insider Trading Policies ......................................................................................................60

    (c)   Cohen Deemed Insider Trading Policies Mere "Guidelines" and Described the Policies Prohibiting Insider Trading as "Vague"........................61

    (d)   Cohen Testified that Obtaining Inside Information at SAC Is a Common Occurrence .................................................................................64

    (e)   SAC Has Never Fired or Suspended an Employee for Insider Trading ......................................................................................................67

(f) Cohen Engaged in Insider Trading Early in His Career and Invoked His Fifth Amendment Rights When Questioned by the SEC ............................68

J. The Claims Are Timely ..........................................................................................69

K. Defendants' Gains from Their Insider Trading Conspiracy ..................................70

1. SAC's Profits Gained During the Insider Buying Class Period ..................70

2. SAC's Losses Avoided and Profits Gained Following the July 29 Announcement ............................................................................................71

3. SAC's Losses Avoided and Profits Gained Following the July 31 PML Disclosure ..................................................................................................71

4. Prejudgment Interest ..................................................................................72

5. Summary of SAC's Profits Gained and Losses Avoided ...........................75

6. Martoma's Profits ......................................................................................75

7. Gilman's Profits .........................................................................................75

CONTEMPORANEOUS PURCHASES AND SALES ....................................................75

CLASS ACTION ALLEGATIONS ..................................................................................76

CLAIMS FOR RELIEF ....................................................................................................78

FIRST CLAIM – For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants).....................................................................................78

SECOND CLAIM – For Violations of Section 20A of the Exchange Act (Against All Defendants).........................................................................................................80

THIRD CLAIM – For Violations of Section 20(a) of the Exchange Act (Against the Control Defendants).........................................................................................83

PRAYER FOR RELIEF ...................................................................................................84

DEMAND FOR TRIAL BY JURY ..................................................................................84

Lead Plaintiffs David E. Kaplan, Roxy D. Sullivan, Lindsey Rankin, Michael S. Allen and Chi-Pin Hsu, together with plaintiff Gary W. Muensterman (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Class Action Complaint against the above-named defendants (collectively, "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Such information and belief is based on, *inter alia*, the investigation conducted by their attorneys, which included the review of Court filings in related actions, media reports, filings with the Securities and Exchange Commission ("SEC"), trading records, press releases, and other publicly-available information.

## NATURE OF THE ACTION

1. This is a securities class action arising from the most profitable insider trading conspiracy ever uncovered. By trading while in possession of material, nonpublic information, the SAC Defendants (as defined below) illegally obtained at least $549 million in profits gained and losses avoided from trades in the American Depositary Receipts ("ADRs") of Elan Corporation, plc ("Elan") and related options.

2. This action is brought on behalf of all Elan investors who traded contemporaneously with and opposite to the SAC Defendants, during the periods (i) July 1, 2006 through and including July 18, 2008 (the "Insider Buying Class Period"), and (ii) July 21, 2008 through and including 4:00 pm EDT on July 29, 2008 (the "Insider Selling Class Period"), pursuant to Sections 10(b), 20A and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t-1 and 78t(a).

3. The conspiracy set forth herein is the subject of a pending criminal prosecution, *United States v. Martoma*, No. 12 Cr. 973 (PGG) (the "Criminal Action"), and an SEC enforcement action, *SEC v. CR Intrinsic Investors, LLC*, No. 12 Civ. 8466 (VM) (the "SEC Action").

4.     On March 15, 2013, the SAC Defendants announced a settlement of the claims against them in the SEC Action (the "SEC-SAC Settlement"), which was conditionally approved by the Court by Decision and Order entered April 16, 2013. Pursuant to the SEC-SAC Settlement, the SAC Defendants agreed to pay $274,972,541 in disgorgement, together with $51,802,381 in interest thereon and $274,972,541 in civil penalties. Approximately 80% of those payments were in respect of the insider trading in Elan securities at issue in this action.

5.     The SEC-SAC Settlement, while historic in size, provides for disgorgement of only a fraction of the SAC Defendants' gains from their two-year conspiracy, which yielded them profits from Elan ADRs' run-up in value between 2006 and mid-2008, and then enabled them to avoid losses and reap further gains from short positions when they learned in mid-July 2008 that Elan would be disclosing negative news. Their gains, prejudgment interest thereon, and the net amounts to which Plaintiffs and the proposed Class are entitled (subject to revision following discovery), after offset of the portion of the SEC-SAC Settlement paid on account of the insider trading in Elan, are as follows:

| Source of Gain (Complaint ¶¶) | Principal Amount | Prejudgment Interest | SEC Offset | Total Net of SEC Offset |
|---|---|---|---|---|
| Insider Buying Class Period Profits (¶¶ 265-266) | $178,041,701 | $126,687,931 | | $304,729,632 |
| July 29 Announcement (¶ 267) | $218,500,000 | $158,341,019 | ($259,663,457) | $117,177,562 |
| July 31 PML Disclosure (¶ 268) | $152,663,782 | $111,028,494 | | $263,692,277 |
| Total | $549,205,483 | $396,057,444 | ($259,663,457) | $685,599,471 |

6.     As set forth in detail below, Defendant S.A.C. Capital Advisors, L.P. ("SAC LP"), together with its affiliates (collectively, "SAC" or the "Fund"), illegally traded in Elan ADRs and options between 2006 and 2008 while in the possession of nonpublic information concerning the Phase 2 clinical trial of bapineuzumab (AAB-001) ("bapi"), an Alzheimer's disease treatment that was the focus of Elan's drug development efforts.

7.     SAC obtained the inside information regarding the bapi clinical trial (the "Inside Information") from Defendant Sidney Gilman ("Gilman"), the medical doctor who chaired the Safety Monitoring Committee (the "SMC") that oversaw the bapi clinical trial on behalf of Elan. Gilman secretly disclosed the Inside Information to an SAC portfolio manager, Defendant Mathew Martoma ("Martoma").  As detailed below, Martoma discussed bapi with Gilman on numerous occasions between 2006 and 2008, and obtained material nonpublic information concerning the ongoing bapi Phase 2 clinical trial from him through these conversations.

8.     In November 2012, Gilman entered into a nonprosecution agreement with the U.S. Department of Justice ("DOJ") which required him to serve as a cooperating witness, and he consented to a judgment against him in the SEC Action requiring him to disgorge $234,868, representing the profits from his unlawful conduct.  Martoma is the defendant in the Criminal Action and is also a defendant in the SEC Action.

9.     During the Insider Buying Class Period, SAC purchased a total of at least 16.9 million Elan ADRs while in possession of the Inside Information, which it sold during and after such class period for profits presently estimated at $178 million.  As further discussed below in paragraphs 265 and 266, this calculation is based on publicly-filed data regarding holdings at the end of each calendar quarter and may therefore significantly understate SAC's total trading and profits.

10.     As of July 18, 2008, SAC's holdings totaled approximately 10,560,000 Elan ADRs, then worth about $366 million.  SAC also held a similarly large long position in Wyeth, a New Jersey-based pharmaceutical company, which was co-developing bapi with Elan.  SAC's positions in Wyeth and Elan represented its second and fifth largest positions out of the more than 1,200 companies in which it was then invested.

11.     SAC's trades were directly supervised by Defendant Steven A. Cohen ("Cohen"), its founder, Chief Executive Officer and Chief Investment Officer, and Cohen based his approval of the trades on his direct communications with Martoma.

12.     Cohen approved SAC's acquisition and retention of its massive position in Elan over the objections of other, more experienced SAC portfolio managers, despite Martoma's junior position and lack of track record.  The other portfolio managers surmised – correctly – that Martoma had inside information.  Martoma had joined SAC in 2006, shortly before his consultations with Gilman began and SAC opened its position in Elan.  Illustrating his lack of proven performance as a portfolio manager both before and after the insider trading detailed herein, when Martoma was later terminated in 2010, an officer of the Fund described him as a "one trick pony with Elan."

13.     A majority of SAC's Elan holdings were acquired through Defendant CR Intrinsic Investors, LLC ("CR Intrinsic"), the Fund subsidiary that directly employed Martoma.  According to deposition testimony by Cohen in an unrelated case, Cohen exercised unusually close control over CR Intrinsic.  He explained "Intrinsic was a division of S.A.C. and essentially it was me and a guy named Matt Grossman who was running that division."  He further explained that the idea behind CR Intrinsic was "[e]ssentially that we would have a group of analysts that would work solely for us as opposed to relying on portfolio managers and analysts in the firm to ferret out ideas."  *See* ¶¶ 66-67 below.  According to news reports, Cohen also had much of his personal net worth, estimated at $8.8 billion, invested with CR Intrinsic.

14.     On June 17, 2008, Elan and Wyeth released top-line (summary) results from the Phase 2 clinical trial of bapi (the "June 17 Announcement").  The market reacted positively, with Elan ADRs rising 10.7% after the announcement.  Martoma reaffirmed his positive outlook on

Elan after the June 17 Announcement, predicting in a June 30 email to Cohen that, after detailed trial results were to be released a month later, "I think stock breaks $40."

15.     Gilman learned in late June 2008 that he would be presenting the results of the bapi clinical trial at the International Conference on Alzheimer's Disease ("ICAD"), a widely-anticipated event to be held in Chicago on July 29, 2008.  In the weeks before ICAD, Gilman learned the complete safety and efficacy results for the Phase 2 trial.

16.     The full Phase 2 trial results privately revealed to Gilman were, as stock analysts and medical experts later noted, complex and ambiguous, with differing efficacy results for various patient subgroups, unclear statistical significance, and an absence of correlation between dosage levels and patient benefit, called "dose response."  These results were far less favorable than the market expected, anticipating clear efficacy signals and the prospect of early Food and Drug Administration ("FDA") approval of the drug.

17.     On Thursday, July 17, 2008, Gilman had a lengthy telephone conversation with Martoma and provided him an encrypted presentation of the full trial results.  Gilman subsequently spoke to Martoma on six additional occasions before public disclosure of the Phase 2 results at ICAD.

18.     On the morning of Sunday, July 20, 2008, Martoma emailed Cohen to say that he would like to speak with him and that "[i]t's important."  Thereafter, they spoke for nearly 20 minutes.

19.     While ***no new public information had been disclosed regarding bapi since the June 17 Announcement***, and only three weeks had passed since Martoma's bullish statements regarding Elan's target price, Cohen and Martoma then directed SAC's head trader, identified in news reports as Phillipp Villhauer ("Villhauer"), to begin aggressively selling the Fund's

positions in both Elan and Wyeth the following day.  Over the seven trading days leading up to

the announcement of the bapi Phase 2 results on July 29, SAC liquidated its entire positions in

Elan and Wyeth, worth $365 million and $335 million, respectively.

20.     In addition, SAC opened large short positions in both Elan and Wyeth toward the

end of the same seven day period.  By the time that the results of the bapi Phase 2 clinical trial

were announced, after the close of the market on July 29 (the "July 29 Announcement"), SAC

was short 4,525,104 Elan ADRs, worth over $152 million.

21.     Villhauer's emails reflect that he actively concealed the sales from both the

market and others at the Fund, excepting Cohen and Martoma.  On July 21, he emailed Martoma

regarding the sales, stating that "obviously no one knows except me[,] you and [Cohen]."

Villhauer later reported to Cohen by email that:

> We executed a sale of over 10.5 million ELN for [various portfolios at CR
> Intrinsic and SAC LP] at an avg price of 34.21. This was executed quietly
> and efficiently over a 4 day period through algos and darkpools and
> booked into two firm accounts that have very limited viewing access.
> This process clearly stopped leakage of info from either in [or] outside the
> firm and in my viewpoint clearly saved us some slippage.

22.     As scheduled, Elan and Wyeth issued a press release announcing the Phase 2

results at 5:00 pm EDT on July 29, and Gilman reported the results in a 13-minute presentation

at ICAD.  The overall market reaction to the July 29 Announcement was strongly negative.

After briefly rising following issuance of the Elan/Wyeth press release, the price of Elan ADRs

dropped sharply in after-hours trading on July 29 and over the course of the trading day on July

30, closing at $19.63, down 41.8% from its $33.75 close on July 29.

23.     Gilman's brief presentation was widely criticized by analysts and Alzheimer's

specialists as rushed and unclear.  While market observers agreed that the results were

significantly less favorable than expected and the data were complex and ambiguous, their

assessments of the Phase 2 trial results were broadly mixed, with some interpreting the limited publicly-released data as strongly negative and others as cautiously positive.

24.     By causing SAC to both liquidate its long positions in Elan and Wyeth and establish short positions in the companies during the seven trading days before the July 29 Announcement, SAC avoided $194 million in losses on its long positions and secured a $75 million profit on its short positions, based on the July 30 market decline.

25.     The following day, July 31, while investors and analysts continued to evaluate the bapi Phase 2 trial results, Elan announced at 5:16 pm EDT two confirmed cases of progressive multifocal leukoencephalopathy ("PML") in multiple sclerosis ("MS") patients treated with Elan's predominant commercially-marketed drug, *Tysabri* (the "July 31 PML Disclosure").

26.     Disclosure of the PML cases drove a 50.5% decline in the trading price of Elan ADRs in after hours trading on July 31 and over the course of the trading day on August 1, with the ADRs closing at $9.93.

27.     As a direct result of completely reversing their trading position following receipt of the nonpublic Phase 2 trial results from Gilman, the SAC Defendants avoided additional losses and made additional profits totaling approximately $152 million, based on the August 1 market decline.

28.     Martoma received a $9.3 million bonus for 2008, a significant portion of which was attributable to the illegal profits that SAC had generated from the Elan and Wyeth short sales in late July.  He was subsequently unsuccessful as a portfolio manager, and was terminated by SAC in 2010.

29.     The insider trading detailed herein fits a pattern and practice of illegal use of inside information at SAC: Martoma is the third employee of Defendant CR Intrinsic to be

criminally indicted or charged by the SEC with insider trading since 2011, and he is the eighth

SAC employee to be charged with or admit insider trading at SAC since 2009. Within the past

year, three other SAC employees have also been identified by the government or cooperators as

active participants in various insider trading schemes.

## JURISDICTION AND VENUE

30.     The claims asserted herein arise under Sections 10(b), 20A and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b), 78t-1 and 78t(a), and this Court therefore has jurisdiction

over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of

the Exchange Act, 15 U.S.C. § 78aa.

31.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. § 1391(b). During the Insider Buying Class Period and the Insider

Selling Class Period (together, the "Class Periods"), Elan ADRs traded on the New York Stock

Exchange ("NYSE"), which is located in this District. In addition, the expert firm that facilitated

communications between Martoma and Gilman is based in this District at 850 Third Avenue,

New York, New York, and SAC maintains an office in this District at 510 Madison Avenue,

New York, New York. Martoma and Gilman used SAC's Manhattan office in furtherance of the

fraudulent scheme set forth herein.

32.     In connection with the challenged conduct, Defendants, directly or indirectly,

used the means and instrumentalities of interstate commerce, including, but not limited to, the

United States mails, interstate telephone and data communications and the facilities of the

national securities markets.

## PARTIES

### A.      Plaintiffs

33.      Lead Plaintiff David E. Kaplan first invested in Elan in 1998 and, as set forth in his accompanying certification, traded Elan ADRs during both the Insider Buying Class Period and Insider Selling Class Period, contemporaneously with the insider trades by SAC (the "SAC Insider Trades").

34.      Lead Plaintiff Roxy D. Sullivan first invested in Elan in 2005 and, as set forth in her previously-filed certification, purchased Elan ADRs during the Insider Selling Class Period, contemporaneously with the SAC Insider Trades.

35.      Lead Plaintiff Lindsey Rankin first invested in Elan in 2002 and, as set forth in his previously-filed certification, purchased Elan ADRs during the Insider Selling Class Period, contemporaneously with the SAC Insider Trades.

36.      Lead Plaintiff Michael S. Allen first invested in Elan in 2003 and, as set forth in his previously-filed certification, purchased call options and sold put options on Elan ADRs during the Insider Selling Class Period, contemporaneously with the SAC Insider Trades.

37.      Lead Plaintiff Chi-Pin Hsu first invested in Elan in 2002 and, as set forth in his accompanying certification, traded Elan ADRs during both the Insider Buying Class Period and Insider Selling Class Period, contemporaneously with the SAC Insider Trades.

38.      Plaintiff Gary W. Muensterman first invested in Elan in or about 1999 and, as set forth in his accompanying certification, traded Elan ADRs during both the Insider Buying Class Period and Insider Selling Class Period, contemporaneously with the SAC Insider Trades.

### B.      Defendants

39.      Defendant SAC LP is a Delaware limited partnership with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut.  SAC LP is an investment adviser

registered with the SEC, CRD No. 161111. SAC LP has disclosed that it received a Wells notice from the SEC on or about November 20, 2012 relating to insider trading in advance of the July 29 Announcement.

40. Defendant S.A.C. Capital Advisors, Inc. ("SAC Inc.") is a Delaware corporation with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut. SAC Inc. is the general partner of SAC LP and is identified as a control person of SAC LP in SAC LP's Form ADV, filed with the SEC.

41. Defendant CR Intrinsic is a Delaware limited liability company with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut. CR Intrinsic, an unregistered investment advisor, is a wholly-owned subsidiary of SAC LP, and according to SAC LP's Form ADV, SAC LP is a control person with respect to CR Intrinsic. CR Intrinsic is a "relying advisor" of SAC LP, and therefore either shares the same officers as SAC LP or SAC LP's officers supervise CR Intrinsic's officers.

42. Defendant CR Intrinsic Investments, LLC is an Anguilla limited liability company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West Indies. CR Intrinsic Investments, LLC is a hedge fund affiliated with CR Intrinsic that benefitted from the SAC Insider Trades.

43. Defendant S.A.C. Capital Advisors, LLC ("SAC LLC") is a Delaware limited liability company with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut. SAC LLC, the predecessor to SAC LP, is an investment adviser that managed certain affiliated hedge funds that benefitted from the SAC Insider Trades.

44. Defendant S.A.C. Capital Associates, LLC is an Anguilla limited liability company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West

Indies.  S.A.C. Capital Associates, LLC is a hedge fund that in July 2008 was affiliated with SAC LP and benefitted from the SAC Insider Trades.

45.     Defendant S.A.C. International Equities, LLC is an Anguilla limited liability company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West Indies.  S.A.C. International Equities, LLC is a hedge fund that in July 2008 was affiliated with SAC LP and benefitted from the SAC Insider Trades.

46.     Defendant S.A.C. Select Fund, LLC is an Anguilla limited liability company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West Indies.  S.A.C. Select Fund, LLC is a hedge fund that in July 2008 was affiliated with SAC LP and benefitted from the SAC Insider Trades.

47.     Defendant Cohen is a Connecticut resident and the founder, Chief Executive Officer and Chief Investment Officer of SAC, which began operations in 1992.  According to SAC LP's Form ADV, Cohen is a control person with respect to SAC LP.  Cohen is also a control person of CR Intrinsic, since according to SAC LP's Form ADV, CR Intrinsic "shares the same control persons" as SAC LP.  Cohen also serves as either a CR Intrinsic officer or supervises CR Intrinsic's officers, because CR Intrinsic is a "relying advisor" of SAC LP and Cohen is an SAC LP officer.  Cohen is identified as "Portfolio Manager A" in the SEC Complaint and as the "Hedge Fund Owner" in the Criminal Complaint.

48.     Defendant Martoma is a Florida resident who was employed by CR Intrinsic between 2006 and 2010 as a portfolio manager.  Martoma is named as the defendant in the Criminal Complaint and is also named as a defendant in the SEC Complaint.

49.     Defendant Gilman is a Michigan resident and, until his resignation on or about November 27, 2012, was the William J. Herdman Distinguished University Professor of

Neurology at the University of Michigan Medical School. Gilman is identified in the Criminal Complaint as the "Cooperating Witness" or "CW" and is named as a defendant in the SEC Complaint.

50. The defendants identified in paragraphs 39 to 48 above are referred to herein as the "SAC Defendants."

51. The defendants identified in paragraphs 39 to 41, 43 and 47 above are referred to herein as the "Control Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.** **Background Regarding Elan and the Bapineuzumab Clinical Trials**

52. Elan is an Irish public limited company with its principal executive offices in Dublin, Ireland. Elan's principal research and development facilities are located in the United States.

53. Elan was incorporated as a private limited company in Ireland in December 1969 and became a public limited company in January 1984. It has reported with the SEC as a foreign issuer since at least 1996.

54. Elan's Ordinary Shares trade on the Irish Stock Exchange, and its American Depositary Shares, evidenced by ADRs, trade on the NYSE under the symbol "ELN."

55. Elan undertook research and clinical trials of bapi for the treatment of Alzheimer's disease jointly with Wyeth, a New Jersey-based pharmaceutical company that was acquired by Pfizer Inc. in 2009.

56. Clinical trials, divided into three phases involving progressively greater numbers of test subjects, are a central part of the process of new drug review and approval required by the FDA.

57.     In 2006, data from a Phase 1 study of bapineuzumab showed promise, and Elan and Wyeth initiated two Phase 2 studies.

58.     Prior to the completion of the Phase 2 studies, in May 2007, Elan and Wyeth announced the decision to initiate Phase 3 studies, which proceeded concurrently with the Phase 2 studies in 2008.  The companies' investment in bapi was enormous; in the case of Elan (which held a 50% interest in the drug), its research and development budget increased by 20% in 2007 (to $260.4 million), "primarily due to increased expenses associated with the progression of our Alzheimer's disease programs, particularly the move of AAB-001 [bapi] into Phase 3 clinical trials and the move of ELND005 into Phase 2 clinical trials during 2007."

59.     As of 2008, Elan was heavily reliant on the continued success of a single drug, *Tysabri*, which after being approved in the U.S. in 2004 had been temporarily suspended for 16 months in 2005-2006 due to safety concerns, and Elan's future prospects depended on the success of drugs in its development pipeline, particularly bapi.

60.     In its 2007 annual report on Form 20-F, filed February 28, 2008, Elan emphasized the importance of bapi (referenced by the identifier AAB-001), cautioning as its first-listed risk factor that "***if our Phase 2 and 3 clinical trials for AAB-001 are not successful and we do not successfully develop and commercialize additional products, we will be materially and adversely affected.***"  (Emphasis in original.)

61.     The market shared the view that bapi was crucial to Elan's future.  A July 28, 2008 analyst report from Cowan and Co., for example, stated that "we estimate that Elan's current $15.9B valuation implies approximately $7-8B+ in bapineuzumab sales by 2015."[1]

---

[1]     All cited materials are maintained on file and are available at the request of the parties or upon direction from the Court.

62.    SAC was founded by Defendant Steven A. Cohen in 1992 and according to the most recent published information, has over $15 billion in assets under management, making it among the largest 25 U.S. hedge funds.

63.    SAC's investments cover a broad spectrum of international long/short equity, fixed income, statistical arbitrage, credit, commodities and options.

64.    SAC's investment strategy relies heavily on collecting market information.  As explained in a 2010 *Vanity Fair* profile of Cohen – one of two interviews that had then ever been granted by him – in the late 1990s, "Cohen became renowned in trading circles as a voracious gatherer of market information."  According to a recent *New York Times* article, "Cohen and his staff are known for relentlessly digging for information about publicly traded companies to form a 'mosaic,' building a complete picture of the company's prospects that gives the firm an edge over other investors."  Peter Lattman, *New Breed of SAC Capital Hire Is at Center of Insider Trading Case*, N.Y. Times, Nov. 25, 2012.

65.    SAC is highly centralized, with a "hub and spoke" trading structure in which "[e]ach portfolio group is further responsible for sharing high conviction ideas with Steve Cohen and his investment team in a hub and spoke trading structure where Steve Cohen and his team are the hub of receiving information from the various spokes of investment managers."  *Fairfax Fin. Holdings Ltd. v. SAC Capital Mgmt. LLC*, No. L-2032-06 (N.J. Super. Ct.), Deposition of Steven A. Cohen, Feb. 22, 2011 ("Cohen Dep."), at 623:23-624:3.

66.    CR Intrinsic is a division of SAC that is directly supervised by Cohen and, according to news reports, managed much of his personal net worth, estimated at $8.8 billion in 2008.  Svea Herbst-Bayliss & Katya Wachtel, *Latest Arrest Shines Light on Cohen's CR Intrinsic Unit*, Reuters, Nov. 20, 2012.

67.     Asked about his relationship with CR Intrinsic at his 2011 deposition in the

*Fairfax* litigation, Cohen explained that, as of 2006 (Cohen Dep. 586:5-25):

> A. Intrinsic was a division of S.A.C. and essentially it
> was me and a guy named Matt Grossman who was running that
> division.
>
> Q. And what was the idea behind Intrinsic?
>
> A. Essentially that we would have a group of analysts that
> would work solely for us as opposed to relying on portfolio
> managers and analysts in the firm to ferret out ideas.
>
> Q. Okay. So C. R. Intrinsic was your own -- your own
> analysts?
>
> A. That's right.
>
> Q. Did it -- did it have its own funds?
>
> A. It was allocated funds from S.A.C. Capital.
>
> Q. Okay. And then who made the investment decisions on
> that, you?
>
> A. It was me and Matt Grossman. Well, that's not true.
> There were other people who had the ability to invest.
>
> Q. Okay. Was it in the same office?
>
> A. It was in the same office . . . .

68.     Martoma joined SAC in 2006, after working at a smaller hedge fund in Boston.

He received his B.A. in biomedicine, ethics and public policy from Duke University in 1995 and

worked at the National Human Genome Research Institute after college.  He later received an

MBA from Stanford University.

69.     For 2008, Martoma received a bonus of over $9.3 million that included a

percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan

profits in certain other SAC portfolios.

70.     Martoma's success with Elan in 2008 contrasts sharply with his later performance

at SAC.  Martoma received no bonus in 2009, and was fired in 2010.  In a 2010 email suggesting

that Martoma be fired, an SAC officer commented that Martoma had been a "one trick pony with

Elan."

71.     Martoma was criminally charged with insider trading by complaint dated November 19, 2012 and pleaded not guilty at his arraignment on January 3, 2013.  *See United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y.), ECF Nos. 1, 10.

**C.     Gilman and His Role in the Bapi Clinical Trials**

72.     Defendant Gilman is a leading neurologist and expert on Alzheimer's disease. Until he resigned in late November 2012 after the filing of the Criminal and SEC Complaints, he was the William J. Herdman Distinguished University Professor of Neurology at the University of Michigan.  He was also the Director of the Michigan Alzheimer's Disease Research Center, has authored or co-authored over 200 peer-reviewed papers, and has received numerous awards in his field.

73.     Gilman became affiliated with the Gerson Lehrman Group, Inc. ("GLG"), a leading expert network firm, in 2002, serving as a member of GLG's Scientific Advisory Board. He was later introduced to Martoma through GLG in 2006.

74.     Gilman served as Chair of the Safety Monitoring Committee (the SMC) for bapi Phase 1, Phase 2 and Phase 3 clinical trials starting in 2003 and continuing until at least 2011. Gilman was paid approximately $79,000 by Elan for his work on the SMC in 2007 and 2008.

75.     By the time Gilman was introduced to Martoma, Gilman's ongoing relationship with Elan and Wyeth and resulting access to non-public safety data was therefore well-known publicly and known to Martoma.

76.     As Chair of the bapineuzumab SMC, Gilman had continuing access to material nonpublic information concerning the Phase 2 trials of bapi beginning in 2006.

77.     In addition, in June 2008, Elan invited Gilman to present the Phase 2 trial results on behalf of Elan and Wyeth at ICAD, a widely-anticipated Alzheimer's disease conference

scheduled to be held on July 29, 2008.  To perform this function, Gilman was given access to the full Phase 2 trial results approximately two weeks prior to the July 29 Announcement.

78.    By virtue of his roles in the clinical trial, and in accordance with the terms of his contract with Elan, Gilman owed Elan a duty to hold in strict confidence all information he learned in connection with his participation in the clinical trial and to use such information only for Elan's benefit.  The consulting agreement between Elan and Gilman provided that "[a]ny and all information which Elan may disclose to Consultant under this Agreement will be considered confidential . . . ."  In addition, the SMC Operating Guidelines, to which Gilman was subject, provided that "strict confidentiality will be maintained by all the SMC members in accordance with written agreements" with Elan.

79.    Elan and its Alzheimer's disease development partners placed a great deal of confidence in Gilman.  From 2001 to 2003, Gilman was Chair of the Elan/Wyeth SMC for the Phase 2 clinical trials of AN1792 for Alzheimer's disease, and from 2008 to 2010, Gilman was Chair of the Elan/Transition Therapeutics SMC for the Phase 2 clinical trials of Scyllo-Inositol for Alzheimer's disease.  From 2010 and continuing until at least 2011, Gilman was also Chair of the SMC for the Phase 1 clinical trial of AAB-003, another drug being jointly developed by Pfizer and Elan to treat Alzheimer's disease.

80.    Gilman also received training on the conduct prohibited by the federal securities laws from GLG, the expert network firm that introduced him to Martoma, which repeatedly reminded Gilman not to share nonpublic information with clients.  Emails sent to Gilman by GLG also listed bapi as a topic that Gilman was "not allowed to discuss."

81.    Martoma was also placed on notice by GLG that bapi was a prohibited topic in his consultations with Gilman.  An email dated June 25, 2008 from GLG to Martoma confirming a

consultation that Martoma had requested with Gilman stated that experts "participating in clinical trials may not discuss the patient experience or trial results not yet in the public domain" and specifically stated that Gilman was "unable to discuss" bapi due to his involvement in its clinical trials.

82.     Prior to the indictment of Martoma in November 2012, the DOJ entered into a nonprosecution agreement with Gilman in exchange for his cooperation, and he is identified in the Criminal Complaint as the "Cooperating Witness" or "CW."  Gilman is also a named defendant in the SEC Complaint and on November 16, 2012 consented to entry of a judgment against him, which provided for disgorgement of profits and interest in the amount of $234,868, as well as an injunction against further violations of the securities laws.

     **D.**     **SAC Accumulates a $366 Million Position
in Elan ADRs in 2006-2008 While
<u>Receiving Inside Information from Gilman</u>**

83.     Martoma was introduced to Gilman through paid consultations arranged by GLG. Between 2006 and 2009, Gilman participated in 59 consultations with SAC portfolio managers and analysts, including 42 consultations with Martoma, for which he was paid approximately $1,000 per hour.

84.     Gilman's consultations with Martoma began in the summer of 2006.  Starting at some time in the second half of 2006, Gilman began providing Martoma with material nonpublic information concerning the bapi Phase 2 trial.  As a member of the SMC, Gilman received periodic updates from Elan concerning safety data for the ongoing trial.  Among other communications, in advance of SMC meetings, Elan sent Gilman PowerPoint presentations that included dosage information and information concerning side-effects that patients in the Phase 2 trial were experiencing.

85.     During consultations with Martoma, Gilman discussed his view that the SMC data showed that bapineuzumab was reasonably safe for a drug of its kind, with side effects broadly consistent with expectations.  Gilman further told Martoma that the fact that a particular side effect was observed only in patients taking the drug (and not the placebo), and that the side effect occurred more frequently in patients taking higher doses of the drug, indicated that the drug was likely having the hoped-for therapeutic effect.  Gilman also indicated to Martoma that while not definitive, this apparent "dose-response" relationship was a positive sign that the drug could be effective in treating Alzheimer's disease.

86.     The interim safety data, and the insights Gilman provided regarding efficacy, were never publicly disclosed during the Class Periods.

87.     Beginning in late 2006, Gilman contacted Martoma after SMC meetings to report to Martoma what he had learned during the meetings.  During these calls, Gilman discussed the PowerPoint presentations and provided Martoma with his perspective on the data.  Gilman's consultations with Martoma frequently occurred later the same day or shortly after Gilman had attended an SMC meeting.  Among other meetings, Gilman had consultations with Martoma on November 22, 2006 (the day after an SMC meeting), February 9, 2007 (also the day after an SMC meeting), October 9, 2007 (later in the day following an SMC meeting), March 18, 2008 (also hours after an SMC meeting), and July 13, 2008 (two days after an SMC meeting).

88.     The PowerPoint presentations prepared for SMC meetings and Gilman's perspective on them were never publicly disclosed during the Class Periods.

89.     Martoma and Gilman coordinated their expert network consultations around scheduled SMC meetings.  For example, on August 23, 2007, Gilman advised Martoma that "[t]he SMC teleconference will be postponed until the following week. Should we postpone our

planned teleconferences until a more definitive date has been established?"  When the SMC

meeting was not rescheduled as expected, Gilman emailed Martoma on September 5, 2007 to

report that the SMC meeting had still not been scheduled and noted to Martoma, "you may want

to postpone [our scheduled conference call] until there is more to discuss."  Gilman next

consulted with Martoma through GLG on October 9, 2007 – hours after the next SMC meeting.

90.     Among other communications in which Gilman conveyed nonpublic information

regarding the Phase 2 trial to Martoma, Gilman sent Martoma an email on April 30, 2008, which

he labeled "For Your Eyes Only" and "High Priority," in which he discussed in detail the

dropout rate for the bapi clinical trial and referred to how many patients took bapi during each

round of the trial.  The figures used in the email (including certain mathematical errors discussed

by Gilman) were taken directly from a slide in the Elan-prepared PowerPoint presentation used

at the March 18, 2008 SMC meeting.

91.     Martoma and Gilman also took steps to conceal the true subject of their

conversations from GLG.  For example, when Martoma scheduled a consultation with Gilman

three hours after the March 18, 2008 SMC meeting, Martoma reported to GLG that the purpose

of the call was "Follow-up with Dr. Gilman: AAN Abstract Preview," even though Martoma and

Gilman discussed the bapi Phase 2 trial during the consultation.  Later, in advance of a

consultation that Gilman's personal calendar noted was to discuss side-effects that the Phase 2

trial was finding in patients taking bapi, Gilman emailed Martoma and asked him to set up a

consultation with GLG, suggesting that Martoma tell GLG that the consultation was to discuss a

drug to treat Parkinson's disease.  A consultation in late June regarding ICAD referenced

multiple sclerosis (MS), a disease unrelated to bapi.

92.     During the period of Martoma's consultations with Gilman, CR Intrinsic and SAC

LP established very large long positions in Elan and Wyeth securities.  As reflected in the

following chart, as of June 30, 2006, SAC had no holdings in Elan.  By the start of trading on

July 21, 2008, SAC held 10,560,250 Elan ADRs, worth more than $366 million:



Source:  Form 13-F filings of S.A.C. Capital Advisors, LLC, CR Intrinsic Investors, LLC and Sigma Capital
Management, LLC.

93.     The Elan and Wyeth positions held by CR Intrinsic and SAC LP were held

primarily in portfolios controlled by Martoma and Cohen, respectively.  Martoma included Elan

and Wyeth as "long ideas" in his weekly portfolio updates circulated between January 1, 2008

and early July 2008 to Cohen, among others, and listed the release of the bapi Phase 2 trial

results as an "[u]pcoming catalyst."

94.     Martoma and Cohen maintained their bullish positions in Elan and Wyeth even

though there was significant dissent within SAC on the wisdom of doing so.  In March and April

2008, two analysts at CR Intrinsic, David Munno ("Munno") and Benjamin Slate ("Slate"),

repeatedly sent emails to Cohen advocating against the Elan and Wyeth positions and suggesting

trading strategies designed to hedge them.  Sheelah Kolhatkar, *On the Trail of SAC Capital's Steven Cohen*, Businessweek, Jan. 17, 2013.

95.     On March 26, 2008, one of these analysts sent Cohen an email with the subject line "ELN, (important, please read) negative reads from company and other buysiders" and listed several reasons why the analyst was concerned with the Elan position.  Cohen forwarded the email to Martoma, who responded, "I read the message. Nothing worrisome here.  Let me know when you are free to discuss in detail."  Martoma and Cohen made no changes to their holdings despite the analysts' concerns.  In fact, after the June 17 Announcement, Cohen indicated he would no longer consider any investment ideas regarding Elan or Wyeth from Munno or Slate.  *Id.*

96.     Munno did not understand why Cohen was so bullish on Elan, and expressed his surprise in an email to his supervisor, Jason Karp ("Karp"), then the director of research at CR Intrinsic.  Karp agreed and wrote that Martoma was acting like he had a "black edge."  *Id.*

97.     "Edge" refers to a trader's informational advantage over others in the stock market, and can imply improper access to inside information.

98.     Reflecting its negative connotations, Cohen stated that he "hate[s]" the word when asked about it at his 2011 deposition (Cohen Dep. 468:17-469:3):

> Q.  Mr. Cohen, are you familiar with the term "edge"?
> A.  Yes, I am.
> Q.  That's a word that you use at S.A.C., correct?
> A.  I hate that word.
> Q.  What's that word mean?
> A.  It just means that somebody believes that in a particular situation, stock, that the word suggests that somehow their expectations are different than either investors' expectations or Wall Street's expectations.

99.    Karp's use of the term "black edge" thus connotes his belief that Martoma had access to inside information, and that Cohen's knowledge of this was prompting him to favor Martoma's perspective over the informed views of far more seasoned portfolio managers.  As further discussed below, Karp's immediate assumption that Martoma had inside information – a belief that turned out to be exactly right – reflects the widespread access to inside information within SAC – something that Cohen himself has acknowledged.

100.    Elan and Wyeth released summary, top-line results of the Phase 2 trial on June 17, 2008 – the June 17 Announcement.  The market reacted positively and the trading price of Elan ADRs and Wyeth stock rose more than 10% and 4%, respectively.

101.    Martoma maintained his positive outlook on Elan after the June 17 Announcement.  In a June 30, 2008 email, sent when Elan ADRs were trading at approximately $35, Martoma told Cohen that he intended to add further to the Elan position, saying, "I think stock breaks $40" following the announcement of full Phase 2 trial results, scheduled for one month later, on July 29.

102.    In late June 2008, Gilman learned that he likely would be selected to present the Phase 2 trial results at ICAD on July 29.  After finding out about his selection, Gilman sent an email to Martoma on June 25 with the subject line "Some news" and told Martoma to "[p]lease set up [a GLG] conversation re MS."  Martoma then requested that his secretary contact GLG to arrange a consultation with Gilman "on MS therapies . . . ."  During this consultation – purportedly about multiple sclerosis, a disease treated by Elan's principal marketed drug, *Tysabri*, but with no connection to bapi – Gilman informed Martoma that he would be the presenter of the final Phase 2 clinical trial results at ICAD on July 29.

103.    After being named as the presenter, Gilman arranged to travel to Elan's offices on July 15 and 16, 2008, so that he could learn the full results of the Phase 2 trial.

104.    On July 7, 2008, Gilman created an entry in his electronic calendar for an appointment on July 13, titled "Mat Martoma will call me re: SAEs in bap" [serious adverse effects in bapineuzumab].  The call was scheduled so Gilman could brief Martoma on the full safety data for the trial, which was to be discussed at the SMC meeting scheduled for Friday, July 11.  However, to avoid creating a record that they would be discussing Inside Information, Gilman and Martoma arranged to disguise the purpose of the consultation with GLG.  Specifically, on Sunday, July 13, Gilman emailed Martoma "Hi Mat, For today's call at 5 pm EDT, please: 1. Obtain [GLG] consent for us to speak, perhaps on Parkinson's disease and Rasagiline [a drug to treat Parkinson's disease]."  GLG records reflect that Martoma made a request the same day to speak to Gilman "regarding Rasagiline for Parkinson's Disease."  At approximately 5:33 p.m., Martoma called Gilman from his home and spoke to Gilman for more than one hour and 40 minutes.  During the conversation, Gilman described in detail the final safety data presented to the SMC, which Gilman continued to interpret as largely positive.

105.    Toward the end of the July 13 call, Martoma and Gilman each created Outlook calendar entries reflecting that they intended to speak again on July 17, 2008 – the day after Gilman returned from his scheduled meetings with Elan.

106.    On July 15, 2008, Elan flew Gilman to San Francisco by private jet to participate in two days of meetings concerning the Phase 2 trial safety and efficacy results.  This was the first time that Gilman had seen data on the efficacy of bapi, rather than simply safety data.  The efficacy data were significantly less favorable than the market expected following the June 17 Announcement.

107.     On July 17, 2008, after Gilman returned to Michigan, an Elan executive sent Gilman an updated ICAD PowerPoint presentation in an email labeled "Confidential, Do Not Distribute."  The 24-page PowerPoint included summaries of the detailed efficacy results and safety results for the Phase 2 trial as well as additional commentary on how Elan and Wyeth were interpreting the data.

108.     Later in the afternoon of July 17, 2008, Gilman and Martoma had another lengthy phone call, lasting approximately one hour and 45 minutes, during which Gilman provided Martoma with confidential information regarding the detailed results of the Phase 2 trial, including all the information contained in the PowerPoint presentation.  To conduct this call, Martoma left SAC's New York office mid-afternoon and traveled to his home in Greenwich, Connecticut.  He then called Gilman from his home at 4:15 pm.  Unlike prior consultations, this call was not arranged through or reported to GLG.

109.     Shortly after this call, Gilman sent the PowerPoint presentation to Martoma. Martoma subsequently called Gilman to request the password needed to open the encrypted file, which Gilman provided.

110.     Gilman and Martoma continued to communicate after their July 17 conversation in the days leading up to the July 29 Announcement.  In addition to three short calls on July 18, Martoma and Gilman had a 39-minute conversation on July 22, a 23-minute conversation on July 24, and an approximately 11-minute conversation on July 28.

###     E.     The Disappointing Clinical Trial Results and SAC's Resulting Long and Short Sales of Elan and Wyeth

111.     The detailed safety and efficacy results of the Phase 2 clinical trial fell well short of market expectations.  In particular, the efficacy data showed a benefit for only one subgroup of patients, and the reliability of that result was uncertain, based on the trial's methodology.

112.     On the morning of Sunday, July 20, 2008 – nine days before the Phase 2 results were scheduled to be released and three days after his receipt of the confidential Phase 2 efficacy data from Gilman – Martoma emailed Cohen "[i]s there a good time to catch up with you this morning?  It's important."  Cohen replied a short time later with his cell phone number, and Cohen and Martoma then spoke by phone at around 9:45 a.m. for approximately 20 minutes.

113.     The following day, Monday, July 21, 2008, Cohen and Martoma instructed Villhauer, Cohen's head trader, to begin selling Elan and Wyeth securities held in the CR Intrinsic and SAC LP portfolios that Martoma and Cohen controlled, and to do so in a way that would not alert anyone else, either inside or outside of SAC.  Before the market opened on July 21, 2008, these portfolios held approximately 10,560,250 Elan ADRs worth more than $366 million and over 7 million Wyeth shares worth more than $335 million, for a total position of over $700 million.

114.     At Cohen's direction, the trades that Villhauer executed in Elan and Wyeth securities between July 21 and July 29, 2008 were kept confidential even within SAC.  At the end of the day on Monday, July 21, Villhauer reported to Martoma that he had sold 1.5 million Elan ADRs that day, and "obviously no one knows except you me and [Cohen]."

115.     Martoma also urged Cohen and Villhauer to sell the Elan securities in the CR Intrinsic and SAC LP portfolios quickly.  On July 22, ten minutes after Villhauer called Martoma, Martoma sent Cohen an instant message at 1:22:34 p.m. saying, "would do more today if possible[,]" suggesting that Cohen sell more Elan ADRs.  At 1:22:50 p.m., Cohen responded, in relevant part, "we are done on 2.3 [million] today" for a "total 3.8 [million] in 2 days."  Martoma replied, "my sense is today-thurs are best days / so if possible to do more, would do

so." After receiving Martoma's message, Cohen sold over an additional 2.2 million Elan ADRs on July 22.

116.    On Sunday, July 27, 2008, Villhauer reported to Cohen on his selling efforts in Elan over the prior week: "We executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and SAC LP] at an avg price of 34.21. This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access."

117.    The use of "algos" and "dark pools," in the words of Villhauer, "clearly stopped leakage of info from either in [or] outside the firm and in my viewpoint clearly saved us some slippage."

118.    Trading in dark pools enabled the SAC Defendants to make their activity less visible to other investors and more difficult for the SEC to detect.  Dark pools are private alternative stock exchanges reserved for the largest traders, including hedge funds.  The pools use computers to match buyers and sellers of a particular stock, drawing pricing data from public stock exchanges.  Dark pools provide an increased level of secrecy because neither the size of the trade, nor the identities of the buyer or seller are revealed until the trade is filled.  As a result, it is impossible to know if just one trader or firm is doing all the buying or selling until after the trade is completed.  The SEC regulates dark pool exchanges, but it has no way of quickly determining who is trading what.  *See* Tom Winter, *Gazing into 'Dark Pools,' the Tool that Enables Anonymous Insider Trading*, NBC News, Jan. 23, 2013.

119.    Similarly, algorithmic trade execution "involves splitting a trade into multiple orders in order to reduce visibility and market impact . . . ."  Algorithmic Trading, http://www.automatedtrader.net/Algorithmic_Trading.xhtm.  Algorithmic trading is therefore a

*method of execution* of the trade; the decision whether or not to make the trade in the first instance may or may not be automated, *id.*, and in this case was not; the trades here were executed at the direction of Cohen and Martoma. *See also* Cohen Dep. 455:20 (acknowledging SAC's use of algorithmic trade execution and noting the distinction between using algorithms to make trading decisions and using them for trade execution).

120.     Having sold out the Fund's entire long position in Elan, SAC next sold short 4,525,104 additional Elan ADRs on July 28-29, 2008, prior to the July 29 Announcement. SAC thereby made a major bet that the price of Elan ADRs would decline in the near future.

121.     In total, between July 21, 2008 and July 29, 2008, SAC sold over 15 million Elan ADRs for gross proceeds of over $500 million. The trading by SAC in Elan securities constituted over 20% of the reported trading volume in the seven days prior to the July 29 Announcement.

122.     In addition, between July 21, 2008 and July 29, 2008, SAC sold over 10.4 million shares of Wyeth for gross proceeds of more than $460 million, including over 6.1 million Wyeth shares worth more than $270 million during the day of the July 29 Announcement. As a result of these sales, the CR Intrinsic and SAC LP portfolios had a zero balance in Wyeth stock during the trading day on July 29, 2008, but continued to place short sales of Wyeth stock that day. By the close of the market on July 29, 2008, the CR Intrinsic and SAC LP portfolios had a combined short position of approximately 3.3 million Wyeth shares.

123.     The following chart sets forth SAC's holdings of Elan ADRs on a quarterly basis through June 30, 2008, at the start of trading on July 21, and on July 29, immediately prior to the July 29 Announcement:



Source: Form 13-F filings of S.A.C. Capital Advisors, LLC, CR Intrinsic Investors, LLC and Sigma Capital Management, LLC.

124.    CR Intrinsic and SAC LP also made options trades that bet on the price of Elan ADRs declining.  For example, on July 28 and July 29, the CR Intrinsic and SAC LP portfolios purchased over $1 million of Elan put options with strike prices below the Elan ADR price on those trading days.

125.    The scale and speed of SAC's reversal of position on Elan and Wyeth – all in the seven trading days following the 20 minute telephone conversation between Cohen and Martoma on July 20 – is striking.

126.    As of June 30, 2008, before Villhauer began selling, SAC's long positions in Wyeth and Elan represented its *second* and *fifth* largest positions, respectively – out of the more than 1,200 companies in which it was then invested.[2]

---

[2]    These calculations are based on reported holdings as of June 30, 2008, reflecting the combined Form 13-F reports of SAC LLC, CR Intrinsic, and Sigma, filed August 14, 2008.

127.    SAC's bet on Elan also represented the largest investment of *any* hedge fund in Elan.

128.    By the time that the bapi Phase 2 clinical trial results were announced seven trading days later, however, SAC's complete reversal of position and bets on the *decline* of Elan ADRs and Wyeth shares were large enough to rank among its 20 biggest publicly-reported positions, out of more than 1,200 disclosed investments.

129.    The massive short position that SAC acquired on July 28-29 reflected an extraordinary level of confidence that Elan's trading price would decline in the near future.  Had Elan's trading price reached $40 – as Martoma had predicted less than a month earlier – the Fund would have suffered a loss of more than $28,000,000.

130.    Cohen's sudden decision on July 20-21 to sell out of both Elan and Wyeth and then bet against them massively is all the more inexplicable – absent his reliance on inside information provided by Gilman to Martoma a few days earlier – in light of the fact that the principal shared venture between the two companies was bapi and ***there had been no new public information disclosed about bapi for over a month***.

**F.    Elan and Gilman Disclose the Disappointing, Ambiguous
        Clinical Trial Results, Prompting a Sell-off of Elan
        ADRs and Divergent Views of Bapi's Potential**

131.    On July 29, 2008, after the close of U.S. securities markets, Elan and Wyeth issued a press release summarizing the results of the Phase 2 trial and Gilman reported the results in a 13 minute presentation at ICAD.

132.    The overall market reaction was strongly negative.  After briefly rising following issuance of the press release at 5:00 pm EDT, the price of Elan ADRs dropped sharply in after-hours trading on July 29 and over the course of the trading day on July 30, closing at $19.63, down 41.8% from its $33.75 close on July 29.

133.    The reaction of individual analysts and Alzheimer's specialists, however, varied broadly. Some viewed the trial results as very bad; others, while recognizing that the data did not meet the market's high expectations following the June 17 Announcement, were cautiously positive. Gilman's brief presentation was widely criticized as weak and unclear; the data themselves were repeatedly described as confusing and challenging to interpret.

### 1.    The Reported Bapi Phase 2 Results Were Confusing and Ambiguous

134.    A Lehman Brothers analyst discussed the challenges of analyzing the publicly-reported Phase 2 results in a July 30, 2008 report:

> When dealing with a disease with a largely unknown pathophysiology and a Phase 2 data set that is rather ambiguous it is challenging to draw a clear, rational conclusion. This is further complicated by the fact that the Phase 2 bap data represents a foray into unchartered waters. There is really no historical precedent for which to fairly evaluate this data. Without easy compares [sic] investors and analysts will do their best to evaluate the available data.

Richard Silver, *Bap P2 Detail Supports Top Line*, Lehman Bros., July 30, 2008, at 2-3.

135.    Other equity analysts similarly cited the confusing, contradictory nature of the data. A Credit Suisse analyst, for example, stated in a July 31, 2008 report that "the full data set opened up as many questions as it answered" and that "the lack of apparent dose response [was] confusing . . . ." Scott Bardo et al., *Bapineuzumab Data Asks Questions – We Still See An Opportunity*, Credit Suisse, July 31, 2008, at 1, 2.

136.    A Cowen & Co. analyst similarly reported that "[t]he biomarker data presented yesterday were compelling in some cases while confounding in others. . . . The relevance of [a] result [in the carrier group] remains a mystery." Ian Sanderson et al., *Bapineuzumab Phase II Data Presentation Raises Questions – And Phase III Risk*, Cowen & Co., July 30, 2008, at 6.

137.    A UBS analyst noted in a July 30, 2008 report that "[i]t is also unclear if the meaningful efficacy benefit seen vs. placebo in the non-carriers was for real, or due to an unusually higher deterioration of placebo scores. . . .  While ELN/WYE explained the relatively high deterioration in the placebo group as being not out of normal and in the range of data seen previously, we believe that this remains a point of contention . . . ."  Martin Wales, *Bapineuzumab. The Rollercoaster Continues*, UBS, July 30, 2008, at 4.  *See also* Jack Gorman, *Full Phase II Data Prompt New Questions on Strength of Efficacy Signals*, Davy, July 30, 2008, at 2 (noting "[c]onfounding messages on dose response"); David Risinger et al., *Back to "Show Me" on Bapineuzumab*, Merrill Lynch, July 30, 2008, at 1 (data "did not show highly compelling efficacy and instead included some mixed signals" and "[p]ost hoc 'statistical significance' [was] unclear."); Corey Davis et al., *ELN: Wow – What Is Really That Bad?*, Natixis Bleichroeder, July 31, 2008, at 1 ("[t]here was certainly a lot of confusing data").

### 2.    Gilman's Weak 13 Minute Presentation Further Contributed to Market Uncertainty

138.    Investors' understanding of the Phase 2 results was further complicated by the rushed and muddy nature of Gilman's presentation.

139.    Elan's chief scientific officer, Dale Schenk, defended Gilman's presentation, explaining that " '[i]t was challenging, we had to explain a huge amount of data in 13 minutes (at the conference), it takes a while to explain it all,' . . . ."  *Elan Shares Slump on Phase II Data on Alzheimer's Drug*, Irish Independent, July 31, 2008.

140.    Analysts and researchers faulted Gilman for an unclear presentation.  A research clearinghouse for Alzheimer's specialists, the Alzheimer Research Forum, commented that "bapineuzumab rode to ICAD on high expectations, and its luster has dimmed somewhat after the company's presentation there. This is not only because investors promptly dumped Elan

stock but also because scientists felt that the presentation could have been more straightforward." Gabrielle Strobel, *Bapineuzumab's Phase 2 – Was the Data Better than the Spin?*, Alzheimer Res. F., Aug. 11, 2008.

141.    A story on TheStreet.com made the same point more bluntly: "[t]he presentation of the bapineuzumab data was weak, the results were underwhelming and inconclusive."  Adam Feuerstein, *Elan-Wyeth Alzheimer's Data Spook Bulls*, The Street, July 30, 2008.

142.    Analysts agreed that the presentation of the data was weak.  An analyst at Caris & Co., for example, observed that "the presentation was rushed and still incomplete . . . ."  David Moskowitz, *Reality Check for Phase II Bappy Data*, Caris & Co., July 30, 2008, at 1.

143.    Credit Suisse similarly noted in a July 31, 2008 report that the methodology employed was not well presented.  Scott Bardo et al., *Bapineuzumab Data Asks Questions – We Still See An Opportunity*, Credit Suisse, July 31, 2008, at 3 (addressing the criticism that "[t]he [transition] from a linear analysis to a non-linear analysis for the Post Hoc analysis weakens findings," Credit Suisse commented "[w]e agree that this transition was not communicated well to the market.").

144.    A July 30, 2008 Stanford Group analyst report also commented that Dr. Gilman "presented the Phase 2 results which we would describe as confusing at least" and that the "Bapineuzumab Phase 2 results [were] mixed; data may be better than presented."  Han Li, *ELN: Bapineuzumab Phase 2 Data Fails to Meet High Expectations; More Questions Remain to be Answered in Phase 3*, Stanford Group Co., July 30, 2008, at 1, 3.

### 3. The Complex, Ambiguous Nature of the Publicly Disclosed Phase 2 Results Prompted Widely Divergent Analyst and Expert Assessments of Bapi's Potential

145. Illustrating the complex and ambiguous nature of the results, analysts and medical experts were widely divided in their assessments of bapi's prospects, ranging from strongly negative to cautiously optimistic.

146. Among the negative reports, an analyst at Caris & Co. concluded that "[w]hile the presentation was rushed and still incomplete, enough information was revealed to suggest that the Phase II results could be completely invalid." David Moskowitz, *Reality Check for Phase II Bappy Data*, Caris & Co., July 30, 2008, at 1. *See also* Caroline Stewart, *Bap Data Inconclusive*, Piper Jaffray, July 30, 2008, at 1 ("Based on data presented (and omitted), we are more doubtful than optimistic regarding bapineuzumab's prospects.").

147. Analysts at Citi similarly commented that "[w]e believe the lack of a clear dose response in the study is concerning. Importantly, the positive efficacy results in ApoE non-carriers were based on a post-hoc analysis . . . which makes the validity of these findings questionable, in our opinion." John Boris et al., *Bapineuzumab Disappoints*, Citigroup Global Markets, July 30, 2008, at 1.

148. Other respected analyst firms were much more positive. Goldman Sachs stated in a July 31, 2008 report that "[w]e remain strongly positive on Bapineuzumab's ultimate potential and do not see anything in the data to warrant a change to our current forecasts . . . ." *ELN: Remain Positive on Bapineuzumab but Off Conviction List*, Goldman Sachs, July 31, 2008, at 1.

149. Credit Suisse's analysts similarly titled their report "*We Still See An Opportunity*" and observed that "we believe that there were some positives in this data for the APOE4 non carrier patients (around half of all patients) and believe that if these findings are replicated in phase III - then this would represent an important medical advance for Alzheimer patients and an

important commercial opportunity for Elan."  Scott Bardo et al., *Bapineuzumab Data Asks Questions – We Still See An Opportunity*, Credit Suisse, July 31, 2008, at 1.

150.    Natixis Bleichroeder's analysts commented even more forcefully:  "[w]e were shocked by the stock's reaction to what we think were extremely promising results from the presentation of the Phase II data on bapineuzumab at ICAD. After exhaustive conversations with company officials, clinicians, and investigators, we are even more convinced that this is the most promising Alzheimer's treatment ever."  Corey Davis et al., *ELN: Wow – What Is Really That Bad?*, Natixis Bleichroeder, July 31, 2008, at 1.

151.    Alzheimer's experts shared the divergent views of the analysts.

152.    As reported by the Associated Press, "[e]xperts appeared divided on the results, but investors dumped Elan and Wyeth shares because the results were much less upbeat than the companies' advance characterizations."  Shawn Pogatchnik, *Elan Shares Fall Over Alzheimer's Drug Results*, Assoc. Press, July 30, 2008.

153.    The divergence of analyst views is reflected in the probabilities that they assigned to ultimate successful approval and sale of the drug.

154.    Some analysts maintained their prior forecasts unchanged.  *E.g.*, Richard Silver, *Bap P2 Detail Supports Top Line*, Lehman Bros., July 30, 2008, at 2 ("Based on yesterday's events, we continue to assume a 50% probability of technical and regulatory success; peaks sales of $4.9B and a filing in 2011."); *ELN: Remain Positive on Bapineuzumab but Off Conviction List*, Goldman Sachs, July 31, 2008, at 1 ("We remain strongly positive on Bapineuzumab's ultimate potential and do not see anything in the data to warrant a change to our current forecasts") .

155.    Others reduced their forecasts of the probability of ultimate success.  *E.g.*, Han Li, *ELN: Bapineuzumab Phase 2 Data Fails to Meet High Expectations; More Questions Remain to be Answered in Phase 3*, Stanford Group Co., July 30, 2008, at 2 ("Following the presentation of Phase 2 data, we lowered our chance of clinical success for Bapineuzumab Phase 3 studies from 75% to 50%."); Karl Keegan et al., *Bapineuzumab Disappoints*, Canaccord Adams, July 30, 2008, at 5 ("We have updated our model to reflect a reduced probability of success on bapineuzumab (30% from 50%)."); David Risinger et al., *Back to "Show Me" on Bapineuzumab*, Merrill Lynch, July 30, 2008, at 1 ("We have lowered our odds of launch (in late 2010) from 40% to 33%.").

156.    Other analysts removed bapi from their valuation models entirely – effectively assuming it had a zero chance of success.  *E.g.*, Caroline Stewart, *Bap Data Inconclusive*, Piper Jaffray, July 30, 2008, at 1 ("We are conservatively stripping bap sales from our model and consequently lowering our price target to $15 from $25."); John Boris et al., *Bapineuzumab Disappoints*, Citigroup Global Markets, July 30, 2008, at 1 ("We removed bapineuzumab from our model as the likelihood of phase III clinical success, regulatory approval and commercial success are extremely low.").

157.    Consistent with the widely divergent views on bapi's prospects, a number of the more bullish analysts concluded that the market's negative reaction to the Phase 2 results was excessive.  A Lehman Brothers analyst, for example, concluded that "[w]e believe the after-market weakness (indicated in low $20s) in ELN shares is more a reflection of valuation having become overextended ahead of the data release &, to some degree, the double-edged sword of more data for investors to pick apart.  With time & greater understanding, we envision a more

rational view will prevail, suggesting a more favorable risk/reward profile."  Richard Silver, *Bap P2 Detail Supports Top Line*, Lehman Bros., July 30, 2008, at 1.

158.    Goldman Sachs analysts expressed a similar view:  "From attending the conference and discussing the dataset further, it is clear to us that the almost universally negative view of the data by the market is not shared by the majority of clinicians."  *ELN: Remain Positive on Bapineuzumab but Off Conviction List*, Goldman Sachs, July 31, 2008, at 1.

159.    Analysts at Davy, a leading Irish brokerage firm, similarly concluded that "[t]he initial stock reaction looks overdone in our view, but we expect it to remain volatile in the shorter term."  Jack Gorman, *Full Phase II Data Prompt New Questions on Strength of Efficacy Signals*, Davy, July 30, 2008, at 1.  They reaffirmed this view after the July 31 PML Disclosure (discussed below), observing that "[c]larity on both Bapineuzumab and Tysabri will take time, but we believe that the share price is factoring in an overly pessimistic scenario for both. The shares should have strong upside from here as this clarity becomes available."  Jack Gorman & Mark Healy, *Forecasts Revised, but Overly Pessimistic Scenario is Factored into Price*, Davy, Aug. 1, 2008, at 1.

160.    Natixis Bleichroeder analysts similarly observed that "[w]e were shocked by the stock's reaction to what we think were extremely promising results from the presentation of the Phase II data on bapineuzumab at ICAD. After exhaustive conversations with company officials, clinicians, and investigators, we are even more convinced that this is the most promising Alzheimer's treatment ever."  Corey Davis et al., *ELN: Wow – What Is Really That Bad?*, Natixis Bleichroeder, July 31, 2008, at 1.  They reaffirmed this view on August 5, stating that "[w]e continue to view the results positively and stand by our $24 value [for bapi], as we think the

market has grossly overreacted to the data." Corey Davis et al., *ELN: Lowering Price Target to $34 and Reducing Tysabri Value*, Natixis Bleichroeder, Aug. 5, 2008, at 1.

### G. The July 31 PML Disclosure

161.    On July 31, as investors and analysts continued to evaluate the bapi Phase 2 data, Elan announced at 5:16 pm EDT that it had confirmed two cases of PML – a rare and usually fatal brain disease – in patients taking Elan's predominant commercially-marketed drug, *Tysabri*.

162.    The July 31 PML Disclosure drove a 50.5% decline in the trading price of Elan ADRs in after hours trading on July 31 and over the course of the trading day on August 1, with Elan ADRs closing at $9.93, down from their $20.05 close on July 31.

### H.    SAC's Insider Trading Caused It to Avoid Losses and Gain Profits as a Result of the August 1, 2008 Elan Price Decline

#### 1.    As of August 1, SAC Retained an Informational Advantage over Public Investors as a Result of Receiving the Inside Information

163.    In contrast to the mixed and confused understanding analysts took away from Gilman's July 29 presentation, the SAC Defendants had a much clearer grasp of the significantly adverse nature of the Phase 2 results as a consequence of their extensive series of private discussions with Gilman between July 13 and July 28.

164.    At the time he informed Martoma of the Phase 2 clinical trial efficacy results, Gilman had been involved in the bapi clinical trials for over five years, and had been extensively briefed on the Phase 2 results at in-person meetings with the Elan and Wyeth scientists conducting the clinical trial over two days in San Francisco on July 15-16, 2008. Accordingly, as a result of his relationship with Elan and the confidential information he received, Gilman had a uniquely well-informed perspective on bapi and the significance of the Phase 2 trial results.

165.     Gilman's communications with Martoma prior to ICAD extended well beyond simply providing the information that was later publicly disclosed on July 29.  In contrast to the limited information received by the public, Gilman discussed the data with Martoma on at least *eight* occasions, including a call that ran close to two hours on July 13, another conversation of similar length on July 17, three short calls on July 18, a 39-minute conversation on July 22, a 23-minute conversation on July 24 and an approximately 11-minute conversation on July 28.

166.     Accordingly, public investors, including Plaintiffs and the other members of the Insider Selling Subclass (as defined below), were not placed on an equal informational footing by the July 29 Announcement, and the SAC Defendants retained an informational advantage as of August 1 – less than 72 hours after Gilman's ICAD presentation.

167.     Because the SAC Defendants retained an informational advantage as of August 1 as a consequence of receiving the Inside Information, Defendants are liable to disgorge the losses avoided and profits gained from the price decline in Elan ADRs on that day.

### 2.     SAC's Avoidance of Losses and Profits Gained on August 1 Can Be Traced with Reasonable Certainty to Its Illegal Insider Trading

168.     Defendants are also liable for the profits gained and losses avoided as a consequence of the market decline following the July 31 PML Disclosure, without regard for whether the Inside Information had been fully disclosed by the time of such disclosure.

169.     On July 30 and 31, 2008 combined, the total volume of Elan ADRs traded was less than 30% of the ADRs outstanding.

170.     But for the SAC Defendants' decision to sell Elan ADRs while in possession of the Inside Information, they, like Plaintiffs and the large majority of other public investors, would have continued to hold such ADRs as of August 1, 2008 – less than 72 hours after the July

29 Announcement and just twelve days after the communication of the Phase 2 clinical trial results to Cohen.

171.    Accordingly, the losses avoided and profits gained by the SAC Defendants on August 1, 2008 can be traced with reasonable certainty to the SAC Defendants' decision to sell while in possession of the Inside Information, and are therefore properly subject to disgorgement by Defendants.

## I.    SAC and Cohen Had a Duty to Prevent Misuse of Nonpublic Information and the Pattern of Widespread Insider Trading at SAC Demonstrates that They Violated this Duty

172.    The SAC Defendants' insider trading in Elan and Wyeth reflects a widespread pattern and culture of insider trading at SAC – fostered by Cohen's tacit approval of the practice. Cohen's views are reflected in a 2011 deposition, in which he deemed SAC's compliance policies mere "guidelines," disclaimed specific knowledge of SAC's policies against insider trading, characterized the legal prohibitions against insider trading as "vague," and *testified that obtaining access to inside information is common at SAC*.

173.    The breadth of illegal insider trading and the permissive culture that Cohen fostered warrant a determination that each of the Control Defendants acted at least recklessly in connection with the SAC Insider Trades, and that such defendants breached their duty under the Investment Advisers Act of 1940 (the "Advisers Act") to supervise their employees and, if applicable, maintain an effective insider trading compliance program.

### 1.    The Control Defendants Had a Duty to Prevent Misuse of Nonpublic Information

174.    As registered or unregistered investment advisors and as their control persons, SAC LP, SAC LLC, SAC Inc., CR Intrinsic, and Cohen had a duty pursuant to Section 203(e)(6) of the Advisers Act, 15 U.S.C. §80b-3(e)(6), "reasonably to supervise, with a view to preventing

violations of the provisions of [the federal securities laws] another person who commits" a violation of such laws "if such other person is subject to [their] supervision." In addition, if registered investment advisors,[3] such parties were required pursuant to Section 204A of the Advisers Act, 15 U.S.C. §80b-4a, to "establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse in violation of [the Advisers Act and the Exchange Act], or the rules or regulations thereunder, of material, nonpublic information by such investment adviser or any person associated with such investment adviser."

175. As detailed below, the widespread practice of insider trading at SAC demonstrates that the Control Defendants violated these duties.

### 2. Since 2009, Eleven SAC Employees Have Been Charged with, Admitted, or Been Implicated by Co-Conspirators in, Insider Trading While at SAC

176. A series of criminal prosecutions and SEC enforcement actions naming former SAC portfolio managers and their co-conspirators has established that the use of inside information at SAC is widespread.

#### (a) Noah Freeman

177. In February 2011, Noah Freeman ("Freeman"), who worked as a portfolio manager at SAC from June 2008 to January 2010, was indicted and pled guilty to insider trading, admitting he traded on illegal tips about publicly-traded technology companies while at SAC. *See United States v. Freeman*, No. 11 Cr. 116 (DAB) (S.D.N.Y.), Plea Agreement, *available at* http://www.nypost.com/r/nypost/2011/02/08/news/media/020811_Freeman_ Noah_Plea_Agreement.pdf.

---

[3] The registration status of the SAC entities in 2008 is presently unknown to Plaintiffs.

178.    As described in more detail below, Freeman testified that while at SAC, he received inside information about NVIDIA Corporation ("NVIDIA") and Marvell Technology Group, Ltd. ("Marvell") from Winifred Jiau ("Jiau"), a consultant for Primary Global Research ("PGR"), an expert network firm. *See United States v. Jiau*, No. 11 Cr. 161 (JSR) (S.D.N.Y.), Trial Transcript ("Jiau Trial Tr."), at 221:25-222:22.

179.    Freeman also testified that while he worked as a portfolio manager at SAC, he received information about NVIDIA from Tai Nguyen ("Nguyen"), *id.* at 506:22-507:4, 511:12-23, who was another PGR consultant.

180.    Additionally, on numerous occasions between 2006 and 2009, Nguyen provided Freeman with inside information about Abaxis Inc., a biotechnology company where Nguyen's sister worked. *United States v. Nguyen*, No. 12 Cr. 495 (NRB) (S.D.N.Y.), ECF No. 2, at 3-4; ECF No. 12, at 7.

181.    In addition, Freeman received inside information from and provided inside information to Donald Longueuil ("Longueuil"), another SAC portfolio manager, and Samir Barai ("Barai"), a portfolio manager at another fund. *See* Jiau Trial Tr. 280:7-24; *see also* Press Release ("Longueuil Press Release"), U.S.A.O., S.D.N.Y., Former Research Analyst and Portfolio Manager Sentenced in Manhattan Federal Court to 30 Months in Prison for Insider Trading, July 29, 2011, *available at* http://www.justice.gov/usao/nys/pressreleases/July11/longueuildonaldsentencingpr.pdf.

182.    The widespread, routine use of illegal inside information by portfolio managers at SAC is illustrated by Freeman's testimony in June 2011 at the criminal trial of Jiau, who was convicted of securities fraud and sentenced to four years in prison. *See United States v. Jiau*, ECF No. 124.

183.     Freeman worked at SAC from June 2008 through January 2010.  Jiau Trial Tr.

218:18-21.  He managed a $200 to $300 million portfolio, over which he had day-to-day trading

authority.  *Id*. at 255:14-20, 271:19-272:4.

184.     Freeman testified that he made a half dozen trades while at SAC that he was

"confident" were on the basis of material nonpublic information – where "trade" was defined

broadly, to include multiple transactions over time that used the same inside information (*id*. at

549:15-21):

> Q. And what about with respect to your time at SAC.  How
> many trades did you do that you are confident were on the
> basis of material nonpublic information?
>
> A. Again, focusing on only ones where there is no question
> about gray area, I would say perhaps half dozen.  But it's
> hard to say.  My trading style was much faster turnover at
> SAC, so I don't remember all of the additions, as well,
> sir.

185.     Freeman testified that he would attempt to obtain inside information for the

purpose of making trades "multiple times per day" (*id*. at 576:6-17[4]):

> Q. Other than the 18 times[5] you stated you recalled engaging
> in insider trading or trades based on inside information,
> were there other times that you received inside information
> or attempted to receive inside information?
>
> A.  Many.
>
> **Q.  How often were you attempting to receive inside
> information?**
>
> **A.  Multiple times per day.**
>
> **Q. And what was the purpose of trying to receive inside
> information?**
>
> **A. To potentially make an inside trade if we got inside
> information that was accurate and usable.**

---

[4]     **Boldface** and underscoring in block quotations have been added for emphasis.

[5]     The eighteen trades referenced by Freeman span his employment at SAC and at another fund,
Sonar Capital Management LLC.  *See* Jiau Trial Tr. 547:23-549:21; *see also id.* at 552:20-24.

186.     Freeman testified that he received inside information from Jiau while working at

SAC; that he traded stock based on that information; and that the information she provided was

"extremely" helpful (*id*. at 222: 20-223:2):

> [Q.] Which hedge funds did you work at while you were
> getting insider information from Ms. Jiau?
>
> A. Sonar Capital and SAC Capital.
>
> Q. And what did you do with inside information you
> received.
>
> A. We traded stocks based on that information.
>
> Q. Was the inside information that Ms. Jiau provided you
> helpful to your trading?
>
> A. Extremely.

187.     Freeman testified in detail about his receipt of illegal inside information from Jiau

concerning NVIDIA Corp. and Marvell Technology Group.  In the case of both companies, she

would provide multiple updates each quarter, providing essential financial information such as

revenue, gross margin, and profits per share (*id*. at 337:9-21):

> Q. Let's turn to Marvell for the moment.
>
> Generally speaking, what sorts of information was Winifred
> Jiau providing you about Marvell?
>
> A. Almost identical to NVIDIA, so it would be revenue, cost
> of goods, gross margin, various operating cost numbers,
> taxes, profits and profits per share.
>
> **Q. Was she providing you Marvell information as frequently
> as she was providing you NVIDIA information?**
>
> **A. My memory is that there would be fewer updates on
> Marvell per quarter, so for NVIDIA we might get four or
> five revisions as the numbers got more accurate whereas
> with Marvell it was more typically an initial number and a
> final number and not the weekly updates.**

188.     Freeman also testified that he "regularly" exchanged illegal inside information

with a second portfolio manager at SAC, Donald Longueuil (*id*. at 284:24-285:4):

> Q. Did you ever provide Mr. Longueuil inside information
> you learned about from other people?
>
> A. Regularly.
>
> Q. And did he ever provide you insider information that he
> learned from other people?

```
A.  Regularly.
```

189.    Freeman testified that Longueuil told him that Longueuil had hundreds of sources

within companies (*id*. at 513:8-12):

```
Q.  Don Longueuil, he had hundreds of sources inside
companies, right?

A.  That's my belief.

Q.  He told you that?

A.  That's what he told me, sir.
```

190.    Freeman testified that once or twice a week, he would exchange research – both

legitimate and inside information – with Longueuil and Samir Barai, who worked for Tribeca

Capital Management, a hedge fund operated by Citigroup Inc. until early 2008, and then

established his own fund.

191.    Freeman testified that he, Longueuil and Barai would discuss the sources of their

information, including the fact that some of the sources were insiders (*id*. at 279:16-280:14):

```
Q. You also stated that you sometimes did research by
contacting other hedge funds.  Was there anybody in
particular that you would contact to further your research?

A. Yes.  The two people that I worked with most closely in
terms of exchanging information were Donald Longueuil and
Sam Barai, both of whom worked at a variety of different
funds over time.

Q. What sorts of information were you exchanging with
Donald Longueuil and with Sam Barai?

A. What we would do once or twice a week we would sit down
and just open up our computers and just systematically swap
every piece of research we had done, every piece we had
done so we all had shared research and some of the
information we would share with each other was legitimate
research and some of it was insider information.

Q. What leads you to believe that some of the information
you were receiving from Donald Longueuil and Sam Barai was
inside information?

A. They would -- we would discuss how we had gotten the
information when we exchanged it and so there were a number
of times when both Mr. Longueuil and Mr. Barai specifically
said such as I got -- I talked to a sales guy at company X,
he said revenue is $973 million.
```

192.     Freeman, Longueuil and Barai also sometimes shared the same public company insider sources (*id*. at 280:15-24):

> Q. Were there also sources inside companies that you shared with Sam Barai and Donald Longueuil?
>
> A. Yes, in both cases that we -- both -- we all knew some of the same people so we would talk to them and get the same information or swap off who was talking to them.
>
> Q. And was some of the information you received from the sources at public companies who you shared with Sam Barai or with Donald Longueuil information that you understood to be inside information?
>
> A. Yes.

193.     Freeman testified that he and Longueuil would speak as often as multiple times per day to discuss inside information they had obtained, and that calls to share such information would, late in the fiscal quarter, last "hours" (*id*. at 513:15-514:8):

> Q. And you would meet with Mr. Longueuil and Mr. Barai sometimes three times a week for four hours at a clip to discuss the insider information you all had?
>
> A. That's not accurate, sir.
>
> Q. How many times a week on average did you meet with them?
>
> A. We rarely met in person, sir.
>
> **Q. How many times did you speak with them on the phone per week?**
>
> A. I probably spoke with Don on the phone **multiple times per day for short conversations.**
>
> Q. I think you called them data dumps yesterday.  How many data dumps did you have in a given week on average?
>
> A. It would vary throughout the quarter depending whether we were near the end of the quarter.  Much more toward the end of the quarter than the beginning.  Toward the end of the quarter often it would be twice a week, at the beginning of the quarter it would be once every three weeks perhaps.
>
> Q. And how long would the sessions last on average?
>
> A. A few hours.

194.     The "data dumps" that Freeman held with Longueuil and Barai in which they discussed inside information were so common that they began making up names for them (*id*. at 514:9-22):

```
Q. Did you have any other terms that you would use to refer
to data dumps?

A. We had many.  **We got creative because we had so many of
them** so we started making up funny names for them.

Q. What other names did you use for data dumps?

A. I can't recall all of them, but we started using WWF
terminology to --

Q. Any others you remember?

A. I believe there may have been some sexual ones, but I
don't recall any specific ones.

Q. And sometimes in your calendar those would be reflected,
it would be not just smackdown, but it might be WWF
smackdown?

A. Again, I can't to speak exact details, but **they were so
common we started using silly phrases just to amuse
ourselves.**
```

195.     Freeman further testified that a second source, Tai Nguyen, provided him with

inside information about NVIDIA during Freeman's entire tenure at SAC (*id.* at 506:23-507:4,

511:3-11, 511:21-25):

```
[Q.] And do you know a gentleman by the name of Tai Nguyen?

A. Yes, I do.

Q. He was a source of NVIDIA information for you, wasn't
he?

A. Yes, he was.

Q. And he was the source of NVIDIA information going back
to 2005?

A. Yes, sir, I believe so.

. . .

Q. And at the end of 2010 didn't Mr. Nguyen tell you
because of the investigation into insider trading it had
become a little more difficult for him to get inside
information for you on NVIDIA?

A. Yes, he did.

Q. And didn't he tell you that before the investigation it
only took him about two calls to get inside information
regarding NVIDIA?

A. Yes, I believe he did.

. . .

Q. Well, how much of that time period was he giving you
insider information?

A. From 2005 to January 5 of 2010, sir.
```

```
Q. January 5 of 2010?

A. Yes, sir.
```

### (b) **Donald Longueuil**

196.     Also in early 2011, Longueuil, a portfolio manager at Defendant CR Intrinsic

from July 2008 to June 2010, was indicted in the same case as Jiau, and in April 2011 pled guilty

to an insider trading conspiracy that included Freeman and Barai and spanned his tenure at CR

Intrinsic.  As described by Freeman, between 2006 and 2010, Longueuil, Freeman and Barai

conspired to obtain inside information about numerous companies.

197.     Longueuil was recorded telling Freeman how, after reading a November 2010

*Wall Street Journal* article about the government's insider trading investigation, he destroyed

two hard drives and a flash drive with pliers and placed them in four Manhattan garbage trucks

to dispose of the evidence.  *See* Steve Eder, Michael Rothfeld & Jenny Strasburg, *They Were*

*Best of Friends, Until the Feds Showed Up*, Wall St. J., Jan. 11, 2012.  Longueuil is now serving

a two-and-a-half year prison sentence.  *See* Longueuil Press Release, *supra*.

### (c) **Jonathan Hollander**

198.     In April 2011, Jonathan Hollander ("Hollander"), an analyst at Defendant CR

Intrinsic, was charged by the SEC with insider trading and settled the charges against him in

May 2011, agreeing to pay more than $220,000.  *See SEC v. Hollander*, No. 11 Civ. 2885 (RJS)

(S.D.N.Y.).

199.     Specifically, Hollander was charged with receiving and trading on inside

information while at CR Intrinsic about a pending acquisition of Albertson's, LLC in January

2006.  He also passed the information to others who traded on the information.  *See* Order

Instituting Admin. Proceedings, Investment Advisers Act Release No. 3208 (May 19, 2011),

*available at* http://www.sec.gov/litigation/admin/2011/ia-3208.pdf.

**(d)** **Jon Horvath**

200.    In February 2012, Jon Horvath ("Horvath"), a technology analyst at SAC subsidiary Sigma Capital Management, LLC ("Sigma"), was indicted for insider trading and in September 2012, pled guilty and admitted receiving confidential financial information about technology companies Dell Inc. ("Dell") and NVIDIA while employed at Sigma.  *See United States v. Newman*, No. 12 Cr. 121 (RJS) (S.D.N.Y.); *SEC v. Adondakis*, No. 12 Civ. 409 (HB) (S.D.N.Y.).  Horvath received the Dell inside information from Jesse Tortora ("Tortora") of Diamondback Capital Management, LLC ("Diamondback") in 2008 and 2009 and the NVIDIA inside information from Danny Kuo ("Kuo") of Whittier Trust Company in May 2009.  *See SEC v. Steinberg*, No. 13 Civ. 2082 (HB) (S.D.N.Y.), ECF No. 1, at 2-3.  In addition, Horvath passed information about Sun Microsystems, Inc. to Tortora in 2007.  *See United States v. Newman*, ECF No. 242, at 8-9.

201.    At his plea allocution, Horvath stated that he knowingly obtained material nonpublic information from public company insiders and that "[i]n each instance I provided the information to the [SAC] portfolio manager I worked for and we executed trades in the stocks based on that information."  Patricia Hurtado, *Ex-SAC Analyst Horvath's Insider-Trading Sentence Delayed*, Bloomberg, Apr. 17, 2013.

202.    The portfolio manager for whom Horvath worked was Michael Steinberg ("Steinberg").  Horvath told federal criminal investigators that he was pressured by his manager, Steinberg, to gather inside information on technology stocks.  *See* Michael Rothfeld & Jenny Strasburg, *Ex-SAC Analyst Said He Was Pressured for Illegal Tips*, Wall. St. J., Feb. 13, 2013.  Horvath's sentencing was delayed in April 2013 at the government's request as he continues to work with prosecutors.  *See United States v. Newman*, ECF No. 237.

203.    Steinberg was placed on leave by SAC in 2012 after he was implicated by Horvath and identified by prosecutors as an unindicted co-conspirator.  He was indicted for insider trading in March 2013 and sued by the SEC at the same time.  Steinberg is charged with receiving and trading on inside information from Horvath about Dell in 2008 and 2009 and about NVIDIA in May 2009.  *See United States v. Newman*, ECF No. 230, at 2-3; *SEC v. Steinberg*, ECF No. 1, at 2-3.

204.    An August 26, 2008 email exchange among Steinberg, Horvath and Gabriel Plotkin ("Plotkin"), a senior Sigma trader and close associate of Cohen's, illustrates their use of inside information.  In the email, Steinberg reported to Horvath and Plotkin that he had discussed with Cohen the conflicting views of Dell inside SAC at the time.  Referring to Dell's upcoming earnings announcement, Steinberg wrote: "I was talking to Steve about DELL earlier today, and he asked me to get the two of you to compare notes before the print, as we are on opposite sides of this one."  Emails among Steinberg, Horvath and Plotkin, Aug. 26, 2008, *available at* http://online.wsj.com/public/resources/documents/Steinbergemails03.pdf.

205.    Horvath replied to Steinberg and Plotkin a few minutes later:

> I have a 2nd hand read from someone at the company- this is 3rd quarter I have gotten this read from them and it has been very good in the last two quarters. They are saying GMs [gross margins] miss by 50-80 bps due to poor mix, opex in-line and a little revenue upside netting out to an EPS miss. Even if they have some flexibility in the opex/other income to offset the light GMs and report in-line EPS or even a penny upside I think the stock goes down (I know they said the headcount reductions last quarter were backend loaded). Please keep to yourself as obviously not well known.

206.    Steinberg then replied within minutes "[y]es normally we would never divulge data like this, so please be discreet. Thanks."

207.     Steinberg has been employed by SAC for fifteen years as a portfolio manager and,

as described by the *New York Times*, "[h]e joined in 1997, when it was just Mr. Cohen and

several dozen traders; for years, he sat near Mr. Cohen on the trading floor and the two grew

close."  Peter Lattman, *Trail to a Hedge Fund, From a Cluster of Cases*, N.Y. Times, Dec. 5,

2012.

### (f)     Gabriel Plotkin

208.     Plotkin is identified as "Portfolio Manager B" in the SEC enforcement actions

*SEC v. Sigma Capital Management, LLC*, No. 13 Civ. 1740 (HB) (S.D.N.Y.), and *SEC v.*

*Steinberg*.  Shortly after receiving the August 26, 2008 email from Horvath quoted in paragraph

205 above, Plotkin began selling Dell stock, which permitted Sigma to avoid losses of about $2

million.  *See SEC v. Steinberg*, ECF. No. 1, at 14-15.  As a result of Steinberg and Plotkin's

trading in Dell stock during 2008 and 2009, affiliates of SAC generated over $6.4 million in

profits and avoided losses.  *See id.* at 2.

209.     Plotkin joined SAC in 2006 and is one of ten portfolio managers at Sigma

focusing on consumer stocks.  He oversees more than $1 billion and remains employed by the

Fund.  *See* Patricia Hurtado, *SAC's Plotkin Said to Have Been Tipped by Ex-SAC Analyst*,

Bloomberg, Mar. 18, 2013.

### (g)     Ron Dennis

210.     At the insider trading trial of Todd Newman ("Newman"), Tortora, a portfolio

manager at the Diamondback hedge fund, testified that he regularly exchanged inside

information with Ron Dennis ("Dennis") while Dennis was employed as a technology analyst at

CR Intrinsic.

211.     Tortora's exchange of inside information with Dennis was illustrated by their

communications in advance of Dell's August 28, 2008 earnings announcement.  Through his

contacts, Tortora had obtained inside information that Dell had missed its gross profit margin targets. *United States v. Newman*, Trial Transcript ("Newman Trial Tr."), at 273:25-274:8, 278:22-297:15. When asked at trial if he understood that the information he had received was confidential inside information, Tortora replied, "[a]bsolutely." *Id.* at 279:16-24. He nevertheless passed this information along by email to Horvath, at SAC, as well as two co-conspirators at other funds – Sam Adondakis ("Adondakis") at Level Global Investors LP, and Danny Kuo at Whittier Trust Company. *See, e.g.*, *id.* at 274:9-275:1.

212.    Because Dennis preferred to avoid communicating by email, *id.* at 281:5-12, Tortora communicated with him by phone and instant message. *See id.* at 279:25-280:12. At 2:37 pm on August 28, 2008, prior to Dell's scheduled earnings announcement at 4:00 pm, Tortora sent Dennis an instant message with the words "call cell" and gave his cell phone number. *Id.* at 282:5-9. Dennis responded at 2:46pm, "OM or GM or both," which Tortora testified meant "operating margin" and "gross margin." *Id.* at 282:15-17.

213.    At 4:00 pm, Dell stunned investors by announcing a 17% decline in quarterly profits. Shares of Dell declined more than 10% in after-hours trading. As one analyst commented, "[n]obody expected gross margins to be this bad." Laurie J. Flynn, *Dell's Profit Drop Surprises Investors*, N.Y. Times, Aug. 28, 2008.

214.    At 4:13pm, minutes after Dell's announcement, Dennis responded to Tortora, "You da man." and "I owe you." Newman Trial Tr. 282:18-22.[6]

---

[6]    Horvath sent a similar note of thanks for Tortora's delivery of the inside information about Dell on this occasion. Tortora sent Horvath an instant message asking if he was short on Dell. Horvath replied, "Nice man, you nailed it," which Tortora understood to mean that Horvath shorted Dell stock based on the information Tortora had provided him. Newman Trial Tr. 283:2-19.

215.     Tortora also testified that Dennis reciprocated for the inside information that

Tortora and others in their group supplied by providing Tortora and the others with confidential

information, which he referred to as "Intrinsic checks" (*id.* at 281:13-23):

> Q. Did Mr. Dennis provide you with any confidential
> information during your time at Diamondback?
>
> A. He did.
>
> Q. What did you do with that information when you got it?
>
> A. I passed it along to Todd [Newman] and I passed it along
> to the group.
>
> Q. How did you pass it to Todd and the group?
>
> A. Usually on e-mail.
>
> Q. When you passed Mr. Dennis' information by e-mail, how
> did you refer to it?
>
> A. Usually as Intrinsic checks.

216.     Based in part on the testimony of Tortora, Newman was convicted of insider

trading following a jury trial and was sentenced to 4½ years in prison in May 2013.

217.     A second member of the group, Adondakis, also testified that he had obtained

inside information from Dennis.  Adondakis testified against Anthony Chiasson ("Chiasson") at

the trial of Newman and Chiasson, where he stated that he obtained and swapped inside

information with a group of friends that included Dennis, Tortora and Horvath.  Patricia Hurtado,

*Former Level Global Analyst Says Two SAC Friends Got Inside Tips*, Bloomberg, Nov. 29,

2012.  Referring to Dennis, Adondakis stated that he told Chiasson that he "had a friend at [CR]

Intrinsic who is sharing information with us."  Newman Trial Tr. 1951:9-18.

218.     Dennis worked at CR Intrinsic until 2010.  *See* Kaja Whitehouse, *Bad Cohen

Optics*, N.Y. Post, Nov. 19, 2012.

### (h)     Wesley Wang

219.     In July 2012, Wesley Wang ("Wang"), a former analyst at Sigma, pled guilty to

two counts of conspiracy to commit securities fraud, one of which encompassed his entire tenure

at Sigma, from 2002 to 2005.  *United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y.), Trial Transcript ("Whitman Trial Tr."), at 1431:12-1432:9, 1435:2-23; *United States v. Wang*, No. 12 Cr. 541 (JSR) (S.D.N.Y.), ECF No. 13, at 1-2.

220.    At Sigma, Wang worked as a research analyst, supporting the portfolio manager Dipak Patel ("Patel").  Whitman Trial Tr. 1435:14-16.

221.    During his time at Sigma, Wang received what he believed to be material nonpublic information about various companies, including Cisco Systems, Inc., Polycom, Inc., QLogic Corp., Broadcom Corp., eBay Inc., Cypress Semiconductor Corp., Taiwan Semiconductor Manufacturing Company Ltd., Cirrus Logic, Inc., NVIDIA and Marvell.  *United States v. Wang*, ECF No. 13, at 3; Whitman Trial Tr. 1436:5-10.

222.    As part of his plea agreement, Wang testified at the criminal trial of Doug Whitman.  Wang testified that when he received inside information while at Sigma, he would "not personally" trade on it, but he would pass it on to his portfolio manager Patel and others (Whitman Trial Tr. 1436:16-23):

> Q. Without specifying names, the inside information you
> received while you were at SAC Capital, would you pass that
> on to others?
> A. Yes.
> Q. Did you trade on that information?
> A. Not personally.
> Q. What did you do with it when you passed it on to others?
> A. I gave it to Dipak Patel and other people I talked to.

223.    When asked why he sought inside information instead of relying on analyst reports or other publicly available information, Wang testified that "you can't really make money.  It's hard to make money if you just follow what analysts say.  You have to be contrarian in some ways."  Whitman Trial Tr. 1450:8-17; 1574:4-11.

224.     In January 2013 Wang was sentenced to two years' probation in light of his "exceptional" cooperation with the government.  *See United States v. Wang*, ECF No. 15, at 2; ECF No. 13, at 14.  He was also ordered to disgorge $500,000.  *See id.*, ECF No. 16.

### (i)     Dipak Patel

225.     At Sigma, Patel was a portfolio manager who led a five-person technology investment team and had discretion over roughly $500 million, "considered a significant amount at the firm, according to people familiar with SAC operations."   Michael Rothfeld & Jenny Strasburg, *Witness Adds Thread to SAC Probe*, Wall. St. J., Jan. 23, 2013.  Patel left Sigma in 2010 after eight years.

226.     Wang, one of the analysts who worked for Patel, testified at the trial of Doug Whitman that when he received inside information, he "gave it to Dipak Patel and other people I talked to."  Whitman Trial Tr. 1435:14-21, 1436:16-23.

227.     Further, Patel is an unnamed co-conspirator (CC-3) in the criminal information against Wang, which states that Wang provided Patel with inside information so that Patel could trade on it.  *United States v. Wang*, ECF No. 2, at 7-9.  Wang's sentencing memorandum states that it was Wang's supervisor – Patel – who directed the conspiracy at SAC.  *United States v. Wang*, ECF No. 14, at 18-19 ("It was Mr. Whitman, and Mr. Wang's subsequent bosses at Sigma and Trellus, who directed the charged conspiracies.").

228.     Other sources identify Patel as having received illegal inside information.  In an email exchange between Steinberg and Horvath regarding the August 2008 Dell financial results discussed above – entitled "Pls keep the DELL stuff especially on the down low" – Steinberg wrote that he had consulted with Patel, identified as "DP," who was "going to call his guy" to get advance information on the quarter-end financial results.  Email, Steinberg to Horvath, Aug. 18, 2008, *available at* http://online.wsj.com/public/resources/documents/Steinbergemails01.pdf.  In

addition, Reema Shah, a former technology specialist at J&W Seligman & Co. turned

government informant, also implicated Patel in a conspiracy involving the exchange of inside

information sometime between 2004 and 2009.  Rothfeld & Strasburg, *supra*.

### (j)      Richard Choo-Beng (C.B.) Lee

229.    In October 2009, Richard Choo-Beng (C. B.) Lee ("Lee"), a former SAC

technology analyst, pled guilty to insider trading.  Under the terms of his cooperation agreement,

the government agreed not to prosecute Lee for inside trading between 1999 and 2009,

specifically including the five years, from 1999 to 2004, that he worked at SAC.  *See United

States v. Lee*, No. 09 Cr. 972 (PKC) (S.D.N.Y.), Cooperation Agreement, at 2, *available at*

http://www.scribd.com/doc/22169660/Lee-Richard-Choo-Beng-Cooperation-Agreement.

230.    As part of his plea agreement, Lee agreed to share information about illegal

conduct that he learned of while working at SAC.  Lee also provided investigators with detailed

insights into expert network firms, and he told them that SAC and other funds aggressively used

such firms, which frequently traded in inside information.  *See* Peter Lattman, *Trail to a Hedge

Fund, From a Cluster of Cases*, N.Y. Times, Dec. 5, 2012.

### (k)      Mathew Martoma

231.    Defendant Martoma was criminally charged with the insider trading set forth

herein in November 2012 and sued by the SEC at the same time.  According to the complaints in

both actions, his receipt of the Inside Information spanned roughly two years, as pled above.

232.    As detailed above, Martoma is the third employee of Defendant CR Intrinsic to be

indicted or charged by the SEC with insider trading in the past two years and the eighth SAC

portfolio manager or analyst to be charged with or admit insider trading since 2009.

**Summary of SAC Employees Who Have
Been Charged with, Admitted, or Been
Implicated in, Insider Trading While at SAC**

233.    The following table summarizes the insider trading cases or allegations against

present and former SAC employees, for conduct while employed by SAC, discussed above:

| SAC Employee | Case Type or Source of Allegations | Status/Outcome |
| --- | --- | --- |
| Noah Freeman | Criminal Prosecution; SEC Enforcement Action | Pled guilty in February 2011; not yet sentenced (cooperating with prosecutors) |
| Donald Longueuil | Criminal Prosecution; SEC Enforcement Action | Sentenced to 2½ years in prison in July 2011; paid $350,000 in disgorgement and penalties |
| Jonathan Hollander | SEC Enforcement Action | Settled charges in May 2011; paid $222,000 in disgorgement and penalties |
| Jon Horvath | Criminal Prosecution; SEC Enforcement Action | Pled guilty in September 2012; not yet sentenced (cooperating with prosecutors) |
| Michael Steinberg | Criminal Prosecution; SEC Enforcement Action | Cases pending; pled not guilty in March 2013 |
| Gabriel Plotkin | Not yet charged; identified as "Portfolio Manager B" in *SEC v. Sigma Capital Management, LLC* | n/a |
| Ron Dennis | Not yet charged; implicated in trial testimony by Jesse Tortora and Spyridon "Sam" Adondakis | n/a |
| Wesley Wang | Criminal Prosecution | Sentenced to two years of probation in January 2013; disgorgement of $500,000 ordered in March 2013 |
| Dipak Patel | Not yet charged; implicated by Wang and others | n/a |
| Richard Choo-Beng Lee | Criminal Prosecution; SEC Enforcement Action | Pled guilty in October 2009; not yet sentenced (cooperating with prosecutors) |
| Mathew Martoma | Criminal Prosecution; SEC Enforcement Action | Pled not guilty to criminal charges in January 2013 |

(m)    **Additional Pending Investigations**

234.    In addition to the eleven individuals discussed above, news reports indicate that

the Federal Bureau of Investigation and U.S. Attorney's Office are conducting additional

investigations into insider trading at SAC that include four to six more stocks and could lead to

additional employees being charged.  *See* Kara Scannell, *US Authorities Widen SAC Capital Probe*, Fin. Times, Feb. 13, 2013.

### 3. The Large Number of SAC Employees Charged with Insider Trading Contrasts Sharply with the Absence of Such Charges Against Peer Funds

235.    The extraordinary number of SAC employees charged with or convicted of insider trading since 2009 is even more striking when compared to its peer funds.  SAC, which then had $14 billion under management, ranked 26th out of the largest fifty hedge funds as of June 30, 2008. *See* The Hedgefund Journal, US50: The US' Largest 50 Single Managers Ranked by AUM 8 (1st ed. 2008), *available at* http://www.thehedgefundjournal.com/sites/default/files/hfj-us50-2008.pdf.

236.    Plaintiffs' research has identified only one other fund on that list that has had even one employee charged with insider trading since 2009.  That case was ultimately dismissed after trial when the Court ruled there was no evidence that insider trading had occurred.  *SEC v. Rorech*, 720 F. Supp. 2d 367, 403, 415-17 (S.D.N.Y. 2010).

### 4. Cohen Created a Culture That Has Encouraged Insider Trading, and He Himself Has Previously Engaged in Insider Trading

#### (a) Background Regarding Cohen's Testimony about Insider Trading in the *Fairfax* Litigation

237.    The widespread use of illegal inside information at SAC reflects Cohen's own approval of the practice.  Cohen testified at length regarding SAC's insider trading policies and compliance procedures during a deposition in 2011 in *Fairfax Financial Holdings Ltd. v. SAC Capital Management LLC*, No. L-2032-06 (N.J. Super. Ct.).

238.    In the *Fairfax* case, the plaintiffs asserted that SAC and other hedge funds had conspired to drive down the stock price of Fairfax Financial Holdings Limited ("Fairfax")

through dissemination of false information to the market. SAC was granted summary judgment and dismissed from the action in September 2011, in part because trading records established that it held a net long position in Fairfax during the relevant period.

239. One of the issues in the case concerned how SAC had handled nonpublic information regarding a forthcoming analyst report. A portfolio manager at SAC had learned that an analyst at one of its brokerage firms, Morgan Keegan & Co. ("Morgan Keegan"), would be issuing a negative report on Fairfax, and communicated this fact to others at SAC. Cohen Dep. 114:5-15, 125:20-126:7, 340:3-341:16. When the report was later issued, Fairfax's share price declined sharply. *Id*. at 114:6-15.

240. SAC portfolio managers purchased Fairfax stock while aware of the forthcoming negative report, and while such purchases did not benefit from the negative inside information, the handling of the non-public information received from the Morgan Keegan analyst was a focus of questioning by Fairfax's counsel at Cohen's deposition.

241. As revealed by the questioning, there was no indication that the portfolio manager involved ever sought guidance from SAC's legal counsel concerning the information he had received. *Id.* at 303:12-305:23, 308:6-315:2. In addition, while SAC's compliance manual imposes a blanket prohibition on trading while in possession of inside information, the portfolio manager proceeded to trade despite possessing non-public information that Morgan Keegan would be issuing its negative report. *Id.* at 87:11-88:7, 125:4-13, 283:6-19. The portfolio manager also communicated the existence of the forthcoming negative report to other investment personnel at SAC, in violation of SAC's policy against communicating such information to individuals other than the general counsel or his designee. *Id.* at 114:5-15, 264:18-265:4, 340:3-341:16. Finally, while Cohen testified that SAC maintains a "restricted list" for securities about

which its employees have obtained material nonpublic information, there is no indication that Fairfax was placed on this list.  *Id.* at 124:13-125:3, 331:4-334:3, 336:13-23.

242.     Questioned about these significant violations of SAC policy, Cohen's responses, detailed below, illustrate his casual approach to compliance and demonstrate how SAC's corrupt culture of insider trading came to exist.

### (b)     Cohen Disclaimed Specific Knowledge of SAC's Insider Trading Policies

243.     During the deposition, Cohen repeatedly disclaimed specific knowledge of SAC's insider trading policies (*id.* at 117:12-24, 118:4-15, 118:24-119:10):

> Q.  Okay.  **Now, the S.A.C. compliance manual at the time provided that if you were in possession of material nonpublic information, you could not trade, period, correct?**
>
> A.  Yes.  Well, the way --
>
> Q.  Is that correct?
>
> A.  **Actually, I don't know what it says.**
>
> Q.  Okay. So you don't know -- at the time you didn't know what S.A.C.'s compliance manual said on insider trading?
>
> A. When it comes to trading, I rely on counsel.
>
> *       *       *
>
> Q.  Okay. **Now, is it your testimony, as the head of the firm at this time, other than consulting counsel, you didn't know what the compliance manual said?**
>
> A.  It's -- **the answer is, I've read the compliance manual but I don't remember exactly what it says.**
>
> Q.  **Do you recall that it said that if you're in possession of material nonpublic information, you cannot trade in that security?**
>
> A.  **Answer is, I don't remember.**
>
> *       *       *
>
> Q.  **My question was, do you know today whether your compliance manual says that if you're in possession of material nonpublic information, you can't trade, period?**
>
> A.  **I don't remember what it says.**

```
Q.  So you don't know today, sitting here today as the head
of the firm, what your compliance manual says?

A.  That's right. I've read it. But if you're asking me what
it says today, I don't remember.
```

    **(c)**    **Cohen Deemed Insider Trading Policies Mere
           "Guidelines" and Described the Policies
           Prohibiting Insider Trading as "Vague"**

244.    While Cohen disclaimed knowledge of SAC's insider trading policies at his 2011

deposition, SAC's compliance manual, as is typical, contains clear and unqualified prohibitions

against insider trading, directing that (*id.* at 283:11-15; 264:20-25):

- "Employees may not solicit, recommend, influence, or effect transactions in any
  security, commodity interest or any account, whether personal or firm, while in
  possession of material, nonpublic information related to such interest."

- "Any employee who believes that he or she may be in possession of material
  nonpublic information should . . . not communicate the information to anyone else
  inside or outside the firm other than the general counsel or his designee."

245.    Cohen acknowledged that SAC's compliance manual contained these explicit

prohibitions, however he disagreed that they should be followed strictly.  Asked directly whether

SAC's policy prohibiting trading on insider information needed to be adhered to strictly, Cohen

demurred (*id.* at 293:12-19):

```
Q. So my question is simply: Does this have to be strictly
adhered to or not?

A. And my answer to you is: As long as the intent is to
adhere to the -- the policies and intent of how we want our
employees to act, I believe that paragraph's been -- is
being effected correctly.
```

246.    Consistent with his own lack of familiarity with it, Cohen also repeatedly

described the compliance manual's strictures as mere "guidelines" (*id.* at 264:2-267:8):

```
[Q.] Now, with respect to this -- this part about paragraph
2, it says, "Employees in possession of material nonpublic
information are prohibited from tipping, transmitting, or
otherwise disclosing such information to another person or
entity."
```

**So I'm clear, as the head of S.A.C., you say that doesn't apply to people internally talking to each other.**

A. **I think these are rigid interpretations and these are guidelines. These are rigid interpretations. I view these things as guidelines. Okay?** And then because it's such a complex issue, you need to look at it on a judgment basis and on an individual basis.

Q. Okay.

So if you look at page 11, in the middle of the page where it says in bold, "Any employee who believes that he or she may be in possession of material nonpublic information should," the third bullet, "not communicate the information to anyone else inside or outside the firm other than the general counsel or his designee."

That's not a rule. That's a guideline.

A. I would say it's a strong guideline.

Q. But not a rule.

A. I would say there -- there are times when people know how to act in certain situations.

Q. Okay.

Then when it says at the top of the first paragraph on that page 11, second sentence, in italics, "Thus any violation of the firm's policy on the improper use or misappropriation of proprietary, confidential, or inside information is and will be considered extremely serious and will result in sanctions, including the possibility of suspension or discharge from the firm."

As I understand your testimony, one cannot follow these rules that are set forth in this policy manual and not be sanctioned or punished, right?

A. **These rules are guidelines**, and I can't think of a situation where if someone did a serious -- made a serious violation, you know, that they had – you know, those situations would be discussed by senior management and outside counsel. . . . I view these as guidelines, strong guidelines, deterrents, and -- but there are situations that don't require the – the involvement of general counsel or outside counsel in making a decision.

247.   Elsewhere in the deposition, Cohen again emphasized that he viewed SAC's

compliance manual as merely precatory (*id.* at 289:4-10, 268:13-17, 297:24-298:15):

[Q.] **[W]hat you're telling me is that the literal terms of this compliance manual don't actually apply at S.A.C.?**

A. **When I look at this manual, I see guidelines. It's a code of ethics. It's a code of conduct.** It's what we want our people to do.

> ```
>                       *      *      *
>
>       Because these are guidelines, I can think of situations
>       where one would be in possession of material nonpublic
>       information, act correctly, and not have to involve
>       compliance or general counsel in that decision.
>
>                       *      *      *
>
>       Q. Where in paragraph 4 is there any ambiguity as to the
>       right of somebody to trade while in possession of material
>       nonpublic information?
>
>       A. I'm going to say this again.
>
>       These are guidelines. There are no absolutes in my
>       business. Interpretation is important. And I can think of
>       situations where someone would act -- and we've explained
>       some today. I feel that they've made the - an absolute
>       right decision and they -- and while they may have chosen
>       to go to counsel and go -- and go to compliance, they would
>       be certainly showing good judgment in acting on -- on
>       acting in those situations.
> ```

248.     In addition to expressing unfamiliarity with SAC's policies against insider trading

and that such policies, in any event, were mere guidelines, Cohen also repeatedly stated that he

believed the legal prohibitions against insider trading to be "very vague."  Asked whether he

understood it to be legal to trade opposite to an analyst report that was going to be released, he

stated that he believed it would (*id.* at 116:5-8):

> ```
>       Q.  You think that would be consistent with the SEC rules
>       on trading on inside information?
>
>       A.  The way I understand the rules on trading on inside
>       information, it's very vague.
> ```

249.     Asked the same question again, he repeated this view (*id.* at 126:24-127:4):

> ```
>       Q.  Okay. Is that your understanding of what the law
>       provides?
>
>       A.  The way I understand the law is that it's very vague,
>       so it's an interpretation of the law.
> ```

250.     Pressed to explain the basis for his belief that it was permissible to trade opposite

to a forthcoming analyst report, Cohen again emphasized his belief that insider trading law is

"vague" (*id.* at 133:14-134:7; 135:3-11):

> Q. Okay. I understand your belief as to what the purpose
> of the rule is, but I want to talk about what the rule
> actually provides. Do you understand that distinction?
>
> A. **It's my belief that the rule is vague, and therefore,
> you can interpret the rule any way** -- you know, with -- as
> a lawyer, you can probably interpret it in lots of
> different ways.
>
> Q. **You were about to say you can interpret it any way you
> want. That's what you were about to say?**
>
> A. I wasn't going to say that.
>
> Q. You started to say that, right?
>
> A. I don't remember what I was going to say.
>
> *     *     *
>
> [Q.] **You can't answer for me whether you are prohibited
> categorically from trading on the basis of material
> nonpublic information?**
>
> A. **If you're in possession of -- of material nonpublic
> information, I think we just -- well, because the rule is
> vague, I think we've just gone through an example of where
> I would accept that you could trade.**

251.     Cohen also testified that trading decisions in connection with inside information

are "a judgment call" (*id.* at 119:11-18, 138:11-20):

> Q. Are you concerned at all that what you're telling me
> would be okay would be contrary to your compliance manual?
>
> A. The answer is, **when you're trading securities, it's a
> judgment call.** Whatever the compliance manual says, it
> probably doesn't take into account every -- every potential
> situation.
>
> *     *     *
>
> [Q.] Yes or no, is it your testimony that's a
> qualification to the prohibition on trading on the basis of
> material nonpublic information, and that qualification is
> it's okay as long as no one gets hurt?
>
> A. **Because of the vagueness of the law, I believe it's a
> judgment call.** In this case, we're talking about this case
> now, I believe that we acted totally appropriately.

### (d)     Cohen Testified that Obtaining Inside Information at SAC Is a Common Occurrence

252.     Strikingly, *Cohen testified that obtaining inside information is common at SAC*.

While he claimed that such information would not be used to trade, he described placing

securities on a restricted list because of the receipt of inside information as a "common procedure" (*id.* at 331:4-14; 333:7-17):

> [Q.]  How does that impact on putting a stock on the restricted list?
>
> A.  I mean, **it's <u>common procedure in the firm for employees to ask to put a stock on the restricted list.</u>**
>
> Q.  <u>**Under what circumstances?**</u>
>
> A. **When they -- <u>when they -- when they believe they're in possession of material nonpublic information.</u>**
>
> . . .
>
> [Q.]  **And when would it -- when should it be put on the restricted list?**
>
> A.  When -- I mean, **they're either in possession of material nonpublic information** or they're -- they're -- they want to transact in a way that's -- in the -- in their - whatever material nonpublic information they have, if they want to transact in the direction of what that material nonpublic information -- the way I think -- the way it should work is that the person would go to counsel and explain the situation.

253.    Cohen further explained (*id.* at 347:24-348:12):

> A. Well, once again, I think, you know, in general, I can think of many instances when, in possession of material nonpublic information, you would immediately restrict yourself.
>
> Q.  Give me some examples.
>
> A.  The CEO of a company tells you that he's taking over XYZ tomorrow, I would expect that to be on the restricted list.
>
> Q.  Any other examples?
>
> A.  Somebody in a -- in a public company tells you that what [their] earnings are going to be when they report in two weeks. I would want that immediately restricted.

254.    Cohen further conveyed that situations involving inside information occurred with sufficient frequency that, as in the case of the nonpublic information at issue in *Fairfax*, employees were presented with recurring situations involving inside information that did not require consultation with SAC's counsel (*id.* at 304:3-306:13):

> [Q.]  It says, "Any employee who believes that he or she may be in possession of material nonpublic information

should," bullet point 2, "not purchase or sell the effected security or securities on behalf of the firm, the employee, or others."

Do you see that?

A. I see that.

Q. Once again, that doesn't have any exception to it, does it?

A. Yeah, it does.

Q. Okay. Where?

A. Right above it.

Q. Where is that?

A. **"Report the matter immediately to the general counsel."**

**If a person has been in that situation before, then, the way I read this is that he's got the experience to know how to act and act appropriately in a similar situation.**

Q. Okay.

So your interpretation of this paragraph with the three bullet points is that an employee who believes they're in possession of material nonpublic information could purchase or sell securities?

A. Yes.

Q. And they could do that under what circumstances?

A. Some of the circumstances that we discussed today.

Q. Okay.

**Even circumstances where they don't go to the general counsel.**

A. **If they've -- if they've been in that situation before and they understand how to act and follow the general intentions of -- of -- of what my general counsel, my compliance wants, yes.**

Q. Okay.

Where does it say that in this paragraph?

It says right here, "Report the matter immediately to the general counsel."

Q. Okay.

**My question was, sometimes you don't even have to go to the general counsel?**

**And you said yes.**

So I want to know where does it say here --

A. **It says right here that -- if the way that I interpret that is if the person has gone to the general counsel previously and understands how to act in a same situation and especially the way -- some of the things we discussed**

- 66 -

today, in my mind, he understands the intent and -- and
desire of the firm and -- and understands what the general
counsel is going to say.

255.   Cohen also explained (*id.* at 261:2-23):

Q.  So it's not the case at S.A.C. if you have material
nonpublic information, the only person you're supposed to
communicate it to is the general counsel?

A.  That would be my preference, okay?  And -- **but I could
see situations like we just discussed where, you know,
there may be no need to discuss it with counsel because of
the situation we just talked about or other situations.**

Q.  Well, you said there may be no need because the person
who possesses the information might decide it doesn't
matter?

A.  No.

We train our people to -- you know, to be very thoughtful
about this.  And my preference would be they go to
compliance or go to general counsel.  **But I could see
situations where they would make decisions because they
understand that, you know -- or they have enough experience
to know that what they were doing is okay.**

256.   Cohen further explained (*id.* at 263:17-24):

Q.  **So there are times when you come into possession of
material nonpublic information and you don't tell the --
the general counsel, right?**

A.  **That's correct.**

Q.  **Because you think you don't have to.**

A.  **Because I know how to conduct myself in the situation.**

257.   He further explained (*id.* at 291:22-24):

**And so because of the nature of the business we're in, you
can't always get approval.  You have to make a decision and
judgment.**

    **(e)**    **SAC Has Never Fired or Suspended
an Employee for Insider Trading**

258.   The absence of any compliance culture at SAC is perhaps best illustrated by a

single fact: that despite its policies and putative compliance program, ***no SAC employee has ever***

***been discharged or suspended from the firm as a result of insider trading***.

259. Asked at deposition, "[h]as an employee ever been discharged or suspended from the firm as a result of a violation of this -- these policies?" Cohen replied "I don't think so." *Id.* at 249:13-16.

        **(f)**        **Cohen Engaged in Insider Trading Early in<br>His Career and Invoked His Fifth Amendment<br><u>Rights When Questioned by the SEC</u>**

260. According to particularized allegations in a pending action brought by Cohen's former wife, Cohen engaged in insider trading activity early in his career, and one trade was a major source of his early profits. As pled in the lawsuit, *Cohen v. Cohen*, No. 09 Civ. 10230 (RJH) (S.D.N.Y.), ECF No. 1:

**(ii) Defendant Cohen's Insider Trading Activity**

23. In late 1985, defendant Cohen advised Ms. Cohen that he had received inside information in advance of the purchase of RCA Corporation ("RCA") by General Electric Company ("GE"). Although she did not have a college degree and had no training in finance or law, Ms. Cohen questioned defendant Cohen about the legality of trading on inside information in general and with respect to the RCA-GE transaction in particular. Defendant Cohen assured Ms. Cohen that, although he knew the insider (who was a Wharton classmate of Cohen), he had not received the information directly from the insider but from a mutual friend. According to defendant Cohen, this meant that he was not involved in illegal insider trading.

24. Soon after Ms. Cohen's discussions with defendant Cohen about insider trading, the takeover of RCA by GE was announced. Upon information and belief – the sources of which are statements made by him to plaintiff – defendant Cohen traded on the inside information he had received and realized substantial profits in late 1985 and early 1986 from insider trading generated by the RCA-GE transaction. Cohen assured Ms. Cohen that insider trading was only a civil matter, not a criminal one.

**(iii) The SEC Investigation and Cohen's Invocation of His Fifth Amendment Privilege**

25. The [SEC] investigated Cohen's role in the RCA-GE transaction. In connection with that investigation, Cohen was required to appear at an examination under oath before the SEC on June 5, 1986. Ms. Cohen first learned of the fact of defendant Cohen's appearance before the SEC and

the details of the events at that examination when she obtained from the SEC in June 2009 the transcript of defendant Cohen's testimony pursuant to a Freedom of Information Act request.

26. At the examination, defendant Cohen refused to produce any documents, citing his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

27. Likewise, as disclosed in the transcript recently obtained from the SEC, defendant Cohen refused to answer, on Fifth Amendment grounds, the SEC's questions regarding, among other things, (i) his "purchase" of securities "while in possession of non-public information concerning RCA;" (ii) whether "anyone [had told Cohen] prior to the public announcement that RCA would be involved in a merger with General Electric;" and (iii) whether Cohen "had any agreement to share profits and/or losses with anyone else for securities transactions in any account which is in [Cohen's] name or the name of any other person or entity."

261. As subsequently alleged in an amended complaint, *Cohen v. Cohen*, ECF No.48-1 ¶ 51, Cohen's profit from the insider trading in RCA stock was "at least $10 million" – a substantial share of his net worth at the time.

262. While Cohen, through his spokesman, has subsequently derided his former wife's charges as "ludicrous," his assertion of the Fifth Amendment privilege against self-incrimination at the time contradicts this denial. As Cohen would have been advised by counsel, the Fifth Amendment privilege against self-incrimination applies only when a witness "reasonably believes that his testimony could 'furnish a link in the chain of evidence needed to prosecute' him for a crime." *Estate of Fisher v. Commissioner*, 905 F.2d 645, 648 (2d Cir. 1990) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)).

**J.      The Claims Are Timely**

263. The SAC Insider Trades constituted a series of related transactions in reliance on the Inside Information provided by Gilman concerning the bapi Phase 2 clinical trial, and the last of such transactions occurred within five years of the date hereof.

264.     In addition, Plaintiffs first learned of the insider trading at issue herein at or
shortly after the time that the SEC and Criminal Actions were filed, in November 2012, and
remained unaware of Defendants' fraud until such time without any fault or want of diligence or
care.  Prior to the filing of the SEC and Criminal Actions, there was no public information from
which Plaintiffs could have formed a reasonable basis to believe and allege the elements of an
insider trading claim against Defendants.  Accordingly, the statute of limitations governing the
claims herein did not begin to run until November 2012.

### K.     Defendants' Gains from Their Insider Trading Conspiracy

#### 1.     SAC's Profits Gained During the Insider Buying Class Period

265.     The SAC Defendants' profits in respect of the Insider Buying Class Period were
calculated using (i) SAC's holdings at the end of each calendar quarter, as publicly reported on
SEC Form 13F, (ii) the average trading price of Elan ADRs in each quarter, and (iii) where
available, the trading volumes and selling prices specified in court filings in the SEC and
Criminal Actions.  Matching trades on a last-in first-out (LIFO) basis yields the following
trading profits:

| Shares | Purchase Date | Purchase Price | Sale Date | Sale Price | Purchase Net | Sales Net | Profit/(Loss) |
|---|---|---|---|---|---|---|---|
| 406,800 | 12/31/06 | $14.83 | 3/31/07 | $13.18 | $6,033,373 | $5,362,153 | ($671,220) |
| 500,000 | 12/31/06 | $14.83 | 6/30/07 | $17.25 | $7,415,650 | $8,624,900 | $1,209,250 |
| 1,817,184 | 9/30/07 | $19.88 | 12/31/07 | $22.75 | $36,126,708 | $41,346,388 | $5,219,679 |
| 3,684,063 | 3/31/08 | $23.04 | 6/30/08 | $26.35 | $84,869,759 | $97,075,060 | $12,205,301 |
| 4,000,400 | 9/30/07 | $15.31 | 7/28/08 | $34.21 | $61,237,723 | $136,853,684 | $75,615,961 |
| 2,899,600 | 12/31/06 | $14.83 | 7/28/08 | $34.21 | $43,004,837 | $99,195,316 | $56,190,479 |
| 785,926 | 9/30/07 | $19.88 | 7/28/08 | $34.21 | $15,624,680 | $26,886,528 | $11,261,848 |
| 1,581,724 | 3/31/08 | $23.04 | 7/28/08 | $34.21 | $36,438,176 | $54,110,778 | $17,672,602 |
| 1,292,600 | 7/18/08 | $34.72 | 7/28/08 | $34.21 | $44,882,045 | $44,219,846 | ($662,199) |
| **16,968,297** | | | | | **$335,632,952** | **$513,674,653** | **$178,041,701** |

266.     The foregoing profits are likely significantly understated because they (i) do not reflect trades within calendar quarters, and (ii) do not account for profits on reported option trades during the Insider Buying Class Period.

### 2.     SAC's Losses Avoided and Profits Gained Following the July 29 Announcement

267.     As a result of the trades conducted during the Insider Selling Class Period, SAC avoided losses and gained profits in Elan securities as follows, based on the market's reaction to the July 29 Announcement in after hours trading on July 29 and during the trading day on July 30:

| Description | Amount |
|---|---|
| Profits from Short Sales | $59.2 million |
| Profits from Option Trades | $5.1 million |
| Losses Avoided | $154.2 million |
| Total Unlawful Gain | $218.5 million |

### 3.     SAC's Losses Avoided and Profits Gained Following the July 31 PML Disclosure

268.     In addition, as set forth above in paragraphs 161 to 171, the SAC Defendants gained profits and avoided losses suffered by other Elan investors following the July 31 PML Disclosure, on August 1, 2008, as a result of the disclosure of two confirmed cases of PML in MS patients treated with *Tysabri*.  Disclosure of the PML cases drove a 50.5% decline in the trading price of Elan ADRs, which closed down $10.12 on August 1, 2008.  Based on the SAC Defendants' pre-July 29 sales and the short positions in place as of July 29, the SAC Defendants avoided losses and gained profits on August 1 as follows:

| Position | Number of ADRs | Loss Avoided and Profit Gained/Share | Total Loss Avoided and Profit Gained |
|---|---|---|---|
| Long | 10,560,250 | $10.12 | $106,869,730 |
| Short | 4,525,104 | $10.12 | $45,794,052 |
| Total | | | $152,663,782 |

### 4. **Prejudgment Interest**

269.     Prejudgment interest rates are properly determined by reference to the remedial purpose of the statute involved, and in the case of claims for disgorgement, should be fixed at a level that deprives the defendants of the fruits of their ill-gotten gains.

270.     The prejudgment interest payable under the SEC-SAC Settlement was calculated at the interest rate charged by the Internal Revenue Service for tax underpayments, pursuant to 26 U.S.C. § 6621(a)(2).  Such rate is "the sum of— (A) the Federal short-term rate determined under [other provisions of the Internal Revenue Code], plus (B) 3 percentage points."  *Id.*  This is the rate routinely charged by the SEC on amounts disgorged.  *E.g.*, *SEC v. World Info. Tech., Inc.*, 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008).

271.     Accordingly, the interest rate used to calculate prejudgment interest in the SEC-SAC Settlement was not calculated with reference to SAC's cost of funds or otherwise in a manner designed to achieve disgorgement of the actual time-value of such funds to SAC over the period it has been holding them.[7]

272.     The underpayments rate utilized by the SEC has ranged between 3% and 6% over the relevant period, from July 2008 to the present.  SAC's actual cost of funds is far higher.

273.     The cost to SAC of investment capital is reflected by the returns earned by its investors, just as the cost of debt financing is reflected by the interest earned by lenders.

---

[7]      Had Defendants not engaged in insider trading with respect to Elan, SAC would have been required to either raise additional capital to compensate for the losses incurred and profits not gained, or, alternatively, operate as a smaller hedge fund.  The measure of prejudgment interest set forth herein conservatively assumes that SAC could have and would have raised additional capital to replace the profits gained and losses avoided through the insider trading pled herein.  Absent that assumption, the prejudgment interest rate should be increased to reflect SAC's gross investment returns, as such returns would not have been obtained in the absence of Defendants' wrongdoing.

According to news reports, the annual net returns earned by SAC investors for calendar years 2007 through 2012 were as follows:

| Year | Rate |
|------|------|
| 2007 | 13.0% |
| 2008 | -27.5% |
| 2009 | 28.6% |
| 2010 | 16.0% |
| 2011 | 8.0% |
| 2012 | 13.0% |

274. While SAC, like many hedge funds, is financed through a combination of investment capital and debt, the profits obtained and losses avoided through the SAC Insider Trades were the equivalent of investment capital, rather than debt, as a matter of both finance and law.

275. The distinction between debt and equity in both finance and law is based on a variety of factors, principally including the unconditional right to receive payment at a fixed date or on demand, the power to enforce payment of principal and interest, and priority of the holder's claim in relation to other claimants. *See, generally, TIFD III-E, Inc. v. United States*, 459 F.3d 220, 232 (2d Cir. 2006).

276. Unlike debt financing, and particularly the margin financing that most hedge funds employ, the profits gained and losses avoided from the conduct at issue in this action did not (absent this action and the SEC Action) carry any right to payment or obtain priority over other claims. Indeed, the monies obtained through the wrongdoing at issue in this action had greater value and presented lower risk to SAC than even regular investment capital, because investment capital in hedge funds carries the right to redemption at the option of the investor.

277. In addition, while debt financing, often referred to as "leverage," increases the funds available for investment by the hedge fund borrower, it also increases risk. According to one industry report, margin calls were a principal source of hedge fund failures in the recent

financial crisis.  JPMorgan Chase & Co., *Hedge Funds, Leverage and Counterparty Negotiations* 3 (2008) ("one of the primary factors contributing to recent hedge fund failures has been the demand by counterparties to return capital or to meet margin calls, which forces managers to liquidate their assets in short order").

278.    There is no basis to conclude that, absent the insider trading at issue herein, SAC would have chosen to increase its leverage ratio by replacing the funds illegally obtained with additional debt financing.  Rather, the funds SAC obtained through insider trading were themselves leveraged with additional borrowing.

279.    Defendant Cohen has himself acknowledged the risks of excessive borrowing.  In a rare interview, conducted by a fellow hedge fund manager at a conference in February 2011, Cohen explained the importance of avoiding excessive debt.  As reported in a *New York Times* article:

> [Cohen's] lessons from the market tumult in 2008?
>
> "Leverage, concentration and illiquidity are the three things that can kill you," he said.

Peter Lattman, *SAC Capital's Cohen Opens Up*, N.Y. Times, Feb. 15, 2011.

280.    Accordingly, the investment returns earned by SAC investors during the period while SAC has held the losses unlawfully avoided and profits unlawfully gained represent the actual, market-tested cost of such funds, and any lower rate would permit SAC to retain a portion of its profits from the fraud by obtaining capital at a lower cost than it would have paid in the market.

281.    The prejudgment interest calculations set forth in paragraph 5 above and 282 below apply such investment returns, compounded daily, to the illegal profits gained and losses avoided set forth above.

### 5. Summary of SAC's Profits Gained and Losses Avoided

282. A summary of SAC's profits gained and losses avoided through the insider trading set forth herein is as follows:

| Source of Gain (Complaint ¶¶) | Principal Amount | Prejudgment Interest | SEC Offset | Total Net of SEC Offset |
|---|---|---|---|---|
| Insider Buying Class Period Profits (¶¶ 265-266) | $178,041,701 | $126,687,931 | | $304,729,632 |
| July 29 Announcement (¶ 267) | $218,500,000 | $158,341,019 | ($259,663,457) | $117,177,562 |
| July 31 PML Disclosure (¶ 268) | $152,663,782 | $111,028,494 | | $263,692,277 |
| Total | $549,205,483 | $396,057,444 | ($259,663,457) | $685,599,471 |

### 6. Martoma's Profits

283. At the end of 2008, Martoma received a bonus of over $9.3 million that included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain SAC LP portfolios.

### 7. Gilman's Profits

284. Gilman received over $100,000 from GLG for his consultations with Martoma and others at SAC. It is presently unknown whether Gilman received additional payments directly from the SAC Defendants.

## CONTEMPORANEOUS PURCHASES AND SALES

285. As set forth in their previously-filed and accompanying certifications, Plaintiffs traded Elan ADRs and options thereon contemporaneously (within the meaning of Sections 10(b) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t-1) with and opposite to the SAC Defendants trades in Elan ADRs and options during the Class Periods.

286. With respect to the Insider Selling Class Period, one or more Plaintiffs purchased Elan ADRs on all but one day of such class period.

287. With respect to the Insider Buying Class Period, one or more Plaintiffs traded opposite the SAC Defendants during each calendar quarter, and Plaintiffs will further establish

that they or other Class representatives traded contemporaneously with the SAC Defendants after obtaining the SAC Defendants' trading records.

**CLASS ACTION ALLEGATIONS**

288.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of (i) all persons who traded contemporaneously with and opposite to the SAC Defendants during the period July 1, 2006 through July 18, 2008 (the "Insider Buying Subclass"), and (ii) all persons who traded contemporaneously with and opposite to the SAC Defendants during the period July 21, 2008 through and including 4:00 pm EDT on July 29, 2008 (the "Insider Selling Subclass").  Excluded from the Class are Defendants herein, the employees, officers and directors of the Fund during the Class Periods, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

289.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Periods, Elan ADRs were actively traded on the NYSE and over 400,000,000 ADRs were then outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Elan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

290.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, as complained of herein.

291.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

292.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Gilman supplied the Inside Information to the SAC Defendants and whether the SAC Defendants traded Elan ADRs while in possession of material, nonpublic information concerning Elan;

(c)    whether the Control Defendants exercised control within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and whether such defendants are entitled to assert the defense of good faith;

(d)    whether the Inside Information was material; and

(e)    the amount by which Plaintiffs were damaged and Defendants profited and avoided losses as a result of the securities law violations alleged herein.

293.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impractical for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

294. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants failed to disclose material, nonpublic information during the Class Periods;

(b) the omissions were material;

(c) Elan securities traded in an efficient market;

(d) Elan's ADRs and options were liquid and traded with moderate to heavy volume during the Class Periods;

(e) Elan traded on the NYSE; and

(f) Plaintiffs and other members of the Class purchased and/or sold the applicable Elan securities between the time Defendants failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

295. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
(Against All Defendants)**

296. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 295 as if fully set forth herein.

297. This Claim is brought against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

298. The information provided by Gilman to Martoma concerning the Phase 2 bapi trial was, in each case, material and nonpublic. In addition, the information was, in each case, considered confidential by Elan and the SMC.

299.    Gilman provided the Inside Information to Martoma in breach of the duty of confidentiality arising from the fiduciary relationship or similar relationship of trust and confidence that Gilman owed to Elan, its shareholders, and the SMC, did so with the expectation of receiving a benefit therefrom, and received such a benefit.

300.    Martoma and Cohen knew, recklessly disregarded, or should have known, that Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the Inside Information confidential, provided such information with the expectation of receiving a benefit from doing so, and received such a benefit.

301.    Martoma traded Elan securities and provided the Inside Information that he received from Gilman to the other SAC Defendants named herein and other persons employed by SAC with the expectation of a receiving benefit from doing so, and received such a benefit.

302.    Cohen traded Elan securities while in possession of the Inside Information that he received from Martoma while knowing or recklessly disregarding that Martoma provided such information in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, and with the expectation of receiving a benefit from doing so, and received such a benefit.

303.    By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly, made material omissions.

304.    Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

305.    Plaintiffs purchased and sold securities of Elan contemporaneously with the SAC Defendants' sales and purchases.

306.     The measure of damages for trading while in possession of material nonpublic information under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, is the disgorgement of profits gained and losses avoided by such trading.

307.     During the Insider Buying Class Period, the SAC Defendants purchased Elan ADRs while in possession of Inside Information and gained profits on such purchases in an amount estimated at $178 million.  Plaintiffs and the Insider Buying Subclass are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

308.     During the Insider Selling Class Period, the SAC Defendants sold Elan securities while in possession of Inside Information and gained profits and avoided losses on such sales in amounts estimated at $218.5 million following the July 29 Announcement and $152 million following the July 31 PML Disclosure.  Plaintiffs and the Insider Selling Subclass are entitled to disgorgement of such amounts, together with prejudgment interest thereon, net of the amounts disgorged to the SEC in respect of the SAC Insider Trades.

309.     Plaintiffs are further entitled to disgorgement of the amounts by which Martoma and Gilman profited from their participation in the insider trading alleged herein.

310.     By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Class pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM
### For Violations of Section 20A of the Exchange Act
### (Against All Defendants)

311.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 310 as if fully set forth herein.

312.	This Claim is brought against all Defendants under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

313.	The information provided by Gilman to Martoma concerning the Phase 2 bapi trial was, in each case, material and nonpublic.  In addition, the information was, in each case, considered highly confidential by Elan and the SMC.

314.	Gilman provided the Inside Information to Martoma in breach of the duty of confidentiality arising from the fiduciary relationship or similar relationship of trust and confidence that Gilman owed to Elan, its shareholders, and the SMC, and did so with the expectation of receiving – and did receive – a benefit therefrom.

315.	Martoma and Cohen knew, recklessly disregarded, or should have known, that Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the Inside Information confidential, provided such information with the expectation of receiving a benefit from doing so, and received such a benefit.

316.	Martoma traded Elan securities and provided the Inside Information that he received from Gilman to the other SAC Defendants named herein and other persons employed by SAC with the expectation of receiving a benefit from doing so, and received such a benefit.

317.	Cohen traded Elan securities while in possession of the Inside Information that he received from Martoma while knowing or recklessly disregarding that Martoma provided such information in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, and with the expectation of receiving a benefit from doing so, and received such a benefit.

318.    By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly, made material omissions.

319.    Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

320.    Plaintiffs contemporaneously purchased and sold securities of the same class as those sold and purchased by the SAC Defendants.

321.    The measure of damages for trading while in possession of material nonpublic information under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, is the disgorgement of profits gained and losses avoided by such trading.

322.    During the Insider Buying Class Period, the SAC Defendants purchased Elan ADRs while in possession of Inside Information and gained profits on such purchases in an amount estimated at $178 million.  Plaintiffs and the Insider Buying Subclass are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

323.    During the Insider Selling Class Period, the SAC Defendants sold Elan securities while in possession of Inside Information and gained profits and avoided losses on such sales in amounts estimated at $218.5 million following the July 29 Announcement and $152 million following the July 31 PML Disclosure.  Plaintiffs and the Insider Selling Subclass are entitled to disgorgement of such amounts, together with prejudgment interest thereon, net of the amounts disgorged to the SEC in respect of the SAC Insider Trades.

324.    Plaintiffs are further entitled to disgorgement of the amounts by which Martoma and Gilman profited from their participation in the insider trading alleged herein.

325.     By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Class pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

**THIRD CLAIM**
**For Violations of Section 20(a) of the Exchange Act**
**(Against the Control Defendants)**

326.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 325 as if fully set forth herein.

327.     This Claim is brought against SAC LP, SAC LLC, SAC Inc., CR Intrinsic and Cohen for control person liability under Section 20(a) of the Exchange Act.

328.     Pursuant to Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

329.     Each of the Control Defendants controlled Martoma by virtue of their function or status and each of the Control Defendants in fact exercised control over Martoma in connection with the SAC Insider Trades.

330.     Each of the other Control Defendants controlled CR Intrinsic by virtue of their function or status and each of the other Control Defendants in fact exercised control over CR Intrinsic in connection with the SAC Insider Trades.

331.     The Control Defendants did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by (i) permitting the SAC Insider Trades to occur with actual knowledge or reckless disregard for whether the persons trading on behalf of

the Fund possessed material, nonpublic information, or (ii) failing to adequately supervise Martoma in connection with his acquisition of the Inside Information and trading thereon.

332. By virtue of the foregoing, the Control Defendants are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to Plaintiffs and the Class with the Defendants liable under the First and Second Claims above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to disgorge the profits gained and losses avoided by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

Dated: New York, New York
      May 13, 2013

                         **WOHL & FRUCHTER LLP**


                         By: _Ethan Wohl_____
                             Ethan D. Wohl
                             Krista T. Rosen
                             Sara J. Wigmore
                         570 Lexington Avenue, 16th Floor
                         New York, New York 10022
                         Telephone: (212) 758-4000
                         Facsimile: (212) 758-4004

                         Marc I. Gross
                         Jason S. Cowart
                         Emma Gilmore
                         **POMERANTZ GROSSMAN HUFFORD
                         DAHLSTROM & GROSS LLP**
                         600 Third Avenue, 20th Floor
                         New York, New York  10016
                         Telephone: (212) 661-1100
                         Facsimile: (212) 661-8665

                         *Attorneys for Plaintiffs and Co-Lead
                         Counsel for the Proposed Class*

# CERTIFICATION OF DAVID E. KAPLAN PURSUANT TO THE
## PRIVATE SECURITIES LITIGATION REFORM ACT

I, David E. Kaplan, hereby declare as follows:

1.  As previously certified, I reviewed a complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and authorized its filing.

2.  I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  The attached Schedule A lists all of my purchases and sales in Elan securities during the period July 1, 2006 to July 29, 2008 at 4:00 pm EDT.

5.  During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except in the present action.

6.  I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of April 2013 at Washington, D.C.

_____
DAVID E. KAPLAN

| Date | Transaction | Quantity | ADR Price |
|---|---|---|---|
| 10/16/2006 | Buy | 2,752 | $15.65 |
| 10/23/2006 | Buy | 5,000 | $15.42 |
| 10/23/2006 | Buy | 5,000 | $15.35 |
| 10/30/2006 | Buy | 5,000 | $14.74 |
| 11/2/2006 | Buy | 5,000 | $14.30 |
| 11/9/2006 | Buy | 4,000 | $14.14 |
| 6/6/2007 | Sell | 15,000 | $19.85 |
| 6/15/2007 | Sell | 15,000 | $21.85 |
| 6/20/2007 | Buy | 2,065 | $21.28 |
| 7/6/2007 | Sell | 5,000 | $22.52 |
| 7/13/2007 | Buy | 5,000 | $21.92 |
| 7/20/2007 | Buy | 5,000 | $20.25 |
| 7/27/2007 | Buy | 5,000 | $18.75 |
| 7/30/2007 | Buy | 5,000 | $17.35 |
| 8/9/2007 | Sell | 10,000 | $19.85 |
| 10/12/2007 | Sell | 2,000 | $23.85 |
| 2/4/2008 | Sell | 5,000 | $26.87 |
| 2/14/2008 | Buy | 10,000 | $24.75 |
| 2/14/2008 | Sell | 8,180 | $25.01 |
| 2/15/2008 | Sell | 1,800 | $25.17 |
| 2/15/2008 | Buy | 10,000 | $24.87 |
| 2/19/2008 | Sell | 10,000 | $25.40 |
| 2/19/2008 | Sell | 10,000 | $25.62 |
| 2/21/2008 | Buy | 10,000 | $24.05 |
| 2/22/2008 | Buy | 10,000 | $23.05 |
| 2/26/2008 | Sell | 10,000 | $24.48 |
| 2/27/2008 | Sell | 10,000 | $24.97 |
| 2/27/2008 | Buy | 10,000 | $23.05 |
| 2/27/2008 | Buy | 10,000 | $22.95 |
| 2/27/2008 | Buy | 10,000 | $22.38 |
| 2/29/2008 | Buy | 10,000 | $22.60 |
| 2/29/2008 | Sell | 10,000 | $22.81 |
| 3/3/2008 | Buy | 10,000 | $22.15 |
| 3/4/2008 | Buy | 10,000 | $21.32 |
| 3/17/2008 | Buy | 3,200 | $18.75 |
| 3/17/2008 | Sell | 3,200 | $18.98 |
| 4/7/2008 | Sell | 10,000 | $23.20 |
| 4/7/2008 | Sell | 10,000 | $23.46 |
| 4/11/2008 | Buy | 10,000 | $21.90 |
| 4/14/2008 | Buy | 10,000 | $21.22 |
| 4/16/2008 | Sell | 200 | $23.51 |
| 4/16/2008 | Sell | 10,000 | $23.98 |

| Date | Transaction | Quantity | ADR Price |
|---|---|---|---|
| 4/16/2008 | Sell | 10,000 | $24.28 |
| 4/24/2008 | Sell | 10,000 | $25.94 |
| 4/25/2008 | Buy | 10,000 | $25.75 |
| 4/25/2008 | Sell | 10,000 | $25.98 |
| 4/30/2008 | Buy | 10,000 | $26.91 |
| 5/1/2008 | Buy | 10,000 | $26.02 |
| 5/2/2008 | Sell | 10,000 | $27.52 |
| 6/6/2008 | Buy | 400 | $24.89 |
| 6/9/2008 | Buy | 9,600 | $24.87 |
| 6/10/2008 | Sell | 10,000 | $25.55 |
| 6/12/2008 | Buy | 10,000 | $25.55 |
| 6/13/2008 | Sell | 10,000 | $26.25 |
| 6/17/2008 | Buy | 10,000 | $27.65 |
| 6/17/2008 | Sell | 10,000 | $28.55 |
| 6/17/2008 | Sell | 10,000 | $29.55 |
| 6/20/2008 | Sell | 20,000 | $32.95 |
| 6/20/2008 | Sell | 11,979 | $33.15 |
| 7/1/2008 | Buy | 10,000 | $35.18 |
| 7/1/2008 | Buy | 10,000 | $35.00 |
| 7/1/2008 | Buy | 10,000 | $34.80 |
| 7/1/2008 | Sell | 10,000 | $35.35 |
| 7/1/2008 | Sell | 10,000 | $35.76 |
| 7/1/2008 | Sell | 10,000 | $35.87 |
| 7/2/2008 | Buy | 10,000 | $35.24 |
| 7/2/2008 | Buy | 10,000 | $35.38 |
| 7/2/2008 | Buy | 10,000 | $35.22 |
| 7/3/2008 | Buy | 10,000 | $34.20 |
| 7/8/2008 | Sell | 10,000 | $34.75 |
| 7/8/2008 | Sell | 10,000 | $35.68 |
| 7/8/2008 | Sell | 10,000 | $35.78 |
| 7/10/2008 | Sell | 10,000 | $36.85 |
| 7/11/2008 | Buy | 10,000 | $34.75 |
| 7/11/2008 | Buy | 10,000 | $34.85 |
| 7/14/2008 | Buy | 10,000 | $33.85 |
| 7/15/2008 | Buy | 10,000 | $33.41 |
| 7/15/2008 | Sell | 9,700 | $34.55 |
| 7/16/2008 | Buy | 10,000 | $33.61 |
| 7/17/2008 | Buy | 10,000 | $33.14 |
| 7/17/2008 | Buy | 10,000 | $32.15 |
| 7/21/2008 | Sell | 10,000 | $35.22 |
| 7/21/2008 | Sell | 8,900 | $35.75 |
| 7/21/2008 | Sell | 1,100 | $35.76 |
| 7/22/2008 | Buy | 10,000 | $34.55 |
| 7/22/2008 | Buy | 10,000 | $34.15 |
| 7/23/2008 | Buy | 10,000 | $34.02 |
| 7/23/2008 | Buy | 9,000 | $33.93 |

| Date | Transaction | Quantity | ADR Price |
|------|-------------|----------|-----------|
| 7/23/2008 | Buy | 10,000 | $33.70 |
| 7/23/2008 | Sell | 10,000 | $34.85 |
| 7/24/2008 | Buy | 300 | $32.47 |
| 7/24/2008 | Buy | 775 | $32.45 |
| 7/24/2008 | Buy | 2,075 | $32.46 |
| 7/24/2008 | Buy | 2,450 | $32.49 |
| 7/24/2008 | Buy | 3,450 | $32.48 |
| 7/24/2008 | Buy | 4,413 | $32.59 |
| 7/28/2008 | Buy | 10,000 | $33.53 |

**CERTIFICATION OF CHI-PIN HSU PURSUANT TO THE
PRIVATE SECURITIES LITIGATION REFORM ACT**

I, Chi-Pin Hsu, hereby declare as follows:

1.  As previously certified, I reviewed a complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and authorized its filing.

2.  I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  The attached Schedule A lists all of my purchases and sales in Elan securities during the period July 1, 2006 to July 29, 2008 at 4:00 pm EDT.

5.  During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except in the present action.

6.  I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _8th_ day of May 2013 at Northbrook, Illinois.

_Chi. Ph Hs_
CHI-PIN HSU

**Schedule A**
**Chi-Pin Hsu (ELN) -- July 1, 2006 to July 29, 2008**

| Date | Transaction | Quantity | ADR Price |
|------|-------------|----------|-----------|
| 12/13/2006 | Sell | 4,500 | $14.04 |
| 6/12/2008 | Sell | 30,000 | $26.60 |
| 6/17/2008 | Buy | 300 | $27.79 |
| 6/17/2008 | Buy | 1,500 | $27.80 |
| 6/17/2008 | Buy | 1,200 | $27.80 |
| 6/17/2008 | Buy | 1,113 | $28.25 |
| 6/17/2008 | Buy | 200 | $28.26 |
| 6/17/2008 | Buy | 100 | $28.26 |
| 6/17/2008 | Buy | 3,280 | $28.27 |
| 6/17/2008 | Buy | 200 | $28.28 |
| 6/17/2008 | Buy | 500 | $28.29 |
| 6/17/2008 | Buy | 1,200 | $28.30 |
| 6/17/2008 | Buy | 18,607 | $28.31 |
| 6/23/2008 | Sell | 60,000 | $34.26 |
| 6/24/2008 | Buy | 200 | $33.84 |
| 6/24/2008 | Buy | 3,100 | $33.85 |
| 6/24/2008 | Buy | 800 | $33.86 |
| 6/24/2008 | Buy | 900 | $33.87 |
| 6/25/2008 | Buy | 26,700 | $33.00 |
| 6/25/2008 | Buy | 3,802 | $33.42 |
| 6/25/2008 | Buy | 3,100 | $33.44 |
| 6/25/2008 | Buy | 300 | $33.45 |
| 6/25/2008 | Buy | 1,200 | $33.46 |
| 6/25/2008 | Buy | 2 | $33.47 |
| 6/25/2008 | Buy | 4,500 | $33.48 |
| 6/25/2008 | Buy | 17,096 | $33.49 |
| 7/3/2008 | Buy | 60 | $34.46 |
| 7/10/2008 | Sell | 27,500 | $36.40 |
| 7/22/2008 | Buy | 200 | $33.96 |
| 7/22/2008 | Buy | 400 | $33.97 |
| 7/22/2008 | Buy | 1,200 | $33.99 |
| 7/22/2008 | Buy | 7,800 | $34.00 |
| 7/22/2008 | Buy | 400 | $34.02 |
| 7/23/2008 | Buy | 1,800 | $34.24 |
| 7/23/2008 | Buy | 500 | $34.25 |
| 7/23/2008 | Buy | 3,440 | $34.26 |
| 7/23/2008 | Buy | 5,000 | $34.27 |
| 7/24/2008 | Buy | 9,100 | $31.90 |

**CERTIFICATION OF GARY W. MUENSTERMAN PURSUANT TO THE
PRIVATE SECURITIES LITIGATION REFORM ACT**

I, Gary W. Muensterman, hereby declare as follows:

1.  As previously certified, I reviewed a complaint against S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman arising out of insider trading of the securities of Elan Corporation, plc ("Elan") and authorized its filing.

2.  I did not purchase Elan securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  The attached Schedule A lists all of my purchases and sales in Elan securities during the period July 1, 2006 to July 29, 2008 at 4:00 pm EDT.

5.  During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except in the present action.

6.  I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9TH day of May 2013 at Henrico, Virginia.

GARY W. MUENSTERMAN

| Date | Transaction | Quantity | ADR Price |
|---|---|---|---|
| 7/6/2006 | Buy | 10,000 | $16.20 |
| 7/17/2006 | Sell | 38,910 | $14.21 |
| 7/18/2006 | Sell | 50,000 | $13.91 |
| 12/13/2006 | Buy | 6,130 | $14.01 |
| 12/19/2006 | Buy | 3,870 | $13.92 |
| 1/8/2007 | Buy | 2,500 | $13.20 |
| 1/17/2007 | Buy | 5,000 | $13.17 |
| 1/17/2007 | Buy | 5,000 | $12.98 |
| 1/18/2007 | Sell | 5,000 | $12.70 |
| 1/18/2007 | Sell | 5,000 | $12.71 |
| 1/18/2007 | Buy | 5,000 | $12.52 |
| 1/19/2007 | Buy | 5,000 | $12.73 |
| 1/19/2007 | Buy | 7,500 | $12.80 |
| 1/23/2007 | Buy | 2,000 | $12.20 |
| 1/23/2007 | Buy | 3,000 | $12.55 |
| 1/25/2007 | Buy | 5,000 | $12.05 |
| 1/26/2007 | Sell | 5,000 | $12.32 |
| 1/29/2007 | Buy | 2,500 | $12.30 |
| 2/8/2007 | Sell | 15,000 | $13.56 |
| 2/13/2007 | Sell | 5,500 | $13.65 |
| 2/20/2007 | Buy | 5,000 | $14.33 |
| 2/23/2007 | Sell | 9,500 | $13.85 |
| 2/23/2007 | Sell | 5,000 | $13.85 |
| 2/28/2007 | Sell | 7,500 | $13.05 |
| 3/20/2007 | Buy | 10,000 | $12.52 |
| 4/9/2007 | Sell | 10,000 | $14.42 |
| 6/7/2007 | Buy | 5,000 | $19.40 |
| 6/7/2007 | Sell | 5,000 | $19.40 |
| 8/6/2007 | Sell | 19,314 | $18.68 |
| 8/7/2007 | Sell | 10,000 | $19.01 |
| 11/28/2007 | Buy | 7,500 | $22.00 |
| 11/28/2007 | Buy | 10,000 | $21.95 |
| 11/29/2007 | Sell | 10,000 | $22.66 |
| 1/3/2008 | Sell | 5,000 | $23.20 |
| 1/9/2008 | Sell | 2,500 | $24.98 |
| 1/23/2008 | Buy | 9,250 | $22.82 |
| 1/24/2008 | Sell | 9,250 | $24.15 |
| 2/12/2008 | Buy | 5,000 | $25.00 |
| 2/13/2008 | Sell | 5,000 | $25.15 |
| 2/21/2008 | Buy | 10,350 | $24.00 |
| 2/21/2008 | Sell | 10,350 | $23.87 |
| 2/21/2008 | Buy | 10,000 | $23.49 |
| 2/21/2008 | Sell | 10,000 | $23.63 |

| Date | Transaction | Quantity | ADR Price |
|---|---|---|---|
| 2/27/2008 | Buy | 30,000 | $22.42 |
| 2/27/2008 | Sell | 30,000 | $22.44 |
| 3/11/2008 | Sell | 20,000 | $19.05 |
| 4/9/2008 | Buy | 10,000 | $22.74 |
| 4/11/2008 | Buy | 10,000 | $22.33 |
| 4/17/2008 | Sell | 15,000 | $23.51 |
| 5/2/2008 | Buy | 20,000 | $26.98 |
| 5/5/2008 | Sell | 15,000 | $26.97 |
| 5/8/2008 | Sell | 5,000 | $26.80 |
| 5/12/2008 | Buy | 5,000 | $27.05 |
| 5/12/2008 | Sell | 5,000 | $27.06 |
| 5/14/2008 | Buy | 5,000 | $27.14 |
| 5/19/2008 | Buy | 15,000 | $26.54 |
| 6/10/2008 | Buy | 5,000 | $25.70 |
| 6/10/2008 | Sell | 10,000 | $25.91 |
| 6/11/2008 | Sell | 10,000 | $26.42 |
| 6/17/2008 | Buy | 5,000 | $28.25 |
| 6/17/2008 | Sell | 5,000 | $28.00 |
| 6/23/2008 | Sell | 5,000 | $35.25 |
| 7/3/2008 | Buy | 5,000 | $33.75 |
| 7/7/2008 | Sell | 5,000 | $34.85 |
| 7/11/2008 | Buy | 5,000 | $34.85 |
| 7/24/2008 | Buy | 10,000 | $31.70 |

**CERTIFICATE OF SERVICE**

I, Sara J. Wigmore, do hereby certify that on this 13th day of May, 2013, a copy of the

foregoing Consolidated Class Action Complaint was served by overnight delivery and by email,

upon the following counsel of record:

Daniel J. Kramer
Michael E. Gertzman
Audra J. Soloway
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019

Martin B. Klotz
Michael S. Schachter
Sameer Advani
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

Laurence A. Silverman
David R. Kolker
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020

Richard M. Strassberg
John O. Farley
Daniel P. Roeser
Larkin M. Morton
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018

Roberto M. Braceras
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109

Donald A. Broggi
Joseph P. Guglielmo
SCOTT + SCOTT, L.L.P.
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174

Dated: New York, New York
May 13, 2013

_____
Sara J. Wigmore