UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAVID E. KAPLAN, MICHAEL S. ALLEN, CHI-PIN
HSU, GARY W. MUENSTERMAN, FRED M. ROSS,
MICHAEL CAHILL, JOHN P. CONNOLLY, JOHN
M. GOULD, CAROLINE P. GOULD, GREG
KAPPES, DEEANN LEMMERLING, LUC
LEMMERLING, GARRY LEONARD, DAVID
LINDSAY, RICHARD LLOYD, GLEN
LOCHMUELLER, STEPHEN W. MAMBER, JAMES
C. MCGOWAN, CHRIS MITCHEM, BRIDGET
MONRAD, CHRISTIAN MONRAD, BENJAMIN
MONRAD, JOSEPH F. MORGAN, JIM MOSER,
STEVEN R. OLSON, LAWSON PHILLIPS,
SEYMOND PON, PAT A. SANYE, RONALD J.
SANYE, PATRICIA TRACY, LINH TU, RAJ VADDI,
JOHN WOLFF, and RHONDA WOLFF, Individually
and on Behalf of All Others Similarly Situated,

Plaintiffs,

- against -

S.A.C. CAPITAL ADVISORS, L.P., S.A.C. CAPITAL
ADVISORS, INC., CR INTRINSIC INVESTORS,
LLC, CR INTRINSIC INVESTMENTS, LLC, S.A.C.
CAPITAL ADVISORS, LLC, S.A.C. CAPITAL
ASSOCIATES, LLC, S.A.C. INTERNATIONAL
EQUITIES, LLC, S.A.C. SELECT FUND, LLC,
STEVEN A. COHEN, MATHEW MARTOMA, and
SIDNEY GILMAN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

*(caption continued . . . )*

No. 12 Civ. 9350 (VM) (KNF)
(All Actions)

**<u>JURY TRIAL DEMANDED</u>**

<u>ECF CASE</u>

**<u>JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

*( . . . caption continued)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|   |   |
|---|---|
| BIRMINGHAM RETIREMENT AND RELIEF SYSTEM and KBC ASSET MANAGEMENT NV, Individually and on Behalf of All Others Similarly Situated, | :<br>:<br>:<br>:<br>:<br>: |
| Plaintiffs, | :<br>: No. 13 Civ. 2459 (VM) (KNF)<br>: |
| - against - | :<br>: **JURY TRIAL DEMANDED**<br>: |
| S.A.C. CAPITAL ADVISORS, L.P., S.A.C. CAPITAL ADVISORS, INC., CR INTRINSIC INVESTORS, LLC, CR INTRINSIC INVESTMENTS, LLC, S.A.C. CAPITAL ADVISORS, LLC, S.A.C. CAPITAL ASSOCIATES, LLC, S.A.C. INTERNATIONAL EQUITIES, LLC, S.A.C. SELECT FUND, LLC, STEVEN A. COHEN, MATHEW MARTOMA, and SIDNEY GILMAN, | :<br>:<br>: <u>ECF CASE</u><br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Defendants. | :<br>: |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Deborah Clark-Weintraub
Joseph P. Guglielmo
Tom Laughlin
**SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York  10174
Telephone: (212) 223-6444

Gregg S. Levin
David P. Abel
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina  29464
Telephone: (843) 216-9000

*Co-Lead Counsel for the* Birmingham *Plaintiffs and the Wyeth Investor Class*

Ethan D. Wohl
Krista T. Rosen
Sara J. Wigmore
**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, New York  10022
Telephone: (212) 758-4000

Marc I. Gross
Tamar A. Weinrib
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York  10016
Telephone: (212) 661-1100

*Co-Lead Counsel for the* Kaplan *Plaintiffs and the Elan Investor Class*

## TABLE OF CONTENTS

INDEX OF PERSONS AND DEFINED TERMS ................................................................. vi

INTRODUCTION ......................................................................................................... 1

JURISDICTION AND VENUE .................................................................................... 11

PARTIES ................................................................................................................... 12

    A.    The *Kaplan* Plaintiffs ................................................................................. 12

    B.    The *Birmingham* Plaintiffs ......................................................................... 13

    C.    Defendants ................................................................................................... 13

SUBSTANTIVE ALLEGATIONS .............................................................................. 16

I.     BACKGROUND REGARDING SAC AND COHEN ........................................... 16

    A.    Cohen, SAC and Their Reliance on "Edge" .............................................. 16

    B.    SAC's Organizational Structure Served to Encourage Employees to
           Obtain Illegal Inside Information and Funnel It to Cohen ........................... 19

    C.    CR Intrinsic, the SAC Unit that Employed Martoma, Was Directly
           Supervised by Cohen and Managed Much of His Personal Wealth ............ 20

II.    DEFENDANTS' INSIDER TRADING IN ELAN AND WYETH ....................... 22

    A.    Background Regarding Elan and Wyeth....................................................... 22

    B.    The Bapineuzumab Phase 2 Clinical Trial and Its Role as a Key Share
           Price Driver for Elan and Wyeth During the Class Periods......................... 23

           1.    Background Regarding Bapineuzumab and the Phase 2 Clinical Trial ............. 23

           2.    The Phase 2 Trial Was the Primary Source of Elan ADR Price Gains
                  During the Period That Cohen and Martoma Were Buying Elan
                  Securities and Receiving Inside Information from Gilman ................................. 24

           3.    The Phase 2 Trial Was a Major Source of Wyeth Price Gains During
                  the Period That SAC Was Buying on Illegal Inside Information ....................... 30

    C.    Background Regarding Martoma and Gilman ............................................. 35

           1.    Martoma Was Hired to Work on Cohen's Investment Team Based
                  on His Contacts at Public Companies, and His Access to Inside
                  Information Was Later Noted by Cohen ............................................................ 35

           2.    Gilman and His Role in the Bapineuzumab Clinical Trials................................ 36

D.   Martoma Pursues Contacts with Numerous Bapineuzumab Phase 2
     Clinical Investigators and Recruits Gilman and at Least One Other Doctor
     Participating in the Phase 2 Trial ...................................................................39

E.   Gilman Provides Martoma with Inside Information Regarding the
     Bapineuzumab Phase 2 Trial on Numerous Occasions Between August
     2006 and July 2008 ........................................................................................40

F.   Martoma Also Receives Inside Information Regarding the Bapi Phase 2
     Trial from a Second Doctor, Joel Ross, Who Was a Principal Investigator
     in the Phase 2 Bapi Trial ...............................................................................52

G.   Cohen and Martoma Accumulate Stakes in Elan and Wyeth That Were
     Among SAC's Largest Positions in Any Stock While Receiving Inside
     Information Regarding the Bapineuzumab Phase 2 Trial from Gilman and
     Ross.................................................................................................................57

H.   Martoma Supplies Cohen Overtly Inside Information Regarding the
     Bapineuzumab Phase 2 Trial, Including Detailed Information Concerning
     the Trial Results that Had Not Been Publicly Disclosed ...............................60

I.   In the Months Before ICAD, Cohen Closely Analyzes the Prospects for
     the Bapineuzumab Phase 2 Trial After Two CR Intrinsic Fund Managers
     Urgently Warn of a Negative Outcome ..........................................................62

J.   Cohen Sides with Martoma, Citing His "Good Relationships in this
     Arena" and Does Not Respond to the Managers' Repeated Urging that
     Martoma Disclose the Source of His "Edge" .................................................66

K.   In Contrast with His Detailed Written Analyses of Other Issues, Martoma
     Provided Cohen No Written Analysis to Support His "High Conviction" of
     Positive Phase 2 Trial Results, Instead Updating Cohen Periodically by
     Phone...............................................................................................................74

L.   Cohen Receives and Responds to Emails Explicitly Discussing Negative
     Inside Information Regarding the Bapineuzumab Phase 2 Trials from
     Other CR Intrinsic Fund Managers, But Continues to Side with Martoma.....78

M.   Cohen Does Not Object to Martoma's Efforts to Elicit Information
     Concerning the Bapineuzumab Phase 2 Trial from Elan's CEO at a Private
     Dinner Meeting Days Before the Phase 2 Trial Results Were to Be
     Released ..........................................................................................................80

N.   Cohen and Martoma Remain Bullish on Elan and Wyeth Following the
     June 17 "Top Line" Announcement – the Final Public Disclosure
     Regarding Bapineuzumab Before ICAD ........................................................81

O.   Gilman Supplies Martoma the Phase 2 Trial Results ...................................82

P.    Martoma Reports His Pessimism About the Phase 2 Trial Results to Cohen, and They Then Liquidate SAC's Positions in Elan and Wyeth and Massively Short Both Stocks in the Seven Trading Days Before ICAD ....................85

Q.    Cohen Actively Supervises the Elan and Wyeth Sales, and Takes Extraordinary Measures to Conceal Them, Even from Other SAC Personnel ................................................................................................................90

R.    Elan and Gilman Disclose the Mixed and Disappointing Clinical Trial Results, Prompting a Sell-off of Elan ADRs and Wyeth Shares and Divergent Views of Bapineuzumab's Potential ............................................................97

    1.    The Reported Bapineuzumab Phase 2 Results Were Confusing and Ambiguous ...............................................................................................98

    2.    Gilman's Weak 13 Minute Presentation Further Contributed to Market Uncertainty ..........................................................................99

    3.    The Complex, Ambiguous Nature of the Publicly Disclosed Phase 2 Results Prompted Widely Divergent Analyst and Expert Assessments of Bapineuzumab's Potential ........................................101

S.    Elan Drops Sharply Again Based on Negative Safety News Concerning Tysabri Disclosed Two Days After ICAD ................................................106

T.    SAC's Insider Trading Caused It to Avoid Losses Resulting from the July 31 PML Disclosure ................................................................................106

    1.    As of July 31, SAC Retained an Informational Advantage over Public Investors as a Result of Receiving the Inside Information ...................106

    2.    SAC's Avoidance of Losses Following the July 31 PML Disclosure Can Be Traced with Reasonable Certainty to Its Illegal Insider Trading ...........................................................................107

III.    THE WIDESPREAD INSIDER TRADING AT SAC AND COHEN'S PERSONAL INVOLVEMENT IN IT FURTHER ESTABLISH SAC AND COHEN'S LIABILITY FOR MARTOMA'S ILLEGAL ACTS ....................................108

A.    SAC and Cohen Had a Duty to Prevent Misuse of Nonpublic Information ..............109

B.    Since 2009, Twelve SAC Employees Have Been Convicted of, Admitted, or Been Implicated as Co-Conspirators in, Insider Trading While at SAC ..............109

    1.    Noah Freeman ..........................................................................................109

    2.    Donald Longueuil .....................................................................................116

    3.    Jonathan Hollander ...................................................................................116

    4.    Jon Horvath ..............................................................................................117

5.      Michael Steinberg ..............................................................118

6.      Gabriel Plotkin .................................................................121

7.      Ron Dennis......................................................................121

8.      Wesley Wang .....................................................................123

9.      Dipak Patel......................................................................125

10.     Richard Choo-Beng (C.B.) Lee .............................................126

11.     Richard Lee .....................................................................127

12.     Mathew Martoma.................................................................128

13.     Summary of SAC Employees Who Have Been Convicted of,
        Admitted, or Been Implicated in, Insider Trading While at SAC ..................128

C.   The Large Number of SAC Employees Charged with Insider Trading
     Contrasts Sharply with the Absence of Such Charges Against Employees
     at Peer Hedge Funds ..............................................................129

D.   Cohen Created a Culture at SAC That Has Encouraged Insider Trading,
     and Has Personally Received and Traded on Inside Information on
     Multiple Occasions ...............................................................130

     1.      Cohen's Personal Receipt and Use of Inside Information Established
             a Culture that Approved and Encouraged Insider Trading ...............................130

     2.      Other Senior SAC Officers Also Fostered a Culture of Insider
             Trading ..........................................................................134

     3.      SAC's Hiring Decisions Emphasized Access to Inside Information...............135

     4.      SAC's Practice of Paying Large Fees to Sell-Side Analyst Firms as a
             Quid-Pro-Quo for Information Further Embedded Insider Trading in
             SAC's Culture ....................................................................136

     5.      Cohen's Testimony in the *Fairfax* Litigation Further Demonstrates
             His Tacit Approval of Insider Trading and Disregard for Effective
             Compliance .......................................................................139

             (a)     Background Regarding Cohen's Testimony about Insider
                     Trading in the *Fairfax* Litigation....................................139

             (b)     Cohen Disclaimed Specific Knowledge of SAC's Insider
                     Trading Policies .......................................................140

             (c)     Cohen Deemed Insider Trading Policies Mere "Guidelines"
                     and Described the Policies Prohibiting Insider Trading as
                     "Vague" ................................................................141

(d)  Cohen Testified that Obtaining Inside Information at SAC Is a Common Occurrence ...........................................................................145

6.  SAC's Failure to Detect or Discipline Employees for Insider Trading Further Demonstrates that It Did Not Maintain an Effective Compliance Program ...........................................................................148

7.  SAC Compliance Overlooked Martoma's Insider Trading Despite Multiple Factors Warranting Special Scrutiny .................................150

8.  SAC Itself Has Pled Guilty to Insider Trading .................................152

ALLEGATIONS CONCERNING THE TIMELINESS OF THE CLAIMS .............................152

DEFENDANTS' UNLAWFUL GAINS AND PREJUDGMENT INTEREST THEREON ......153

A.  Damages Methodology ......................................................................153

B.  SAC's Profits During the Insider Buying Period............................154

C.  SAC's Losses Avoided and Profits Gained After Announcement of the Bapineuzumab Phase 2 Trial Results at ICAD on July 29, 2008 ..............154

D.  SAC's Losses Avoided in Elan Following the July 31 PML Disclosure .................154

E.  Prejudgment Interest .........................................................................155

F.  Summary of SAC's Profits Gained and Losses Avoided ..........................158

G.  Martoma's Profits .............................................................................158

H.  Gilman's Profits ...............................................................................158

CONTEMPORANEOUS PURCHASES AND SALES...............................................159

CLASS ACTION ALLEGATIONS .......................................................................159

A.  Elan Investor Class ...........................................................................159

B.  Wyeth Investor Class ........................................................................162

CLAIMS FOR RELIEF .....................................................................................165

FIRST CLAIM – For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)...........................................................165

SECOND CLAIM – For Violations of Section 20A of the Exchange Act (Against All Defendants)...................................................................................167

THIRD CLAIM – For Violations of Section 20(a) of the Exchange Act (Against the Control Defendants)..............................................................................170

PRAYER FOR RELIEF .....................................................................................171

DEMAND FOR TRIAL BY JURY .......................................................................171

## INDEX OF PERSONS AND DEFINED TERMS

AAB-001 .................................................................................................. p. 3, ¶ 5

AD ......................................................................................................... p. 23, ¶ 81

ADAS-cog ............................................................................................ p. 64, ¶ 189

Adondakis, Sam .................................................................................. p. 122, ¶ 392

ADRs .................................................................................................... p. 2, ¶ 2

ADSs .................................................................................................... p. 22, ¶ 78

Advisers Act ........................................................................................ p. 108, ¶ 340

Apple ................................................................................................... p. 137, ¶ 461

Atheros ................................................................................................ p. 109, ¶ 344

Avnet ................................................................................................... p. 109, ¶ 344

Bapi ..................................................................................................... p. 3, ¶ 5

Barai, Samir ........................................................................................ p. 110, ¶ 348

Betensky, Rebecca .............................................................................. p. 71, ¶ 219

BIIB ..................................................................................................... p. 74, ¶ 227

*Birmingham* Action .......................................................................... p. 1, intro.

*Birmingham* Plaintiffs ...................................................................... p.1, intro.

Bocklage, Chandler ............................................................................ p. 60, ¶ 176

Broadcom ............................................................................................ p. 109, ¶ 344

Businessweek, *Most Powerful Trader* ............................................. p. 17, ¶ 61

Chang, Kevin ...................................................................................... p. 137, ¶ 461

Chiasson, Anthony .............................................................................. p. 123, ¶ 397

Citadel ................................................................................................. p. 136, ¶ 453

Citigroup ............................................................................................. p. 137, ¶ 460

Civil Forfeiture Action ....................................................................... p. 2, ¶ 3

Class Periods ....................................................................................... p. 11, ¶ 35

Cohen Administrative Proceedings ..................................................... p. 3, ¶ 3

Cohen Fairfax Dep. ............................................................................. p. 18, ¶ 63

Cohen, Steven A. ................................................................................. p. 3, ¶ 3

Control Defendants ............................................................................. p. 16, ¶ 57

CR Intrinsic ......................................................................................... p. 2, ¶ 3

CRII ..................................................................................................... p. 14, ¶ 49

Debler, Edmund .................................................................................................p. 8, ¶ 19

Defendants ..............................................................................................p. 1, intro.

Dell.........................................................................................................p. 109, ¶ 344

Dennis, Ron..............................................................................................p. 121, ¶ 391

DeVore, Daniel ........................................................................................p. 148, ¶ 491

Diamondback ............................................................................................p. 117, ¶ 367

DOJ........................................................................................................p. 4, ¶ 6

Elan .........................................................................................................p. 1, intro.

Elan 2007 Form 20-F...............................................................................p. 22, ¶ 79

Elan Class Period (August 23, 2006 to July 29, 2008 at 4:00 pm EDT) .............p. 2, ¶ 2

Elan Investor Class ...................................................................................p. 1, intro.

Fairchild ..................................................................................................p. 109, ¶ 344

Fairfax .....................................................................................................p. 139, ¶ 468

*Fairfax* Litigation .....................................................................................p. 18, ¶ 18

FDA.........................................................................................................p. 6, ¶ 13

Freeman, Noah .........................................................................................p. 109, ¶ 344

Gilman, Sidney .........................................................................................p. 2, ¶ 3

GLG ........................................................................................................p. 36, ¶ 106

Goldstein, Jerome .....................................................................................p. 78, ¶ 232

Grossman, Matthew ..................................................................................p. 29, ¶ 92

Hollander, Jonathan ..................................................................................p. 116, ¶ 365

Holman Dep. .............................................................................................p. 34, ¶ 98

Holman, Wayne .........................................................................................p. 34, ¶ 98

Hon Hai ...................................................................................................p. 137, ¶ 461

Horvath, Jon .............................................................................................p. 117, ¶ 367

ICAD.......................................................................................................p. 8, ¶ 20

IM............................................................................................................p. 18, ¶ 62

Inside Information.....................................................................................p. 3, ¶ 5

Insider Buying Period (August 23, 2006 to July 18, 2008 for the Elan Investor
Class and January 14, 2008 to July 18, 2008 for the Wyeth Investor Class).......p. 4, ¶ 7

Insider Selling Period (July 21, 2008 to July 29, 2008 at 4:00 pm EDT)..........p. 7, ¶ 16

Jandovitz, Tim...........................................................................................p. 89, ¶ 263

Jiau Trial Tr...............................................................................................p. 110, ¶ 345

Jiau, Winifred.........................................................................................p. 110, ¶ 345

June 17 Announcement (June 17, 2008).................................................p. 4, ¶ 8

July 29 Announcement (July 29, 2008)..................................................p. 7, ¶ 17

July 31 PML Disclosure (July 31, 2008).................................................p. 9, ¶ 24

*Kaplan* Action..........................................................................................p. 1, intro.

*Kaplan* Plaintiffs.....................................................................................p. 1, intro.

Karp, Jason.............................................................................................p. 62, ¶ 182

Kinnucan, John.......................................................................................p. 149, ¶ 493

Kuo, Danny.............................................................................................p. 117, ¶ 367

Lee, C.B. .................................................................................................p. 126, ¶ 410

Lee, R......................................................................................................p. 127, ¶ 414

LIFO........................................................................................................p. 153, ¶ 511

Longueuil, Donald..................................................................................p. 110, ¶ 348

Longueuil Press Release.........................................................................p. 110, ¶ 348

Lyndon, Kate...........................................................................................p. 89, ¶ 264

Martin, Kelly...........................................................................................p. 5, ¶ 11

Martoma Criminal Action.......................................................................p. 2, ¶ 3

Martoma, Mathew...................................................................................p. 2, ¶ 3

Martoma Trial Tr....................................................................................p. 19, ¶ 66

Marvell....................................................................................................p. 109, ¶ 344

Medicis....................................................................................................p. 150, ¶ 497

Microsoft.................................................................................................p. 127, ¶ 416

Morgan Keegan.......................................................................................p. 139, ¶ 469

MS...........................................................................................................p. 9, ¶ 24

MSD........................................................................................................p. 137, ¶ 460

Munno, David..........................................................................................p. 5, ¶ 9

Newman, Todd........................................................................................p. 121, ¶ 391

Newman Trial Tr.....................................................................................p. 122, ¶ 392

Nguyen, Tai............................................................................................p. 110, ¶ 346

NTB.........................................................................................................p. 64, ¶ 189

NVIDIA ..................................................................................................p. 109, ¶ 344

NYSE......................................................................................................p. 11, ¶ 35

P1............................................................................................................p. 23, ¶ 82

P2 ..........................................................................................................p. 23, ¶ 82

P3 ..........................................................................................................p. 23, ¶ 82

Patel, Dipak...........................................................................................p. 124, ¶ 401

Perrigo ..................................................................................................p. 22, ¶ 76

PGR ......................................................................................................p. 110, ¶ 345

Plaintiffs ...............................................................................................p. 1, intro.

Plotkin, Gabriel ....................................................................................p. 120, ¶ 379

PML ......................................................................................................p. 9, ¶ 24

Principal Investigators' Meeting..........................................................p. 55, ¶ 163

Ridgeback .............................................................................................p. 62, ¶ 185

Ross, Joel .............................................................................................p. 3, ¶ 5

SAC ......................................................................................................p. 2, ¶ 1

SAC Associates ....................................................................................p. 15, ¶ 50

SAC Criminal Action ...........................................................................p. 2, ¶ 3

SAC Defendants ...................................................................................p. 16, ¶ 56

SAC Equities ........................................................................................p. 15, ¶ 51

SAC Funds ...........................................................................................p. 13, ¶ 45

SAC Inc. ...............................................................................................p. 14, ¶ 48

SAC Insider Trades ..............................................................................p. 12, ¶ 37

SAC LLC ..............................................................................................p. 10, ¶ 31

SAC LP .................................................................................................p. 2, ¶ 1

SAC Select ...........................................................................................p. 15, ¶ 52

SEC .......................................................................................................p. 1, intro.

SEC Action ...........................................................................................p. 2, ¶ 3

SEC-SAC Settlement ...........................................................................p. 9, ¶ 28

Shen, Rene ............................................................................................p. 51, ¶ 148

Sigma ....................................................................................................p. 11, ¶ 32

Slate, Ben .............................................................................................p. 5, ¶ 9

SMC ......................................................................................................p. 3, ¶ 5

Stanford ................................................................................................p. 35, ¶ 99

Steinberg, Michael ...............................................................................p. 77, ¶ 231

Steinberg Trial Tr. ................................................................................p. 77, ¶ 231

Sun ........................................................................................................p. 117, ¶ 367

Tortora, Jesse ........................................................................................p. 117, ¶ 367

USAO........................................................................................................p. 3, ¶ 4

Vanity Fair, *Hunt for Cohen* ...............................................................p. 17, ¶ 60

Villhauer, Phillipp...................................................................................p. 7, ¶ 16

Wang, Wesley ......................................................................................p. 123, ¶ 400

Whitman Trial Tr. ................................................................................p. 123, ¶ 400

Wyeth Class Period (January 14, 2008 to July 29, 2008 at 4:00 pm EDT).........................p. 2, ¶ 2

Wyeth Investor Class .............................................................................p. 1, intro.

Yahoo ..................................................................................................p. 127, ¶ 414

Lead Plaintiffs in Case No. 12 Civ. 9350 (the "*Kaplan* Action"), David E. Kaplan, Michael S. Allen, Chi-Pin Hsu, Gary W. Muensterman and Fred M. Ross, together with plaintiffs Michael Cahill, John P. Connolly, John M. Gould, Caroline P. Gould, Greg Kappes, Deeann Lemmerling, Luc Lemmerling, Garry Leonard, David Lindsay, Richard Lloyd, Glen Lochmueller, Stephen W. Mamber, James C. McGowan, Chris Mitchem, Bridget Monrad, Christian Monrad, Benjamin Monrad, Joseph F. Morgan, Jim Moser, Steven R. Olson, Lawson Phillips, Seymond Pon, Pat A. Sanye, Ronald J. Sanye, Patricia Tracy, Linh Tu, Raj Vaddi, John Wolff, and Rhonda Wolff (collectively, the "*Kaplan* Plaintiffs"), individually and on behalf of a class of investors in Elan Corporation, plc ("Elan") securities (as further defined below, the "Elan Investor Class"), together with Lead Plaintiffs in Case No. 13 Civ. 2459 (the "*Birmingham* Action"), City of Birmingham Retirement and Relief System and KBC Asset Management NV (collectively, the "*Birmingham* Plaintiffs" and together with the *Kaplan* Plaintiffs, "Plaintiffs"), individually and on behalf of a class of investors in Wyeth securities (as further defined below, the "Wyeth Investor Class"), by their undersigned attorneys, for their Joint Consolidated Amended Class Action Complaint against the below-named defendants (collectively, "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Such information and belief is based on, *inter alia*, the investigation conducted by Plaintiffs' attorneys, which included the review of Court filings in related actions, media reports, filings with the Securities and Exchange Commission ("SEC"), trading records, press releases, other publicly-available information, and the document discovery previously ordered by the Court.

## INTRODUCTION

1.      This is a securities class action arising from the most profitable insider trading scheme ever uncovered.  By trading while in possession of material, nonpublic information

concerning a drug trial, between August 2006 and July 2008, Defendant S.A.C. Capital

Advisors, L.P. ("SAC LP"), together with its affiliates (collectively, "SAC"), illegally gained

profits and avoided losses of at least $555 million from trades in Elan and Wyeth securities and

related options.

2.      This action is brought on behalf of all persons who traded Elan American

Depositary Receipts ("ADRs") and related options contemporaneously with and opposite to SAC

during the period August 23, 2006 through and including 4:00 pm EDT on July 29, 2008 (the

"Elan Class Period"), and all persons who traded Wyeth common stock and related options

contemporaneously with and opposite to SAC during the period January 14, 2008 through and

including 4:00 pm EDT on July 29, 2008 (the "Wyeth Class Period"), pursuant to Sections 10(b),

20A and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§

78j(b), 78t-1 and 78t(a).

3.      The scheme set forth herein has been the subject of multiple government enforcement

actions, including (i) the criminal prosecution of the portfolio manager who was the original tippee of

the inside information at issue, Defendant Mathew Martoma ("Martoma"), titled *United States v.*

*Martoma*, No. 12 Cr. 973 (PGG) (the "Martoma Criminal Action"), (ii) an SEC enforcement action

against Martoma, the SAC entity that employed him, Defendant CR Intrinsic Investors, LLC ("CR

Intrinsic"), and his tipper, Defendant Sidney Gilman ("Gilman"), titled *SEC v. CR Intrinsic*

*Investors, LLC*, No. 12 Civ. 8466 (VM) (the "SEC Action"), (iii) a criminal action against SAC LP

and certain of its affiliates, titled *United States v. S.A.C. Capital Advisors, L.P.*, No. 13 Cr. 541

(LTS) (the "SAC Criminal Action"), (iv) a related civil forfeiture action, titled *United States v.*

*S.A.C. Capital Advisors, L.P.*, No. 13 Civ. 5182 (RJS) (the "Civil Forfeiture Action"), and (v)

administrative enforcement proceedings brought by the SEC against SAC's owner, Defendant

Steven A. Cohen ("Cohen"), titled *In re Cohen*, No. 3-15382 (the "Cohen Administrative Proceedings").

4.     On March 15, 2013, SAC announced a settlement of the claims against CR Intrinsic in the SEC Action (the "SEC-SAC Settlement"), which was conditionally approved by the Court by Decision and Order entered April 16, 2013.  In the SEC-SAC Settlement, SAC agreed to pay a total of approximately $602 million in disgorgement, civil penalties, and prejudgment interest.  On November 1, 2013, SAC entered into a plea agreement with the United States Attorney's Office for the Southern District of New York ("USAO") in the SAC Criminal Action, pursuant to which each of the defendant entities agreed to plead guilty to wire fraud and securities fraud and pay $1.184 billion in fines and civil forfeiture.  On February 6, 2014, a jury convicted Martoma of securities fraud and conspiracy to commit securities fraud in connection with his insider trading in Elan and Wyeth.

5.     The inside information at issue in this action (the "Inside Information") concerned the Phase 2 clinical trial of bapineuzumab ("bapi"), also known by the designation AAB-001, an Alzheimer's disease drug under joint development by Elan and Wyeth.  Martoma, an SAC portfolio manager, obtained the Inside Information from two individuals – Gilman, a medical doctor who chaired the Safety Monitoring Committee (the "SMC") that oversaw the bapi clinical trial on behalf of Elan and Wyeth, and Joel Ross ("Ross"), a doctor who served as principal investigator at one of the sites that treated patients participating in the trial.  As detailed below, Martoma discussed bapi with Gilman and Ross on numerous occasions between August 2006 and July 2008, and obtained extensive, detailed confidential information from them concerning the safety and efficacy of bapi and the conduct of its clinical trials.

6.  In November 2012, Gilman entered into a nonprosecution agreement with the U.S. Department of Justice (the "DOJ") that required him to serve as a cooperating witness, and he consented to a judgment against him in the SEC Action requiring him to disgorge $234,868, representing the profits from his unlawful conduct.  In December 2013, Ross also entered into a nonprosecution agreement with the DOJ.

7.  Between the start of the Elan and Wyeth Class Periods (on August 23, 2006 and January 14, 2008, respectively) and July 18, 2008 (the "Insider Buying Period"), SAC greatly increased its holdings of Elan and Wyeth, ultimately accumulating a position in Elan worth $366 million and a position in Wyeth worth roughly $900 million – both among SAC's five largest holdings of any stock.  These positions were held primarily in accounts personally managed by Martoma and by SAC's founder, Chief Executive Officer and owner, Cohen.

8.  Over the same period, Martoma repeatedly provided Cohen reports that overtly supplied Inside Information concerning the bapi Phase 2 trial.  In May 2007, Martoma advised Cohen that Elan and Wyeth would be initiating a Phase 3 trial of bapi – an event that later drove a 12.6% gain in Elan ADRs when publicly announced.  In October 2007, Martoma emailed Cohen with a predicted start date of the Phase 3 trial and details that had not been publicly disclosed.  In early June 2008, Martoma emailed Cohen to address a decline in the value of Elan ADRs, citing nonpublic information regarding the status of the Phase 2 data analysis.  Finally, after Elan and Wyeth released top-line (summary) results from the Phase 2 clinical trial on June 17, 2008 (the "June 17 Announcement") that reported no clinical benefit for roughly half of the Alzheimer's population, Martoma confidently predicted to Cohen that "the entire population will be on drug" and "data will support that."

9.      Cohen approved the acquisition and retention of massive positions in Elan and Wyeth over the repeated objections of two other CR Intrinsic analysts, David Munno ("Munno") and Ben Slate ("Slate"), who believed the bapi Phase 2 trial results would be negative.  At their urging, Cohen closely analyzed the prospects for the bapi Phase 2 trial, discussing the issue repeatedly with them and Martoma.  During the course of these discussions, however, Martoma refused to divulge to Munno or Slate the reasons for his confidence that the Phase 2 results would be positive, and Cohen repeatedly sidestepped Munno and Slate's requests that he direct Martoma to do so.  Cohen's evasiveness was noted by Munno and Slate.  On one occasion, however, Cohen did explain his reason for trusting Martoma's views:  that it "*seems like mat has alot of good relationships in this arena*."  (Emphasis added.)

10.     At one point, to support their position, Munno and Slate themselves supplied Cohen with inside information from another doctor participating in the bapi clinical trials.  That doctor reported that he had seen the confidential interim Phase 2 data and that they showed mixed results.  Cohen discussed the information in multiple emails, but never questioned the propriety of receiving this overtly inside information, and continued to side with Martoma.

11.     Cohen similarly displayed no concern with pursuing material nonpublic information from sources inside publicly-traded companies.  Shortly before release of the top-line Phase 2 trial results on June 17, 2008, Martoma arranged a private dinner for himself and Cohen with Elan's Chief Executive Officer, Kelly Martin ("Martin").  Prior to the dinner, Martoma forwarded to Cohen an email listing "Questions for Kelly Martin Dinner tonight" that posed a series of questions designed to elicit responses helpful to predicting the outcome of the Phase 2 trial.  Cohen, again, did not raise any objection.

12.     The market reacted positively to the June 17 Announcement of top-line results, with Elan ADRs rising 10.7% and Wyeth stock increasing 4.8% over the course of the trading day.  Following the announcement, Cohen and Martoma remained bullish on the Phase 2 trial results, increasing their position in Elan by more than 26% over the next month.  In a June 30, 2008 email to Cohen, Martoma reaffirmed his positive outlook on Elan, predicting that, after detailed trial results were released a month later, "I think stock breaks $40" – roughly $5 per share above its trading price at the time.  Cohen and Martoma continued to purchase Elan ADRs and Wyeth shares as late as the week of July 14-18.

13.     During the week of July 14-18, however, Gilman obtained access to the complete results for the Phase 2 trial.  The full Phase 2 trial results privately revealed to Gilman were, as stock analysts and medical experts later noted, mixed and ambiguous, with differing efficacy results for various patient subgroups, unclear statistical significance, and an absence of "dose response," which is a correlation between dosage levels and patient benefit.  These results were far less favorable than the market expected.  The market had anticipated clear efficacy signals and the prospect of early Food and Drug Administration ("FDA") approval of the drug.

14.     On Thursday, July 17, 2008, the day after his briefing by Elan on the full Phase 2 results, Gilman had a nearly two-hour telephone conversation with Martoma.  On Saturday, July 19, 2008, Martoma flew from New York to Michigan to meet personally with Gilman.  Gilman subsequently spoke to Martoma on three additional occasions before public disclosure of the Phase 2 results.

15.     On the morning of Sunday, July 20, 2008, the day after he returned from meeting with Gilman, Martoma emailed Cohen to say that he would like to speak with him and that "[i]t's important."  Thereafter, they spoke for nearly 20 minutes.

16.     While ***no new public information had been disclosed regarding bapi since the June 17 Announcement*** and Cohen and Martoma had continued to purchase hundreds of thousands of Elan ADRs and Wyeth shares the prior week, Cohen and Martoma then directed SAC's head trader, Phillipp Villhauer ("Villhauer"), to begin aggressively selling SAC's positions in both Elan and Wyeth the following day.  Over the seven trading days leading up to the announcement of the bapi Phase 2 results on July 29 (the "Insider Selling Period"), SAC liquidated its entire long position in Elan, worth more than $366 million, and sold all of its Wyeth stock, worth more than $335 million.  SAC's profits on the sale of the long positions in Elan and Wyeth acquired during the Insider Buying Period totaled over $179 million.

17.     In addition, SAC opened large short positions in both Elan and Wyeth toward the end of the same seven-day period.  By the time that the results of the bapi Phase 2 clinical trial were announced after the close of the market on July 29, 2008 (the "July 29 Announcement"), SAC was short 4,525,104 Elan ADRs, then worth over $152 million, and 3,245,300 Wyeth shares, then worth approximately $144 million.

18.     Villhauer, at Cohen's direction, actively concealed the sales from both the market and others at SAC, excepting Cohen and Martoma.  On July 21, he emailed Martoma regarding the sales, stating that "obviously no one knows except me you and steve [Cohen]."  Villhauer later reported to Cohen by email that:

> We executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and SAC LP] at an avg price of 34.21. This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access.  This process clearly stopped leakage of info from either in [or] outside the firm and in my viewpoint clearly saved us some slippage.

19.     Even after having sold out of Elan, Cohen maintained the secrecy of the trades. He did not inform Munno or Slate and on Sunday, July 27, 2008, Cohen emailed the research

analyst who handled his healthcare sector trading, Edmund Debler ("Debler"), "Between u and me and u can't mention to anyone- i am completely out of eln-."  Martoma similarly kept his change in position secret, falsely reporting that he maintained a high conviction, bullish outlook for Elan in an internal email on July 27, after he and Cohen had both sold out of their positions. The only long position in either Elan or Wyeth that Cohen did not unwind was an equity swap that gave SAC exposure to 12 million Wyeth shares.  Unlike the stock sales, the swap could not have been unwound in secret because there were counterparties which would have to be informed.  Cohen elected to hold this position, rather than have his decision to sell on the eve of the Phase 2 results announcement become widely known.

20.     As scheduled, Elan and Wyeth issued a press release announcing the Phase 2 results at 5:00 pm EDT on July 29.  A few minutes later Gilman reported the results in a 13-minute presentation at the International Conference on Alzheimer's Disease ("ICAD"), a widely-anticipated event in the Alzheimer's medical community.

21.     The overall market reaction to the July 29 Announcement was strongly negative. After briefly rising following issuance of the press release, the price of Elan ADRs dropped sharply in after-hours trading on July 29 and over the course of the trading day on July 30, closing at $19.63, down 41.8% from its $33.75 close on July 29.  The July 29 Announcement, made after the close of the market, drove a nearly 12% decline in the value of Wyeth, from $45.11 at the close on July 29 to $39.74 at the close on July 30.

22.     Gilman's brief presentation was widely criticized by analysts and Alzheimer's specialists as rushed and confusing.  While market observers agreed that the results were significantly less favorable than expected and the data were mixed and ambiguous, their

assessments of the Phase 2 trial results varied broadly, with some interpreting the limited

publicly-released data as strongly negative and others as cautiously positive.

23.     By causing SAC to both liquidate its long positions in Elan and Wyeth and

establish short positions in the companies during the seven trading days before the July 29

Announcement, SAC avoided $194 million in losses on its long positions and secured a $73

million profit on its short positions, based on the July 30 market decline.

24.     The following day, July 31, while investors and analysts continued to digest the

bapi Phase 2 trial results, Elan announced at 5:16 pm EDT two confirmed cases of progressive

multifocal leukoencephalopathy ("PML") in multiple sclerosis ("MS") patients treated with

Elan's main commercially-marketed drug, *Tysabri* (the "July 31 PML Disclosure").

25.     Disclosure of the PML cases drove a 50.5% decline in the trading price of Elan

ADRs in after-hours trading on July 31 and over the course of the trading day on August 1, with

the ADRs closing at $9.93.

26.     As a direct result of liquidating its long position in Elan following receipt of the

nonpublic Phase 2 trial results and detailed analysis thereof from Gilman, SAC avoided

additional losses on its investment in Elan totaling $106.9 million, based on the August 1 market

decline.

27.     Martoma received a $9.3 million bonus for 2008, a significant portion of which

was attributable to the illegal profits that SAC had generated from the Elan sales in late July.  He

was subsequently unsuccessful as a portfolio manager, and was terminated by SAC in 2010, with

an SAC officer commenting that Martoma had been a "one trick pony with Elan."

28.     Pursuant to the SEC-SAC Settlement, which was conditionally approved by the

Court on April 16, 2013, SAC agreed to pay $274,972,541 in disgorgement, together with

$51,802,381 in interest thereon and $274,972,541 in civil penalties based on insider trading in Elan and Wyeth securities.

29.     The SEC-SAC Settlement, while historic in size, provides for disgorgement of only a fraction of SAC's gains from the massive insider trading scheme described herein.

30.     Based on Plaintiffs' analysis to date, SAC's gains, and prejudgment interest thereon, are, at minimum, as follows:

**ELAN INVESTOR CLASS**

| Source of Gain (Complaint ¶¶) | Principal Amount | Prejudgment Interest | Total |
|---|---|---|---|
| Insider Buying Period Profits (¶ 514) | $158,346,018 | $174,372,828 | $332,718,846 |
| July 29 Announcement (¶ 515) | $212,330,997 | $233,821,835 | $446,152,832 |
| July 31 PML Disclosure (¶ 516) | $106,869,730 | $117,686,427 | $224,556,157 |
| Total | $477,546,745 | $525,881,090 | $1,003,427,835 |

**WYETH INVESTOR CLASS**

| Source of Gain (Complaint ¶¶) | Principal Amount | Prejudgment Interest | Total |
|---|---|---|---|
| Insider Buying Period Profits (¶ 514) | $21,458,705 | $23,630,623 | $45,089,328 |
| July 29 Announcement (¶ 515) | $56,096,029 | $61,773,724 | $117,869,753 |
| Total | $77,554,734 | $85,404,347 | $162,959,081 |

31.     The insider trading detailed herein fits a pattern and practice of illegal use of inside information at SAC that led to the criminal indictment of Defendants SAC LP, CR Intrinsic, and S.A.C. Capital Advisors, LLC ("SAC LLC"), and SEC administrative proceedings against Cohen.  Defendant Martoma is the third employee of Defendant CR Intrinsic to be criminally prosecuted or charged by the SEC with insider trading since 2011, and he is the ninth SAC employee to be convicted of or admit insider trading at SAC since 2009.  Three other SAC employees have also been identified by the government or cooperators as active participants in various insider trading schemes.

32.     In the SAC Criminal Action, all four criminal defendants – SAC LP, CR Intrinsic, SAC LLC, and a fourth SAC entity, Sigma Capital Management, LLC ("Sigma") – agreed on November 1, 2013 to plead guilty to wire fraud and securities fraud and pay $1.184 billion in fines and civil forfeiture.  The Court, the Honorable Laura Taylor Swain, conducted a plea allocution on November 8, 2013 and reserved decision on whether to accept the plea for a hearing on March 14, 2014.

33.     The numerous securities law violations described herein resulted from the failure to establish a culture of compliance at SAC and leadership that approved and encouraged illegal insider trading.  As detailed below, Cohen has received and traded on inside information on numerous other occasions.  He has also adopted policies at SAC designed to enhance the firm's access to inside information, by basing hiring decisions on candidates' access to public company insiders and by paying far higher trading commissions than peer funds, with the widely-understood expectation of access to stock analysts and nonpublic information.

## JURISDICTION AND VENUE

34.     The claims asserted herein arise under Sections 10(b), 20A and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t-1 and 78t(a), and this Court therefore has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

35.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  During the Elan and Wyeth Class Periods (together, the "Class Periods"), Elan ADRs and Wyeth shares traded on the New York Stock Exchange ("NYSE"), which is located in this District.  In addition, the expert firm that facilitated communications between Martoma and Gilman is based in this District at 850 Third Avenue, New York, New York, and SAC maintains an office in this District at 510 Madison Avenue,

New York, New York.  Martoma and Gilman used SAC's Manhattan office in furtherance of the fraudulent scheme set forth herein.

36.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone and data communications and the facilities of the national securities markets.

## PARTIES

### A.     The *Kaplan* Plaintiffs

37.     As set forth in his previously-filed certification, Lead Plaintiff David E. Kaplan traded Elan ADRs during the Elan Class Period, contemporaneously with the insider trades by SAC (the "SAC Insider Trades").

38.     As set forth in his previously-filed certification, Lead Plaintiff Michael S. Allen traded options on Elan ADRs during the Elan Class Period, contemporaneously with the SAC Insider Trades.

39.     As set forth in his previously-filed certification, Lead Plaintiff Chi-Pin Hsu traded Elan ADRs during the Elan Class Period, contemporaneously with the SAC Insider Trades.

40.     As set forth in his previously-filed certification, Lead Plaintiff Gary W. Muensterman traded Elan ADRs during the Elan Class Period, contemporaneously with the SAC Insider Trades.

41.     As set forth in his previously-filed certification, Lead Plaintiff Fred M. Ross traded Elan ADRs during the Elan Class Period, contemporaneously with the SAC Insider Trades.

42.     As set forth in their previously-filed certifications, Plaintiffs Michael Cahill, John P. Connolly, John M. Gould, Caroline P. Gould, Greg Kappes, Deeann Lemmerling, Luc

Lemmerling, Garry Leonard, David Lindsay, Richard Lloyd, Glen Lochmueller, Stephen W.

Mamber, James C. McGowan, Chris Mitchem, Bridget Monrad, Christian Monrad, Benjamin

Monrad, Joseph F. Morgan, Jim Moser, Steven R. Olson, Lawson Phillips, Seymond Pon, Pat A.

Sanye, Ronald J. Sanye, Patricia Tracy, Linh Tu, Raj Vaddi, John Wolff, and Rhonda Wolff

traded Elan ADRs during the Elan Class Period, contemporaneously with the SAC Insider

Trades.

**B.    The *Birmingham* Plaintiffs**

43.    As set forth in its previously-filed certification, Lead Plaintiff Birmingham

Retirement and Relief System traded Wyeth stock during the Wyeth Class Period,

contemporaneously with the SAC Insider Trades.

44.    As set forth in its previously-filed certification, Lead Plaintiff KBC Asset

Management NV traded Wyeth stock during the Wyeth Class Period, contemporaneously with

the SAC Insider Trades.

**C.    Defendants**

45.    Defendant SAC LP is a Delaware limited partnership with its principal place of

business at 72 Cummings Point Road, Stamford, Connecticut.  SAC LP is an investment adviser

and has been registered with the SEC since February 2012, CRD No. 161111.  At or about the

beginning of 2009, SAC LP was assigned the employment and investment management contracts

of SAC LLC and became the parent company of both CR Intrinsic and a second SAC

management company, Sigma.  It thereby assumed active direct or indirect management of the

investment funds operated by SAC (the "SAC Funds").  SAC LP is a named defendant in the

SAC Criminal Action and the Civil Forfeiture Action.

46.    Defendant SAC LLC is a Delaware limited liability company with its principal

place of business at 72 Cummings Point Road, Stamford, Connecticut.  SAC LLC was organized

in or around 1995, and actively managed certain of the SAC Funds until approximately the end

of 2008, when its contracts and obligations were assumed by SAC LP. During the Class Periods,

SAC LLC managed investments in certain of the SAC Funds that benefitted from the SAC

Insider Trades. SAC LLC is a relief defendant in the SEC Action, and is a named defendant in

the SAC Criminal Action and the Civil Forfeiture Action. Defendant Cohen is the President of

S.A.C. Holdings, Inc., a member of SAC LLC.

47. Defendant CR Intrinsic is a Delaware limited liability company with its principal

place of business at 72 Cummings Point Road, Stamford, Connecticut. CR Intrinsic was

organized in or around 2004. CR Intrinsic, an unregistered investment advisor, is a wholly-

owned subsidiary of SAC LP, and, prior to 2009, was a wholly-owned subsidiary of SAC LLC.

CR Intrinsic advises certain SAC Funds with approximately $2.8 billion in assets. During the

Class Periods, CR Intrinsic actively managed investments in SAC Funds that benefited from the

SAC Insider Trades. CR Intrinsic is a named defendant in the SEC Action, the SAC Criminal

Action, and the Civil Forfeiture Action.

48. Defendant S.A.C. Capital Advisors, Inc. ("SAC Inc.") is a Delaware corporation

with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut. SAC

Inc. is the general partner of SAC LP and is identified as a control person of SAC LP in SAC

LP's Form ADV, filed with the SEC. Defendant Cohen is the Sole Director of SAC Inc.

49. Defendant CR Intrinsic Investments, LLC ("CRII") is an Anguilla limited liability

company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West

Indies. CRII is managed by CR Intrinsic and is one of the SAC Funds that benefitted from the

SAC Insider Trades. CRII is a relief defendant in the SEC Action and a defendant *in rem* in the

Civil Forfeiture Action.

50.     Defendant S.A.C. Capital Associates, LLC ("SAC Associates") is an Anguilla limited liability company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West Indies.  SAC Associates was managed by SAC LLC during the Class Periods and is one of the SAC Funds that benefitted from the SAC Insider Trades.  SAC Associates is a relief defendant in the SEC Action and a defendant *in rem* in the Civil Forfeiture Action.

51.     Defendant S.A.C. International Equities, LLC ("SAC Equities") is an Anguilla limited liability company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West Indies.  SAC Equities was managed by SAC LLC during the Class Periods and is one of the SAC Funds that benefitted from the SAC Insider Trades.  SAC Equities is a relief defendant in the SEC Action and a defendant *in rem* in the Civil Forfeiture Action.

52.     Defendant S.A.C. Select Fund, LLC ("SAC Select") is an Anguilla limited liability company with an address at Mitchell House, P.O. Box 174, The Valley, Anguilla, British West Indies.  SAC Select was managed by SAC LLC during the Class Periods and is one of the SAC Funds that benefitted from the SAC Insider Trades.  SAC Select is a relief defendant in the SEC Action and a defendant *in rem* in the Civil Forfeiture Action.

53.     Defendant Cohen is a Connecticut resident and the founder, Chief Executive Officer and Chief Investment Officer of SAC, which began operations in 1992.  Cohen is a control person with respect to SAC LP and CR Intrinsic, and was a control person with respect to SAC LLC and CR Intrinsic during the Class Periods.  Cohen is identified as "Portfolio Manager A" in the SEC Action, and as the "SAC Owner" in the superseding indictment in the Martoma Criminal Action, the indictments in the SAC Criminal Action, and the complaint in the Civil Forfeiture Action.

54.     Defendant Martoma is a Florida resident who was employed by CR Intrinsic between 2006 and 2010 as a portfolio manager.  Martoma is named as the defendant in the Martoma Criminal Action and is also named as a defendant in the SEC Action.

55.     Defendant Gilman is a Michigan resident and, until his resignation on or about November 27, 2012, was the William J. Herdman Distinguished University Professor of Neurology at the University of Michigan Medical School.  Gilman is identified in the superseding indictment in the Martoma Criminal Action as "Doctor-1" and is named as a defendant in the SEC Action.

56.     The defendants identified in paragraphs 45 to 54 above are referred to herein as the "SAC Defendants."

57.     The defendants identified in paragraphs 45 to 48 and 53 above, SAC LP, SAC LLC, CR Intrinsic, SAC Inc. and Cohen, are referred to herein as the "Control Defendants."

## SUBSTANTIVE ALLEGATIONS

I.     **BACKGROUND REGARDING SAC AND COHEN**

A.     **Cohen, SAC and Their Reliance on "Edge"**

58.     SAC was founded by Defendant Steven A. Cohen in 1992.  According to published rankings, SAC had $14 billion in assets under management as of 2008, making it then among the 50 largest U.S. hedge funds.  Reflecting the unusually high investment returns it generated, SAC charged its investors among the highest fees in the industry – typically 3% of assets under management and 50% of investment gains, compared to the industry standard 2% and 20%.  Susan Pulliam, *The Hedge-Fund King Is Getting Nervous*, Wall St. J., Sept. 16, 2006.

59.     SAC's trading style was primarily "event-driven," meaning that it would "dive in and out of stocks before and after market-moving developments."  Anita Raghavan, *An Earlier Hedge Fund Inquiry May Have Led to the SAC Capital Case,* N.Y. Times, June 3, 2013.  This

"event-driven trading style" has been compared to the approach used by Galleon Group, a

prominent hedge fund that was closed after its founder was indicted for insider trading.  *Id.*

60.      SAC's investment strategy therefore relies heavily on collecting market

information.  As explained in a 2010 *Vanity Fair* profile of Cohen, in the late 1990s, "Cohen

became renowned in trading circles as a voracious gatherer of market information."  Brian

Burrough, *What's Eating Steve Cohen?*, Vanity Fair, July 2010.  A 2013 *Vanity Fair* article

described SAC as "one of Wall Street's greatest information-gathering machines."  Bryan

Burrough & Bethany McLean, *The Hunt for Steve Cohen*, Vanity Fair, May 3, 2013 ("Vanity

Fair, *Hunt for Cohen*").  In 2012, the *New York Times* explained that "Cohen and his staff are

known for relentlessly digging for information about publicly traded companies to form a

'mosaic,' building a complete picture of the company's prospects that gives the firm an edge

over other investors."  Peter Lattman, *New Breed of SAC Capital Hire Is at Center of Insider

Trading Case*, N.Y. Times, Nov. 25, 2012.

61.      While most hedge funds now execute trades via automated electronic systems at a

fraction of a penny per share, SAC continues to pay "scores of Wall Street firms for processing

its trades and other services . . . paying three to five cents [per share], making it, by wide

agreement, the largest payer of fees on Wall Street, $400 million a year by some estimates."

Vanity Fair, *Hunt for Cohen*.  This is a longstanding strategy; as early as 2003, when SAC was

roughly one-quarter of the size it reached in 2008, it was already one of Wall Street's ten largest

customers.  Marcia Vickers, *The Most Powerful Trader on Wall Street You Never Heard of*,

Businessweek, July 20, 2003 ("Businessweek, *Most Powerful Trader*").  Those payments

"grease[d] the superpowerful information machine that Cohen ha[d] built at SAC," *id.*, and

"some charge, spurs a blizzard of tips from Wall Streeters eager to ingratiate themselves with

Cohen."  Vanity Fair, *Hunt for Cohen*.  As one analyst explained in 2003, "I call Stevie [Cohen] personally when I have any insight or news tidbit on a company.  I know he'll put the info to use and actually trade off it."  Businessweek, *Most Powerful Trader*.

62.     SAC's informational advantage is frequently referred to inside the firm as "edge," and as reflected in the email and instant message ("IM") communications set forth below, the term often indicates access to inside information.

63.     Reflecting its negative connotations of access to illegal inside information, Cohen stated that he "hate[s]" the word "edge" when asked about it at deposition in a case brought against SAC and other hedge funds, alleging market manipulation, titled *Fairfax Financial Holdings Ltd. v. SAC Capital Management LLC*, No. L-2032-06 (N.J. Super. Ct.) (the "*Fairfax* litigation").  As he testified in his February 2011 deposition there ("Cohen Fairfax Dep."), at 468:17-469:3:

> Q.  Mr. Cohen, are you familiar with the term "edge"?
>
> A.  Yes, I am.
>
> Q.  That's a word that you use at S.A.C., correct?
>
> A.  I hate that word.
>
> Q.  What's that word mean?
>
> A.  It just means that somebody believes that in a particular situation, stock, that the word suggests that somehow their expectations are different than either investors' expectations or Wall Street's expectations.

64.     In fact, in 2008, SAC used the term "edge" prominently in its marketing literature and, as shown below, SAC personnel frequently used the term in internal communications.

**B.      SAC's Organizational Structure Served to
          Encourage Employees to Obtain Illegal
          <u>Inside Information and Funnel It to Cohen</u>**

65.      SAC employs dozens of portfolio managers specializing in particular business

sectors, including technology, health care, financial services, industrial, energy, and consumer

products.

66.      SAC portfolio managers typically employ their own research analysts to provide

investment ideas for their portfolios.  Portfolio managers generally operate autonomously, and

may take trading positions contrary to those of other portfolio managers at SAC.  *See United

States v. Martoma*, No. 12 Cr. 973 (PGG), Trial Transcript ("Martoma Trial Tr."), at 510:14-21.

67.      The largest trading portfolio or "book" at SAC is managed by Cohen personally.

During the Class Periods, Cohen's book was $3 to $4 billion, roughly one-quarter of the total

capital managed by SAC.  *See* CNBC.com, *Facing Probe, Steve Cohen Shrinks Trading Book*,

Oct. 17, 2013.

68.      Portfolio managers and analysts at SAC are required to provide Cohen with their

best "high conviction" trading ideas on a regular basis, and this is a critical part of their job and

principal source of their compensation.

69.      As explained in an internal SAC document (SAC_ELAN0388584, emphasis in

original):

> All investment professionals at each SAC division are required to support
> Steve with idea flow. . . .
>
> The goal of the idea submission process is to get ideas into the Cohen
> Account. Idea template submissions are a tool in the process of supporting
> Steve.  *A regular dialog with Steve and his team is a critical.*
>
> Idea flow from the firm is an important component of Steve's investment
> process. The major component of the yearend "firm bonus" is based on the
> P&L generated on Cohen Account positions to which you have contributed
> and been tagged. . . .
>
> Submissions should be your highest conviction ideas. If your highest
> conviction ideas remain the same from a previous week, send in an update

reiterating your conviction and any information/perspective changes.
Reiteration of an idea conveys conviction.

70.     As indicated, SAC tracks the trades made by Cohen in his portfolio, and credits

the portfolio manager or analyst responsible for providing Cohen with the trading idea.  If

Cohen's portfolio makes a profit from an investment idea, the portfolio manager or analyst

responsible receives a percentage of the profits made in Cohen's account.

71.     Portfolio managers are compensated primarily based on their own portfolio's

performance and the success of any trading ideas they provide to Cohen.  Research analysts are

compensated at the discretion of their portfolio managers.

72.     SAC's business model provides SAC employees the incentive to obtain inside

information and pass it along to Cohen as a "high conviction idea" while enabling him to claim

that "he doesn't know the sources of information behind his traders' tips."  Vanity Fair, *Hunt for

Cohen*.  As one former SAC analyst explained, "Steve knows his business model protects him,"

and leads SAC fund managers to "think Steve wants you to have inside information but doesn't

want to know you do."  *Id.*

C.     **CR Intrinsic, the SAC Unit that Employed
       Martoma, Was Directly Supervised by Cohen
       and Managed Much of His Personal Wealth**

73.     CR Intrinsic, the division of SAC that directly employed Martoma, is directly

supervised by Cohen and, according to news reports, managed much of Cohen's personal net

worth, estimated at $8.8 billion in 2008.  Svea Herbst-Bayliss & Katya Wachtel, *Latest Arrest

Shines Light on Cohen's CR Intrinsic Unit*, Reuters, Nov. 20, 2012.

74.     Asked about his relationship with CR Intrinsic at his 2011 deposition in the

*Fairfax* litigation, Cohen explained (Cohen Fairfax Dep. 586:5-25):

A. Intrinsic was a division of S.A.C. and essentially it was me and a guy named Matt Grossman who was running that division.

Q. And what was the idea behind Intrinsic?

A. Essentially that we would have a group of analysts that would work solely for us as opposed to relying on portfolio managers and analysts in the firm to ferret out ideas.

Q. Okay. So C. R. Intrinsic was your own -- your own analysts?

A. That's right.

Q. Did it -- did it have its own funds?

A. It was allocated funds from S.A.C. Capital.

Q. Okay. And then who made the investment decisions on that, you?

A. It was me and Matt Grossman. Well, that's not true. There were other people who had the ability to invest.

Q. Okay. Was it in the same office?

A. It was in the same office . . . .

75.    Martoma's employment contract also reflected that he worked closely with

Cohen.  That contract provided (GX 570[1], emphasis added):

> CR Intrinsic Investors, LLC ("Intrinsic") is pleased to offer you
> employment in accordance with the following terms (the "Agreement'"):
>
> 1. **Duties and Responsibilities:**
>
>    a.  Intrinsic will employ you as a portfolio manager for the GEHC
>        account working as part of the **Intrinsic Team** focusing on issuers
>        in the European healthcare sector. As used herein, "**Intrinsic
>        Team"** means the portfolio managers, analysts and trading
>        assistants (but not execution traders) constituting at any time
>        **Steven A. Cohen's investment team**.
>
>    b.  **You will report to** Matt Grossman, **Steven A. Cohen** and/or his or
>        their designee (who will be reasonably acceptable to you) and
>        Intrinsic's senior management. You will work at Intrinsic's offices
>        in Stamford, Connecticut.

---

[1]    References in the form "GX __" and "DX __" are to exhibits introduced at the Martoma
criminal trial, held January 10, 2014 through February 3, 2014.

c.  Throughout each business day by telephone, email or in person you will discuss with and/or provide to Matt Grossman and **Steven A. Cohen** or his designee information relating to investment ideas and any other matter relating to the subject matter herein. . . .

## II.  DEFENDANTS' INSIDER TRADING IN ELAN AND WYETH

### A.  Background Regarding Elan and Wyeth

76.     Elan was an Irish public limited company with its principal executive offices in Dublin, Ireland.  Elan's principal research and development facilities were located in the United States.  On December 18, 2013, Elan was acquired by Perrigo Company plc ("Perrigo"), an NYSE-listed pharmaceutical company.

77.     Elan was incorporated as a private limited company in Ireland in December 1969 and became a public limited company in January 1984.  It reported with the SEC as a foreign issuer from at least 1996 until its acquisition by Perrigo, and its ADRs were registered pursuant to Exchange Act Section 12(b) during the Elan Class Period.

78.     Elan's Ordinary Shares traded on the Irish Stock Exchange, and its American Depositary Shares ("ADSs"), evidenced by ADRs,[2] traded on the NYSE under the symbol "ELN" during the Elan Class Period.

79.     Elan's 2007 annual report on Form 20-F, filed February 28, 2008 (the "Elan 2007 Form 20-F") identifies the NYSE as "the exchange on which the majority of our shares are traded" and during the Elan Class Period, more than 93% of all such trades occurred on the NYSE.

---

[2]     ADSs are securities that directly represent an ownership interest in deposited securities; ADRs are the physical certificates that evidence ADSs.  *See* SEC, *American Depositary Receipts*, S.E.C. Release Nos. 33-6894, 34-29226, IS-274, 48 S.E.C. Docket 1440 (May 23, 1991), *available at* 1991 WL 294145, at *2 n.5.  While SEC regulations distinguish between ADRs and ADSs, the SEC has noted that "confusion has resulted from this distinction," and as such has deemed it "appropriate to eliminate the ADR/ADS distinction."  *Id.*

80.     Wyeth was a pharmaceutical company incorporated in Delaware with its principal place of business in Madison, New Jersey.  Wyeth's securities were registered with the SEC pursuant to Section 12(b) of the Exchange Act, and its stock traded on the NYSE under the symbol "WYE" until Wyeth was acquired by Pfizer Inc. in 2009, after the Wyeth Class Period.

**B.      The Bapineuzumab Phase 2 Clinical Trial and Its Role as a Key
           Share Price Driver for Elan and Wyeth During the Class Periods**

**1.      Background Regarding Bapineuzumab
           and the Phase 2 Clinical Trial**

81.     Starting prior to the Class Periods, Elan and Wyeth jointly undertook research and clinical trials of bapi, then viewed as one of the most promising treatments for Alzheimer's disease (sometimes abbreviated "AD"), a progressive brain disorder that gradually destroys a person's memory and ability to communicate and carry out daily activities.

82.     Clinical trials are divided into three phases involving progressively greater numbers of test subjects, and are a central part of the process of new drug review and approval required by the FDA.  In Phase 1 (sometimes abbreviated "P1"), a trial tests the drug on a small group of people (generally, 20-80) to determine its safety, determine a safe dosage range, and identify side effects.  In Phase 2 (sometimes abbreviated "P2"), the drug is given to a larger group of people (generally, 200-300) to determine if it is effective and to further evaluate its safety.  Finally, in Phase 3 (sometimes abbreviated "P3"), the drug is administered to large groups of people to confirm its effectiveness and its safety, and to monitor any side effects.

83.     In 2006, a Phase 1 trial of bapi showed promise, and between 2006 and 2008, Elan and Wyeth jointly conducted a Phase 2 clinical trial.  The Phase 2 trial was designed to assess the safety and tolerability of bapi in mild-to-moderate Alzheimer's disease and to explore bapi's efficacy at a range of doses.

84.     Prior to the completion of the Phase 2 trial, in May 2007, Elan and Wyeth announced the decision to initiate the Phase 3 trial of bapi, which proceeded concurrently with the Phase 2 trial, starting December 2007.

85.     Both companies' investments in bapi were enormous; in the case of Elan (which held a 50% interest in the drug), its research and development budget increased by 20% in 2007 (to $260.4 million), "primarily due to increased expenses associated with the progression of our Alzheimer's disease programs, particularly the move of AAB-001 [bapi] into Phase 3 clinical trials and the move of ELND005 into Phase 2 clinical trials during 2007."  Elan 2007 Form 20-F at 44.  Wyeth's investment was equally large.

### 2. The Phase 2 Trial Was the Primary Source of Elan ADR Price Gains During the Period That Cohen and Martoma Were Buying Elan Securities and Receiving Inside Information from Gilman

86.     During the Elan Class Period, Elan was heavily reliant on the continued success of a single drug, *Tysabri*, which after being approved in the U.S. in 2004 had been temporarily suspended for 16 months in 2005-2006 due to safety concerns.  Elan's future prospects depended almost entirely on *Tysabri* and the success of drugs in its development pipeline, particularly bapi.

87.     In its 2007 Form 20-F, Elan emphasized the importance of bapi (referenced by the identifier AAB-001), cautioning as its first-listed risk factor that "***if our Phase 2 and 3 clinical trials for AAB-001 are not successful and we do not successfully develop and commercialize additional products, we will be materially and adversely affected.***"  (Emphasis in original.)

88.     Both stock analysts and internal SAC communications confirm Elan's view that the bapi Phase 2 trial was crucial to its future, citing bapi and the Phase 2 trial as key drivers of Elan's ADR price during the Elan Class Period.

89.     The views of stock analysts are reflected in numerous analyst reports in 2006, 2007, and 2008, which explicitly recognized the central role of the ongoing bapi Phase 2 trial (sometimes referred to more generally as Elan's "Alzheimers program") to Elan's future prospects.  A representative sample of analyst reports during this period is as follows:[3]

Davy[4] (Oct. 3, 2006):
Alzheimers still the key catalyst

The market is increasingly focussed on the potential of Elan's Alzheimers Disease (AD) programme.

Goldman Sachs (Mar. 7, 2007):
While near-term cash flows depend on Tysabri, the company's Alzheimer's pipeline is a key source of Elan's value.

Natexis Bleichroeder (Apr. 10, 2007):
Our fair value estimate remains $16. As described above, we think a generous value for the stock without AAB-001 would be roughly $10 – or $4 lower than where it is currently trading. We think the stock value with AAB-001 is something in the range of $25, which would be a substantial upside from current levels but coming with substantial risk.

AG Edwards (Apr. 24, 2007):
Data flow over next two months (Tysabri at AAN, and admin look at AAB-001 Phase II data) may shed light on long-term prospects of these two key drivers of ELN's valuation.

JP Morgan (July 30, 2007):
Elan's 2Q07 earnings release was relatively uneventful as there weren't many updates on the two primary drivers of valuation, Tysabri (multiple sclerosis) and bapineuzumab (AAB-001, Alzheimer's disease).

Davy (Oct. 25, 2007):
The depth and breadth of Elan's AD [Alzheimer's disease] franchise remains the key reason to buy the shares.

Citigroup (Jan. 14, 2008):
The main catalyst for Elan's shares in 2008 remains data from the Alzheimer's programs and we view investor expectations as optimistic.

---

[3]     All cited materials are maintained on file and are available at the request of the parties or upon direction from the Court.

[4]     Davy is a leading Irish broker-dealer and sell-side analyst firm.

Goodbody[5] (Jan. 17, 2008):

    AAB-001 data release remains the main catalyst for 2008: The main catalyst in 2007 (share price up 48% in 6 weeks) was the announcement that after an interim look at Phase II data, AAB-001 was going to be moved into a Phase III trial one year ahead of schedule. The main catalyst this year, we believe, will be the release of the full Phase II data, the interim portion of which caused the acceleration of the trial process.

JP Morgan (Apr. 16, 2008):

    What's next? Alzheimer's program is key. In the next 6 months, we expect incremental data from the Alzheimer's programs to drive share price performance.

Caris & Co. (May 14, 2008):

    A significant percentage of ELN's $14.1B EV depends on bapineuzumab's success, based on our assumptions, and poor clinical results would be a major negative.

Goldman Sachs (June 23, 2008):

    We view the presentation of the Bapineuzumab phase II data at the ICAD Meeting on July 29 as the most significant near-term catalyst for the stock. However, we continue to believe that the possibility of a sub-part E filing [accelerated FDA approval for bapi] (potentially on interim phase III data) cannot be ruled out.

Goodbody (July 16, 2008):

    Tysabri progress secondary to AAB-001 at present: With the AAB-001 Phase II headline data on the treatment of Alzheimer's released and the full data to come at the end of July, Elan is reporting its Q208 results next Thursday, 24 July into a relative vacuum. Recent price movements have concentrated around the development progress of AAB-001, with the commercial progress of Tysabri playing second fiddle.

       90.    The quantitative impact of bapi on Elan's stock price is also reflected in the "sum-of-the-parts" valuation analyses performed by several of the leading equity analysts covering Elan. These analyses attribute a specific component of their overall stock price targets for Elan to bapi and this component grows sharply over the Elan Class Period, as shown in the following charts reflecting their analyses over time:

---

[5]     Goodbody is another leading Irish broker-dealer and sell-side analyst firm.







91.     The impact of bapi on Elan is also reflected graphically in a stock chart for the

Elan Class Period.  As the chart shows, both of the principal events – in May 2007 and June

2008 – that drove Elan's ADR price higher during such period were bapi Phase 2

announcements:



92.     Internal SAC communications regarding Elan between Martoma, Cohen and others reflect the same perspective as the market – viewing bapi and *Tysabri* as the joint principal drivers of share price in the early part of the Elan Class Period, from late 2006 through 2007, and citing bapi as the primary price catalyst in 2008:

Email, Aug. 27, 2006, Martoma to Cohen and CR Intrinsic head Matthew Grossman ("Grossman") (SAC_ELAN2756721):

Here's the ELN notes I wrote up in Intrinsic format. . . .

Thesis: (1) AD program (worth up to $40 per share if works, another ~$4 from here if drug moves to P3); (2) Tysabri (worth ~$25 per share on higher peak sales than consensus); (3) ELN profits (worth ~$20 per share on higher earnings leverage than consensus).

Conviction: High

Email, July 19, 2007, Martoma to Cohen and Grossman (SAC_ELAN1826452):

Our big driver continues to be AD program and safety updates on Tysabri, which have catalysts this quarter.

Email, Jan. 13, 2008, Martoma to Cohen (GX 440), proposing to sell 10-20% of Elan position to take some profits, with the intention to "size back up to max size on any weakness in broader markets.  I want to be there in size well ahead on Alz data release."

Email, Mar. 9, 2008, Martoma to Cohen (SAC_ELAN0516219-20):

In terms of events revaluing the stock [Elan], we see the following events benefiting the stock:

AAN (April 12-19[th]) [about Tysabri] . . .

Analyst Day (May 7th) - Mgt will set the stage for Bap data coming and (I believe) highlight a planned investment in Bap manufacturing. . . .

Topline Alz data (late May/June) - a statistically significant result mentioned in the topline will produce a sharp move in stock and create a great deal of expectation going into data release in late July.

ICAD Bap Data presentation (July 25-31) - Data will lead to speculation about whether ALZ suggests high expectations for P3 to be positive and/or lead to an early filing.

***Target Price***

I think stock could reach mid 30s on a positive topline release and grind higher to low 40s on data presentation and early filing potential.

3. **The Phase 2 Trial Was a Major Source of Wyeth Price Gains During the Period That SAC Was Buying on Illegal Inside Information**

93.     Both public sources and internal SAC communications establish that the bapi Phase 2 trial was also a key driver of Wyeth's share price during the Wyeth Class Period.

94.     Multiple analyst reports in the first half of 2008 explicitly recognized the central role of the ongoing bapi Phase 2 trial to Wyeth, as reflected in the following representative sample of analyst reports during this period:

Morgan Stanley (March 12, 2008):
> Importantly, today's news does not impact our fundamental view on WYE, for which we still believe has attractive upside potential. WYE has the largest exposure to some of the most attractive assets in the drug industry, including vaccines, biologics, OTC, and an early-mid-stage Alzheimer's pipeline. . . Also, WYE has a valuable call option that it shares with ELN on bapineuzumab that could be a signficant blockbuster if it shows disease-modifying potential. We expect to see top line Phase II data in mid-2008.

Morgan Stanley (April 22, 2008):
> We are maintaining our Overweight rating and $48 target. . . . Our price target is based on . . . an assumption that the base case for bapineuzumab (positive data showing that the drug delays the progression of symptoms but is not disease-modifying) will play out.

Credit Suisse (April 22, 2008):
> **1Q08: Nice Backdrop Pre-Bapineuzumab Data**
>
> [W]e now expect that WYE's stock price performance will be closely linked to 2 key catalysts: FDA action by Relistor (methylnaltrexone), expected on April 30 for the subcutaneous formulation; and bapineuzumab Phase 2 data release (June-July). WYE conveyed confidence about both milestones.

Morgan Stanley (May 27, 2008):
> Ahead of the highly anticipated Phase II data release for bapineuzumab, the most exciting lead candidate for the treatment of Alzheimer's disease, we are highlighting what we believe to be the possible scenarios and how the stock reacts to each of these. We see three potential scenarios: (1) spectacular data defined by statistical significance (stock goes up $>6), (2) good data defined by positive trends (stock up $3-4), and (3) disappointing data defined by lack of activity and/or unexpected safety signal (stock goes down $2-3). Based on our calls with clinicians along with

WYE/ELN's decision to move into Phase 3 studies based on an interim analysis of Phase 2, we believe the highest probability outcome is scenario #2. We expect to change our risk-adjusted sales depending on the quality of the Phase II data. Under our bapineuzumab model, we currently assume our base case, which is a strong profile but short of disease-modifying, and ascribe a 15% probability of success (sales of $200 million by 2012).

*          *          *

We are maintaining our Overweight rating and $48 price target . . . the upcoming Phase 2 data presentation for bapineuzumab (mid-2008) has driven multiple expansion. We think the stock can trade up to the high $40s in anticipation of positive Phase 2 data, but clearly as we reach the top end of our price objective, there becomes less room for any data disappointments (which we are not anticipating).

Cowen and Company (May 28, 2008):

We updated our WYE model and extended our estimates through 2015. Despite significant Bapineuzumab projections, we forecast modest growth through 2012. However, growth should accelerate thereafter. . . . We forecast Bapineuzumab sales of $300MM in 2011 and $3.5B in 2015.

Deutsche Bank (June 4, 2008):

**AD Phase 2 data expected shortly, and we assume they will be positive**
Top-line results from the bapineuzumab phase 2 AD trial will be forthcoming in June. Our assumption is the results will provide positive preliminary evidence for bapineuzumab, and we forecast WYE's shares should react positively to the news short term. We maintain our Hold rating on the stock, however, as we believe the shares will remain range bound over remainder of the year given the multitude of other pipeline disappointments and generic losses for important drug which should continue to limit EPS growth over the next few years . . . . However, a breakthrough in AD could transform WYE into a growth company longer term

Credit Suisse (June 12, 2008):

**Many Scenarios Imply Large Commercial Opportunity for Bapineuzumab**
We think the phase II bapineuzumab data in mild-moderate Alzheimer's Disease (AD) is likely to imply a large commercial opportunity for Wyeth and Elan. The key question is: how large?
The range of outcomes implies many possibilities for a big commercial drug because of the large unmet medical need and the notion that a drug that is either 1) reasonably safe with limited efficacy or 2) less safe but with tremendous efficacy (for even a niche AD population) could be big.
If the data is reasonably positive (implying a multibillion dollar potential) Wyeth's long-term outlook is upgraded vs. consensus numbers and the speculation of an acquisition is increased. Both of these factors will drive the stock up and give it more support, even if profit taking occurs.

A reasonable forecast range for bapineuzumab global revenues to WYE is $900 MM - $2.9 Bn in 2015. Our base case for 2015 is $2.25 Bn, assumes 50% probability of success and 50/50 split with Elan.

The stock reaction will come in 2 parts:

1. Company press release (to be distributed in the next several weeks) that will likely contain a summary of the overall safety and efficacy findings- this may elicit the more profound reaction. For Wyeth, this is likely to be positive, but modes profit-taking could occur pre-ICAD. Good news could take the stock towards $49, worst case towards $40.

2. Full data presentation at the ICAD Meeting (July 26-31, 2008) where investors will have the chance to add precision to forecasts.

*        *        *

Our thesis on WYE, and our Outperform rating on the stock, is based on three factors:

(1) Low investor expectations
(2) Potential of their Alzheimer's Disease program (especially bapineuzumab)
(3) Potential as an acquisition target

We see a tie in to the bapineuzumab outcome to the other factors of our thesis. We believe that the data will show a reasonably safe product while also supporting its potential on efficacy with positive trends and maybe some statistically significant outcomes on pooled data sets. This should result in an increase in WYE's share price when the press release is distributed and futher gains around the ICAD meeting. If the data is reasonably positive, investors may become more positive about Wyeth's longer term outlook and speculation regarding the company's attraction as an acquisition target could grow.

Cowen and Company (June 13, 2008):

Conclusion: Our probability-weighted outcomes analysis suggests that the WYE share price could see around 10% upside against the market when the Bapineuzumab Phase II data is revealed in the next two weeks. This conclusion represents the average stock movement from six potential outcomes. . . . Highest Probability: Trend Toward Effectiveness with Safety Questions . . . we assess the probability of a trend toward effectiveness with safety questions at 45-50%. In this scenario, we believe WYE stock could be up $5. Should effectiveness achieve statistical significance with good safety (0.16 probability), we believe WYE stock could be up $10. But, should there be no positive trend in effectiveness but some safety questions (0.16 probability), we believe WYE stock could be down $5.

Credit Suisse (June 17, 2008):

Alzheimer's Data Very Promising
The positive top-line phase II bapineuzumab data released by WYE (and partner ELN) today are promising for WYE shareholders for 3 reasons:

1. Strong clinical and MRI efficacy and reasonable safety in the 40-70% of Alzheimer's Disease (AD) patients who are not carriers of the ApoE4 gene appears to exceed consensus expectations for the data and should allow WYE shares to migrate into the high 40s in the near term

2. Over the mid-longer term, the addition of bapineuzumab to WYE models by the Street should lead to positive revisions in WYE estimates and an improved view on the company's outlook for the 2011/2012 timeframe

3. Finally, takeover speculation should increase on today's news given the interest larger pharma companies have shown in expanding their biologics business in general and their focus on AD in particular.

*          *          *

Given the size of the AD market and the vast unmet medical need that exists, similar results in non-carriers in the ongoing phase III studies should allow for bapineuzumab to become a blockbuster (see sales forecast in Exhibit 1) and support our Outperform rating and $55 12-month price target on the stock. Any benefit seen with carriers in phase III would be upside

Deutsche Bank (July 23, 2008)

Our $48 PT assumes a target multiple of 13.3X our '09 est, the highest in the drug group. While this may appear rich given the near term EPS pressures, and uninspiring new drug launches, it is in fact justifiable, in our view, due to the recent positive phase 2 study results for bapineuzumab, which suggest that the rev potential in AD could be substantial in '10 and beyond. We have believed that ex-Alzheimer's, the company's pipeline is unattractive, and certainly insufficient to offset the loss of exclusivity through '10 for two of its largest drugs, Effexor and Protonix, representing 35-40% of profits. The downside risks are a less positive read on bapineuzumab on July 29th at ICAD, and a disappointing launch for Pristiq. The upside risk to our PT and Hold rating, would be a NT incrementally much more positive reception of data from the company's Alzheimer's program and/or a takeout.

95.     The impact of bapi on Wyeth is also reflected graphically in a Wyeth Class Period

stock chart:



96.     Internal SAC communications regarding Wyeth also reflect bapi's importance.  In an email to Cohen dated January 30, 2008, Martoma described Wyeth as "a compelling long at this price" and listed stock catalysts, with the bapi Phase 2 trial identified as having a larger price impact than all other factors combined (SAC_ELAN0428910):

> P2 Alz data with results topline in 1H08 and data presentation in July at Alz Conference (major catalyst). Won't rehash our stance on data, but we believe it can be a major driver for stock if results are in line with our thinking. We have high conviction in this datapoint. +25% ($10)

97.     Similarly, a July 13, 2008 email from Martoma to Cohen listed Wyeth, together with Elan, as two of his three long positions and cited "P2 AD data presentation at ICAD (7/24-7/31)," along with quarterly earnings calls, as "upcoming catalysts."  SAC_ELAN0145386-87.

98.     In addition, Wayne Holman ("Holman"), a former SAC portfolio manager who had an advisory agreement with Cohen with respect to Wyeth during the Wyeth Class Period, testified at his deposition by the SEC on March 20, 2012 (the "Holman Dep.") that his investment thesis in favor of Wyeth was based on (i) the relative stability of Wyeth's base business, and (ii) his view that bapi had great potential that had not been priced into the stock. Holman Dep. 61:8-66:20.  In Holman's analysis, the principal source of upside in Wyeth shares was therefore bapi (*id.* at 66:2-11):

> So you know the market size was very large and you knew if the drug worked well it could potentially be billions of dollars, even tens of billions of dollars in years of sales, so I like Wyeth, because I felt that the base business was more stable than a lot of the other companies and the potential for upside was there if Bapineuzumab turned out to be a huge success and if Bapineuzumab failed, whether it failed in Phase II or failed in Phase III, there wasn't a lot of value in Wyeth for that, such that even with a failure you might not lose money.

C.     **Background Regarding Martoma and Gilman**

    1.    **Martoma Was Hired to Work on Cohen's
Investment Team Based on His Contacts at
Public Companies, and His Access to Inside
Information Was Later Noted by Cohen**

99.     Martoma joined SAC in 2006, after working at a smaller hedge fund in Boston.

He received his B.A. in biomedicine, ethics and public policy from Duke University in 1995 and

worked at the National Human Genome Research Institute after college.  He later received an

MBA from Stanford University ("Stanford").  In March 2014, Stanford revoked his MBA,

following public disclosure in his criminal case that he been expelled from Harvard Law School

for falsifying his law school transcript before enrolling at Stanford, an event that he failed to

disclose in his business school application.

100.     At the time Martoma was hired, the due diligence report on him referred to his

"industry contacts beyond management," and his personal "network of doctors in the field."

101.     Cohen later noted Martoma's contacts inside biotech pharmaceutical company in

a February 2007 IM exchange (SAC_ELAN0044408):

> Martoma: hey steve, wanted to make sure u saw the novartis news
>
> . . .
>
> Cohen: street got galvus right
>
> Martoma: well actually most of market was expecting approval until pru note
> came out ||[6] his note spooked market, and yes he was correct || but we have
> better edge given the second product is partnered with a small biotech
> company, while first was internal to novartis only
>
> Cohen: and i would think u have a line into smaller co
>
> Martoma: yes

---

[6]    Line breaks in IMs are indicated with the notation "||".

102.   For 2008, Martoma received a bonus of over $9.3 million.  That bonus included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain other SAC portfolios.  GX 555; GX 554-A.

103.   Martoma's success with Elan in 2008 contrasts sharply with his later performance at SAC.  Martoma received no bonus in 2009, and was fired in 2010.  In a 2010 email suggesting that Martoma be fired, an SAC officer commented that Martoma had been a "one trick pony with Elan."

104.   On February 6, 2014, a jury convicted Martoma of securities fraud and conspiracy to commit securities fraud in connection with his insider trading in Elan and Wyeth.

**2.**      **Gilman and His Role in the Bapineuzumab Clinical Trials**

105.   Defendant Gilman is a leading neurologist and expert on Alzheimer's disease. Until he resigned in late November 2012 after the Martoma Criminal Action and SEC Action had been filed, Gilman was the William J. Herdman Distinguished University Professor of Neurology at the University of Michigan.  He was also the Director of the Michigan Alzheimer's Disease Research Center, has authored or co-authored over 200 peer-reviewed papers, and has received numerous awards in his field.

106.   Gilman became affiliated with Gerson Lehrman Group, Inc. ("GLG"), a leading expert network firm, in 2002, and joined GLG's Scientific Advisory Board.  GLG introduced Gilman to Martoma in 2006.  Martoma Trial Tr. 1231:19-1232:1.

107.   Gilman served as Chair of the Safety Monitoring Committee (the SMC) for bapi Phase 1, Phase 2 and Phase 3 clinical trials starting in 2003 and continuing until at least 2011. Gilman was paid approximately $79,000 by Elan for his work on the SMC in 2007 and 2008.

108. By the time Gilman was introduced to Martoma, Gilman's ongoing relationship with Elan and Wyeth and resulting access to nonpublic safety data was therefore well-known publicly and known to Martoma.

109. As Chair of the bapi SMC, Gilman had continuing access to material nonpublic information concerning the Phase 2 trials of bapi beginning in 2006.

110. In addition, in June 2008, Elan invited Gilman to present the Phase 2 trial results on behalf of Elan and Wyeth at ICAD, a widely-anticipated Alzheimer's disease conference scheduled to be held on July 29, 2008. To perform this function, Gilman was given access to the full Phase 2 trial results approximately two weeks prior to the July 29 Announcement.

111. By virtue of his roles in the clinical trial, and in accordance with the terms of his contract with Elan, Gilman owed Elan a duty to hold in strict confidence all information he learned in connection with his participation in the clinical trial and to use such information only for Elan's benefit. The consulting agreement between Elan and Gilman provided that "[a]ny and all information which Elan may disclose to Consultant under this Agreement will be considered confidential . . . ." GX 20. In addition, the SMC Operating Guidelines, to which Gilman was subject, provided that "strict confidentiality will be maintained by all the SMC members in accordance with written agreements" with Elan. GX 124-A.

112. Elan and its Alzheimer's disease development partners placed a great deal of confidence in Gilman. From 2001 to 2003, Gilman was Chair of the Elan/Wyeth SMC for the Phase 2 clinical trials of AN1792 for Alzheimer's disease, and from 2008 to 2010, Gilman was Chair of the Elan/Transition Therapeutics SMC for the Phase 2 clinical trials of Scyllo-Inositol for Alzheimer's disease. From 2010 and continuing until at least 2011, Gilman was also Chair of

the SMC for the Phase 1 clinical trial of AAB-003, another drug being jointly developed by Pfizer and Elan to treat Alzheimer's disease.

113.    Gilman also received training regarding conduct that was prohibited by the federal securities laws from GLG, the expert network firm that introduced him to Martoma. GLG repeatedly reminded Gilman not to share nonpublic information with clients.  Emails sent to Gilman by GLG listed bapi as a topic that Gilman was "not allowed to discuss," GLG-053905, and Gilman was informed as early as 2006 of a GLG rule that prohibited GLG members who served on safety monitoring boards from speaking to clients about the clinical trials for which they served on such boards.  GX 662.

114.    Martoma was also placed on notice by GLG that Gilman was subject to confidentiality obligations concerning bapi and, later, that bapi was a prohibited topic in his consultations with Gilman.  *See* GX 261 (August 23, 2006 email from GLG to Martoma, stating that Gilman is "Chair of the Safety Monitoring Committee" for the bapi trial, and "has a confidentiality agreement and will share only information that is openly available"); GX 272 and GX 268 (December 18, 2007 and March 28, 2008 emails from GLG to Martoma stating that "[t]he Council Member [Gilman] has indicated that they are unable to discuss the following topics: - AAB-001").

115.    Prior to the indictment of Martoma in November 2012, the DOJ entered into a nonprosecution agreement with Gilman.  GX 740.  Gilman is also a named defendant in the SEC Complaint and on November 16, 2012 consented to entry of a judgment against him, which provided for disgorgement of profits and interest in the amount of $234,868, as well as an injunction against further violations of the securities laws.

**D.    Martoma Pursues Contacts with Numerous Bapineuzumab Phase 2 Clinical Investigators and Recruits Gilman and at Least One Other Doctor Participating in the Phase 2 Trial**

116.    Martoma's access to nonpublic information regarding the bapi Phase 2 trial from Gilman and Ross, discussed in detail below, reflects part of an ongoing, broader effort by him to obtain inside information from doctors working on the bapi Phase 2 trial.

117.    Following his initial consultations with Gilman, Martoma sent GLG an email on August 30, 2006 that listed twenty-two doctors and asked: "Are any of these docs in your database? I would like to seek consultations with all of them on Alzheimer's Disease and AAB-001. For those not available, can we recruit?"  GX 262.  *See also* GX 260 (August 19-20, 2006 email exchange between GLG and Martoma regarding contacting "the AAB 001 investigators you have spoken with before").

118.    *Each* of the twenty-two doctors listed in the email was a clinical investigator participating in the bapi Phase 2 trial.  *See* GX 19-A at 22.

119.    The next day, Martoma sent a similar list of seventeen doctors to a second expert network firm, Wall Street Access.  GX 320.

120.    Each of the seventeen doctors listed in the email was also a clinical investigator participating in the bapi Phase 2 trial.  *Id.*

121.    Reflecting the widespread recognition in the medical community that doctors participating in a drug's clinical trial should not be conducting paid consultations regarding the drug, most of the doctors in GLG's network declined to consult, citing "conflict of interest."  GX 264.

122.    In May 2007, Martoma again sought to recruit additional doctors participating in the bapi Phase 2 trial through Wall Street Access.  Again, each of the six doctors listed in the email was a bapi Phase 2 trial investigator.  SAC_ELAN1863116-17.

123.    In April 2008, Martoma again sought to recruit additional doctors participating in the bapi Phase 2 trial through Wall Street Access, explicitly asking "who do u have?" who were "AAB-001 investigators" and then requesting to speak with two of the doctors whose names were supplied.  SAC_ELAN0682259-62.  *See also* GX 324 (March 19, 2008 email exchange between Martoma and Wall Street Access, in which Wall Street Access stated "[b]elow pls find bio's for a few PI's who've worked on the Phase II trial for AAB-001 -pls let me know whom you'd like to speak with," to which Martoma responded "Would like to speak to all of them - how is next week?").

### E.    Gilman Provides Martoma with Inside Information Regarding the Bapineuzumab Phase 2 Trial on Numerous Occasions Between August 2006 and July 2008

124.    Martoma was introduced to Gilman through GLG.  He first consulted with Gilman in early 2006, prior to joining SAC.  GLG-058027.  Martoma resumed contact with Gilman on August 19, 2006, a month after joining SAC, and asked if he was available for a consultation.  GX 200.  At Gilman's request, Martoma then immediately contacted GLG to request a consultation, specifically regarding "AAB-001" – bapi.  GX 260.

125.    Martoma then spoke with Gilman for approximately two hours and 20 minutes during the afternoon of August 22, 2006.  DX 780.  The consultation was identified in GLG's records as regarding "AAB-001 for Alzheimer's Disease."  SAC_ELAN2893684.

126.    A follow-up email from Martoma after hours on August 22 confirms that they discussed Gilman's assessment of a safety issue associated with bapi – a topic on which Gilman had special insight from his work as SMC chair.  Indeed, the specific issue discussed in Martoma's follow-up email, vasogenic edema, was a major safety concern associated with the drug that had been publicly reported in April 2006.  The presence of the condition was also viewed as suggesting that the drug was effective at treating Alzheimer's.  As Ross later

explained at the Martoma criminal trial, "[i]t was theorized that [vasogenic edema] actually may be not only a completely reversible event but one which may indicate benefit or what we call efficacy of the compound bapineuzumab." Martoma Trial Tr. 678:14-16.

127.    That Gilman's observations regarding bapi extended beyond simply a summary of the public literature is reflected in their email exchange on August 22 – the very first time they consulted regarding bapi. Martoma wrote (GX 202):

> Hi Dr. Gilman,
>
> One follow-up question if I may, if we look at P1 data and think about the transient adema that was seen, does this really matter for the drug's potential. Ultimately, we can stop treating patients who develop adema without consequence. We may not be able to treat them thereafter, but we don't harm the patient. Thus, even if we are not able to treat all patients with the drug, there are many who would still benefit (assuming all the necessary caveats). Am I thinking about things too simplistically?
>
> Thanks again for the time today. Really appreciate your valuable time.
>
> Mathew

128.    Gilman responded a few minutes later (*id.*, emphasis added):

> Hi Mr. Martoma,
>
> I think you are right on target with these assumptions. ***I am hoping that we will be able to continue treating them after the edema subsides, but this remains to be determined.***
>
> Sid

129.    The day after Martoma's lengthy August 22, 2006 consultation with Gilman, SAC began aggressively increasing its ownership of Elan, more than doubling its holdings on August 23 and tripling them by the end of the week.

130.    Over the next week, Martoma and Gilman also held two follow-up calls. SAC_ELAN2893621; SAC_ELAN2892779. Both were identified in GLG's records as "Follow-up with Dr. Gilman: AAB-001 for Alzheimer's Disease." SAC_ELAN2893503; SAC_ELAN2892625.

131.    In all, between 2006 and 2009, Gilman participated in 59 consultations with SAC

portfolio managers and analysts arranged through GLG, including 42 consultations with

Martoma, for which Gilman was paid approximately $1,000 per hour:

| Date | Subject (Per GX 600) | Duration (in Minutes) |
|---|---|---|
| 8/22/2006 | AAB-001 for Alzheimer's Disease | 131 |
| 8/24/2006 | Follow-up with Dr. Gilman: AAB-001 for Alzheimer's Disease | 60 |
| 8/30/2006 | Follow-up with Dr. Gilman: AAB-001 for Alzheimer's Disease | 26 |
| 10/3/2006 | Follow-up with Dr. Gilman: AAB-001 for Alzheimer's Disease | 29 |
| 10/18/2006 | GLG: (NYC) Private Visit with Sid Gilman, MD on Alzheimer's Disease at SAC | N/A |
| 11/14/2006 | Follow-up: Therapies for Alzheimer's Disease | 70 |
| 11/22/2006 | Follow-up with Dr. Gilman: Overview of AAN Conference | 74 |
| 12/14/2006 | Follow-up with Dr. Gilman: AAB-001 for Alzheimer's Disease | 78 |
| 1/17/2007 | N/A | 3 |
| 1/19/2007 | Follow-up with Dr. Gilman: AAB-001 for Alzheimer's Disease | 47 |
| 2/2/2007 | Flurizan for Alzheimer's Disease | 86 |
| 2/9/2007 | Request for Dr. Gilman: Flurizan for Alzheimer's Disease | 82 |
| 2/15/2007 | Request for Dr. Gilman: Therapies for Alzheimer's Disease | 2 |
| 3/22/2007 | Request for Dr. Gilman: Alzhemed for Alzheimer's Disease | 85 |
| 4/4/2007 | Follow-up with Dr. Gilman: Overview of AAN Conference | N/A |
| 4/5/2007 | Follow-up with Dr. Gilman: Overview of AAN Conference | 67 |
| 4/24/2007 | Follow-up with Dr. Gilman: Overview of AAN Conference | 78 |
| 5/2/2007 | AAN - Morning Break with Sid Gilman, MD | N/A |
| 5/23/2007 | Request for Dr. Gilman: Alzhemed for Alzheimer's Disease | 65 |
| 6/4/2007 | Follow-up with Dr. Gilman: Alzhemed for Alzheimer's Disease | N/A |
| 6/10/2007 | Request for Dr. Gilman: Therapies for Parkinson's Disease | N/A |
| 6/14/2007 | Follow-up with Dr. Gilman: International Conference on Prevention of Dementia Overview | 91 |
| 8/22/2007 | Request for Dr. Gilman: Overview of Novel Therapies for Parkinson's Disease | N/A |
| 10/9/2007 | Follow-up with Dr. Gilman: Therapies for Alzheimer's Disease | 49 |
| 10/10/2007 | Follow-up with Dr. Gilman: Therapies for Alzheimer's Disease | 76 |
| 11/30/2007 | Follow-up with Dr. Gilman: Therapies for Alzheimer's Disease | 88 |
| 12/19/2007 | Request for Dr. Gilman: Overview of MS Therapies | 82 |
| 3/6/2008 | Request for Dr. Gilman: AAN Conference Preview | 95 |
| 3/10/2008 | Follow-up with Dr. Gilman: AAN Abstract Preview | 54 |
| 3/18/2008 | Follow-up with Dr. Gilman: AAN Abstract Preview | 149 |
| 4/8/2008 | Follow-up with Dr. Gilman: AAN Abstract Preview | 71 |
| 4/10/2008 | Follow-up with Dr. Gilman: AAN Abstract Preview | 180 |
| 4/15/2008 | GLG: (Chicago) Roundtable at AAN with Sid Gilman, MD | N/A |
| 4/17/2008 | GLG: (Chicago) Private Visit at AAN for SAC with Sid Gilman, MD on Alzheimer's Disease | N/A |
| 4/17/2008 | N/A | < 1 |
| 5/8/2008 | N/A | 5 |
| 5/9/2008 | Request for Dr. Gilman: Oral Fingolimod (FTY720) for Relapsing MS | 70 |
| 5/10/2008 | N/A | 131 |
| 5/22/2008 | N/A | 9 |
| 5/28/2008 | N/A | < 1 |
| 6/4/2008 | N/A | 34 |

| Date | Subject (Per GX 600) | Duration (in Minutes) |
|------|----------------------|-----------------------|
| 6/13/2008 | N/A | 3 |
| 6/14/2008 | N/A | 3 |
| 6/15/2008 | N/A | 5 |
| 6/16/2008 | N/A | 46 |
| 6/17/2008 | Preview of International Conference on Alzheimer's Disease (ICAD) 2008 | 64 |
| 6/18/2008 | N/A | 44 |
| 6/25/2008 | Request for Dr. Gilman: Therapies for MS | 30 |
| 7/9/2008 | Request for Dr. Gilman: Dimebon For Alzheimer's Disease | 75 |
| 7/11/2008 | N/A | 11 |
| 7/13/2008 | Request for Dr. Gilman: Parkinson's Disease and Rasagiline | 102 |
| 7/17/2008 | N/A | 116 |
| 7/18/2008 | N/A | 5 |
| 7/19/2008 | N/A (Martoma office visit) | N/A |
| 7/22/2008 | N/A | 39 |
| 7/23/2008 | N/A | < 1 |
| 7/24/2008 | N/A | 23 |
| 7/28/2008 | N/A | 15 |
| 7/30/2008 | GLG Conference: (Chicago) Roundtable at ICAD with Sid Gilman, MD | N/A |
| 7/30/2008 | GLG Conference: (Chicago) Private Visit at ICAD w/ Sid Gilman, MD on Alzheimer's for SAC | N/A |
| 7/30/2008 | N/A | 5 |
| 11/21/2008 | Request for Dr. Gilman: Current Overview of Neurology Space | N/A |
| 1/23/2009 | Request for Dr. Gilman: Current Overview of Neurology Space | N/A |

132.    At Martoma's criminal trial, Gilman described the confidential information that

he provided to Martoma (Martoma Trial Tr. 1168:24-1169:6):

> Q. Now, you said a moment ago you revealed confidential
> information to Mathew Martoma. What information did you
> reveal to him?
>
> A. I revealed progressively over time increasing amounts
> of information about adverse side effects until I was
> giving him all the information about adverse side
> effects. And I also revealed the results of the clinical
> trial with respect to efficacy.

133.    Gilman testified that he provided this information to Martoma although he

(Gilman) knew that all material related to his participation in the SMC was to be kept

confidential, including dates, discussion topics, and his personal views regarding the clinical trial

(*id.* at 1189:22-1190:10, 1195:23-1196:11):

> Q. Did you have an understanding while you were on the
> Phase II clinical trial for bapineuzumab of what, if any,

obligation of confidentiality you had as a member of the
safety monitoring committee?

A. I did.

Q. What was your understanding of what your obligations
were with respect to confidentiality?

A. My understanding that all the material we saw was to
be kept confidential.

Q. All material you saw from what?

A. All material we saw with safety was to be kept
confidential.

Q. And the "we" in that sentence is who?

A. We, the safety monitoring committee.

. . .

Q. Taking all of those agreements together, what was your
understanding of whether you were permitted to disclose
any information about the ongoing safety monitoring
committee?

A. My understanding was that I was not permitted to
disclose any part of the safety monitoring committee
results.

Q. What about dates of meetings, for example?

A. I was not permitted to disclose the dates of the
meetings.

Q. What about the general topics that were discussed at
the meetings without getting into details?

A. I was not permitted to disclose that item either.

Q. What about just your personal views as to what you
were seeing as a neurologist on the safety monitoring
committee?

A. I was not permitted to discuss my own views of what we
were seeing.

134.   Gilman testified that Martoma was particularly interested in information about the

side effect discussed at their August 22, 2006 consultation, vasogenic edema, and seemed to take

notes when Gilman was providing him specific numbers (Martoma Trial Tr. 1243:22-1245:2):

Q. Do you recall any particular subjects that Mr. Martoma
was interested in with respect to the drug trial?

A. He asked whether Mr. Martoma was interested in
particular subjects, and my response was, yes, he was
particularly interested in vasogenic edema.

Q. Did you talk to him about vasogenic edema?

- 44 -

A. Yes, sir, I did.

Q. What did you tell him about vasogenic edema?

A. I told him what I think the mechanism of it may be.

Q. What do you mean mechanism?

A. How it indicates that there is antibody attack of the beta amyloid in the blood vessels as I described earlier. I told him the relationship to dose. I told him the relationship as time went on to gene carriers; that it is more frequent in gene carriers, in carriers of the APOE4 gene.

Q. Did you have any information from SMC meetings as to the status of various people who had experienced vasogenic edema?

A. Yes.

Q. Did you ever share any of that information with Mr. Martoma?

A. Yes, I did share that information with him.

Q. Do you recall any other particular interests he had with respect to safety data on the drug trial?

A. Yes, he wanted to know precisely the number of patients and placebo cases who experienced each adverse event, both minor and major. He wanted to know the numbers. He wanted very specific information, in other words, and it sounds as if he was copying the numbers down.

Q. What made you believe he was copying the numbers down?

A. He asked me to go more slowly as I was telling him the numbers.

135.    During consultations with Martoma, Gilman discussed his view that the SMC data showed that bapi was reasonably safe for a drug of its kind, with side effects broadly consistent with expectations.  Martoma Trial Tr. 1221:1-7, 1242:2-8, 1403:14-1404:1, 1409:1-8.  Gilman further told Martoma that the fact that a particular side effect was observed only in patients taking the drug (and not the placebo), and that the side effect occurred more frequently in patients taking higher doses of the drug, indicated that the drug was likely having the hoped-for therapeutic effect.  *Id.* at 1218:13-15, 1218:19-25, 1244:4-11, 1346:11-23, 1350:1-8.  Gilman also indicated to Martoma that while not definitive, this apparent "dose-response" relationship

was a positive sign that the drug could be effective in treating Alzheimer's disease. *Id.* at 1219:1-25, 1244:4-11, 1346:24-1348:7, 1350:1-8.

136.    The interim safety data, and the insights Gilman provided regarding efficacy, were never publicly disclosed during the Class Periods.

137.    Starting in late 2006, Gilman began contacting Martoma after SMC meetings to report to Martoma what he had learned during the meetings.  During these calls, Gilman discussed the PowerPoint presentations and provided Martoma with his perspective on the data. Gilman's consultations with Martoma frequently occurred later the same day or shortly after Gilman had attended an SMC meeting.  Among other telephone and in-person meetings, Gilman had consultations with Martoma on November 22, 2006 (the day after an SMC meeting), February 9, 2007 (also the day after an SMC meeting), October 9, 2007 (later in the day following an SMC meeting), March 18, 2008 (also hours after an SMC meeting), and July 13, 2008 (two days after an SMC meeting).  GX 600; GX 706.

138.    Martoma and Gilman coordinated their expert network consultations around scheduled SMC meetings.  For example, on August 23, 2007, Gilman advised Martoma that "[t]he SMC teleconference will be postponed until the following week. Should we postpone our planned teleconferences until a more definitive date has been established?"  GX 209.  When the SMC meeting was not rescheduled as expected, Gilman emailed Martoma on September 5, 2007 to report that the SMC meeting had still not been scheduled and noted to Martoma, "you may want to postpone [our scheduled conference call] until there is more to discuss."  GX 211.  Later on September 5, Gilman forwarded Martoma an SMC scheduling email confirming the October 9, 2007 SMC meeting with the comment "It might [be] best for us to speak some time after October 9 unless I have materials for the meeting in advance."  GX 213.

139.     Gilman next consulted with Martoma through GLG on October 9, 2007 – hours

after the next SMC meeting.  SG000591-93; GX 600.

140.     Gilman testified that the purpose of these consultations was for him to disclose

confidential information about the results reported to the SMC (Martoma Trial Tr. 1274:4-11,

1275:12-1276:2, 1356:8-17):

> Q. What did you understand the purpose of the
> consultations to be that Mr. Martoma booked shortly after
> SMC meetings occurred?
>
> A. The purpose of those consultations was for me to
> disclose to him confidential information about the
> results.
>
> Q. The results of what?
>
> A. The results of the last Safety Monitoring Committee,
> including details of numbers of patients with safety
> issues, safety results.
>
> . . .
>
> Q. So during the consultations that occurred that Martoma
> booked following SMC meetings, do you remember what you
> discussed in detail on each and every one of those
> consultations?
>
> A. I do not remember in detail what we discussed. We
> discussed mostly the serious adverse events in the
> unblinded data set.
>
> Q. Did you develop any practice with respect to what you
> would talk about in the consultations that followed SMC
> meetings?
>
> A. Yes. I'm sorry. That is the question I was just
> answering.
>
> Q. And what was -- what was your practice?
>
> A. My practice was to read to him the slides showing the
> number of subjects with each -- in each dose group, both
> placebo and treated, who had various kinds of adverse
> events -- headache, backache, leg ache, vasogenic edema,
> etc., etc.
>
> . . .
>
> Q. Dr. Gilman, when you consulted with Mr. Martoma
> following SMC meetings, were these consultations in
> person or over the phone?
>
> A. Usually over the phone, almost always.

> Q. Did you have any understanding as to whether Mr. Martoma was taking down notes as to what you said?
>
> A. I -- umm -- I deduced that often he took down notes because he frequently asked me to pause or go more slowly when I was telling him numbers from the safety monitoring committee slides.

141.    Gilman testified that Martoma often asked about dosage information and

vasogenic edema following SMC meetings (*id.* at 1276:3-8; 1339:1-13; 1342:8-23):

> Q. Do you recall any particular topics Mr. Martoma would inquire about during the consultations you had following SMC meetings?
>
> A. He was mostly interested in the vasogenic edema cases. I don't recall his showing great interest in the various other side effects.
>
> . . .
>
> Q. Were there particular matters discussed in the safety monitoring committee meetings that Mr. Martoma would ask you about?
>
> A. Yes.
>
> Q. What do you recall those being?
>
> A. Mr. Martoma wanted to know the number of patients who had been subjected to each dose level and how many had been completed, how many doses had been completed.
>
> Q. Is that something he asked you about once or more than once?
>
> A. He asked me about them repeatedly.
>
> Q. Did you provide him that information?
>
> A. I did.
>
> . . .
>
> Q. . . .  You testified a moment ago that one of the things Mr. Martoma asked you about with respect to safety monitoring committee meetings was the table that reflected how many patients had completed each dose; is that right?
>
> A. Yes.
>
> Q. Do you recall any other subjects that Mr. Martoma would ask you about following safety monitoring committee meetings?
>
> A. Yes. He was very interested in vasogenic edema.
>
> Q. What, if any, information would you provide to him about vasogenic edema after safety monitoring committee meetings?

- 48 -

```
A. I provided him with information about the number of
cases affected, about the number of patients who had
symptoms, and about what the safety monitoring committee
recommended regarding management of these patients, and
then how they fared.
```

142.     The Phase 2 bapi safety data, the PowerPoint presentations prepared for SMC

meetings, and Gilman's perspective on them were never publicly disclosed during the Class

Periods.

143.     On one occasion, Gilman informed Martoma about confidential information he

received while attending the inaugural meeting of a safety monitoring committee for a Japanese

bapi trial in April 2007, before he shared it with Elan staff or his colleagues on the bapi Phase 2

SMC.  On April 18, 2007, Gilman wrote to Martoma about attending the Japanese committee

meeting and suggested that they have a teleconference the following week "about experimental

treatment of AD."  GX 236.  Gilman testified that the reason he suggested this call was to update

Martoma on "vasogenic edema seen in the Japanese cases."  Martoma Trial Tr. 1355:19-1356:6.

Martoma and Gilman held a consultation the following week, on April 24, 2007.  GX 600.

Gilman brought the new cases of vasogenic edema to the attention of his contacts at Elan *the*

*week after* his consultation with Martoma, at a time when the other members of the Phase 2 SMC

had not yet been informed.  GX 61.  On April 30, 2007, Gilman wrote: "I attended a meeting of

the SMC for the Phase I trial of AAB-001 Japanese trial in Tokyo on April 17, and received the

attached two slide sets just in time for the meeting. They show three new cases of vasogenic

edema, but the SMC of the Phase II trial of AAB-001 was not informed of these cases. As you

know, we should hear about each adverse event when it happens so that we are all on top of any

untoward event.  It would be a good idea to inform the other members of the Phase II SMC about

these additional cases pretty soon." *Id.*

144.     Among other communications in which Gilman conveyed nonpublic information regarding the Phase 2 trial to Martoma, Gilman sent Martoma an email on April 30, 2008, which he labeled "For Your Eyes Only" and "High Priority," in which he discussed in detail the dropout rate for the bapi clinical trial and referred to how many patients took bapi during each round of the trial.  GX 224.  The figures used in the email (including certain mathematical errors discussed by Gilman) were taken directly from a slide in the Elan-prepared PowerPoint presentation used at the March 18, 2008 SMC meeting.  GX 111.

145.     Gilman testified that there came a time when GLG indicated to him that it was not legal for him to consult on bapi, but he continued to do so with Martoma.  Martoma Trial Tr. 1249:13-20.  When asked how they circumvented GLG's prohibition, Gilman testified: "I think that he or I or both of us disguised the topics."  *Id.* at 1249:21-24.

146.     Consistent with Gilman's testimony, while the first few consultations between them were accurately identified as discussions regarding "AAB-001 for Alzheimer's Disease," thus explicitly referencing bapi, later consultations ceased to mention bapi.  *See* GX 601.  For example, when Martoma scheduled a consultation with Gilman three hours after the March 18, 2008 SMC meeting, Martoma reported to GLG that the purpose of the call was "Follow-up with Dr. Gilman: AAN Abstract Preview,"[7] GLG-043019, even though Martoma and Gilman discussed the bapi Phase 2 trial during the consultation.  Later, in advance of a consultation that Gilman's personal calendar noted was to discuss side effects that the Phase 2 trial was finding in patients taking bapi, SG000786, Gilman emailed Martoma and asked him to set up a consultation with GLG, suggesting that Martoma tell GLG that the consultation was to discuss a drug to treat

---

[7]        A reference to the American Academy of Neurology annual meeting.

Parkinson's disease.  GX 234.  A consultation in late June regarding ICAD referenced multiple

sclerosis (MS), SAC_ELAN0198894, a disease unrelated to bapi.

147.    Gilman's willingness to discuss the ongoing Phase 2 clinical trial of bapi with

Martoma starting in just their second consultation is consistent with Gilman's practice of

discussing the clinical trial with other portfolio managers with whom he consulted through GLG.

148.    Notes prepared by an analyst, Rene Shen ("Shen"), employed at Tokum Capital

Management, indicate that Gilman provided nonpublic information concerning the bapi Phase 2

trial to him on at least three occasions in 2008.  *See* DX 759 (April 15, 2008 notes prepared by

Shen regarding bapi safety and efficacy); DX 760 (May 1, 2008 notes prepared by Shen

referencing bapi Phase 2 trial, including timing of upcoming data lock); DX 761 (June 17, 2008

notes prepared by Shen discussing detailed data from the bapi Phase 2 trial, including

information about patient deaths, the number of patients experiencing vasogenic edema, and

many other details not included in the June 17 "top line" press release).  *See* Martoma Trial Tr.

1687:10-1694:9, 2521:9-2523:13.

149.    Gilman also acknowledged that following disclosure of "top line" results on June

17, he had multiple consultations with other fund managers who wanted to discuss the Phase 2

results.  *See id.* at 1685:14-17 ("Q. And is it fair to say that on June 17 and in the days that

followed, you had multiple consultations with clients who wanted to discuss the Phase II

bapineuzumab trial results? A. Yes.").  On June 17, 2008 alone, Gilman had separate

consultations with *five* other investment managers.  *See id.* at 1685:17-21; DX 864.

150.    Gilman's propensity for sharing confidential information with hedge fund clients

was also noted by Elan and was a source of significant concern to its senior staff.  In a July 23,

2008 email copying Elan's CEO, a staffer observed (DX 630):

VERY SOON AFTER or AFTER ORAL SESSION: we need to have conversation with Sid about sensitivity of talking to everybody somehow. Everyone who is aware of Sid being the presenter and has interaction with investor community all think it is great that Sid is presenting from the science/clinical point of view but all VERY CONCERNED about his talking to investor community indiscriminately . . . .

**F.     Martoma Also Receives Inside Information Regarding the Bapi Phase 2 Trial from a Second Doctor, Joel Ross, Who Was a Principal Investigator in the Phase 2 Bapi Trial**

151.     In addition to Gilman, Martoma succeeded in recruiting at least one other doctor participating in the bapi Phase 2 trial, Ross, a prominent New Jersey neurologist who, according to his practice's website, "has served as Principal Investigator or Subinvestigator for nearly every medication tested to treat the symptoms of Alzheimer's disease since 1994 . . . ." *See* http://www.memorycenternj.com/drross.

152.     Martoma recruited Ross through Wall Street Access, the expert network firm to which Martoma had sent a list of bapi investigators on August 31, 2006, as discussed above in paragraphs 119 and 120.  Ross was among the doctors who Martoma had identified in his email. *See* GX 320.

153.     Ross was engaged by Elan as a principal investigator for the Phase 2 bapi clinical trial, meaning that he was responsible for the overall safety and conduct of the study at his location.  Martoma Trial Tr. 564:24-565:4.  Ross had twenty-five patients under his care, roughly one-tenth of the total Phase 2 U.S. trial patient population.  *Id.* at 568:18-23.

154.     As a principal investigator, Elan expressly forbade Ross from disclosing any information about his work to third parties.  *See*, *e.g.*, GX 6 (March 2008 letter from Elan reminding Ross about his confidentiality obligations under the agreement he signed at the start of the clinical process).

155.     At Martoma's criminal trial, Ross testified that "on more than one occasion," he shared with Martoma "[c]onfidential information about the safety and results of [bapi] studies that had not yet reached the public domain."  Martoma Trial Tr. 558:8-16.  Ross entered into a nonprosecution agreement with the DOJ in December 2013 that required him to serve as a cooperating witness.  GX 971.

156.     Martoma began consulting with Ross in September 2006; according to entries in Martoma's calendar, they had ten meetings or telephone consultations between September 14, 2006 and July 28, 2008, the evening before the bapi Phase 2 results were publicly announced, as follows: September 14, 2006 (GX 501), October 6, 2006 (GX 502), February 2, 2007 (GX 505), December 4, 2007 (GX 510), December 19, 2007 (GX 512), April 4, 2008 (GX 514), May 28, 2008 (GX 516), June 10, 2008 (GX 517), June 19, 2008 (GX 518), and their final meeting on July 28, 2008 (GX 527 and GX 529).

157.     Ross was paid $1,500 to $5,000 per hour for the consultations with Martoma.  Martoma Trial Tr. 784:10-14; *see also* DX 472 (rate increased around May 2007).  In addition, Ross was "hopeful" that Martoma could bring studies to the clinical research center with which he was associated.  Martoma Trial Tr. 684:18-22.  If his efforts to develop more business for the research center were successful, Dr. Ross would receive a bonus and the opportunity to buy into the company that owned the research center.  *Id.* at 669:16-21.

158.     Consistent with Cohen's belief that Martoma would have a "line into," a small biotech company, *see* ¶ 101 above, Ross testified that "Mr. Martoma had a large number of connections in the pharmaceutical field, and I had hoped that his introduction of this Phase I unit and myself as their principal investigator may bring some needed business to the Iberica Research Center."  Martoma Trial Tr. 642:14-17.

159.     In early May 2008, Ross emailed Martoma asking for "a favor" – the names of contacts at drug companies who decide on Phase 1 sites. *Id.* at 641:19-642:5; GX 364. Ross closed the email by stating, "I appreciate your help and will be happy to return the courtesy in other ways. Kind regards, Dr. Ross." Ross testified that by "other ways" he meant by providing additional inside information (Martoma Trial Tr. 645:3-9):

> Q. What do you mean when you said you would be happy to return the courtesy in other ways?
>
> A. Well, as I had said, I already told him some confidential information about the bapineuzumab patient with the cerebral edema and the 201 enrollment numbers, and if other information come to light that I thought would be of benefit to him, I would share that with him.

160.     Over the course of their consultations, Ross shared with Martoma the "results of yet-to-be-announced outcomes of safety and efficacy, meaning benefit or lack of benefit, as well as certain numbers of patients enrolled at my site and certain side effects that had occurred in one of my patients." *Id.* at 558:23-559:4.

161.     For example, in early 2007, Ross and Martoma had a dinner meeting at which Martoma asked Ross about vasogenic edema, the side effect that Martoma discussed with Gilman in their earliest consultation at SAC. Martoma and Ross discussed Ross's experience with a patient who had experienced vasogenic edema and Ross's interpretation of that side effect as a favorable indication that bapi was targeting the correct pathogen. *Id.* at 614:15-615:17. In response to Martoma's question about how Ross thought the drug was doing, Ross explained that even though he did not know which patients were getting the drug, he thought that some of them were improving. *Id.* at 679:9-25.

162.     In April 2008, Martoma asked Ross via email for the number of patients participating in the Phase 2 bapi trial at Ross's clinical site. Ross provided that information to Martoma, knowing it was non-public. *Id.* at 637:13-638:1; *see also* GX 354.

163.     In late May, before Martoma learned that Gilman would be presenting the bapi

Phase 2 results at ICAD, Martoma scheduled a meeting with Ross in the evening of July 28,

2008, following a presentation at which Ross and other bapi principal investigators were to learn

for the first time the final bapi Phase 2 clinical trial results (the "Principal Investigators'

Meeting").

164.     The purpose of the scheduled meeting between Ross and Martoma was to

"discuss the confidential results" that had been presented to Ross at the Principal Investigators'

Meeting minutes earlier.  Martoma Trial Tr. 826:13-15.

165.     At Martoma's criminal trial, Ross described how, after conclusion of the

presentation discussing efficacy results at the Principal Investigators' Meeting, but before the

presentation ended, Ross stepped out into the hotel lobby where he had pre-arranged to meet

Martoma.  *Id.* at 692:19-23; 714:7-18.

166.     When Martoma asked how the meeting had gone, Ross responded that the drug

had failed to reach statistical significance for efficacy, but that he still thought the drug had

therapeutic value.  *Id.* at 714:22-25.  In response, Ross testified, Martoma "shocked" him by

referencing specific technical details of the confidential presentation Ross had just heard (*id.* at

715:10-717:1[8]):

> Q. What, if anything, did [Martoma] say to you in
> response?
>
> A. He said, I don't understand how you can say that when
> the statistical evidence shows otherwise. And **I recall
> him even bringing up, I don't remember the exact number,
> but the p-values[9] which I'd just seen a moment ago in the**

---

[8]     **Boldface** and <u>underscoring</u> in block quotations have been added for emphasis.

[9]     Ross explained that p-values are: "a statistical term that's very, very commonly used, and
depending on the value of that number, a result can be due to the drug or chance, in other words, just
luck. A number that's commonly quoted to show something is not working, meaning a drug versus
placebo, would be any value of the p greater than 0.05. So 0.051 and higher, like in this case the

*(continued . . .)*

**presentation. I was, I'd say, shocked to know because I was the only one that knew that along with the other investigators.**

Q. What do you recall him saying about the p-values?

A. He knew that on the primary outcome values, he said that the p-values were not significant, and having refreshed my memory looking at these slides, **I think he knew the exact numbers, almost to the detail.** He was always very detailed oriented.

Q. How long did this conversation last?

A. I'd say about ten to 15 minutes.

Q. Do you remember any more of the specifics about what was discussed between the two of you?

A. Yes, although **I was, I guess the word is, if not flabbergasted, very surprised he knew it**, and I kept saying, "But I'm very hopeful, I have patients that I think are still benefiting from it." And he had responded, "But what about the dose effect. There's no effect on dose." He said, "How can you be so high on it?" I said, "I don't care about the dose effect. I'm telling you what I see in my patients." And we continued to discuss back and forth what the lack of benefit meant in terms of patients not having any hope, but I still felt there was reason to be optimistic. . . .

Q. Anything else you recall about that meeting in the lobby with Mr. Martoma?

A. That's the best of my recollection: The dose effect, the p-values on [two efficacy measures]. He was seemingly quite familiar. **It seemed to me like he was in the room with me with those slides that I had just seen.**

167.    Ross admitted that he knew that the information he shared with Martoma on July 28, 2008 after the Principal Investigators' Meeting was confidential, *id.* at 687:18-688:1, 688:13-23, 689:23-690:7, 690:14-19, 691:1-3; 691:10-21, and he knew that he was not allowed to share information from that meeting.  *Id.* at 691:15-21.

---

*(. . . continued)*

highlighted p, 0.078 on ADAS-cog, shows that there was no difference in placebo patients versus bapineuzumab-treated patients on the primary outcome measure ADAS-cog."  *Id.* at 703:3-18.

G.      **Cohen and Martoma Accumulate Stakes in Elan and
        Wyeth That Were Among SAC's Largest Positions in Any
        Stock While Receiving Inside Information Regarding the
        Bapineuzumab Phase 2 Trial from Gilman and Ross**

168.    During the period of Martoma's consultations with Gilman and Ross, CR Intrinsic
and SAC LP established very large long positions in Elan ADRs and Wyeth common stock.

169.    As reflected in the following chart, as of August 22, 2006, SAC had a relatively
small net holding in Elan, totaling 906,218 ADRs, worth approximately $13.4 million.  After
Martoma initiated contact with Gilman regarding bapi, however, SAC rapidly increased its
holdings in Elan, and continued to build the position as Gilman and Ross provided progressively
more detailed information regarding the Phase 2 trial.  By the start of trading on July 21, 2008,
SAC held 10,560,250 Elan ADRs, worth more than $366 million:



- 57 -

170.     Similarly, SAC grew its position in Wyeth substantially during the Wyeth Class Period.  On January 13, 2008, Martoma sent Cohen an email adding Wyeth common stock as one of his investment recommendations.  Martoma's email advocated for Defendants to increase their holdings in Wyeth stock by approximately 800,000 shares, assigning a price target of $55 to $60 and citing "P2 AD data in 1H08" as an "upcoming catalyst" for the stock.  GX 440.   Cohen responded to Martoma's email, leading to an email exchange between Martoma and Cohen concerning the bapi trial data.   Martoma stated "I want to be there in size well ahead of Alz data release," to which Cohen responded "agreed- afraid to sell anything given potential upside."  *Id.* Shortly thereafter, on January 30, 2008, Martoma sent Cohen an email discussing SAC's long position in Wyeth stock at length.  Martoma cited "P2 Alz data with results topline in 1H08 and data presentation in July at Alz Conference" as the only "major catalyst" and commented **"Won't rehash our stance on data, but we believe it can be a major driver for stock if results are in line with our thinking**.  We have high conviction in this data point.  **+25% ($10).**"  SAC_ELAN0428910 (emphasis in original).

171.     Thereafter, Cohen and Martoma substantially increased their holdings, such that SAC's holdings as of the start of trading on July 21, 2008 (inclusive of both shares and swaps providing equivalent exposure), were worth roughly $900 million:



172.    As of June 30, 2008, before Villhauer began selling, SAC's long positions in Wyeth and Elan represented its **largest** and ***fifth largest*** positions, respectively – out of the more than 1,200 companies in which it was then invested.[10]

173.    Based on publicly-available information, SAC's bets on Elan and Wyeth also represented the largest investment of *any* hedge fund in each of these companies.

174.    Because CR Intrinsic and Cohen managed only a fraction of SAC's total assets, Martoma and Cohen's investments in Elan represented a far larger portion of their respective portfolios.

---

[10]    These calculations are based on reported holdings as of June 30, 2008, reflecting the combined Form 13-F reports of SAC LLC, CR Intrinsic, and Sigma, filed August 14, 2008, together with SAC's exposure to Wyeth common stock under a swap agreement.

**H.    Martoma Supplies Cohen Overtly Inside Information Regarding the Bapineuzumab Phase 2 Trial, Including Detailed Information Concerning the Trial Results that Had Not Been Publicly Disclosed**

175.    On multiple occasions during the Class Periods, Martoma supplied Cohen with information concerning the bapi Phase 2 trial obtained from Gilman that was manifestly inside information.

176.    First, in a May 20, 2007 email to Cohen, Grossman and Chandler Bocklage ("Bocklage"), a research trader who served as Cohen's "right hand," Martoma discussed Elan and Wyeth's then-unannounced decision to initiate the Phase 3 bapi clinical trial as an event that was certain to occur in the near future.  Gilman was the chair of the Phase 3 Safety Monitoring Committee.  The decision to initiate the Phase 3 trial was a highly material event Martoma had previously cited as a key stock catalyst in an email to Cohen and Grossman.  SAC_ELAN2756725.  When the news was subsequently publicly disclosed, it drove a 12.6% price increase in Elan ADRs and a 3.6% increase in the price of Wyeth shares.  In the May 20 email, Martoma reported (SAC_ELAN1865541):

> At Citigroup this week, WYE Chief Scientific Officer is presenting, so possible that his comments misinterpreted. At this stage, it's too early to expect a formal announcement of P3 move. I'm not expecting anything formal until next month. Should we get any weakness around his comments, I would look to add back stock. Even if nothing confusing said, we prob get another opportunity to add back shares at current price closer to data announcement.

177.    Martoma's email conveys that he knew that a "formal announcement of P3 move" would occur and his stated intention to "add back stock" after any near-term weakness conveys his expectation that the news would drive a positive market reaction.  The email also reflects that he had previously discussed his advance knowledge of this major development with the recipients – Cohen, Grossman and Bocklage.

178.    Martoma later reported to Cohen and Grossman in an October 11, 2007 email that "recent checks lead me to believe the AD program is on track to start P3 this year, most likely in November. I think the program will be the MOST COMPREHENSIVE ALZHEIMER'S PROGRAM to date. The disclosure on trial details around initiation should make that clear." SAC_ELAN1875735 (capitalization in original).

179.    On June 12, 2008 – a week before the Phase 2 "top line" results were announced – Martoma explained in an email to Cohen, addressing a recent price dip, that (SAC_ELAN0210935):

> Shorts are suggesting that ELN did not present data at the conference b/c it's not good, and they need more time to "dredge" the data to find something positive to say. This is not the case. The database was only recently locked and we are still in the normal time frame for analyzing/checking topline analysis.

180.    Neither the status of the data nor timing of its analysis was public, and Martoma was able to report when the database was locked only because he had discussed the issue with Gilman, *see* GX 226 and GX 227 (emails dated May 28, 2008 between Martoma and Gilman addressing this issue); Martoma Trial Tr. 1391:22-1391:1.  The information Gilman provided Martoma contradicted public speculation that the data could have been locked earlier.  *See* DX 1133; at Martoma Trial Tr. 2135:13-18, 2136:19-2137:4, 2139:5-12.

181.    Finally, although the June 17 Announcement affirmatively stated that "no clinical benefits or statistically significant effects were observed on efficacy endpoints" with respect to the ApoE4 carrier subgroup – roughly half of the Alzheimer's disease population – Martoma continued to maintain that the drug would ultimately be found effective for them.  Cohen reported in an IM exchange with another SAC analyst, David Munno, following the announcement on June 17 (SAC_ ELAN0833850):

Cohen: supposedly 1/2 the market gone not true

Munno: y, mat [Martoma] saying that those pts could still get the drug || don't think ppl will give them credit for that group anymore though

Cohen: mat thinks this will be a huge drug

Munno: it could be $5-7b - that would be a huge drug, i don't disagree with that || at 30, you're pricing in 60% prob that its a 15b drug

Cohen: huh || well, my boys think the entire population will be on drug || and data will support that

182.     The contrast between the June 17 Announcement and Martoma's confident forecast of what "the data" would later show was noted by a second SAC analyst, Ben Slate, in an email to Munno and their boss, CR Intrinsic's Director of Research, Jason Karp ("Karp"), on June 19 (SAC_ELAN0760926):

tell me how u believe that mat knows carriers being fine and why that's not in the press release? of all things wouldnt that be there?

183.     There is no written record of Cohen questioning the basis for Martoma's confident prediction that the data would ultimately show something different from what Elan and Wyeth had publicly disclosed.

I.     **In the Months Before ICAD, Cohen Closely Analyzes the Prospects for the Bapineuzumab Phase 2 Trial After Two CR Intrinsic Fund Managers Urgently Warn of a Negative Outcome**

184.     In early 2008, two healthcare analysts at CR Intrinsic, David Munno and Ben Slate, raised concerns regarding SAC's investments in Elan and Wyeth, based primarily on their skepticism that the bapi Phase 2 trial would be successful.  Munno held a Ph.D. in neuroscience, and was accordingly well-equipped to evaluate the drug and clinical trial process.

185.     In two January 26, 2008 emails, Munno and Slate questioned the quality of Martoma's analysis, as well as the views of Wayne Holman, who was bullish on Wyeth. SAC_ELAN1319119.  Holman had formerly traded healthcare stocks at SAC, and had left in 2006 to establish his own fund, Ridgeback Capital Management ("Ridgeback"), with backing

from Cohen.  In November 2007, Holman entered into an agreement with SAC to advise specifically on Wyeth, for which Ridgeback would receive up to 30% of any profits from SAC's investments in the stock.  DX 285.  Cohen's reason for providing Holman this lucrative arrangement was unclear – and in his May 3, 2012 deposition by the SEC (the "Cohen SEC Dep."), he could recall no similar arrangement concerning any other stock, with Holman or anyone else.  Cohen SEC Dep. 34:7-22.  In late 2011, around the time that Martoma was approached by agents from the Federal Bureau of Investigation concerning insider trading in Elan and Wyeth, Holman entered into a new arrangement with SAC to provide consulting services, for annual compensation of $19.4 million.  RIDGE0008144.  The agreement was drafted by SAC's principal outside litigation counsel, and once again, Cohen could not recall entering into a similar arrangement with anyone else.  Cohen SEC Dep. 227:14-25, 230:24-231:13.

186.    In late February 2008, Cohen, Munno and Holman held a telephone call to discuss Wyeth and bapi's prospects, and in early March 2008, Munno emailed Cohen, again expressing his concerns about bapi.  SAC_COHEN00001034, SAC_ELAN0938831.

187.    On March 26, 2008, Munno emailed Cohen, copying Karp and Slate, as well as Debler, Cohen's personal healthcare research analyst, and Bocklage, Cohen's personal research trader, to detail his concerns in an email with the urgent subject line "ELN, (important, please read) negative reads from company and other buysiders."   SAC_ELAN0565624.  In the email, Munno wrote "Steve- I realize I've been vocal and negative on ELN/WYE for a while, but based on the work that Ben [Slate] and I have done over the past 2 weeks I think the risk-reward on the position for the data is materially worse than I thought before."

188.     In the email, Munno set forth ten points, noting various statements by Elan and Wyeth that he interpreted as negative guidance.  Munno's principal concern was that the Phase 2 trial would not satisfy the market's expectations of statistically significant results, explaining:

> Both ELN and WYE have said in recent meetings that they would have to be "very lucky" and it is not realistic to expect them to hit statistical significance on any of their endpoints in the phase 2. Simply, there are too few patients in the trial, not enough power, too much variability. I think this is the biggest issue because based on my expectational analysis from conversations with sell side, large shareholders and shorts leads me to believe most are expecting at least one of the cognitive endpoints (ADAS-cog or NTB) if not both, to hit statistical significance.

189.     "ADAS-cog" refers to the Alzheimer's Disease Assessment Scale-Cognitive Subscale, then the most widely-used cognitive test used to measure performance in clinical trials of Alzheimer's treatments, and "NTB" refers to the Neuropsychological Test Battery, a second widely-used cognitive test.  In the terminology of clinical trials, ADAS-cog and NTB were referred to as efficacy "endpoints."

190.     Over the subsequent several weeks, Cohen communicated repeatedly with Munno, Slate and Martoma on the issue of what the Phase 2 data were likely to show.  On March 28, 2008, for example, in a lengthy 135-line IM exchange with Munno, Cohen asked a series of detailed questions regarding ADAS-cog and NTB: "how is cog measured," "is it scored," "what kind of improvement on that scale would be stat sig," "what is the base [score]," "so stat sig would be what," followed by similar questions regarding NTB.  SAC_ELAN0932430-31; SAC_ELAN1686634-36.

191.     In a subsequent IM exchange on April 6, 2008, Slate and Cohen again addressed the issue of the Phase 2 results (SAC_ ELAN0928226, emphasis added):

> Slate: Hey Steve - Feinberg doing a good job getting expectations up in that WYE article in Barrons.  Bapineuzamab can be bigger than Lipitor IF it gets disease modification in the label. *It has to be stat-sig on Adas-cog in that PIII in 2011. Hope you've been able to get better sense of why Mat thinks it is in PII*, we spoke to Kris Jenner at Trowe who owns 14MM shares of ELN, he

- 64 -

was only able to get the standard "we wouldn't spend $300MM on a PIII if there wasnt something" from the CEO.

. . .

Cohen : Munno thinks it has to be stat sig- || matt believes it is stat sig || mat || wayne believe it is stat sig || what else can i do

192.    A few days later, on April 11, 2008, Munno sent Cohen an email quoting a doctor involved in the bapi Phase 3 trial who had seen the Phase 2 interim data (further discussed below in paragraphs 232 to 235), and had the following exchange regarding the Phase 2 trial outcome (SAC_ELAN0257212-13):

Munno: To the specific question of stat sig for the phase 2 and what we will see between may and july, he indicated the data are not stat sig and in a best case, I would think they are not likely to be totally clean vs expectations of stat sig, . . . .

Cohen:  So u think the drug has to be stat sig on both endpoints- will trial size be a factor in stat sig for this study

Munno: I think given current expectations, it needs to be stat sig on both for ELN/WYE to go up and stay up on the data. The trial is very small, 30 pts per arm, and will be a factor in showing stat sig - a point both cos have tried to make repeatedly, but most of street has ignored them and built stat sig into expectations. . . .

193.    The next day, Saturday, April 12, Cohen resumed the discussion (SAC_ ELAN 1454042-43):

Cohen: Seems strange that he would of seen the data when other investigators haven't-supposedly take awhile - more than 12 months to see significant separation between the placebo and drug group-if it happened at 12 month, would be astounding

Munno: I agree it would be astounding to see stat sig at 12 months, but I'm not sure why anyone would assume that if its not stat sig at 12, that it would be at 18.

Cohen: Mat believes that people not expecting stat sig- an informal study he did at cowan conf suggested just 18 per cent expected stat sig

194.    Later in the day, Cohen emailed Martoma that "Munno suggests that Trow pm who is large holder of wye and eln thinks if u see stat sig on just one of adas-cog or ntb - stock will be down."  SAC_ELAN0682277.

195.    The following day, Sunday, April 13, Cohen had a further email exchange with

Munno (SAC_ELAN0915829):

> Cohen: Expectation on eln and wye- u mentioned trow pm- who else believes
> that
>
> Munno: Pretty much everyone I've spoken to thinks this has to be stat sig for
> eln/wye to work. [Listing numerous analysts and hedge funds]
>
> Cohen: Stat sig on both endpoints?

196.    In a later exchange the same day, Munno offered an options hedge, and Cohen

again raised the issue of expectations for the Phase 2 results:

> Cohen: I like 1-2- i still don't understand why both endpoint need to be stat
> sig-
>
> Munno: Street doesn't like re-creating the wheel, and if drug doesn't work on
> old standard measures, but does on the new test, it will raise doubt and
> confusion, which you know never bodes well for stocks
>
> Cohen: Supposedly alot of fda people and euro fda people prefer the ntb

**J.    Cohen Sides with Martoma, Citing His "Good Relationships in
this Arena" and Does Not Respond to the Managers' Repeated
Urging that Martoma Disclose the Source of His "Edge"**

197.    Munno and Slate's concerns regarding bapi were exacerbated by Martoma's

refusal to divulge the basis for his confident predictions of what the Phase 2 trial results would

show.  In a series of emails, they and their boss, Karp, pressed Cohen to have Martoma explain

the basis for his reasoning.  In each case, Cohen ignored the request – a fact noted by both

Munno and Slate.  At one point, however, Cohen did explain his reason for trusting Martoma's

views:  that it "***seems like mat has alot of good relationships in this arena***."  Instructively,

Cohen did not suggest a belief that Martoma's "edge" was derived from any special

understanding of the science or other valid investment research.

198.    Martoma's guardedness was noted in a late January 2008 email from Slate to

Munno and Karp, commenting (SAC_ELAN1319119):

> Goes back to the call w wayne on wye, he was lying about his thesis and has
> no fking clue if bapinuzamab is going to work. Based our discussions w

> martoma and meeting w eln, I don't even think intrinsic should be in eln.
> Wouldn't it be useful to have all of us sit down in a room to discuss that?
> What do they even know? I've heard the thesis from both of them - I think
> steve should hear us argue w them about their edge. Not that I think they
> have edge, but it's totally unacceptable to bet 1/2 billion dollars on alzhemiers
> without a real discussion with wayne, mat and steve.

199.    Slate again noted Martoma and Holman's guardedness regarding their bapi Phase

2 predictions – and Cohen's refusal to probe them – in a March 23, 2008 IM exchange with

Debler (SAC_ELAN0930766, emphasis added):

> not a lot of confidence in other people's "edge." If someone would tell me
> "they know ntb was stat sig" i'd be fine, but that has yet to happen. and **steve
> isnt asking**.

200.    In a subsequent email the same day, Munno commented to Slate (*id.*, emphasis

added):

> We've met w wye and eln recently. Did anything they say make you think any
> of the endpoints will be stat sig? If anything, I think there will be a ton of noise
> and some interesting observations, but no stat sig. I think debs [Debler] is
> starting to think that mm/wh [Martoma/Holman] have edge, but only bc they
> know how to talk to him to make it appear that way - ie **they are reluctant to
> say anything**, so its interpreted as them having info vs way we'd interpret it
> which is the equivalent of buying 15k jan 90c for ALS data . . .

201.    Munno later directly cited Martoma and Holman's reticence to Cohen, pointing

out in his March 26, 2008 email titled "ELN, (important, please read) negative reads from

company and other buysiders" that the market was expecting statistical significance on both

ADAS-cog and NTB, and "[t]his is a sticking point with our internal bulls on ELN/WYE - *they

may have more edge on this outcome but they have never articulated that to me*."

SAC_ELAN0565625.

202.    Following Munno's March 26, 2008 email, Munno, Slate and Karp each pressed

Cohen to have Martoma explain the source of his confidence in the Phase 2 trial outcome.  In

each case, Cohen avoided the question, but alluded to access to trial results and cited Martoma's

"relationships."

203.    First, in a March 28, 2008 IM exchange between Munno and Cohen, Munno

pressed Cohen to find out if Martoma or Holman had a reliable source, or merely a belief

(SAC_ELAN1686636, emphasis added):

> Munno: i don't know if wayne or mat will answer, **but do you think they know something or do they have a very strong feeling**
>
> Cohen: **tough one** || **i think mat is the closest to it**
>
> Munno: the question that I would ask is if its possible to know the data yet - i could be wrong, but I don't think it is yet

204.    There is no record of Cohen responding to this suggestion.

205.    Elsewhere in the same IM thread, Cohen responded to a comment by Munno that

he did not believe the results were knowable with the question whether it was possible that the

trial data was available to some insiders (SAC_ELAN0932430, emphasis added):

> Munno: i'm just saying, i don't think there is any edge to have about what was seen last august that got them to move fwd with this trial, and the rest of the trial isn't done yet to know what that looks like
>
> Cohen: **is it possible that people have seen the data already**
>
> Munno: no || a very small# of ppl saw the interim look || but trial was far from done then

206.    In an email exchange a week later, on April 6, Slate referenced back to the March

28 IM discussion, commenting on the lack of any answer from Cohen (SAC_ELAN0928921):

> Munno: I was going do a quick write up on ELN strangle and send to steve
>
> We should try to talk to him tonight on it ...
>
> Slate: Don't think worth writing anything, just need answer to question from last week on adas cog
>
> "Do they know or do they think"

207.    Later in the day, Slate renewed the question with Cohen, asking him by IM

whether he had "been able to get a better sense" of Martoma's reasons for believing the Phase 2

results would be statistically significant, to which Cohen responded simply that Martoma seemed

to have "good relationships" (SAC_ELAN0928917, emphasis added):

Slate: Hey Steve - Feinberg doing a good job getting expectations up in that WYE article in Barrons. Bapineuzamab can be bigger than Lipitor IF it gets disease modification in the label. ***It has to be stat-sig on Adas-cog in that PIII in 2011. Hope you've been able to get better sense of why Mat thinks it is in PII***, we spoke to Kris Jenner at Trowe who owns 14MM shares of ELN, he was only able to get the standard "we wouldn't spend $300MM on a PIII if there wasnt something" from the CEO.

Cohen: ***seems like mat has alot of good relationships in this arena***

208.     Later in the same IM conversation, Slate returned to the topic twice; Cohen again

evaded the question both times (*id.*, emphasis added):

Cohen : Munno thinks it has to be stat sig- || mat[] believes it is stat sig || wayne believe it is stat sig || what else can i do

Slate: ***i would ask why do they think it is? the trial isnt finished***. I don't have an axe to grind here other than i dont want the firm to lose money, i like the July $25/$17.50 strangle. I really dont know if they are being intellectually honest vs legitimizing a pseudo-lottery ticket.

Cohen: ***i think they are being intellectually honest- both of them || i'm not sure why you would bet against it*** || not sure what you have on the other side || other than skepticism || i think expectations game is useless here

Slate: No other company in the space has an embedded $7B for an alzheimers PIII in their stock. MYGN, MDVN have a couple hundred million. Expectations are huge for this PII. If it shows a trend in Adas-cog that is not a disaster, but it's not a catalyst for the stock going up which is why i like the strangle. ***What i'm trying to point out on intellectual honesty is when people claim to know the unknowable (like KERX's sulonex data), someone has to ask them how they know?***

Cohen: ***what makes u think trend vs stag sig***

209.     Later in the day, Slate and Munno's supervisor, Karp, again pressed Cohen for an

explanation of Martoma's confidence (SAC_ELAN0928257, emphasis added):

Karp: have to love the persistence on ELN

Cohen: geez, pissing on the parade || but it's good that they are doing it

Karp: ***i think there is one question that will shut them up if you can answer it for them || do they "think" or do they "know" that its stat sig on both || if they "know" - which they think is impossible, then all discussions are irrelevant*** || if they "think" - then the strangle [an options trade proposed by Munno and Slate], is a compliment to your bet

210.     Karp then emailed Munno and Slate this exchange, with the subject line "No reply

yet." *Id.* There is no indication that Cohen ever replied.

211.    Finally, Munno raised the issue with Cohen once more in an email a week later,

writing (SAC_ELAN1454042, emphasis added):

> I agree it would be astounding to see stat sig at 12 months, but I'm not sure
> why anyone would assume that if its not stat sig at 12, that it would be at 18. **I
> don't think anyone can have edge on that be its not done, not knowable
> yet.** Given current expectations for stat sig and over $7b of value baked into
> ELN's stock and $10b in WYE's stock for alz, I think the size of the position is
> too big considering the risk reward, **unless there is some other edge that
> is not being shared with us**.

212.    Cohen, once more, sidestepped the point, responding: "Mat believes that people

not expecting stat sig- an informal study he did at cowan conf suggested just 18 per cent

expected stat sig."  *Id.*

213.    At some point later in April 2008, however, Martoma made his access to Gilman

known to Munno and arranged for Gilman to communicate confidential bapi Phase 2 safety data

– the dropout rates discussed above in paragraph 144 – to Munno.

214.    Gilman testified (Martoma Trial Tr. 1365:4-20):

```
Q. . . . Did you provide these numbers to anyone else at
SAC? . . .

A. At one point Mr. Martoma asked me to provide a David –
I believe his first name is David Munno with the number
of dropout cases, and I did that.

Q. Did Mr. Martoma tell you why?

A. Yes. He told me that he and Mr. Munno were having a
dispute about the safety of the drug, and so I did speak
with Mr. Munno who called me, I mean, who was -- who made
an arrangement to call me via GLG.

Q. Did you provide him with the dropout rate information?

A. I did provide him with information about dropout
rates.
```

215.    Gilman's consultation with Munno where he supplied this information occurred

on April 17, 2008, Martoma Trial Tr. 1848:9-12, and Gilman's testimony is confirmed by an

email sent on May 1, correcting the calculation error discussed above in paragraph 144.  DX 839.

216.    Martoma's willingness to share access to Gilman illustrates the routine nature of reliance on inside information at SAC.  Munno was not a friend of Martoma's or a trusted co-conspirator – he was a rival who actively disliked him.  *See* Martoma Trial Tr. 2093:16-19 ("Q. And is it fair to say also, Ms. Lyndon, that you were aware that Mr. Munno, in particular, expressed a view that he did not like Mathew?   A. Yeah, I think that's true.").

217.    By late June 2008, Martoma was apparently even more open about his access to the Phase 2 trial data.  In one email on June 19, 2008, two days after the June 17 Announcement, Munno emailed Slate that with "Martoma telling ppl he has black edge on the p-values, that the other group will be fine at ICAD, etc. how do we win?"  SAC_ELAN0831558.

218.    P-values are a measure of statistical significance – the crucial issue for the market in determining whether a clinical trial shows sufficient evidence of a drug's efficacy, as discussed at length above in paragraphs 188 to 212.  The "edge" on p-values referenced by Munno could come only from inside information, and testimony at trial showed how Martoma developed this edge based on data supplied by Gilman.

219.    In April 2008, Martoma hired a Harvard School of Public Health biostatistician, Rebecca Betensky, Ph.D. ("Betensky"), to perform a statistical analysis for him to calculate potential p-values in the bapi P2 trial results.  To inform her analysis, he provided her with information on dropout rates and vasogenic edema that he had received from Gilman on March 18, 2008, immediately after Gilman's participation in an SMC meeting.  *See* Martoma Trial Tr. 2197:13-25, 2200:9-19 (Betensky testimony describing the assignment); GX 852, 852-A, 852-B, 852-C, 852-D, 852-E, 852-F (April 27, 2008 email and attachments from Martoma to Betensky providing her with data and assumptions to inform her analysis); Martoma Trial Tr. 2214:6-2215:24 (Betensky testifying that the vasogenic edema numbers Martoma sent her in GX 852

and GX 852-B were the ones ultimately reported as final at ICAD for the bapi P2 trial); GX 852-B (showing dropout rate information for each dose cohort derived from information in GX 111, the March 18, 2008 SMC meeting presentation).[11]

220.     In another email on June 19, Karp wrote to Slate regarding Martoma, "Someone who claims to have edge is insisting that the data are very good.  Can you say with certainty that he doesn't know?  Munno and I can't…"  SAC_ELAN0800441.

221.     At his SEC deposition, Cohen asserted that his confidence in the outcome of the bapi clinical trial was based on the views of Wayne Holman, in addition to Martoma's.  Cohen SEC Dep. 72:22-73:25.  Both contemporaneous communications and Holman's testimony at deposition, however, contradict this claim.

222.     *First*, by Cohen's own statement, Martoma was "closest to it," SAC_ELAN1686636, and many of the later internal communications, including those in paragraphs 207, 212 and 213 above focus on Martoma alone.

223.     *Second*, Martoma was "tagged" with full, non-shared credit for both Elan *and Wyeth* in the Cohen account.  GX 298 (showing Martoma with a "NonShared tag" for all Elan and Wyeth positions in the COHE portfolio as of July 16, 2008); GX 299 (same as of July 25, 2008); Martoma Trial Tr. 2052:25-2053:11 (Martoma's analyst describing her understanding that a "Shared" tag meant that more than one analyst shared responsibility for giving Cohen information on a stock, and a "NonShared" tag meant that responsibility was not shared); *id.* at 498:20-499:10 (testimony from SAC CFO that Martoma got "100%" of the credit for Elan and

---

[11]     The dropout numbers that Martoma provided Betensky were 18, 23, 15, and 20 for the four dose cohorts.  GX 852-B.  These numbers can be obtained by subtracting from 60 the number of patients (37, 42, 45, and 40 for each of the four dose cohorts) that had received the sixth and final dose of the P2 trial according to the March 18, 2008 SMC meeting presentation that Gilman shared with Martoma.  *See* GX 111.

Wyeth positions in Cohen's accounts).  At trial, SAC's CFO, Dan Berkowitz ("Berkowitz") testified that it was "inconceivable" this would occur unless Martoma had recommended the trade.  *See id.* at 527:3-8 ("Q. Would it be completely common for Mr. Cohen to tag someone to get compensated if that person had not recommended a particular position to the COHE account?  A. That would be uncommon.  Q. Your understanding is, right, it would be inconceivable?  A. Yes."); *id.* at 511:15-20 (Q. "Mr. Cohen decided who to tag ultimately, isn't that right? A. Or someone who worked for him.  Q. Yes, Mr. Cohen or someone that worked with Mr. Cohen would decide who would get tagged as to a particular stock?  A. Yes.").

224.    *Third*, at his deposition, Holman disclaimed any particular insight into bapi or the science underlying it.  Asked why he purchased Wyeth after the June 17 Announcement, Holman denied that he had any strong belief that bapi would be successful:

> Q. You described previously that the reason these purchases were made was because the press release confirmed a thesis on Bapineuzumab, is that right?
>
> A. Well, I'm not sure it confirmed my thesis, because my thesis wasn't really that I felt strongly that Bapineuzumab was definitely going to be a success based on the science or based on the fact that they went into Phase III.  The thesis was more there was a possibility that it was going to be successful and if it was successful it could be a big revenue generator and that the fact that the Phase II release showed there was still differences at the end of the Phase II as opposed to have a different collapses was better than if it showed there were no differences.  So it still held out the possibility that Bapineuzumab could be a huge success down the road and if was, Wyeth would go up a lot.

Holman Dep. 132:5-20.

225.    While Cohen explained his later decision to begin selling Elan and Wyeth as based on Holman's change of heart about bapi's prospects, Cohen SEC Dep. 177:25-178:6, trading records indicate that the negative sentiment flowed the other way: Cohen and Martoma

began aggressively selling out their Elan and Wyeth positions on July 21; Holman did not began

selling until July 23.

K.  **In Contrast with His Detailed Written Analyses of Other Issues, Martoma Provided Cohen No Written Analysis to Support His "High Conviction" of Positive Phase 2 Trial Results, Instead Updating Cohen Periodically by Phone**

226.    Consistent with Cohen's non-responses to Munno, Slate and Karp, there is no

record that Martoma ever documented the reasons for his extraordinarily "high conviction" that

the Phase 2 trial results would beat market expectations.  In lieu of written explanations, emails

between Martoma and Cohen repeatedly propose that they discuss Elan and bapi by phone.  The

absence of documentation from Martoma on the hotly-contested, central issue concerning one of

SAC's largest investments – apparently the largest in Cohen's personal "book" – is striking, all

the more so given the standard practice at SAC of setting forth investment rationales in writing.

227.    Munno's detailed, 1265-word analysis of bapi's prospects in his March 26 email

to Cohen, discussed in paragraphs 187 and 188 above, reflects normal procedure at SAC, and

Martoma himself repeatedly supplied Cohen with lengthy write-ups of far less crucial issues.

For example, in a 600-word email to Cohen on October 14, 2007 (SAC_ELAN1863704),

Martoma analyzed at length recent news of a potential acquisition of Biogen Idec Inc. ("BIIB"),

Elan's partner in developing *Tysabri* (excerpted here):

> In general, I think the news for Biogen is good for ELN for following reasons:
>
> 1. If BIIB were sold to a third party, it triggers a 'change of control' provision over the Tysabri JV.  Street analysts are confused about the change of control provision works, the key point is that ELN has the right to purchase BIIB's share of Tysabri or sell its share of Tysabri to acquirer at a price set by an independent third party. ELN can also do nothing and let the right pass to the acquirer.  . . .
>
> 2. As mentioned before, I believe Icahn's crew is actively working on a cross sale to PFE.  . . .
>
> 3. As Medi deal (and likely BIIB deal) suggest, biologics are worth a lot more than investors appreciate.  . . . However, Tysabri's peak sales potential ($1.5-$3B as reported by Street and Biogen mgt) is only a fraction of what ELN's

AD products could sell. So a rich Biogen deal should imply an even higher value accorded to ELN's overall product portfolio, although this is a much harder thing to time.

On Monday, ELN will be up mostly b/c BIIB is up ... Post the first 5 mins of trading, I think ELN will be the better risk/reward trade a BIIB sale. As Street comes to appreciate the upside from independent appraisal of Tysabri, the lower risk profile of the drug in general, and inherent value in biologics, I can't see why ELN wouldn't keep grinding higher around disclosures related to BIIB sale.

228.    Martoma also offered multiple similar analyses of other issues that arose with respect to Elan and Wyeth that did not concern the bapi Phase 2 trial results:

Email, Martoma to Cohen, Jan. 7, 2008 (SAC_ELAN0680380):

Mgt's provides [sic] Tysabri safety update.  Company notes 21,000 patients on Tysabri with NO PML cases reported as of late Dec. As of mid Dec, 6,300 patients have been on Tysabri for at least 1 year with NO PML cases. (I've also been told there are over a thousand on therapy for 18 months with NO PML cases, although this is not in press release.).  . . . BIIB mgt attributes '08 guidance outlook to strength in Tysabri. This should be positive for BIIB/ELN. If you attribute all the upside to Tysabri sales, it would imply that BIIB Tysabri estimates ($625M) are 30% too low for 2008. This is inline with the ELN analysts projections of $800M.

Emails, Jan. 13, 2008 (GX 440):

Cohen: are u going to sell some eln if pdufa positive

Martoma: Yes, on approval, I plan to sell 10-20% of position max at price above 25. The next catalyst is if activist s/h puts in nominations for biib board of directors by late jan deadline. This would lead to speculation that tysabri asset still in play. Thereafter, we have 4q earnings in feb, but I think quarter expectations growing now that biib put out strong tysabri safety update at jpm conf.

Email, Martoma to Cohen, Apr. 11, 2008 (SAC_ELAN0263763):

Subject: RE: aggressive hedgie shorting eln off of cowan call on pfe alzheimer/lipitor trial

I heard that also. However, I think it's short-sighted. PFE lipitor/Alz study (LEAD) looked at benefits of Lipitor in treating Alz. The data were accepted for a late-breaker at AAN next week. Cowen sponsored a call yday to discuss LEAD and sales force going out with a "short ELN" call on theory that (1) if data are good, it would increase competitive landscape; and (2) if data are bad, would read negative for Bap study. Cowen has a history of trying to generate negative noise for ELN. But the logic of this call makes no sense to me for following reasons:

1. Whether Lipitor works or not means nothing for Bap study. Lipitor is statin and has no direct impacts on beta amyloid, the target of ELN's drug. Any

benefits with Lipitor are likely to be modest at best and have no read across for ELN/WYE's AAB. Incidentally, an earlier study of Zocor (another statin) showed ABSOLUTELY NO benefit in Alzheimer disease. Zocor crosses blood brain barrier, Lipitor does not. Thus, you would think Zocor should have better results than Lipitor in Alz since it gets into brain, although some disagreement on this point.

2. If Lipitor data were great, they would showcase it at ICAD (big Alzheimer conference) in July, not AAN -- a 2nd tier conference for Aiz data. i suspect the Lipitor data has a signai, but nothing more. This is a big triai, so overpowered to show a small difference.

3. At AAN, there will be data on IVIG, which will be seen as proof of concept for beta amyloid approaches, such as Bap. The data was highly stat sig (p<.001) on global measures and had a 3 point advantage on ADAS Cog (not significant). There were only 19 evaluable patients in the trial, studied for 6 months. This is a better trial to focus on related to Bap.

229.    Martoma's reticence also contrasts with Holman, who laid out his rebuttal to

Munno's March 26 analysis in a detailed email.  SAC_ELAN1739180.

230.    By sharp contrast with his own approach to other topics and other managers'

standard practice, Martoma **never explained in writing** the rationale for his bullish position on

the bapi Phase 2 clinical trial and Cohen **never requested a written explanation**.  Instead,

Martoma repeatedly proposed that he and Cohen discuss this issue by phone, avoiding any

written record on the topic.  Such communications include:

Emails, Mar. 26, 2008 (addressing Munno's March 26, 2008 email raising numerous concerns regarding the bapi Phase 2 trial):

Subject: FW: ELN, (important, please read) negative reads from company and other buysiders

Cohen: Let me know if u got this- read and let's discuss

Martoma: I read the message. Nothing worrisome here. Let me know when you are free to discuss in detail.

Email, Martoma to Cohen, Apr. 14, 2008 (SAC_ELAN0558227) (referencing the doctor who had supplied interim phase 2 data to Munno and Slate, further discussed below):

Subject: Spoke to Dr. Goldstein? Non issue.

Let me know when u are free for an update.

Email, Martoma to Cohen, Apr. 15, 2008 (SAC_ELAN0558209):

Subject:  Important ELN update

U have a second to talk? What is best #?

Email, Martoma to Cohen, Apr. 24, 2008 (SAC_ELAN0453917):

Subject:  Let me know when I should call to discuss tomorrow
Also have some new info to convey.

Email, Martoma to Cohen, May 11, 2008 (SAC_ ELAN0684806):

Subject: ELN follow-up to our conversation

. . .

I have a few other comments to pass along - not time sensitive - but will do
so next time we speak. Am free whenever convenient for you to catch up.

Email, Martoma to Cohen, May 21, 2008 (SAC_ELAN0183602):

Subject: Is there a good time to reach you for full update?

Email, Martoma to Cohen, June 24, 2008 (SAC_ELAN0178793):

Subject:  FW: Are u free to speak?
[Elan CEO] Kelly Martin email is gkm@elan.com

Email, Martoma to Cohen, June 30, 2008 (GX 451, emphasis added):

Hi Steve,
*Per prior discussion*, I'm adding back the ELN sales we made in GGEN. I
think stock breaks $40 on ICAD data and today's Flurizan failure.
Mat

231.    Cohen's avoidance of written communications regarding the Phase 2 trial results

is consistent with his preference for avoiding written communications in other situations

involving use of inside information around the same time period.  In an IM communication on

November 14, 2008 regarding inside information about Dell (discussed below in paragraphs 435

to 439), Cohen had the following exchange with a trusted lieutenant, Michael Steinberg

("Steinberg"), as reported at Steinberg's criminal trial for insider trading in Dell and a second

stock, *United States v. Steinberg*, No. 12 Cr. 121 (RJS) (S.D.N.Y.), Trial Transcript ("Steinberg

Trial Tr."), at 1172:21-1173:8):

Steinberg: Hey. || You there?

Cohen: Y

Steinberg: Dell reports Thursday -- rpts Thursday.

Cohen: Y || Y

Steinberg: We buy 11/12 calls. Nov's. Maybe you can buy stock and short call too. But we like it. We've been good here if you remember.

Cohen: Call me. It's a shame, cause I can be helpful to you too. But that's life.

Steinberg: Steve I have an analyst that covers this stock. He has industry contacts. I'm not hiding anything from you.

Cohen: I would prefer to talk on phone.

**L.      Cohen Receives and Responds to Emails Explicitly Discussing Negative Inside Information Regarding the Bapineuzumab Phase 2 Trials from Other CR Intrinsic Fund Managers, But Continues to Side with Martoma**

232.     Cohen's confidence in Martoma and his "good relationships" is all the more noteworthy in light of the adverse information supplied to Cohen by Slate and Munno from a doctor who had recently received the confidential nonpublic bapi Phase 2 interim trial results from Elan and Wyeth.  In an email exchange with Cohen, Munno and Slate explicitly informed Cohen that the doctor, Jerome Goldstein ("Goldstein"), had seen the interim data because he was participating in the Phase 3 trial, and had informed them that the data did not achieve statistical significance.

233.     The email thread begins with Cohen questioning Goldstein's knowledge, apparently following up a telephone conversation with Munno and Slate (SAC_ELAN0257212-13, emphasis added):

>     Cohen: Supposedly, he has seen 1792 study at 12 months. This was the vaccine data which was the precursor to BAP study being done now..Not comparable-
>
>     Slate: *He said he wasn't in phase 2 for bapineuazamab, but had seen the data as of december when asked to be in phase 3. According to what he saw it was not stat significant on adas-cog but was worth pursuing in phase 3. He's now part of the phase 3. So if someone claims to have edge on the phase 2 interim look, he would be contradictory.* He has been a consultant in trial design to eln for many

years. *He also said he was not in 1792 trial but specifically wanted to see the phase 2 data for bap before signing on for phase 3 given the adverse events in the 1792 trial.*

He's not negative on bap, he's + on amyloid concept. But on the specific question of stat significance (which is all that matters for the near term), he said it was not.

Munno: Goldstein was not in 1792 trial, he has of course seen those data like everyone else. Because of neg results from 1792, he decided not to participate in ph 2 bap study, even though he had been historically heavily involved in ELN trials. *Because of his concerns on 1792 and bap, he implied, though did not say outright, that he told ELN/WYE that he needed to see the interim look at the ph 2 bap data before his center would participate. He said the data looked "interesting" and "warranted further study in trials, but that all statements that have been made by cos and in Barrons that the drug could be a "cure" or has significant activity was ludicrous and more than a bit overstated (these were his words, not mine, don't shoot the messenger). He equated the data he's seen from the ph 2 trial (the 12 month interim look) to that of the flurizan ph 2 trial, which didn't hit stat sig on any endpoints, but was close on a few sub group analyses*. . . . He later said that the data he's seen were not stat sig on any endpoints, there could be some overlap between drug/control arms on some, but on others they were "close" to significant. He thought it was possible but unlikely that they could hit stats on 18 month final data based on the 12 months data.

. . .

*To the specific question of stat sig for the phase 2 and what we will see between may and july, he indicated the data are not stat sig and in a best case, I would think they are not likely to be totally clean vs expectations of stat sig, potential to file on ph 2 data and clean profile.*

Cohen: So u think the drug has to be stat sig on both endpoints- will trial size be a factor in stat sig for this study

234.   Strikingly, presented with a report of what was, on its face, illegal inside information supplied by a doctor participating in a clinical trial in violation of his confidentiality obligations to Elan, Cohen expressed no concern about the source or propriety of his access to the information; he instead simply asked a substantive follow-up question on the issue under discussion.

235.   Cohen's continued rejection of Munno and Slate's position – although buttressed with inside information regarding interim Phase 2 trial data from an Alzheimer's expert who had reviewed the data and "ha[d] been a consultant in trial design to [Elan] for many years" –

underscores Cohen's level of conviction in Martoma and what Cohen described a few days

earlier as his "good relationships in this arena."

>       **M.      Cohen Does Not Object to Martoma's Efforts to Elicit
>                Information Concerning the Bapineuzumab Phase 2 Trial
>                from Elan's CEO at a Private Dinner Meeting Days
>                <u>Before the Phase 2 Trial Results Were to Be Released</u>**

236.    Less than two weeks before the release of the "top line" Phase 2 trial results on

June 17, 2008, Martoma arranged a private dinner for himself and Cohen with Elan's Chief

Executive Officer, Kelly Martin, which was held on June 4, 2008 at Cohen's Greenwich estate.

237.    Prior to the dinner, Martoma forwarded Cohen an email listing "Questions for

Kelly Martin Dinner tonight."  SAC_ELAN0183505.  The questions were overtly designed to

elicit responses helpful to predicting the outcome of the Phase 2 trial:

> 1. In the past you have emphasized the portfolio of programs you have ongoing in Alzheimer's. More recently, there has been increased emphasis on AAB-001 in your communications. How important is the success of AAB in this P2 trial towards establishing your lead/dominance in this space?
>
> 2. You have been very helpful in providing background information about the P2 and P3 trials and I would appreciate your clarifying one point. Wyeth originally said the P2 data needed to be  "spectacular"to move to P3 early. More recently, Wyeth has talked about the totality of the data as underpinning the move to P3. Does that mean that the P2 data no longer needed to be spectacular? . . .
>
> 3. What data has the FDA seen from the P2 data? . . .
>
> 4. On what factors did you base the size of the P3 trial? How do you design a P3 trial when you still lack complete data from the P2? . . .
>
> 5. Obviously you have put a great deal of work into the development and it must be very rewarding for you to see that come to fruition. What is the potential for you to file on the P2 data ahead of completion of P3?
>
> 6. This is obviously a challenging time for you to manage through. There are a number of aggressive short sellers who are targeting your stock post P2 data release with the assumption that (1) there will be limited newsflow for several years until the P3 data are known; (2) there is risk that theP3 program will disappoint even if the P2 data are good; and (3) there is risk that a case of PML is discovered with your other drug, Tysabri. How will you continue to create shareholder value during the intervening period post release of the P2 data and completion of the P3 trials?

238.     As with the Goldstein communications discussed above, Cohen did not raise any objection to Martoma's overt effort to obtain information about an ongoing clinical trial from insiders who were subject to a duty of confidentiality and were prohibited by an SEC regulation, Regulation FD, 17 C.F.R. § 243.100, from providing selective disclosure of just the kind of information these questions sought.

**N.     Cohen and Martoma Remain Bullish on Elan and Wyeth
Following the June 17 "Top Line" Announcement – the Final
Public Disclosure Regarding Bapineuzumab Before ICAD**

239.     Elan and Wyeth released summary, top-line results of the Phase 2 trial on June 17, 2008 – the June 17 Announcement.  The market reacted positively and the trading price of Elan ADRs and Wyeth stock rose more than 10% and 4%, respectively.

240.     Martoma maintained his positive outlook on Elan after the June 17 Announcement.  In a June 30, 2008 email, sent when Elan ADRs were trading at approximately $35, Martoma told Cohen that he intended to add further to the Elan position, saying, "I think stock breaks $40" following the announcement of full Phase 2 trial results, scheduled for one month later, on July 29.  SAC_ELAN0182345.

241.     Reflecting their continued expectation that the Phase 2 results would be positive, Martoma and Cohen substantially increased their position in Elan between June 17 and July 18, increasing their holdings by nearly 2.2 million ADRs – more than 26%.  In just the week of July 14-18 – only one week before they reversed course and liquidated their entire Elan position – Cohen and Martoma bought over 900,000 Elan ADRs worth more than $30 million, growing their holdings by nearly 10%.  Also during the week of July 14-18, Cohen and Martoma purchased nearly 300,000 shares of Wyeth, worth over $13 million.

O.     **Gilman Supplies Martoma the Phase 2 Trial Results**

242.     In late June 2008, Gilman learned that he likely would be selected to present the Phase 2 trial results at ICAD on July 29.  After learning of his selection, Gilman sent an email to Martoma on June 25 with the subject line "Some news" and told Martoma to "[p]lease set up a GLG conversation re MS."  SAC_ELAN2762351.  Martoma then requested that his secretary contact GLG to arrange a consultation with Gilman "on MS therapies . . . ." SAC_ELAN2762350.  During this consultation – purportedly about multiple sclerosis, a disease treated by Elan's principal marketed drug, *Tysabri*, but with no connection to bapi – Gilman informed Martoma that he would be the presenter of the final Phase 2 clinical trial results at ICAD on July 29.

243.     After being named as the presenter, Gilman arranged to travel to Elan's offices on July 15 and 16, 2008, so that he could learn the full results of the Phase 2 trial.  SG000787-89.

244.     On July 7, 2008, Gilman created an entry in his electronic calendar for an appointment on July 13, titled "Mat Martoma will call me re: SAEs in bap" [serious adverse effects in bapineuzumab].  SG000786.  The call was scheduled so Gilman could brief Martoma on the full safety data for the trial, which was to be discussed at the SMC meeting scheduled for Friday, July 11.  Martoma Trial Tr. 1403:1-13.  However, to avoid creating a record that they would be discussing Inside Information, Gilman and Martoma arranged to disguise the purpose of the consultation with GLG.  Specifically, on Sunday, July 13, Gilman emailed Martoma "Hi Mat, For today's call at 5 pm EDT, please: 1. Obtain [GLG] consent for us to speak, perhaps on Parkinson's disease and Rasagiline [a drug to treat Parkinson's disease]."  SAC_ELAN0700823.  GLG records reflect that Martoma made a request the same day to speak to Gilman regarding "Parkinson's Disease and Rasagiline."  GLG-042346.  Gilman testified that this was a "pure deception" and that the true purpose of the conversation was to "talk about the safety effects of

bapineuzumab which [Gilman] just learned."  Martoma Trial Tr. 1408:12-23.  At approximately 5:33 p.m., Martoma called Gilman from his home and spoke to Gilman for more than one hour and 40 minutes.  During the conversation, Gilman described in detail the final safety data presented to the SMC, including the number of vasogenic edema cases and their outcome, *id.* at 1409:1-8, which Gilman continued to interpret as largely positive.

245.    Toward the end of the July 13 call, Martoma and Gilman each created Outlook calendar entries reflecting that they intended to speak again on July 17, 2008 – the day after Gilman returned from his scheduled meetings with Elan.  GX 520; GX 752.

246.    On July 15, 2008, Elan flew Gilman to San Francisco by private jet to participate in two days of meetings concerning the Phase 2 trial safety and efficacy results.  This was the first time that Gilman had seen data on the efficacy of bapi, rather than simply safety data.  Martoma Trial Tr. 1413:17-23.  The efficacy data were significantly less favorable than the market expected following the June 17 Announcement.

247.    On July 17, 2008, after Gilman returned to Michigan, an Elan executive sent Gilman an updated ICAD PowerPoint presentation in an email labeled "Confidential, Do Not Distribute."  ELAN099133.  The 24-page PowerPoint included summaries of the detailed efficacy results and safety results for the Phase 2 trial as well as additional commentary on how Elan and Wyeth were interpreting the data.  ELAN099135.

248.    Later in the afternoon of July 17, 2008, Gilman and Martoma had another lengthy phone call, lasting approximately one hour and 45 minutes, during which Gilman provided Martoma with confidential information regarding the detailed results of the Phase 2 trial, including all the information contained in the PowerPoint presentation.  To conduct this call, Martoma left SAC's New York office mid-afternoon and traveled to his home in Greenwich,

Connecticut.  He then called Gilman from his home at 4:15 pm.  Unlike prior consultations, this call was not arranged through or reported to GLG.  Martoma Trial Tr. 1917:25-1918:2.

249.    Gilman described what he told Martoma on July 17, 2008 (*id.* at 1424:2-24):

```
Q. What did you do on July 17?

A. On July 17, I received a version of the data of the
slide set, and I spoke with Mat Martoma. I told him about
the results in detail in about an hour and a half
conversation. I was very excited about the results and
told him about them in detail.
```

250.    Two days later, on July 19, 2008, Martoma flew to Michigan to visit Gilman at his office at the University of Michigan in Ann Arbor.  SG000791.  This meeting, like the July 17 call, was not arranged through or reported to GLG.  Martoma Trial Tr. 1483:7-21.  Gilman described Martoma's arrival and his request to see the slides that were to be presented at ICAD.  *Id.* at 1453:24-1454:14.  Gilman then testified that he showed Martoma the draft ICAD presentation and discussed it with him at length (Martoma Trial Tr. 1454:15-1456:1):

```
Q. Do you recall whether or not you showed them to him?

A. Yes, I did. I recall, yes, I recall that.

Q. In what fashion?

A. On my computer desktop. . . .

Q. What, if anything, do you recall about showing the
slides to Mr. Martoma on your computer?

A. I recall showing the slides that were then -- they
were under evolution. They were -- I was changing them
constantly. I showed him the slide set that was then
current.

Q. And what slides were these?

A. These were slides that were going back and forth
between myself and Elan Pharmaceuticals, the
representative at Elan.

Q. In relation to your presentation?

A. Yes, in relation to the ICAD presentation.

Q. Do you recall whether or not you and Mr. Martoma had
any conversation while you were showing him the slides?

A. Well, between the 17th when I described the slides to
him and the 19th, we went over the results of the non-
```

- 84 -

```
carriers and the carriers with respect to efficacy, which
we discussed last time.

Q. Do you recall any details about the July 19
conversation when he was in your office or no?

A. I do recall going over the completers analysis for the
non-carriers which we described last time in which the
placebo group dropped 14 on the scale for the ADAS-cog. I
recall showing the carrier group which -- in which the
placebo group dropped much less around eight or so. I
recall showing him the lack of a dose response. I recall
discussion in response to his questions the lack of dose
response, and my overall view of -- he asked my view of
the results, and my response was, well, these are --
these two items, the marked drop of the placebo group and
the lack of a dose response are relative concerns; not
huge concerns. I still was very excited about the
results.
```

251.    Gilman and Martoma continued to communicate after their July 17 conversation in the days leading up to the July 29 Announcement.  In addition to three short calls on July 18, Martoma and Gilman had a 39-minute conversation on July 22, a 23-minute conversation on July 24, and an approximately 11-minute conversation on July 28.   None of these conversations were arranged through or reported to GLG.  *See* GX 600.  As Gilman explained in regards to the July 19, 2008 meeting, he did not report it to GLG or ask Martoma to report it because "it would be tantamount to confessing that I was feeding – giving him inside information."  Martoma Trial Tr. 1918:3-10.

> **P.     Martoma Reports His Pessimism About the Phase 2
> Trial Results to Cohen, and They Then Liquidate SAC's
> Positions in Elan and Wyeth and Massively Short Both
> Stocks in the Seven Trading Days Before ICAD**

252.    The detailed safety and efficacy results of the Phase 2 clinical trial fell well short of market expectations.  In particular, the efficacy data showed a benefit for only one subgroup of patients, and the reliability of that result was uncertain, based on the trial's methodology.

253.    On the morning of Sunday, July 20, 2008 – nine days before the Phase 2 results were scheduled to be released and three days after his receipt of the confidential Phase 2 efficacy

data from Gilman – Martoma emailed Cohen "[i]s there a good time to catch up with you this morning?  It's important."  SAC_ELAN2764428.  Cohen replied a short time later with his cell phone number, SAC_ELAN0734109, and Cohen and Martoma then spoke by phone at around 9:45 a.m. for approximately 20 minutes.

254.    The following day, Monday, July 21, 2008, Cohen and Martoma instructed Villhauer, Cohen's head trader, to begin selling Elan and Wyeth securities held in the SAC LP and CR Intrinsic portfolios that Cohen and Martoma controlled, and to do so in a way that would not alert anyone else, either inside or outside of SAC.  *See* SAC_ELAN2764551.  Before the market opened on July 21, 2008, these portfolios held approximately 10.6 million Elan ADRs worth more than $366 million and approximately 19 million Wyeth shares (or swaps providing equivalent exposure) worth roughly $900 million.

255.    Over the next four days, Villhauer liquidated SAC's entire long position in Elan.

256.    Having sold out of its entire long position in Elan, SAC next sold short 4.5 million additional Elan ADRs on July 28-29, 2008, prior to the July 29 Announcement.  SAC thereby made a major bet that the price of Elan ADRs would decline in the near future.

257.    In total, between July 21, 2008 and July 29, 2008, SAC sold over 15 million Elan ADRs for net proceeds of over $500 million.  The trading by SAC in Elan ADRs constituted over 20% of the reported trading volume in the seven days prior to the July 29 Announcement.

258.    In addition, between July 21, 2008 and July 29, 2008, SAC sold over 10.2 million shares of Wyeth for net proceeds of more than $460 million, including over 6.0 million Wyeth shares worth more than $270 million during the day of the July 29 Announcement.  As a result of these sales, the CR Intrinsic and SAC LP portfolios had a zero balance in Wyeth stock during the trading day on July 29, 2008, but continued to place short sales of Wyeth stock that day.  By the

close of the market on July 29, 2008, the CR Intrinsic and SAC LP portfolios had a combined

short position of 3.2 million Wyeth shares.

259.    Cohen and Martoma's trades in Elan and Wyeth during the six-week period

between the June 17 Announcement and ICAD demonstrate the sudden and abrupt reversal of

their view of the bapi Phase 2 trial immediately after Gilman tipped Martoma:





260.    As the charts above show, Cohen and Martoma continued to increase their

positions in both Wyeth and Elan in just the week before Gilman tipped Martoma and both

Cohen and Martoma then sold out of Elan and began liquidating their positions in Wyeth.  This sudden reversal is particularly noteworthy given that **there had been no new public information disclosed about bapi for over a month**.

261.   CR Intrinsic and SAC LP also made options trades that bet on the price of Elan ADRs declining.  For example, on July 28 and July 29, the CR Intrinsic and SAC LP portfolios purchased over $1 million of Elan put options with strike prices below the Elan ADR price on those trading days.

262.   While Cohen attributed the decision to sell to Martoma's change of sentiment regarding the bapi Phase 2 trial results, neither he nor Martoma have ever offered a credible explanation for the reversal.  Asked at his deposition how Martoma explained his decision, Cohen was extraordinarily vague (Cohen SEC Dep. 162:1-25):

> Q.  What did Mr. Martoma say when you first got on the phone with him?
>
> A.  He called me and he said -- I remember him saying that he was getting uncomfortable with the Elan position.
>
> Q.  Did he explain why?
>
> A.  I must have asked him how come or -- because he repeated back to me, "I am just getting uncomfortable with the Elan position."
>
> Q.  Did he provide any reasons as to why he was uncomfortable in the Elan position?
>
> A.  He might have.  I just don't remember.
>
> [Q.]  What else do you recall about that conversation?
>
> [A.]  I don't recall really anything else.
>
> [Q.]  The only thing that you recall is Mr. Martoma saying, "I am getting uncomfortable with the Elan position," you said "What do you mean" him repeating that, and that's it?
>
> [A.]  That is what I remember, yes.
>
> Q.  After Mr. Martoma said that he was uncomfortable with the Elan position, what else happened in the discussion?
>
> A.  I don't remember.

263.     According to trial testimony, Martoma also offered no explanation for his about-face to others at SAC.  His trader, Tim Jandovitz ("Jandovitz"), testified (Martoma Trial Tr. 154:19-155:5):

> Q. Did you ask Mr. Martoma during this conversation whether he had changed his view about the prospects of bapineuzumab before the drug trial announcement?
>
> A. I did.
>
> Q. What did he tell you?
>
> A. He told me that he had reviewed his notes in the last couple of weeks and wasn't as confident on the outcome of the trial.
>
> Q. Did he describe what these notes were?
>
> A. He did not go into great detail in describing that, no.
>
> Q. Did he go into any detail beyond that they were notes?
>
> A. I don't recall him going into detail.

264.     Similarly, his research analyst, Kate Lyndon ("Lyndon"), testified that Martoma was extremely vague about his reasons for selling out of Elan and Wyeth (*id.* at 2076:14-22):

> I must have had asked him something along the lines of why did you change the positions. I don't remember my exact question, but I remember his answer. And what he said was something like: I looked through all of my notes the week before or a week before -- I don't remember the exact time frame -- but the idea was it was a short time frame before, and it just didn't add up, and I lost conviction so I called Steven, you know, basically wanted to get out of it.

265.     The absence of any credible explanation notwithstanding, the scale and speed of SAC's reversal of position on Elan and Wyeth – all in the seven trading days following the 20 minute telephone conversation between Cohen and Martoma on July 20 – is striking.

266.     As of June 30, 2008, before Villhauer began selling, SAC's long positions in

Wyeth and Elan represented its ***largest*** and ***fifth largest*** positions, respectively – out of the more

than 1,200 companies in which it was then invested.[12]

267.     As of June 30, 2008, SAC's bets on Elan and Wyeth also represented the largest

investments of *any* hedge fund in Elan or Wyeth, based on publicly-available information.

268.     By the time that the bapi Phase 2 clinical trial results were announced on July 29,

2008, however, SAC's complete reversal of position and bets on the *decline* of Elan ADRs and

Wyeth shares were large enough to rank among its 20 biggest publicly-reported positions, out of

more than 1,200 disclosed investments.

269.     The massive short position that SAC acquired on July 28-29 reflected an

extraordinary level of confidence that Elan's trading price would decline in the near future.  Had

Elan's trading price reached $40 – as Martoma had predicted less than a month earlier – SAC

would have suffered a loss of more than $28 million.

> **Q.     Cohen Actively Supervises the Elan and Wyeth
>           Sales, and Takes Extraordinary Measures to
>           <u>Conceal Them, Even from Other SAC Personnel</u>**

270.     Cohen closely supervised the sales of Elan and Wyeth, and at his direction,

Villhauer took extraordinary measures to hide them, even from other personnel at SAC.

271.     On Monday, July 21, 2008, Cohen directed that the sales of Elan and Wyeth be

conducted in accounts that would not be visible to other portfolio managers at SAC.  Due to the

need to locate and properly establish these special accounts, sales were deferred until after the

close of the trading day on July 21 while SAC's trading operations department made the

---

[12]     These calculations are based on reported holdings as of June 30, 2008, reflecting the
combined Form 13-F reports of SAC LLC, CR Intrinsic, and Sigma, filed August 14, 2008, together
with SAC's exposure to Wyeth common stock under a swap agreement.

necessary arrangements.  Villhauer testified that he spoke to Cohen regarding Elan during the morning of July 21, 2008 and thereafter started work on setting up the low-visibility accounts Cohen wanted established (*id.* at 2272:13-2274:20, emphasis added):

> Q. Prior to this exchange with Mr. Schiff, had you spoken to Mr. Cohen?
>
> A. In reference to that morning?
>
> Q. Yeah, that morning of July 21st.
>
> A. I believe I did, yes.
>
> Q. And did you take any action after speaking with Mr. Cohen . . . with respect to Elan?
>
> A. Yes. So Steve wanted to start selling some Elan and he wanted to put it in an account that was not as visible as the other accounts the firm had. So **I was trying to set up some accounts that the visibility was limited on and subsequently sell some Elan.** . . .
>
> Q. When you are talking about visibility in the context you just described it, certainly in the context of accounts within the firm, is the visibility you are referring to within the firm itself?
>
> A. Yes.
>
> Q. So what did you do to find accounts that were less visible?
>
> A. I made a call to operations, and asked them, you know, can we find the visibility of accounts that don't have as many eyes looking at these.
>
> Q. Would those be -- and did those end up being firm accounts?
>
> A. Yes. So operations came back and they were specifically firm accounts, FSAC and, I believe, FINT.
>
> Q. And do you know what those accounts had been used for before that, before this date where you called down to operations?
>
> A. It seems like they were used to for other circumstances also with limited visibility. I think what we did, or **what I did was make sure that the visibility this time around was actually less than what they were used for in the past.** . . .
>
> Q. OK. So after you identified those accounts, what did you do next?
>
> A. Well, the accounts were identified. I believe they weren't actually completely set up until the end of the day. But I left for the day, and I told Doug Schiff to,

> you know, start talking to Steve and understand what he
> wants to do with Elan.
>
> Q. And, in general, did you have an understanding -- not
> in detail, but, again, did you have an understanding of
> what Steve wanted to do with Elan?
>
> A. Generally he said he wanted to start selling some.

272.    Over the course of the day, Cohen had a lengthy IM conversation about trading in

Elan with SAC trader Doug Schiff, who was filling in for Villhauer for part of the day while

Villhauer was out of the office. GX 485.

273.    In the evening of July 21, after the special trading accounts had been established,

Villhauer reported to Martoma that he had sold 1.5 million Elan ADRs that day, and "obviously

no one knows except you me and steve [Cohen]." SAC_ELAN2764551.

274.    The next day, Villhauer executed substantial sales, with Cohen closely monitoring

the trades. *See* GX 432 (showing Villhauer sending Cohen twelve IMs between 8:30 and 9:30

am on July 22, 2008 regarding sales of Elan and receiving two replies from Cohen); GX 433

(showing approximately eighty IMs between Villhauer and Cohen from 11:30 am to 3:00 pm on

July 22, 2008 regarding Elan trades, ending with discussion of total SAC sales that day of over 4

million units).[13]

275.    Martoma assisted Cohen with his trading decisions during this process, urging

Cohen and Villhauer to sell the Elan securities in the CR Intrinsic and SAC LP portfolios

quickly.  On July 22, as Cohen was in the midst of an extensive IM exchange with Villhauer

directing SAC's sales of Elan (GX 433), Martoma sent Cohen an instant message at 1:22:34 p.m.

saying, "would do more today if possible[,]" suggesting that Cohen sell more Elan ADRs.  At

1:22:50 p.m., Cohen responded, in relevant part, "we are done on 2.3 [million] today" for a "total

---

[13]    Another SAC trader, Jeffrey Miller, made significant sales of SAC's Wyeth positions at
Cohen's direction during this same period.  Martoma Trial Tr. 2570:1-2571:8.

3.8 [million] in 2 days." Martoma replied, "my sense is today-thurs are best days / so if possible to do more, would do so." GX 462. After receiving Martoma's message, Cohen sold more than 2.2 million additional Elan ADRs on July 22. Villhauer contacted Martoma again around 2:20 p.m. by email telling Martoma that Cohen was holding and saying "not sure if you want to give him a push." GX 434.

276.    Phone records also show numerous calls between Martoma and Cohen on July 28 and 29, 2008, when they were acquiring large short positions in Elan and Wyeth. GX 1215.

277.    Martoma and Cohen directed this trading activity together – with Cohen directly supervising Villhauer and others to execute the trades, and Martoma providing recommendations and, later, taking credit in compensation negotiations for the profits and avoided losses realized by SAC. *E.g.*, GX 550 at 3 (September 3, 2008 email from Martoma to Cohen negotiating his employment agreement for the subsequent year and attaching a table in which Martoma estimates his performance in 2008 and includes performance in his account, other accounts, and Cohen's account, including Elan short positions).

278.    On Sunday, July 27, 2008, Villhauer reported to Cohen on his selling efforts in Elan over the prior week: "We executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and SAC LP] at an avg price of 34.21. This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access." GX 436.

279.    According to another SAC staff member involved in the trades, Cohen also **selected the strike prices on the complex, multi-component option trades that he and Martoma established in the days before ICAD** – a position wholly inconsistent with Cohen's claimed lack

of familiarity with Elan and Wyeth and the anticipated bapi Phase 2 results.

SAC_ELAN0760305.

280.    The use of "algos" and "dark pools," in the words of Villhauer, "clearly stopped leakage of info from either in [or] outside the firm and in my viewpoint clearly saved us some slippage." *Id.*

281.    Trading in dark pools enabled the SAC Defendants to make their activity less visible to other investors and more difficult for the SEC to detect.  Dark pools are private alternative stock exchanges reserved for the largest traders, including hedge funds.  The pools use computers to match buyers and sellers of a particular stock, drawing pricing data from public stock exchanges.  Dark pools provide an increased level of secrecy because neither the size of the trade, nor the identities of the buyer or seller are revealed until the trade is filled.  As a result, it is impossible to know if just one trader or firm is doing all the buying or selling until after the trade is completed.  The SEC regulates dark pool exchanges, but it has no way of quickly determining who is trading what.  *See* Tom Winter, *Gazing into 'Dark Pools,' the Tool that Enables Anonymous Insider Trading*, NBC News, Jan. 23, 2013.

282.    Similarly, algorithmic trade execution "involves splitting a trade into multiple orders in order to reduce visibility and market impact . . . ."  Algorithmic Trading, http://www.automatedtrader.net/Algorithmic_Trading.xhtm.  Algorithmic trading is therefore a *method of execution* of the trade; the decision whether or not to make the trade in the first instance may or may not be automated, *id.*, and in this case was not; the trades here were executed at the direction of Cohen and Martoma.  *See also* Cohen Fairfax Dep. 455:20 (acknowledging SAC's use of algorithmic trade execution and noting the distinction between using algorithms to make trading decisions and using them for trade execution).

283.    The only long position in either Elan or Wyeth that Cohen did not unwind was an equity swap that gave SAC exposure to 12 million Wyeth shares.  Unlike the stock sales, the swap could not have been unwound in secret.  Rather than draw attention to his sudden reversal of position on the eve of a major announcement for a stock in which SAC held the second largest publicly-disclosed position of any hedge fund, Cohen elected to leave the position in place and take a $64 million loss on it.

284.    Cohen continued to avoid disclosure of SAC's trades in Elan even after he had liquidated the Firm's long position.  In an email to Debler on Sunday, July 27, 2008, two days before ICAD, he emailed "Between u and me and u can't mention to anyone- i am completely out of eln-."  SAC3349531.

285.    Martoma also participated in the ongoing concealment.  In his weekly report to Cohen on Sunday, July 27, 2008, he continued to list Elan and Wyeth as two of his three long positions, both with "Conviction" ratings of 9 out of 10, target prices well above existing trading prices and "P2 AD presentation at ICAD" as the near-term catalyst.  GX 465.

286.    Similarly, on July 25, 2008, the auto-generated firm email that listed positions in Cohen accounts "tagged" to Martoma continued to list long positions in both Elan and Wyeth, GX 298 and 299, even though those positions had been sold off by that time.

287.    The extraordinary efforts that Cohen and Martoma took to preserve the secrecy of their Elan and Wyeth sales are reflected by testimony at trial of other SAC personnel that they had never seen anything like it.  Bocklage, Cohen's "right hand man," testified (Martoma Trial Tr. 2566:18-22):

> Q. In your entire 12-year tenure there, leaving this trade aside, has there ever been an instance where your knowledge sales were made in the COHE portfolio without you seeing them while they happened?
>
> A. Not to my knowledge.

288.     Likewise, the trader who executed transactions for Martoma, Jandovitz, testified that Martoma did not inform him of the decision to sell out of Elan and Wyeth (*id.* at 149:3-10), and that as a result, upon learning of the post-ICAD selloff, Jandovitz thought Martoma's portfolio had incurred a loss "[n]orth of $100 million" and "was concerned about the security of my boss' job as well as my own job."  *Id.* at 151:18, 152:4-5.

289.     Jandovitz testified that according to Martoma, the direction not to inform him came directly from Cohen.  *Id.* at 153:18-19 ("Mat informed me that Steve Cohen had directed Mat Martoma to not inform me of our decision to sell the stock.").

290.     Like Bocklage, Jandovitz testified that the secrecy of the trades was unprecedented (*id.* at 157:3-10, 262:6-14):

> Q. Mr. Jandovitz, how long did you continue trading the GEHC portfolio after July of 2008?
>
> A. Approximately two years.
>
> Q. During your remaining two years trading the GEHC portfolio, was there ever another occasion where, to your knowledge, you couldn't see sales that were happening in the portfolio while they were happening using your Panorama?
>
> A. No.
>
> *     *     *
>
> Q. Were you aware of any good reasons why portfolio managers would want to keep their information confidential from the traders who executed their own trades?
>
> A. Not that I am aware, no.
>
> Q. Other than with respect to the sale of Elan in July 2008, are you aware of any other instance at SAC Capital in which a portfolio manager kept trades in his or her own portfolio secret from the person who normally executed the trades?
>
> A. No.

291.     Martoma's research analyst, Lyndon, similarly testified that Martoma explained the secrecy around the Elan and Wyeth trades "was a one-time thing or Steven had indicated that

the ability to do that was a one-time thing and it wouldn't happen again." *Id.* at 2077:12-14.

Like Jandovitz, Lyndon testified that the secrecy was unprecedented (*id.* at 2077:21-25):

> Q. Do you recall any other occasion when you had access
> to the GEHC portfolio through Panorama when there were
> trades in that portfolio that you couldn't see the same
> day that they were being made?
>
> A. I don't recall that, no.

292.    Consistent with Bocklage, Jandovitz and Lyndon, Villhauer acknowledged that

the way the Elan and Wyeth trades were handled was unique (*id.* at 2303:24-2304:3):

> Q. Mr. Villhauer, can you recall another instance prior
> to July of 2008 in which the firm sold a large position
> using firm accounts and then transferred the sales later
> to the accounts that held the long position?
>
> A. I cannot.

**R.    Elan and Gilman Disclose the Mixed and
Disappointing Clinical Trial Results, Prompting
a Sell-off of Elan ADRs and Wyeth Shares and
Divergent Views of Bapineuzumab's Potential**

293.    On July 29, 2008, after the close of U.S. securities markets, Elan and Wyeth

issued a press release summarizing the results of the Phase 2 trial and Gilman reported the results

in a 13 minute presentation at ICAD.

294.    The overall market reaction was strongly negative.  After briefly rising following

issuance of the press release at 5:00 pm EDT, the price of Elan ADRs dropped sharply in after-

hours trading on July 29 and over the course of the trading day on July 30, closing at $19.63,

down 41.8% from its $33.75 close on July 29.  The July 29 Announcement also drove a nearly

12% decline in the value of Wyeth, from $45.11 at the close on July 29, to $39.74 at the close on

July 30.

295.    The reaction of individual analysts and Alzheimer's specialists, however, varied

broadly.  Some viewed the trial results as very bad; others, while recognizing that the data did

not meet the market's high expectations following the June 17 Announcement, were cautiously

positive.  Gilman's brief presentation was widely criticized as weak and unclear; the data

themselves were repeatedly described as confusing and challenging to interpret.

### 1.    The Reported Bapineuzumab Phase 2 Results Were Confusing and Ambiguous

296.    A Lehman Brothers analyst discussed the challenges of analyzing the publicly-

reported Phase 2 results in a July 30, 2008 report:

> When dealing with a disease with a largely unknown pathophysiology and a Phase 2 data set that is rather ambiguous it is challenging to draw a clear, rational conclusion.  This is further complicated by the fact that the Phase 2 bap data represents a foray into unchartered waters. There is really no historical precedent for which to fairly evaluate this data. Without easy compares [sic] investors and analysts will do their best to evaluate the available data.

Richard Silver, *Bap P2 Detail Supports Top Line*, Lehman Bros., July 30, 2008, at 2-3.

297.    Other equity analysts similarly cited the confusing, contradictory nature of the

data.  A Credit Suisse analyst, for example, stated in a July 31, 2008 report that "the full data set

opened up as many questions as it answered" and that "the lack of apparent dose response [was]

confusing . . . ."  Scott Bardo et al., *Bapineuzumab Data Asks Questions – We Still See An*

*Opportunity*, Credit Suisse, July 31, 2008, at 1, 2.

298.    A Cowen & Co. analyst similarly reported that "[t]he biomarker data presented

yesterday were compelling in some cases while confounding in others.  . . .  The relevance of [a]

result [in the carrier group] remains a mystery."  Ian Sanderson et al., *Bapineuzumab Phase II*

*Data Presentation Raises Questions – And Phase III Risk*, Cowen & Co., July 30, 2008, at 6.

299.    A UBS analyst noted in a July 30, 2008 report that "[i]t is also unclear if the

meaningful efficacy benefit seen vs. placebo in the non-carriers was for real, or due to an

unusually higher deterioration of placebo scores.  . . .  While ELN/WYE explained the relatively

high deterioration in the placebo group as being not out of normal and in the range of data seen previously, we believe that this remains a point of contention . . . ."  Martin Wales, *Bapineuzumab. The Rollercoaster Continues*, UBS, July 30, 2008, at 4.  *See also* Jack Gorman, *Full Phase II Data Prompt New Questions on Strength of Efficacy Signals*, Davy, July 30, 2008, at 2 (noting "[c]onfounding messages on dose response"); David Risinger et al., *Back to "Show Me" on Bapineuzumab*, Merrill Lynch, July 30, 2008, at 1 (data "did not show highly compelling efficacy and instead included some mixed signals" and "[p]ost hoc 'statistical significance' [was] unclear."); Corey Davis et al., *ELN: Wow – What Is Really That Bad?*, Natixis Bleichroeder, July 31, 2008, at 1 ("[t]here was certainly a lot of confusing data").

### 2.    Gilman's Weak 13 Minute Presentation Further Contributed to Market Uncertainty

300.    Investors' understanding of the Phase 2 results was further complicated by the rushed and muddy nature of Gilman's presentation.

301.    Elan's chief scientific officer, Dale Schenk, defended Gilman's presentation, explaining that " '[i]t was challenging, we had to explain a huge amount of data in 13 minutes (at the conference), it takes a while to explain it all,'. . . ."  *Elan Shares Slump on Phase II Data on Alzheimer's Drug*, Irish Independent, July 31, 2008.

302.    At Martoma's criminal trial, however, one of the Elan researchers managing the bapi Phase 2 trial testified that Gilman's presentation  was "confusing" and "unclear" (Martoma Trial Tr. 962:8-20):

> Q. Is it fair to say that Dr. Gilman's presentation
> appeared confusing to you?
>
> A. Yeah, the slide presentation had a ton of content for
> the number -- the amount of time given for the
> presentation.
>
> Q. Am I right that you felt that he appeared flustered as
> he was giving the presentation before the audience at
> ICAD?

```
A. I don't really remember his manner, but I definitely
remember that the data was very complex and maybe it was
too much content for the amount of time allotted.

Q. Was your sense that the presentation wasn't clear in
presenting the actual results of the bapineuzumab trial?

A. I would say it was unclear because it went by so fast;
it was hard to capture the key results.
```

303.    Analysts and researchers also found Gilman's presentation unclear.  A research clearinghouse for Alzheimer's specialists, the Alzheimer Research Forum, commented that "bapineuzumab rode to ICAD on high expectations, and its luster has dimmed somewhat after the company's presentation there. This is not only because investors promptly dumped Elan stock but also because scientists felt that the presentation could have been more straightforward." Gabrielle Strobel, *Bapineuzumab's Phase 2 – Was the Data Better than the Spin?*, Alzheimer Res. F., Aug. 11, 2008.

304.    A story on TheStreet.com made the same point more bluntly: "[t]he presentation of the bapineuzumab data was weak, the results were underwhelming and inconclusive."  Adam Feuerstein, *Elan-Wyeth Alzheimer's Data Spook Bulls*, The Street, July 30, 2008.

305.    Analysts agreed that the presentation of the data was weak.  An analyst at Caris & Co., for example, observed that "the presentation was rushed and still incomplete . . . ."  David Moskowitz, *Reality Check for Phase II Bappy Data*, Caris & Co., July 30, 2008, at 1.

306.    Credit Suisse similarly noted in a July 31, 2008 report that the methodology employed was not well presented.  Scott Bardo et al., *Bapineuzumab Data Asks Questions – We Still See An Opportunity*, Credit Suisse, July 31, 2008, at 3 (addressing the criticism that "[t]he [transition] from a linear analysis to a non-linear analysis for the Post Hoc analysis weakens findings," Credit Suisse commented "[w]e agree that this transition was not communicated well to the market.").

307.    A July 30, 2008 Stanford Group analyst report also commented that Dr. Gilman "presented the Phase 2 results which we would describe as confusing at least" and that the "Bapineuzumab Phase 2 results [were] mixed; data may be better than presented."  Han Li, *ELN: Bapineuzumab Phase 2 Data Fails to Meet High Expectations; More Questions Remain to be Answered in Phase 3*, Stanford Group Co., July 30, 2008, at 1, 3.

3.    **The Complex, Ambiguous Nature of the Publicly Disclosed Phase 2 Results Prompted Widely Divergent Analyst and Expert Assessments of Bapineuzumab's Potential**

308.    Illustrating the complex and ambiguous nature of the results, analysts and medical experts were widely divided in their assessments of bapi's prospects, ranging from strongly negative to cautiously optimistic.

309.    Among the negative reports, an analyst at Caris & Co. concluded that "[w]hile the presentation was rushed and still incomplete, enough information was revealed to suggest that the Phase II results could be completely invalid."  David Moskowitz, *Reality Check for Phase II Bappy Data*, Caris & Co., July 30, 2008, at 1.  *See also* Caroline Stewart, *Bap Data Inconclusive*, Piper Jaffray, July 30, 2008, at 1 ("Based on data presented (and omitted), we are more doubtful than optimistic regarding bapineuzumab's prospects.").

310.    Analysts at Citi similarly commented that "[w]e believe the lack of a clear dose response in the study is concerning.  Importantly, the positive efficacy results in ApoE non-carriers were based on a post-hoc analysis . . . which makes the validity of these findings questionable, in our opinion."  John Boris et al., *Bapineuzumab Disappoints*, Citigroup Global Markets, July 30, 2008, at 1.

311.    Other respected analyst firms were much more positive.  Goldman Sachs stated in a July 31, 2008 report that "[w]e remain strongly positive on Bapineuzumab's ultimate potential

and do not see anything in the data to warrant a change to our current forecasts . . . ."  *ELN: Remain Positive on Bapineuzumab but Off Conviction List*, Goldman Sachs, July 31, 2008, at 1.

312.    Credit Suisse's analysts similarly titled their report "*We Still See An Opportunity*" and observed that "we believe that there were some positives in this data for the APOE4 non carrier patients (around half of all patients) and believe that if these findings are replicated in phase III - then this would represent an important medical advance for Alzheimer patients and an important commercial opportunity for Elan."  Scott Bardo et al., *Bapineuzumab Data Asks Questions – We Still See An Opportunity*, Credit Suisse, July 31, 2008, at 1.

313.    Natixis Bleichroeder's analysts commented even more forcefully:  "[w]e were shocked by the stock's reaction to what we think were extremely promising results from the presentation of the Phase II data on bapineuzumab at ICAD.  After exhaustive conversations with company officials, clinicians, and investigators, we are even more convinced that this is the most promising Alzheimer's treatment ever."  Corey Davis et al., *ELN: Wow – What Is Really That Bad?*, Natixis Bleichroeder, July 31, 2008, at 1.

314.    Alzheimer's experts shared the divergent views of the analysts.

315.    As reported by the Associated Press, "[e]xperts appeared divided on the results, but investors dumped Elan and Wyeth shares because the results were much less upbeat than the companies' advance characterizations."  Shawn Pogatchnik, *Elan Shares Fall Over Alzheimer's Drug Results*, Assoc. Press, July 30, 2008.

316.    The divergence of analyst views is reflected in the probabilities that they assigned to ultimate successful approval and sale of the drug.

317.    Some analysts maintained their prior forecasts.  *E.g.*, Richard Silver, *Bap P2 Detail Supports Top Line*, Lehman Bros., July 30, 2008, at 2 ("Based on yesterday's events, we

continue to assume a 50% probability of technical and regulatory success; peaks sales of $4.9B and a filing in 2011."); *ELN: Remain Positive on Bapineuzumab but Off Conviction List*, Goldman Sachs, July 31, 2008, at 1 ("We remain strongly positive on Bapineuzumab's ultimate potential and do not see anything in the data to warrant a change to our current forecasts") .

318.    Other analysts reduced their forecasts of the probability of ultimate success.  *E.g.*, Han Li, *ELN: Bapineuzumab Phase 2 Data Fails to Meet High Expectations; More Questions Remain to be Answered in Phase 3*, Stanford Group Co., July 30, 2008, at 2 ("Following the presentation of Phase 2 data, we lowered our chance of clinical success for Bapineuzumab Phase 3 studies from 75% to 50%."); Karl Keegan et al., *Bapineuzumab Disappoints*, Canaccord Adams, July 30, 2008, at 5 ("We have updated our model to reflect a reduced probability of success on bapineuzumab (30% from 50%)."); David Risinger et al., *Back to "Show Me" on Bapineuzumab*, Merrill Lynch, July 30, 2008, at 1 ("We have lowered our odds of launch (in late 2010) from 40% to 33%.").

319.    Still other analysts removed bapi from their valuation models entirely – effectively assuming it had a zero chance of success.  *E.g.*, Caroline Stewart, *Bap Data Inconclusive*, Piper Jaffray, July 30, 2008, at 1 ("We are conservatively stripping bap sales from our model and consequently lowering our price target to $15 from $25."); John Boris et al., *Bapineuzumab Disappoints*, Citigroup Global Markets, July 30, 2008, at 1 ("We removed bapineuzumab from our model as the likelihood of phase III clinical success, regulatory approval and commercial success are extremely low.").

320.    Consistent with the widely divergent views on bapi's prospects, a number of the more bullish analysts concluded that the market's negative reaction to the Phase 2 results was excessive.  A Lehman Brothers analyst, for example, concluded that "[w]e believe the after-

market weakness (indicated in low $20s) in ELN shares is more a reflection of valuation having become overextended ahead of the data release &, to some degree, the double-edged sword of more data for investors to pick apart.  With time & greater understanding, we envision a more rational view will prevail, suggesting a more favorable risk/reward profile."  Richard Silver, *Bap P2 Detail Supports Top Line*, Lehman Bros., July 30, 2008, at 1.

321.    Goldman Sachs analysts expressed a similar view:  "From attending the conference and discussing the dataset further, it is clear to us that the almost universally negative view of the data by the market is not shared by the majority of clinicians."  *ELN: Remain Positive on Bapineuzumab but Off Conviction List*, Goldman Sachs, July 31, 2008, at 1.

322.    Analysts at Davy, a leading Irish brokerage firm, similarly concluded that "[t]he initial stock reaction looks overdone in our view, but we expect it to remain volatile in the shorter term."  Jack Gorman, *Full Phase II Data Prompt New Questions on Strength of Efficacy Signals*, Davy, July 30, 2008, at 1.  They reaffirmed this view after the July 31 PML Disclosure (discussed below), observing that "[c]larity on both Bapineuzumab and Tysabri will take time, but we believe that the share price is factoring in an overly pessimistic scenario for both. The shares should have strong upside from here as this clarity becomes available."  Jack Gorman & Mark Healy, *Forecasts Revised, but Overly Pessimistic Scenario is Factored into Price*, Davy, Aug. 1, 2008, at 1.

323.    Natixis Bleichroeder analysts similarly observed that "[w]e were shocked by the stock's reaction to what we think were extremely promising results from the presentation of the Phase II data on bapineuzumab at ICAD. After exhaustive conversations with company officials, clinicians, and investigators, we are even more convinced that this is the most promising Alzheimer's treatment ever."  Corey Davis et al., *ELN: Wow – What Is Really That Bad?*, Natixis

Bleichroeder, July 31, 2008, at 1.  They reaffirmed this view on August 5, stating that "[w]e continue to view the results positively and stand by our $24 value [for bapi], as we think the market has grossly overreacted to the data."  Corey Davis et al., *ELN: Lowering Price Target to $34 and Reducing Tysabri Value*, Natixis Bleichroeder, Aug. 5, 2008, at 1.

324.    Consistent with the reports issued by Goldman Sachs, Davy and Natixis Bleichroeder, both Gilman and Ross were shocked by the market reaction to the Phase 2 results announced at ICAD.

325.     Gilman wrote in an August 15, 2008 email to a researcher at Elan that "I was appalled to see that the Elan and Wyeth stock levels dropped like rocks after the ICAD meetings. . . .  I was amazed, as the data seemed so promising to me. Evidently the investment community was less than convinced about the data..."  DX 708.  Gilman confirmed at trial that this was his belief.  Martoma Trial Tr. 1533:23-1534:1.

326.    Likewise, in an email to Martoma late in the evening on July 29, Ross described the Phase 2 results as "to me quite phenomenal."  GX 981.  At trial, Ross emailed that he sent this email "to make that point again clear to him that there is hope for this drug, and I still remain very high and optimistic on this drug."  Martoma Trial Tr. 718:10-12.  As discussed above in paragraph 166, Ross had made the same point a day earlier – before public announcement of the Phase 2 results – when he met with Martoma to illegally supply him with the Phase 2 results that had just been privately disclosed at the bapi investigators' meeting.

327.    Martoma himself did not expect the post-ICAD selloff in Elan to be so steep.  As another SAC trader reported to Villhauer on July 30, 2008, "I spoke to Martoma and was well aware that the stock sold off to a much larger degree than he originally thought - hence the small

loss on the 3 way [an options trade involving a combination of three puts and calls that had been established during the four trading days before ICAD].”  SAC_ELAN0760305.

> **S.     Elan Drops Sharply Again Based on Negative Safety News Concerning Tysabri Disclosed Two Days After ICAD**

328.    On July 31, the second trading day after ICAD, as investors and analysts continued to digest the bapi Phase 2 data, Elan announced at 5:16 pm EDT that it had confirmed two cases of PML – a rare and usually fatal brain disease – in patients taking Elan's principal commercially-marketed drug, *Tysabri*.

329.    The July 31 PML Disclosure drove a 50.5% decline in the trading price of Elan ADRs in after-hours trading on July 31 and over the course of the trading day on August 1, with Elan ADRs closing at $9.93, down from their $20.05 close on July 31.

> **T.     SAC's Insider Trading Caused It to Avoid Losses Resulting from the July 31 PML Disclosure**
>
> > **1.     As of July 31, SAC Retained an Informational Advantage over Public Investors as a Result of Receiving the Inside Information**

330.    In contrast to the mixed and confused understanding analysts took away from Gilman's July 29 presentation, the SAC Defendants had a much clearer grasp of the significantly adverse nature of the Phase 2 results as a consequence of Martoma's many hours of private phone conversations and meetings with Gilman to discuss the safety and efficacy data between July 13 and July 28.

331.    At the time he informed Martoma of the Phase 2 clinical trial efficacy results, Gilman had been involved in the bapi clinical trials for over five years, and had been extensively briefed on the Phase 2 results at in-person meetings with the Elan and Wyeth scientists conducting the clinical trial over two days in San Francisco on July 15-16, 2008.  Accordingly,

as a result of his relationship with Elan and the confidential information he received, Gilman had a uniquely well-informed perspective on bapi and the significance of the Phase 2 trial results.

332.    Gilman's communications with Martoma prior to ICAD extended well beyond simply providing the information that was later publicly disclosed on July 29.  In contrast to the limited information received by the public, Gilman discussed the data with Martoma on at least *eight* occasions, including a call that ran close to two hours on July 13, another conversation of similar length on July 17, three short calls on July 18, their in-person meeting in Michigan on July 19, a 39-minute conversation on July 22, a 23-minute conversation on July 24 and an approximately 11-minute conversation on July 28.

333.    Accordingly, public investors, including Plaintiffs and the other members of the Elan and Wyeth Investor Classes, were not placed on an equal informational footing by the July 29 Announcement, and the SAC Defendants retained an informational advantage at the time of the PML disclosure – just 49 hours after Gilman's ICAD presentation.

334.    Because the SAC Defendants retained an informational advantage at the time of the PML disclosure on July 31 as a consequence of receiving the Inside Information, Defendants are required to disgorge the losses avoided from the resulting further price decline in Elan ADRs.

### 2.    SAC's Avoidance of Losses Following the July 31 PML Disclosure Can Be Traced with Reasonable Certainty to Its Illegal Insider Trading

335.    Defendants are also liable for the losses avoided as a consequence of the market decline following the July 31 PML Disclosure, without regard for whether the Inside Information had been fully disclosed by the time of such disclosure.

336.    On July 30 and 31, 2008 combined, the total volume of Elan ADRs traded was less than 30% of the ADRs outstanding.

337.    But for the SAC Defendants' decision to sell Elan ADRs while in possession of the Inside Information, they, like the *Kaplan* Plaintiffs and the large majority of other public investors in Elan, would have continued to hold such ADRs at the time of the July 31 PML Disclosure – just two days after the July 29 Announcement and eleven days after the communication of the Phase 2 clinical trial results to Cohen.

338.    Accordingly, the losses avoided by the SAC Defendants following the July 31 PML Disclosure can be traced with reasonable certainty to their decision to sell while in possession of the Inside Information, and are therefore properly subject to disgorgement.

III.    **THE WIDESPREAD INSIDER TRADING AT SAC AND COHEN'S PERSONAL INVOLVEMENT IN IT FURTHER ESTABLISH SAC AND COHEN'S LIABILITY FOR MARTOMA'S ILLEGAL ACTS**

339.    The SAC Defendants' insider trading in Elan and Wyeth reflects a widespread pattern and culture of insider trading at SAC – fostered by Cohen's approval of the practice. Cohen's views are reflected in a 2011 deposition, in which he deemed SAC's compliance policies mere "guidelines," disclaimed specific knowledge of SAC's policies against insider trading, characterized the legal prohibitions against insider trading as "vague," and *testified that obtaining access to inside information is common at SAC*.

340.    The breadth of illegal insider trading and the permissive culture that Cohen fostered warrant a determination that each of the Control Defendants acted at least recklessly in connection with the SAC Insider Trades, and that such defendants breached their duty under the Investment Advisers Act of 1940 (the "Advisers Act") to appropriately supervise their employees.

### A.   SAC and Cohen Had a Duty to Prevent Misuse of Nonpublic Information

341.    As unregistered investment advisors and as their control persons, SAC LP, SAC LLC, SAC Inc., CR Intrinsic, Sigma and Cohen had a duty, pursuant to Section 203(e)(6) of the Advisers Act, 15 U.S.C. §80b-3(e)(6), "reasonably to supervise, with a view to preventing violations of the provisions of [the federal securities laws], another person who commits" a violation of such laws "if such other person is subject to [their] supervision."

342.    As detailed below, the widespread practice of insider trading at SAC demonstrates that the Control Defendants violated this duty.

### B.   Since 2009, Twelve SAC Employees Have Been Convicted of, Admitted, or Been Implicated as Co-Conspirators in, Insider Trading While at SAC

343.    A series of criminal prosecutions and SEC enforcement actions naming former SAC portfolio managers and their co-conspirators has established the widespread use of inside information at SAC.

#### 1.   Noah Freeman

344.    In February 2011, Noah Freeman ("Freeman"), who worked as a portfolio manager at SAC from June 2008 to January 2010, was indicted and pled guilty to insider trading, admitting he traded on illegal tips about publicly-traded technology companies while at SAC. *See United States v. Freeman*, No. 11 Cr. 116 (DAB) (S.D.N.Y.), Plea Agreement, *available at* http://www.nypost.com/r/nypost/2011/02/08/news/media/020811_Freeman_Noah_Plea_Agreement.pdf.  Among other companies, Freeman obtained inside information about Research in Motion, Ltd., NVIDIA Corporation ("NVIDIA"), Marvell Technology Group, Ltd. ("Marvell"), Avnet, Inc. ("Avnet"), Fairchild Semiconductor ("Fairchild"), Atheros Communications, Inc. ("Atheros"), Broadcom Corporation ("Broadcom") and Dell Inc. ("Dell").

345.     As described in more detail below, Freeman testified that while at SAC, he received inside information about NVIDIA and Marvell from Winifred Jiau ("Jiau"), a consultant for Primary Global Research ("PGR"), an expert network firm.  *See United States v. Jiau*, No. 11 Cr. 161 (JSR) (S.D.N.Y.), Trial Transcript ("Jiau Trial Tr."), at 221:25-222:22.

346.     Freeman also testified that while he worked as a portfolio manager at SAC, he received information about NVIDIA from Tai Nguyen ("Nguyen"), *id*. at 506:22-507:4, 511:12-23, who was another PGR consultant.

347.     Additionally, on numerous occasions between 2006 and 2009, Nguyen provided Freeman with inside information about Abaxis Inc., a biotechnology company where Nguyen's sister worked.  *United States v. Nguyen*, No. 12 Cr. 495 (NRB) (S.D.N.Y.), ECF No. 2, at 3-4; ECF No. 12, at 7.

348.     In addition, Freeman received inside information from and provided inside information to Donald Longueuil ("Longueuil"), another SAC portfolio manager, and Samir Barai ("Barai"), a portfolio manager at another fund.  *See* Jiau Trial Tr. 280:7-24; *see also* Press Release ("Longueuil Press Release"), U.S.A.O., S.D.N.Y., Former Research Analyst and Portfolio Manager Sentenced in Manhattan Federal Court to 30 Months in Prison for Insider Trading, July 29, 2011, *available at* http://www.justice.gov/usao/nys/pressreleases/July11/ longueuildonaldsentencingpr.pdf.

349.     The widespread, routine use of illegal inside information by portfolio managers at SAC is illustrated by Freeman's testimony in June 2011 at the criminal trial of Jiau, who was convicted of securities fraud and sentenced to four years in prison.  *See United States v. Jiau*, ECF No. 124.

350.    Freeman worked at SAC from June 2008 through January 2010.  Jiau Trial Tr.

218:18-21.  He managed a $200 to $300 million portfolio, over which he had day-to-day trading

authority.  *Id.* at 255:14-20, 271:19-272:4.

351.    Freeman testified that he made a half dozen trades while at SAC that he was

"confident" were on the basis of material nonpublic information – where "trade" was defined

broadly, to include multiple transactions over time that used the same inside information (*id.* at

549:15-21):

> Q. And what about with respect to your time at SAC.  How
> many trades did you do that you are confident were on the
> basis of material nonpublic information?
>
> A. Again, focusing on only ones where there is no
> question about gray area, I would say perhaps half dozen.
> But it's hard to say.  My trading style was much faster
> turnover at SAC, so I don't remember all of the
> additions, as well, sir.

352.    Freeman testified that he would attempt to obtain inside information for the

purpose of making trades "multiple times per day" (*id.* at 576:6-17):

> Q. Other than the 18 times[14] you stated you recalled
> engaging in insider trading or trades based on inside
> information, were there other times that you received
> inside information or attempted to receive inside
> information?
>
> A.   Many.
>
> **Q.   How often were you attempting to receive inside
> information?**
>
> **A.   Multiple times per day.**
>
> **Q. And what was the purpose of trying to receive inside
> information?**
>
> **A. To potentially make an inside trade if we got inside
> information that was accurate and usable.**

---

[14]    The eighteen trades referenced by Freeman span his employment at SAC and at another fund, Sonar Capital Management LLC.  *See* Jiau Trial Tr. 547:23-549:21; *see also id.* at 552:20-24.

353.    Freeman testified that he received inside information from Jiau while working at

SAC; that he traded stock based on that information; and that the information she provided was

"extremely" helpful (*id.* at 222: 20-223:2):

> [Q.] Which hedge funds did you work at while you were
> getting insider information from Ms. Jiau?
>
> A. Sonar Capital and SAC Capital.
>
> Q. And what did you do with inside information you
> received.
>
> A. We traded stocks based on that information.
>
> Q. Was the inside information that Ms. Jiau provided you
> helpful to your trading?
>
> A. Extremely.

354.    Freeman testified in detail about his receipt of illegal inside information from Jiau

concerning NVIDIA and Marvell.  In the case of both companies, she would provide multiple

updates each quarter, providing essential financial information such as revenue, gross margin,

and profits per share (*id.* at 337:9-21):

> Q. Let's turn to Marvell for the moment.
> Generally speaking, what sorts of information was
> Winifred Jiau providing you about Marvell?
>
> A. Almost identical to NVIDIA, so it would be revenue,
> cost of goods, gross margin, various operating cost
> numbers, taxes, profits and profits per share.
>
> **Q. Was she providing you Marvell information as
> frequently as she was providing you NVIDIA information?**
>
> **A. My memory is that there would be fewer updates on
> Marvell per quarter, so for NVIDIA we might get four or
> five revisions as the numbers got more accurate whereas
> with Marvell it was more typically an initial number and
> a final number and not the weekly updates.**

355.    Freeman also testified that he "regularly" exchanged illegal inside information

with a second portfolio manager at SAC, Donald Longueuil (*id.* at 284:24-285:4):

> Q. Did you ever provide Mr. Longueuil inside information
> you learned about from other people?
>
> A. Regularly.

> Q. And did he ever provide you insider information that
> he learned from other people?
>
> A. Regularly.

356.    Freeman testified that Longueuil told him that Longueuil had hundreds of sources

within companies (*id.* at 513:8-12):

> Q.  Don Longueuil, he had hundreds of sources inside
> companies, right?
>
> A.  That's my belief.
>
> Q.  He told you that?
>
> A.  That's what he told me, sir.

357.    Freeman testified that once or twice a week, he would exchange research – both

legitimate and inside information – with Longueuil and Barai, who worked for Tribeca Capital

Management, a hedge fund operated by Citigroup Inc. until early 2008, and then established his

own fund.

358.    Freeman testified that he, Longueuil and Barai would discuss the sources of their

information, including the fact that some of the sources were insiders (*id.* at 279:16-280:14):

> Q. You also stated that you sometimes did research by
> contacting other hedge funds.  Was there anybody in
> particular that you would contact to further your
> research?
>
> A. Yes.  The two people that I worked with most closely
> in terms of exchanging information were Donald Longueuil
> and Sam Barai, both of whom worked at a variety of
> different funds over time.
>
> Q. What sorts of information were you exchanging with
> Donald Longueuil and with Sam Barai?
>
> A. What we would do once or twice a week we would sit
> down and just open up our computers and just
> systematically swap every piece of research we had done,
> every piece we had done so we all had shared research and
> some of the information we would share with each other
> was legitimate research and some of it was insider
> information.
>
> Q. What leads you to believe that some of the information
> you were receiving from Donald Longueuil and Sam Barai
> was inside information?

> A. They would -- **we would discuss how we had gotten the information when we exchanged it and so there were a number of times when both Mr. Longueuil and Mr. Barai specifically said such as I got -- I talked to a sales guy at company X, he said revenue is $973 million.**

359.    Freeman, Longueuil and Barai also sometimes shared the same insider sources

(*id*. at 280:15-24):

> Q. Were there also sources inside companies that you shared with Sam Barai and Donald Longueuil?
>
> A. Yes, in both cases that we -- both -- we all knew some of the same people so we would talk to them and get the same information or swap off who was talking to them.
>
> Q. And was some of the information you received from the sources at public companies who you shared with Sam Barai or with Donald Longueuil information that you understood to be inside information?
>
> A. Yes.

360.    Freeman testified that he and Longueuil would speak as often as multiple times

per day to discuss inside information they had obtained, and that calls to share such information

would, late in a fiscal quarter, last "hours" (*id*. at 513:15-514:8):

> Q. And you would meet with Mr. Longueuil and Mr. Barai sometimes three times a week for four hours at a clip to discuss the insider information you all had?
>
> A. That's not accurate, sir.
>
> Q. How many times a week on average did you meet with them?
>
> A. We rarely met in person, sir.
>
> **Q. How many times did you speak with them on the phone per week?**
>
> A. I probably spoke with Don on the phone **multiple times per day for short conversations.**
>
> Q. I think you called them data dumps yesterday.  How many data dumps did you have in a given week on average?
>
> A. It would vary throughout the quarter depending whether we were near the end of the quarter.  Much more toward the end of the quarter than the beginning.  Toward the end of the quarter often it would be twice a week, at the beginning of the quarter it would be once every three weeks perhaps.
>
> Q. And how long would the sessions last on average?

> A. A few hours.

361.    The "data dumps" that Freeman held with Longueuil and Barai during which they

discussed inside information were so common that they began making up names for them (*id.* at

514:9-22):

> Q. Did you have any other terms that you would use to
> refer to data dumps?
>
> A. We had many.  **We got creative because we had so many
> of them** so we started making up funny names for them.
>
> Q. What other names did you use for data dumps?
>
> A. I can't recall all of them, but we started using WWF
> terminology to --
>
> Q. Any others you remember?
>
> A. I believe there may have been some sexual ones, but I
> don't recall any specific ones.
>
> Q. And sometimes in your calendar those would be
> reflected, it would be not just smackdown, but it might
> be WWF smackdown?
>
> A. Again, I can't to speak exact details, but **they were
> so common we started using silly phrases** just to amuse
> ourselves.

362.    Freeman further testified that a second source, Nguyen, provided him with inside

information about NVIDIA during Freeman's entire tenure at SAC (*id.* at 506:23-507:4, 511:3-

11, 511:21-25):

> [Q.] And do you know a gentleman by the name of Tai
> Nguyen?
>
> A. Yes, I do.
>
> Q. He was a source of NVIDIA information for you, wasn't
> he?
>
> A. Yes, he was.
>
> Q. And he was the source of NVIDIA information going back
> to 2005?
>
> A. Yes, sir, I believe so.
>
> . . .
>
> Q. And at the end of 2010 didn't Mr. Nguyen tell you
> because of the investigation into insider trading it had
> become a little more difficult for him to get inside
> information for you on NVIDIA?

A. Yes, he did.

Q. And didn't he tell you that before the investigation it only took him about two calls to get inside information regarding NVIDIA?

A. Yes, I believe he did.

. . .

Q. Well, how much of that time period was he giving you insider information?

A. From 2005 to January 5 of 2010, sir.

Q. January 5 of 2010?

A. Yes, sir.

### 2.    Donald Longueuil

363.    In early 2011, Longueuil, a portfolio manager at Defendant CR Intrinsic from July 2008 to June 2010, was indicted in the same case as Jiau.  In April 2011, Longueuil pled guilty to an insider trading conspiracy that included Freeman and Barai and spanned his tenure at CR Intrinsic.  As described by Freeman, between 2006 and 2010, Longueuil, Freeman and Barai conspired to obtain inside information about numerous companies.

364.    Longueuil was recorded telling Freeman how, after reading a November 2010 *Wall Street Journal* article about the government's insider trading investigation, he destroyed two hard drives and a flash drive with pliers and placed them in four Manhattan garbage trucks to dispose of the evidence.  *See* Steve Eder, Michael Rothfeld & Jenny Strasburg, *They Were Best of Friends, Until the Feds Showed Up*, Wall St. J., Jan. 11, 2012.  Longueuil is now serving a two-and-a-half year prison sentence.  *See* Longueuil Press Release, *supra*.

### 3.    Jonathan Hollander

365.    In April 2011, Jonathan Hollander ("Hollander"), an analyst at Defendant CR Intrinsic, was charged by the SEC with insider trading and settled the charges against him in May 2011, agreeing to pay more than $220,000.  *See SEC v. Hollander*, No. 11 Civ. 2885 (RJS) (S.D.N.Y.).

366.     Specifically, Hollander was charged with receiving and trading on inside information while at CR Intrinsic about a pending acquisition of Albertson's, LLC in January 2006.  Hollander also passed the information to others who traded on the information.  *See* Order Instituting Admin. Proceedings, Investment Advisers Act Release No. 3208 (May 19, 2011), *available at* http://www.sec.gov/litigation/admin/2011/ia-3208.pdf.

### 4.     **Jon Horvath**

367.     In February 2012, Jon Horvath ("Horvath"), a technology analyst at SAC subsidiary Sigma Capital Management, LLC, was indicted for insider trading and in September 2012, pled guilty and admitted receiving confidential financial information about technology companies Dell and NVIDIA while employed at Sigma.  *See United States v. Newman*, No. 12 Cr. 121 (RJS) (S.D.N.Y.); *SEC v. Adondakis*, No. 12 Civ. 409 (HB) (S.D.N.Y.).  Horvath received the Dell inside information from Jesse Tortora ("Tortora") of Diamondback Capital Management, LLC ("Diamondback") in 2008 and 2009 and the NVIDIA inside information from Danny Kuo ("Kuo") of Whittier Trust Company in May 2009.  *See SEC v. Steinberg*, No. 13 Civ. 2082 (HB) (S.D.N.Y.), ECF No. 1, at 2-3.  In addition, Horvath passed information about Sun Microsystems, Inc. ("Sun") to Tortora in 2007.  *See United States v. Newman*, ECF No. 242, at 8-9.

368.     Horvath worked as a senior analyst at SAC from September 2006 until September 2012, when he was terminated after pleading guilty.  *See* Steinberg Trial Tr. 882:7-18, 882:24-883:1, 888:10-12.

369.     At his plea allocution, Horvath stated that he knowingly obtained material nonpublic information from public company insiders and that "[i]n each instance I provided the information to the [SAC] portfolio manager I worked for and we executed trades in the stocks

based on that information."  Patricia Hurtado, *Ex-SAC Analyst Horvath's Insider-Trading Sentence Delayed*, Bloomberg, Apr. 17, 2013.

370.    The portfolio manager for whom Horvath worked was Michael Steinberg.  As further discussed below, Steinberg was indicted in March 2013 for trading on inside information provided by Horvath, and was convicted after trial in December 2013.

### 5.    Michael Steinberg

371.    At the time he was found guilty of securities fraud and related conspiracy charges in December 2013, Michael Steinberg, a portfolio manager at Sigma who had worked at SAC for more than fifteen years, was the highest-ranking SAC employee to be convicted of insider trading.

372.    As described by the *New York Times*, Steinberg "joined in 1997, when it was just Mr. Cohen and several dozen traders; for years, he sat near Mr. Cohen on the trading floor and the two grew close."  Peter Lattman, *Trail to a Hedge Fund, From a Cluster of Cases*, N.Y. Times, Dec. 5, 2012.

373.    Steinberg was placed on paid leave by SAC in 2012 after he was implicated by Horvath.  Steinberg was indicted for insider trading in March 2013 and sued by the SEC at the same time. *See United States v. Newman*, ECF No. 230, at 2-3; *SEC v. Steinberg*, ECF No. 1, at 2-3.  He was charged in a five-count indictment with securities fraud and conspiracy to commit securities fraud arising from his trading on inside information received from Horvath in 2008 and 2009 concerning Dell and NVIDIA.  Steinberg was found guilty of all counts in December 2013 after a one-month jury trial.  His sentencing is scheduled for April 25, 2014.

374.    According to Horvath, it was Steinberg who initially encouraged Horvath to seek out inside information, and made clear that Horvath's job depended on him doing so.

375.    In August 2007, less than a year after Horvath started work at SAC, Steinberg told Horvath, "I can day-trade these stocks and make money by myself, I don't need your help to do that, what I need you to do is to go out and get me edgy, proprietary information that we can use to make money in these stocks. . . . You need to talk to your contacts at the companies, bankers, consultants, and leverage your peer network to get me that information."  Steinberg Trial Tr. 915:5-16.  Horvath understood Steinberg to be directing him to cultivate sources of material nonpublic information and that his job depended on it.  *Id*. at 917:12-918:2.

376.    As a result, Horvath first began exchanging information with Jesse Tortora, and eventually several analysts from other hedge funds were added to the information-sharing "circle."  *Id.* at 185:25-186:7.

377.    During the period 2008 through at least 2009, Horvath regularly received key financial information from Tortora and Kuo, members of his "circle," such as gross margin and revenue information about Dell and NVIDIA.  *Id*. at 925:14-926:3, 1300:17-1301:24.  After receiving this information, Horvath would "pass it on" to Steinberg "for the purposes of trading" on it.  *Id*. at 929:15-18, 1301:13-18.

378.    Steinberg's trades in Dell prior to the company's August 28, 2008 earnings announcement were a focus of his criminal trial.  On August 18, 2008, Tortora called Horvath with updated information that Dell would miss its gross margin target.  *Id.* at 1051:4-18, 1053:2-4.  Horvath passed the information to Steinberg the same day, and in an email exchange that followed, Steinberg agreed to keep the information "on the down low" as Tortora had requested.  *Id.* at 1053:20-1054:11.

379.    Days later, Horvath and Steinberg learned that Cohen held a long position in Dell, and Steinberg, aware of the upcoming gross margin "miss," held a short position.  *Id.* at 1074:1-

19.  According to an email from Steinberg on August 26, 2008, Cohen requested that Horvath and Gabriel Plotkin ("Plotkin"), a senior Sigma portfolio manager and close associate of Cohen's, "compare notes" before the Dell announcement, given that Cohen and Plotkin were on the "opposite side[]" of the trade from Steinberg and Horvath.  *Id.* at 1094:10-1095:5.

380.   The email traffic that followed illustrates how inside information was passed around SAC – and supplied to and used by Cohen himself.

381.   In an effort to "compare notes," Horvath replied to Steinberg and Plotkin a few minutes after Steinberg's email (GX 613 in *United States v. Newman*, emphasis added):

> **I have a 2nd hand read from someone at the company- this is 3rd quarter I have gotten this read from them and it has been very good in the last two quarters.** They are saying GMs [gross margins] miss by 50-80 bps due to poor mix, opex in-line and a little revenue upside netting out to an EPS miss. Even if they have some flexibility in the opex/other income to offset the light GMs and report in-line EPS or even a penny upside I think the stock goes down (I know they said the headcount reductions last quarter were backend loaded). **Please keep to yourself as obviously not well known.**

382.   Steinberg then replied within minutes "[y]es normally we would never divulge data like this, so please be discreet. Thanks."  *Id.*

383.   Plotkin then forwarded Horvath's email to Cohen's personal research trader, who forwarded it to Cohen, and also called him.   Shortly afterwards, Cohen began selling his entire long position in Dell, worth more than $10 million.

384.   At 4:00 pm, Dell surprised the market by announcing a 17% decline in quarterly profits.  Shares of Dell declined more than 10% in after-hours trading.  As one analyst commented, "[n]obody expected gross margins to be this bad."  Laurie J. Flynn, *Dell's Profit Drop Surprises Investors*, N.Y. Times, Aug. 28, 2008.

385.   As a result of his trades on the inside information, Cohen gained profits and avoided losses of at least $1.7 million.

386.     At 4:13 pm, Horvath wrote to Tortora via instant message, "Nice man!!!  You nailed it!!!" because Tortora's information about the gross margin miss turned out to be correct. Steinberg Trial Tr. at 1128:2-8.

387.     At 6:52 pm that night, Cohen recognized Steinberg's efforts, emailing him, "nice job on Dell."  *Id*. at 1135:18-22.

### 6.     **Gabriel Plotkin**

388.     Plotkin is identified as "Portfolio Manager B" in the SEC enforcement actions *SEC v. Sigma Capital Management, LLC*, No. 13 Civ. 1740 (HB) (S.D.N.Y.), and *SEC v. Steinberg*, and as "Portfolio Manager A" in the Cohen Administrative Proceedings.

389.     Shortly after receiving the August 26, 2008 email from Horvath quoted in paragraph 381 above, Plotkin began selling Dell stock, which permitted Sigma to avoid losses of about $2 million.  *See SEC v. Steinberg*, ECF. No. 1, at 14-15.  As a result of Steinberg and Plotkin's trading in Dell stock during 2008 and 2009, affiliates of SAC generated over $6.4 million in profits and avoided losses.  *See id.* at 2.

390.     Plotkin joined SAC in 2006 and is one of ten portfolio managers at Sigma focusing on consumer stocks.  He oversees more than $1 billion and remains employed by SAC. *See* Patricia Hurtado, *SAC's Plotkin Said to Have Been Tipped by Ex-SAC Analyst*, Bloomberg, Mar. 18, 2013.

### 7.     **Ron Dennis**

391.     At the insider trading trial of Todd Newman ("Newman"), Tortora, a portfolio manager at the Diamondback hedge fund, testified that he regularly exchanged inside information with Ron Dennis ("Dennis") while Dennis was employed as a technology analyst at CR Intrinsic.  Dennis was named an unindicted co-conspirator in the Steinberg prosecution. *United States v. Steinberg*, No. 12 Cr. 121 (RJS), ECF No. 299.

392.     Tortora's exchange of inside information with Dennis was illustrated by their
communications in advance of Dell's August 28, 2008 earnings announcement.  Through his
contacts, Tortora had obtained inside information that Dell had missed its gross profit margin
targets.  *United States v. Newman*, Trial Transcript ("Newman Trial Tr."), at 273:25-274:8,
278:22-297:15.  When asked at trial if he understood that the information he had received was
confidential inside information, Tortora replied, "[a]bsolutely."  *Id.* at  279:16-24.  He
nevertheless passed this information along by email to Horvath, at SAC, as well as two co-
conspirators at other funds – Sam Adondakis ("Adondakis") at Level Global Investors LP, and
Danny Kuo at Whittier Trust Company.  *See, e.g.*, *id.* at 274:9-275:1.

393.     Because Dennis preferred to avoid communicating by email, *id.* at 281:5-12,
Tortora communicated with him by phone and instant message.  *See id.* at 279:25-280:12.  At
2:37 pm on August 28, 2008, prior to Dell's scheduled earnings announcement at 4:00 pm,
Tortora sent Dennis an instant message with the words "call cell" and gave his cell phone
number.  *Id.* at  282:5-9.  Dennis responded at 2:46pm, "OM or GM or both," which Tortora
testified meant "operating margin" and "gross margin."  *Id.* at  282:15-17.

394.     After Dell's surprise 4:00 pm announcement and accompanying stock price drop,
Dennis responded to Tortora, "You da man." and "I owe you."  Newman Trial Tr. 282:18-22.

395.     Tortora also testified that Dennis reciprocated for the inside information that
Tortora and others in their group supplied by providing Tortora and the others with confidential
information, which he referred to as "Intrinsic checks" (*id.* at  281:13-23):

```
           Q. Did Mr. Dennis provide you with any confidential
           information during your time at Diamondback?
           A. He did.
           Q. What did you do with that information when you got it?
           A. I passed it along to Todd [Newman] and I passed it
           along to the group.
```

```
Q. How did you pass it to Todd and the group?

A. Usually on e-mail.

Q. When you passed Mr. Dennis' information by e-mail, how
did you refer to it?

A. Usually as Intrinsic checks.
```

396.    Based in part on the testimony of Tortora, Newman was convicted of insider

trading following a jury trial and was sentenced to 4½ years in prison in May 2013.

397.    A second member of the group, Adondakis, also testified that he had obtained

inside information from Dennis.  Adondakis testified against Anthony Chiasson ("Chiasson") at

the trial of Newman and Chiasson, where he stated that he obtained and swapped inside

information with a group of friends that included Dennis, Tortora and Horvath.  Patricia Hurtado,

*Former Level Global Analyst Says Two SAC Friends Got Inside Tips*, Bloomberg, Nov. 29,

2012.  Referring to Dennis, Adondakis stated that he told Chiasson that he "had a friend at [CR]

Intrinsic who is sharing information with us."  Newman Trial Tr. 1951:9-18.

398.    Dennis also obtained inside information about Vollterra Semiconductor Corp. and

PMCS Sierra Inc., and provided it to Tortora.  Hurtado, *supra*.

399.    Dennis worked at CR Intrinsic until 2010.  *See* Kaja Whitehouse, *Bad Cohen

Optics*, N.Y. Post, Nov. 19, 2012.

        **8.    Wesley Wang**

400.    In July 2012, Wesley Wang ("Wang"), a former analyst at Sigma, pled guilty to

two counts of conspiracy to commit securities fraud, one of which encompassed his entire tenure

at Sigma, from 2002 to 2005.  *United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y.), Trial

Transcript ("Whitman Trial Tr."), at 1431:12-1432:9, 1435:2-23; *United States v. Wang*, No. 12

Cr. 541 (JSR) (S.D.N.Y.), ECF No. 13, at 1-2.

401.    At Sigma, Wang worked as a research analyst, supporting the portfolio manager Dipak Patel ("Patel").  Whitman Trial Tr. 1435:14-16.

402.    During his time at Sigma, Wang received what he believed to be material nonpublic information about various companies, including Cisco Systems, Inc., Polycom, Inc., QLogic Corp., Broadcom Corp., eBay Inc., Cypress Semiconductor Corp., Taiwan Semiconductor Manufacturing Company Ltd., Cirrus Logic, Inc., NVIDIA and Marvell.  *United States v. Wang*, ECF No. 13, at 3; Whitman Trial Tr. 1436:5-10.

403.    As part of his plea agreement, Wang testified at the criminal trial of Doug Whitman.  Wang testified that when he received inside information while at Sigma, he would "not personally" trade on it, but he would pass it on to his portfolio manager Patel and others (Whitman Trial Tr. 1436:16-23):

> Q. Without specifying names, the inside information you received while you were at SAC Capital, would you pass that on to others?
>
> A. Yes.
>
> Q. Did you trade on that information?
>
> A. Not personally.
>
> Q. What did you do with it when you passed it on to others?
>
> A. I gave it to Dipak Patel and other people I talked to.

404.    When asked why he sought inside information instead of relying on analyst reports or other publicly available information, Wang testified that "you can't really make money.  It's hard to make money if you just follow what analysts say.  You have to be contrarian in some ways."  Whitman Trial Tr. 1450:8-17; 1574:4-11.

405.    In January 2013 Wang was sentenced to two years' probation in light of his "exceptional" cooperation with the government.  *See United States v. Wang*, ECF No. 15, at 2; ECF No. 13, at 14.  He was also ordered to disgorge $500,000.  *See id.*, ECF No. 16.

### 9. **Dipak Patel**

406.    At Sigma, Patel was a portfolio manager who led a five-person technology investment team and had discretion over roughly $500 million, "considered a significant amount at the firm, according to people familiar with SAC operations."   Michael Rothfeld & Jenny Strasburg, *Witness Adds Thread to SAC Probe*, Wall. St. J., Jan. 23, 2013.  Patel left Sigma in 2010 after eight years.

407.    Wang, one of the analysts who worked for Patel, testified at the trial of Doug Whitman that when he received inside information, he "gave it to Dipak Patel and other people I talked to."  Whitman Trial Tr. 1435:14-21, 1436:16-23.

408.    Further, Patel is an unnamed co-conspirator (CC-3) in the criminal information against Wang, which states that Wang provided Patel with inside information so that Patel could trade on it.  *United States v. Wang*, ECF No. 2, at 7-9.  Wang's sentencing memorandum states that it was Wang's supervisor – Patel – who directed the conspiracy at SAC.  *United States v. Wang*, ECF No. 14, at 18-19 ("It was Mr. Whitman, and Mr. Wang's subsequent bosses at Sigma and Trellus, who directed the charged conspiracies.").

409.    Other sources identify Patel as having received illegal inside information.  In an email exchange between Steinberg and Horvath regarding the August 2008 Dell financial results discussed above – entitled "Pls keep the DELL stuff especially on the down low" – Steinberg wrote that he had consulted with Patel, identified as "DP," who was "going to call his guy" to get advance information on the quarter-end financial results.  Email, Steinberg to Horvath, Aug. 18, 2008, *available at* http://online.wsj.com/public/resources/documents/Steinbergemails01.pdf.  In addition, Reema Shah, a former technology specialist at J&W Seligman & Co. turned government informant, also implicated Patel in a conspiracy involving the exchange of inside information sometime between 2004 and 2009.  Rothfeld & Strasburg, *supra*.

10.     **Richard Choo-Beng (C.B.) Lee**

410.     In October 2009, Richard Choo-Beng Lee ("C.B. Lee"), a former SAC technology analyst, pled guilty to insider trading.  He was employed by SAC from 1999 until 2004.  While at SAC, C.B. Lee obtained inside information about, among others, Intel Corporation, Advance Micro Devices, Inc., and Altera Corporation.

411.     Between approximately 2008 until 2009, C.B. Lee also provided inside information to a Sigma portfolio manager.  On January 16, 2009, while operating his own hedge fund, C.B. Lee told the Sigma portfolio manager, in a recorded call, that "between you and me . . . a friend of my cousin" who "works for Dell finance" is "telling me to avoid the stock for Q2, because Q2 is gonna be horrible."  On January 23, 2009, C.B. Lee reiterated to the Sigma portfolio manager "that I do have a contact at Dell, he's in finance," and that the "April quarter could see a problem with gross margins" because sales to business were "very weak and that's where most of the profitability is."  C.B. Lee's tipping is apparently independent of the tipping of Cohen, Steinberg, Horvath and Plotkin discussed above.

412.     Under the terms of his cooperation agreement, the government agreed not to prosecute C.B. Lee for inside trading between 1999 and 2009, specifically including the five years, from 1999 to 2004, that he worked at SAC.  *See United States v. Lee*, No. 09 Cr. 972 (PKC) (S.D.N.Y.), Cooperation Agreement, at 2, *available at* http://www.scribd.com/doc/22169660/Lee-Richard-Choo-Beng-Cooperation-Agreement.

413.     As part of his plea agreement, C.B. Lee agreed to share information about illegal conduct that he learned of while working at SAC.  C.B. Lee also provided investigators with detailed insights into expert network firms, and he told them that SAC and other funds aggressively used such firms, which frequently traded in inside information.  *See* Peter Lattman, *Trail to a Hedge Fund, From a Cluster of Cases*, N.Y. Times, Dec. 5, 2012.

11.   **Richard Lee**

414.   On July 23, 2013, Richard Lee ("R. Lee") (apparently no relation to Richard Choo-Beng Lee), a former SAC LP portfolio manager, pled guilty to securities fraud and conspiracy to commit securities fraud, in connection with trading on the basis of inside information about 3Com Inc. and Yahoo! Inc. ("Yahoo").  *See United States v. Lee*, No 13 Cr. 539 (PGG) (S.D.N.Y.), Plea Agreement dated July 22, 2013.  Under the terms of his cooperation agreement, in exchange for his substantial cooperation, the government agreed not to further prosecute R. Lee for the insider trading at SAC from April 2009 through in or about 2010 that he disclosed to the government.  In a related SEC enforcement action, R. Lee also consented to a judgment disgorging him of all his profits, including interest, and imposing a civil penalty, in amounts to be determined later, and enjoining him from further violating the securities laws. *SEC v. Lee*, No. 13 Civ. 05185 (RMB) (S.D.N.Y.), Judgment, ECF No. 10.

415.   R. Lee had worked at SAC from approximately April 2009 through July 2011 and from September 2012 until March 2013, trading on "special situations" such as major corporate events.

416.   In 2009 R. Lee obtained inside information about Yahoo's partnership negotiations with Microsoft Corp. ("Microsoft").  Those negotiations ultimately resulted in an agreement, announced on July 29, 2009, through which Yahoo and Microsoft agreed to a 10 year search engine and search advertisement collaboration.

417.   In a July 10, 2009 recorded call, Sandeep Aggarwal, a technology analyst at a research firm working with SAC, informed R. Lee that his "buddy" was a "senior guy at Microsoft" who had been "very, very accurate in the past," and he had told him that "a senior team from Yahoo" had arrived at Microsoft to meet "the two senior most people in [the] Microsoft internet business" in order to restart the previously-stalled partnership talks.

418.     A private equity contact with a stake in Yahoo also provided R. Lee with early access to a Yahoo earnings report, and additional inside information about the Yahoo-Microsoft partnership negotiations.

419.     R. Lee was hired by Cohen, as detailed in paragraph 453 below, even though SAC's legal department objected, and Cohen was warned that R. Lee belonged to an "insider trading group" at his prior employer.

### 12.     **Mathew Martoma**

420.     Defendant Martoma was criminally charged with the insider trading set forth herein in November 2012 and sued by the SEC at the same time.  He was convicted by a jury on February 6, 2014 of securities fraud and conspiracy to commit securities fraud in connection with his insider trading in Elan and Wyeth.

421.     As further detailed above, in the past four years Martoma is the fourth employee of Defendant CR Intrinsic to be convicted of, admit to, or be named as an unindicted co-conspirator in a conspiracy to commit insider trading, and is among nine portfolio managers and analysts to be convicted of or admit to insider trading at SAC since 2009.

### 13.     **Summary of SAC Employees Who Have Been Convicted of, Admitted, or Been Implicated in, Insider Trading While at SAC**

422.     The following table summarizes the insider trading cases or allegations against present and former SAC employees, for conduct while employed by SAC, discussed above:

| SAC Employee | Case Type or Source of Allegations | Status/Outcome |
| --- | --- | --- |
| Noah Freeman | Criminal Prosecution; SEC Enforcement Action | Pled guilty in February 2011; not yet sentenced (cooperating with prosecutors) |
| Donald Longueuil | Criminal Prosecution; SEC Enforcement Action | Pled guilty in April 2011; sentenced to 2½ years in prison in July 2011; paid $350,000 in disgorgement and penalties |
| Jonathan Hollander | SEC Enforcement Action | Settled charges in May 2011; paid $222,000 in disgorgement and penalties |

| SAC Employee | Case Type or Source of Allegations | Status/Outcome |
|---|---|---|
| Jon Horvath | Criminal Prosecution; SEC Enforcement Action | Pled guilty in September 2012; not yet sentenced (cooperating with prosecutors) |
| Michael Steinberg | Criminal Prosecution; SEC Enforcement Action | Convicted after trial in December 2013 |
| Gabriel Plotkin | Not yet charged; identified as "Portfolio Manager B" in *SEC v. Sigma Capital Management, LLC* | n/a |
| Ron Dennis | Not yet charged; implicated in trial testimony by Jesse Tortora and Spyridon "Sam" Adondakis | n/a |
| Wesley Wang | Criminal Prosecution | Sentenced to two years of probation in January 2013; disgorgement of $500,000 ordered in March 2013 |
| Dipak Patel | Not yet charged; implicated by Wang and others | n/a |
| Richard Choo-Beng (C.B.) Lee | Criminal Prosecution; SEC Enforcement Action | Pled guilty in October 2009; not yet sentenced (cooperating with prosecutors) |
| Richard Lee | Criminal Prosecution; SEC Enforcement Action | Pled guilty in July 2013; not yet sentenced (cooperating with prosecutors) |
| Mathew Martoma | Criminal Prosecution; SEC Enforcement Action | Convicted after trial in February 2014 |

C. **The Large Number of SAC Employees Charged with Insider Trading Contrasts Sharply with the Absence of Such Charges Against Employees at Peer Hedge Funds**

423.    The extraordinary number of SAC employees charged with or convicted of insider trading since 2009 is even more striking when compared to its peer funds. SAC, which then had $14 billion under management, ranked 26th out of the largest fifty hedge funds as of June 30, 2008. *See* The Hedgefund Journal, US50: The US' Largest 50 Single Managers Ranked by AUM 8 (1st ed. 2008), *available at* http://www.thehedgefundjournal.com/sites/default/files/hfj-us50-2008.pdf.

424.    Plaintiffs' research has identified only one other fund on that list that has had even one employee charged with insider trading since 2009. That case was ultimately dismissed after

trial when the Court ruled there was no evidence that insider trading had occurred.  *SEC v. Rorech*, 720 F. Supp. 2d 367, 403, 415-17 (S.D.N.Y. 2010).

    **D.**    **Cohen Created a Culture at SAC That Has Encouraged Insider Trading, and Has Personally Received and Traded on Inside Information on Multiple Occasions**

        **1.**    **Cohen's Personal Receipt and Use of Inside Information Established a Culture that Approved and Encouraged Insider Trading**

425.     The widespread use of illegal inside information at SAC reflected the culture established by Cohen – one that approved and encouraged inside information as a source of "edge."  As one former SAC analyst explained, "Steve knows his business model protects him," and SAC analysts believe that "Steve wants you to have inside information but doesn't want to know you do."  Vanity Fair, *Hunt for Cohen*.

426.     The repeated occasions on which Cohen has been personally exposed to overtly inside information, and his demonstrated lack of concern about the information's source, illustrate how the corrupt culture at SAC came to be.

427.     The Elan and Wyeth trades themselves reflect Cohen's modus operandi.  As detailed above in paragraphs 176 through 181, Cohen received numerous communications in connection with the Elan and Wyeth trades that overtly reflected nonpublic information without raising any questions as to source.  Cohen also received and extensively discussed inside information that was explicitly identified as coming from a doctor in the bapi clinical trials, as detailed above in paragraphs 232 through 235.  Again, Cohen did not express any concern about the unambiguously illegal nature of this tip.  Cohen also raised no objection to an email from Martoma proposing a series of questions designed to elicit material nonpublic information regarding the Phase 2 trial from Elan's CEO, Kelly Martin, at a private dinner shortly before "top line" results were to be announced, as detailed above in paragraphs 236 through 238.

428.    Cohen has received similar highly suspect information in other situations, and likewise either expressed no concern about the information's source, or in some situations actually confirmed his expectation that employees would obtain such inside information.

429.    In February 2007, for example, Martoma sent Cohen an IM discussing two drugs in development.  Martoma commented that he had a "better edge" with respect to the second drug because "the second product is partnered with a small biotech company, while the first was internal to novartis only."  Cohen responded, "and I would think u have a line into small co," to which Defendant Martoma responded "yes."

430.    In an October 30, 2007 email, Horvath emailed Cohen a recommendation to trade shares of Sun, explaining "[m]y edge is contacts at the company and their distribution channel."

431.    In an email dated June 11, 2008, another CR Intrinsic portfolio manager wrote to Cohen and explained that "my guy at [a public company]" had explained why certain anticipated acquisitions had not taken place.

432.    In an email dated May 3, 2009, the same portfolio manager wrote to Cohen regarding a public pharmaceutical company that "I am very comfortable that this qrt. is going to be solid vs current consensus and guidance.  I am getting coffee on tues afternoon with the guy who runs the American generics business."  Cohen simply replied "[l]et's talk later."

433.    C.B. Lee also supplied Cohen, as well as the portfolio manager to whom he reported, with inside information.  In his communications, he also generally described his sources as "my guy," "my contact," or "my check," "at" the company he was discussing.

434.    As detailed in paragraphs 379 to 387 above, Cohen also traded on illegal inside information in Dell that formed the basis for Horvath's guilty plea.

435.    In late August 2008, shortly before Dell was scheduled to announce its quarterly

financial results, Cohen held a large long position in Dell, as did one of his one of senior

portfolio managers, Plotkin.  At the same time, Steinberg and Horvath had shorted Dell, based on

inside information obtained by Horvath.  When Cohen learned of the conflicting positions, he

directed that Steinberg, Horvath and Plotkin compare notes before the earnings announcement.

In response, Horvath sent Plotkin and Steinberg an email reporting that:

> I have a 2nd hand read from someone at the company- this is the 3rd quarter
> I have gotten this read from them and it has been very good the last two
> quarters.  They are seeing gross margins miss by 50-80 bps due to poor mix,
> opex in-line and a little revenue upside netting out to an EPS miss. . . .
> Please keep to yourselves as obviously not well known.

436.    Plotkin forwarded the email to Cohen's personal research trader four minutes

later, and the research trader forwarded it to Cohen approximately 16 minutes later.  The

research trader also spoke to Cohen by phone eight minutes after he sent the email.  The call

lasted 48 seconds.

437.    Within two minutes after that phone call, Cohen began selling his entire Dell

position, and liquidated his Dell holdings by the close of the market on that day.

438.    When Dell announced its second quarter earnings two days later, its reported

gross margin was, in fact, substantially worse than analysts' consensus forecast, and Dell shares

declined 13.8% on the announcement.  By selling on the basis of the inside information supplied

by Horvath, Cohen avoided losses of approximately $1.7 million.

439.    Three hours after the earnings announcement, Cohen emailed Steinberg "[n]ice

job on Dell."

440.    Cohen's communications with a new hire in July 2009 also illustrate his approach

to the use of inside information.  On July 29, 2009, a new SAC portfolio manager sent an IM to

Cohen saying he planned to short Nokia when he began work at SAC ten days later as a result of

some "recent research."  He apologized to Cohen for being "cryptic" about the nature of his

"research," saying that, before he began working, SAC compliance "was giving him Rules 101

yesterday – so I wont be saying much[.]  [T]oo scary."  As in other instances, Cohen did not

object or inquire further in response to the new employee's suggestion that he would be relying

on illegal sources.

441.    Finally, particularized allegations in a pending action brought by Cohen's former

wife charge that Cohen engaged in insider trading early in his career, and that one particular

illegal trade was a major source of his early success.  As pled in the lawsuit, *Cohen v. Cohen*,

No. 09 Civ. 10230 (WHP), ECF No. 1:

> 23. In late 1985, defendant Cohen advised Ms. Cohen that he had received
> inside information in advance of the purchase of RCA Corporation
> ("RCA") by General Electric Company ("GE"). Although she did not have
> a college degree and had no training in finance or law, Ms. Cohen
> questioned defendant Cohen about the legality of trading on inside
> information in general and with respect to the RCA-GE transaction in
> particular. Defendant Cohen assured Ms. Cohen that, although he knew
> the insider (who was a Wharton classmate of Cohen), he had not received
> the information directly from the insider but from a mutual friend.
> According to defendant Cohen, this meant that he was not involved in
> illegal insider trading.
>
> 24. Soon after Ms. Cohen's discussions with defendant Cohen about
> insider trading, the takeover of RCA by GE was announced. Upon
> information and belief – the sources of which are statements made by him
> to plaintiff – defendant Cohen traded on the inside information he had
> received and realized substantial profits in late 1985 and early 1986 from
> insider trading generated by the RCA-GE transaction. Cohen assured Ms.
> Cohen that insider trading was only a civil matter, not a criminal one.
>
> **(iii) The SEC Investigation and Cohen's Invocation of His Fifth
> Amendment Privilege**
>
> 25. The [SEC] investigated Cohen's role in the RCA-GE transaction. In
> connection with that investigation, Cohen was required to appear at an
> examination under oath before the SEC on June 5, 1986. Ms. Cohen first
> learned of the fact of defendant Cohen's appearance before the SEC and
> the details of the events at that examination when she obtained from the
> SEC in June 2009 the transcript of defendant Cohen's testimony pursuant
> to a Freedom of Information Act request.

26. At the examination, defendant Cohen refused to produce any documents, citing his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

27. Likewise, as disclosed in the transcript recently obtained from the SEC, defendant Cohen refused to answer, on Fifth Amendment grounds, the SEC's questions regarding, among other things, (i) his "purchase" of securities "while in possession of non-public information concerning RCA;" (ii) whether "anyone [had told Cohen] prior to the public announcement that RCA would be involved in a merger with General Electric;" and (iii) whether Cohen "had any agreement to share profits and/or losses with anyone else for securities transactions in any account which is in [Cohen's] name or the name of any other person or entity."

442.    As subsequently alleged in an amended complaint, *Cohen v. Cohen*, ECF No. 48-1 ¶ 51, Cohen's profit from the insider trading in RCA stock was "at least $10 million" – a substantial share of his net worth at the time.

443.    Cohen's assertion of the Fifth Amendment privilege against self-incrimination at the time substantiates his ex-wife's allegations.  As Cohen would have been advised by counsel, the Fifth Amendment privilege against self-incrimination applies only when a witness "reasonably believes that his testimony could 'furnish a link in the chain of evidence needed to prosecute' him for a crime."  *Estate of Fisher v. Commissioner*, 905 F.2d 645, 648 (2d Cir. 1990) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)).

### 2.    Other Senior SAC Officers Also Fostered a Culture of Insider Trading

444.    Horvath's testimony at Steinberg's criminal trial illustrates that Cohen's approval of insider trading extended to other senior SAC officers.

445.    Witnesses at the Steinberg trial testified extensively regarding SAC's Tamale database, a system SAC maintained for collecting and maintaining information gathered regarding investments.

446.     According to Horvath, SAC's Director of Research, Perry Boyle, remarked during a discussion concerning Tamale, "I don't know why you'd put your information in that -- in Tamale; that's just going to come back to haunt you one day."  Steinberg Trial Tr. 2555:16-17.

447.     On another occasion, when Horvath emailed a trading recommendation concerning Sun to Cohen and Steinberg on October 30, 2007, he wrote that "[m]y edge is contacts at the company and their distribution channel."  Steinberg forwarded the email to Andrew Lester ("Lester"), the head of Sigma, commenting "I suspect the line about contacts at the company may wake up some of our legal eagles[.]"  Lester responded, "I think it may precipitate a general inquiry to confirm we are not in possession of non public information.  This seems like an investment idea, not a trade and my interpretation of his comment is just that he developed a good relationship with mgmt. that enhance his comfort level."  Instructively, Horvath was never interviewed by compliance personnel about the sources of his information following this email, or by anyone else in SAC management.

### 3.     SAC's Hiring Decisions Emphasized Access to Inside Information

448.     Access to inside information was institutionalized at SAC through a hiring process that specifically sought out candidates with contacts at public companies and a due diligence process that attempted to identify and assess the candidate's network of public employee contacts in the industry for which they were responsible.

449.     In the case of C.B. Lee, for example, he informed Cohen that employees at NVIDIA gave him information about quarterly earnings and a contact at Taiwan Semiconductor Manufacturing Company Ltd. provided him with wafer data.

450.     Martoma's hiring/due diligence report referred to his "industry contacts beyond management," and his personal "network of doctors in the field."

451.    Horvath's hiring/due diligence report stated that his "contacts with companies" were "a key strength," and that he obtained his investment ideas by "mining his industry contact network for data points."

452.    Another hiring/due diligence report emailed to Cohen in November 2008 described the candidate as "the guy who knows the quarters cold, has a share house in the Hamptons with the CEO of [a Fortune 100 industrial sector company], tight with management."

453.    SAC's hiring of R. Lee provides a particularly egregious example of Cohen's interest in hiring proven insider traders.  R. Lee was hired by SAC in April 2009 despite the fact that Cohen received a warning from another hedge fund that had employed him, Citadel LLC ("Citadel"), that R. Lee was known for being part of Citadel's "insider trading group" while employed there.  In hiring R. Lee, Cohen personally overruled SAC's legal department, which had raised objections to employing him.

### 4.    SAC's Practice of Paying Large Fees to Sell-Side Analyst Firms as a Quid-Pro-Quo for Information Further Embedded Insider Trading in SAC's Culture

454.    As Businessweek reported a decade ago, "Cohen expects to get the first call when an analyst upgrades or downgrades a stock" and as sell-side equity analysts told Businessweek at the time, "SAC traders often pressure[d] them for upgrades, downgrades, information, or insight into trading flow."  Businessweek, *Most Powerful Trader.*

455.    One sell-side analyst described how, on a single day, he had received "at least 15 voicemail messages from two different SAC traders about how I was rating a particular stock" and "they give you a hypercharged sales pitch on why you should change it."  *Id.*

456.    Another analyst told Businessweek that "I call Stevie [Cohen] personally when I have any insight or news tidbit on a company.  I know he'll put the info to use and actually trade off it."  *Id.*

457.     SAC buys this access by paying hundreds of millions of dollars for brokerage services to the firms that employ these equity analysts.

458.     While most hedge funds execute trades electronically at a fraction of a cent per share, SAC continues to pay "scores of Wall Street firms for processing its trades and other services . . . paying three to five cents, making it, by wide agreement, the largest payer of fees on Wall Street, $400 million a year by some estimates."  Vanity Fair, *Hunt for Cohen*.

459.     Last month, SAC was implicated in a regulatory enforcement proceeding that confirmed that SAC continues to seek illicit "edge" from equity analysts as a quid-pro-quo for the fees it pays.

460.     On October 2, 2013, the Massachusetts Securities Division (the "MSD") settled charges against a subsidiary of Citigroup Inc. ("Citigroup"), finding that it violated securities laws by providing confidential research to SAC, one of its clients, prior to publication.  *Citigroup Global Markets, Inc.*, No. 2013-0014 (Mass. Sec. Div.), Consent Order.

461.     As charged by the MSD, Kevin Chang ("Chang"), an equity analyst at Citigroup, published a research report on December 10, 2012 maintaining a "Buy" rating on Hon Hai Precision Industry Co., Ltd. ("Hon Hai"), an Apple Inc. ("Apple") supplier, and projecting increased iPhone shipments from Hon Hai.  However, after a competing research analyst at Macquarie Group downgraded Hon Hai on December 13, 2012 from "Outperform" to "Neutral," and projected decreases in iPhone shipments, SAC employees began requesting unpublished confidential information from Chang and Citigroup.

462.     One SAC employee emailed Chang on December 13, 2012, "Hey Kevin, [a]re you picking up any order cuts to iPhone?"  Another SAC employee emailed Chang the same day asking, "Hi Kevin, Macquaries just downgraded Hon Hai and cited very weak demand for the

iPhone (down 35% -40%) into the March qtr.  Have you picked up any checks that would suggest this is the case?  I think when we exchanged emails a bit earlier you were still pretty bullish about March estimates?  Thanks!"  Likewise, SAC employees emailed Chang asking to arrange a time to discuss Apple and Hon Hai projections, with one describing his request as "urgent."  Chang responded that he was available for a call later that day.

463.    An SAC employee also asked a contact at another Citigroup subsidiary to send "everything u have on the entire iphone 4/4s/5 supply chain[.]"  Other Citigroup personnel responded, providing Citigroup's Global Supply Chain Handbook and detailed supply chain teardown models on the Apple iPhone and iPad.

464.    On December 13, 2012, Chang also sent his unpublished, updated forecasts, research, and analysis on Hon Hai and Apple to at least four SAC employees.  Chang's updated Hon Hai forecasts projected a 26.7% decrease in Apple iPhone orders from his previous report, and were his basis for reducing Hon Hai's target price and earnings in the report he published the next day.  Chang's updated forecasts were also a basis for Citigroup's related, December 16, 2012, downgrade of Apple, a report Chang later helped to prepare.

465.    Chang and other Citigroup employees thus provided material nonpublic information to multiple SAC employees in advance of publicly disseminating that information, allowing SAC to trade ahead of the public.

466.    SAC's efforts to obtain an illegal "edge" from relationships with sell-side analysts also were a focus of the *Fairfax* litigation, discussed immediately below.

**5.     Cohen's Testimony in the *Fairfax* Litigation Further
Demonstrates His Tacit Approval of Insider Trading
and Disregard for Effective Compliance**

**(a)     Background Regarding Cohen's Testimony
about Insider Trading in the *Fairfax* Litigation**

467.     Cohen's permissive approach to insider trading is further illustrated by his 2011

deposition testimony in the *Fairfax* litigation, where Cohen testified at length regarding SAC's

insider trading policies and compliance procedures.

468.     In the *Fairfax* litigation, the plaintiffs asserted that SAC and other hedge funds

had conspired to drive down the stock price of Fairfax Financial Holdings Limited ("Fairfax")

through dissemination of false information to the market.  SAC was granted summary judgment

and dismissed from the action in September 2011, in part because trading records established

that it held a net long position in Fairfax during the relevant period.

469.     One of the issues in the case concerned how SAC had handled nonpublic

information regarding a forthcoming analyst report.  A portfolio manager at SAC had learned

that an analyst at one of its brokerage firms, Morgan Keegan & Co. ("Morgan Keegan"), would

be issuing a negative report on Fairfax, and communicated this fact to others at SAC.  Cohen

Fairfax Dep. 114:5-15, 125:20-126:7, 340:3-341:16.  When the report was later issued, Fairfax's

share price declined sharply.  *Id*. at 114:6-15.

470.     SAC portfolio managers purchased Fairfax stock while aware of the forthcoming

negative report, and while such purchases did not benefit from the negative inside information,

the handling of the nonpublic information received from the Morgan Keegan analyst was a focus

of questioning by Fairfax's counsel at Cohen's deposition.

471.     As revealed by the questioning, there was no indication that the portfolio manager

involved ever sought guidance from SAC's legal counsel concerning the information he had

received.  *Id.* at 303:12-305:23, 308:6-315:2.  In addition, while SAC's compliance manual imposes a blanket prohibition on trading while in possession of inside information, the portfolio manager proceeded to trade notwithstanding his possession of nonpublic information that Morgan Keegan would be issuing its negative report.  *Id.* at 87:11-88:7, 125:4-13, 283:6-19.  The portfolio manager also communicated the existence of the forthcoming negative report to other investment personnel at SAC, in violation of SAC's policy against communicating such information to individuals other than the general counsel or his designee.  *Id.* at 114:5-15, 264:18-265:4, 340:3-341:16.  Finally, while Cohen testified that SAC maintains a "restricted list" for securities about which its employees have obtained material nonpublic information, there is no indication that Fairfax was placed on this list.  *Id.* at 124:13-125:3, 331:4-334:3, 336:13-23.

472.    Cohen was questioned about these significant violations of SAC policy, and his responses, detailed below, illustrate his casual approach to compliance.  These responses also illustrate how SAC's corrupt culture of insider trading came to exist.

### (b)    Cohen Disclaimed Specific Knowledge of SAC's Insider Trading Policies

473.    During the deposition, Cohen repeatedly disclaimed specific knowledge of SAC's insider trading policies (*id.* at 117:12-24, 118:4-15, 118:24-119:10):

> Q.  Okay.  **Now, the S.A.C. compliance manual at the time provided that if you were in possession of material nonpublic information, you could not trade, period, correct?**
>
> A.  Yes.  Well, the way --
>
> Q.  Is that correct?
>
> A.  **Actually, I don't know what it says.**
>
> Q.  Okay. So you don't know -- at the time you didn't know what S.A.C.'s compliance manual said on insider trading?
>
> A. When it comes to trading, I rely on counsel.

*     *     *

Q.  Okay. **Now, is it your testimony, as the head of the firm at this time, other than consulting counsel, you didn't know what the compliance manual said?**

A.  **It's -- the answer is, I've read the compliance manual but I don't remember exactly what it says.**

Q.  **Do you recall that it said that if you're in possession of material nonpublic information, you cannot trade in that security?**

A.  **Answer is, I don't remember.**

*     *     *

Q. **My question was, do you know today whether your compliance manual says that if you're in possession of material nonpublic information, you can't trade, period?**

A.  **I don't remember what it says.**

Q.  **So you don't know today, sitting here today as the head of the firm, what your compliance manual says?**

A. **That's right. I've read it. But if you're asking me what it says today, I don't remember.**

**(c)    Cohen Deemed Insider Trading Policies Mere
"Guidelines" and Described the Policies
<u>Prohibiting Insider Trading as "Vague"</u>**

474.    While Cohen disclaimed knowledge of SAC's insider trading policies at his 2011 deposition, SAC's compliance manual contains clear and unqualified prohibitions against insider trading, directing that (*id*. at 283:11-15; 264:20-25):

- "Employees may not solicit, recommend, influence, or effect transactions in any security, commodity interest or any account, whether personal or firm, while in possession of material, nonpublic information related to such interest."

- "Any employee who believes that he or she may be in possession of material nonpublic information should . . . not communicate the information to anyone else inside or outside the firm other than the general counsel or his designee."

475.    Asked directly whether SAC's policy prohibiting trading on insider information needed to be adhered to strictly, Cohen demurred (*id.* at 293:12-19):

- 141 -

Q. **So my question is simply: Does this have to be strictly adhered to or not?**

A. **And my answer to you is: As long as the intent is to adhere to the -- the policies and intent of how we want our employees to act, I believe that paragraph's been -- is being effected correctly.**

476.    Cohen also repeatedly described the compliance manual's strictures as mere

"guidelines" (*id.* at 264:2-267:8):

[Q.] Now, with respect to this -- this part about paragraph 2, it says, **"Employees in possession of material nonpublic information are prohibited from tipping, transmitting, or otherwise disclosing such information to another person or entity."**

**So I'm clear, as the head of S.A.C., you say that doesn't apply to people internally talking to each other.**

A. **I think these are rigid interpretations and these are guidelines.  These are rigid interpretations.  I view these things as guidelines. Okay?** And then because it's such a complex issue, you need to look at it on a judgment basis and on an individual basis.

Q. Okay.

So if you look at page 11, in the middle of the page where it says in bold, "Any employee who believes that he or she may be in possession of material nonpublic information should," the third bullet, "not communicate the information to anyone else inside or outside the firm other than the general counsel or his designee."

That's not a rule. That's a guideline.

A. I would say it's a strong guideline.

Q. But not a rule.

A. I would say there -- there are times when people know how to act in certain situations.

Q. Okay.

Then when it says at the top of the first paragraph on that page 11, second sentence, in italics, "Thus any violation of the firm's policy on the improper use or misappropriation of proprietary, confidential, or inside information is and will be considered extremely serious and will result in sanctions, including the possibility of suspension or discharge from the firm."

As I understand your testimony, one cannot follow these rules that are set forth in this policy manual and not be sanctioned or punished, right?

- 142 -

> A. **These rules are guidelines**, and I can't think of a
> situation where if someone did a serious -- made a
> serious violation, you know, that they had – you know,
> those situations would be discussed by senior management
> and outside counsel. . . .  I view these as guidelines,
> strong guidelines, deterrents, and -- but there are
> situations that don't require the – the involvement of
> general counsel or outside counsel in making a decision.

477.    Elsewhere during the deposition, Cohen again emphasized that he viewed SAC's

compliance manual as merely precatory (*id.* at 289:4-10, 268:13-17, 297:24-298:15):

> [Q.] **[W]hat you're telling me is that the literal terms
> of this compliance manual don't actually apply at S.A.C.?**
>
> A. **When I look at this manual, I see guidelines.  It's a
> code of ethics.  It's a code of conduct.**  It's what we
> want our people to do.
>
> *       *       *
>
> **Because these are guidelines, I can think of situations
> where one would be in possession of material nonpublic
> information, act correctly, and not have to involve
> compliance or general counsel in that decision.**
>
> *       *       *
>
> Q. **Where in paragraph 4 is there any ambiguity as to the
> right of somebody to trade while in possession of
> material nonpublic information?**
>
> A. **I'm going to say this again.**
>
> **These are guidelines. There are no absolutes in my
> business. Interpretation is important.** And I can think of
> situations where someone would act -- and we've explained
> some today. I feel that they've made the – an absolute
> right decision and they -- and while they may have chosen
> to go to counsel and go -- and go to compliance, they
> would be certainly showing good judgment in acting on --
> on acting in those situations.

478.    Cohen also repeatedly stated that he believed the legal prohibitions against insider

trading to be "very vague."  Asked whether he understood it to be legal to trade opposite to an

analyst report that was going to be released, he stated that he believed it would (*id.* at 116:5-8):

> Q.  You think that would be consistent with the SEC rules
> on trading on inside information?

> A.  **The way I understand the rules on trading on inside information, it's very vague.**

479.    Asked the same question again, he repeated this view (*id.* at 126:24-127:4):

> Q.  Okay. Is that your understanding of what the law provides?
>
> A.  **The way I understand the law is that it's very vague, so it's an interpretation of the law.**

480.    Pressed to explain the basis for his belief that it was permissible to trade opposite to a forthcoming analyst report, Cohen again emphasized his belief that insider trading law is "vague" (*id.* at 133:14-134:7; 135:3-11):

> Q.  Okay. I understand your belief as to what the purpose of the rule is, but I want to talk about what the rule actually provides. Do you understand that distinction?
>
> A.  **It's my belief that the rule is vague, and therefore, you can interpret the rule any way** -- you know, with -- as a lawyer, you can probably interpret it in lots of different ways.
>
> Q.  **You were about to say you can interpret it any way you want. That's what you were about to say?**
>
> A.  **I wasn't going to say that.**
>
> Q.  **You started to say that, right?**
>
> A.  **I don't remember what I was going to say.**
>
>                    *      *      *
>
> [Q.]  **You can't answer for me whether you are prohibited categorically from trading on the basis of material nonpublic information?**
>
> A.  **If you're in possession of -- of material nonpublic information, I think we just -- well, because the rule is vague, I think we've just gone through an example of where I would accept that you could trade.**

481.    Cohen also testified that trading decisions in connection with inside information are "a judgment call" (*id.* at 119:11-18, 138:11-20):

> Q.  Are you concerned at all that what you're telling me would be okay would be contrary to your compliance manual?
>
> A.  The answer is, **when you're trading securities, it's a judgment call.**  Whatever the compliance manual says, it

- 144 -

```
probably doesn't take into account every -- every
potential situation.

                    *     *     *

[Q.]  Yes or no, is it your testimony that's a
qualification to the prohibition on trading on the basis
of material nonpublic information, and that qualification
is it's okay as long as no one gets hurt?

A.  Because of the vagueness of the law, I believe it's a
judgment call.  In this case, we're talking about this
case now, I believe that we acted totally appropriately.
```

### (d)    Cohen Testified that Obtaining Inside
### Information at SAC Is a Common Occurrence

482.    Significantly, *Cohen testified that obtaining inside information is common at*

*SAC*.  While Cohen claimed that such information would not be used to trade, he described

placing securities on a restricted list because of the receipt of inside information as a "common

procedure" (*id.* at 331:4-14; 333:7-17):

```
[Q.]  How does that impact on putting a stock on the
restricted list?

A.  I mean, it's common procedure in the firm for
employees to ask to put a stock on the restricted list.

Q.  Under what circumstances?

A. When they -- when they -- when they believe they're in
possession of material nonpublic information.

. . .

[Q.]  And when would it -- when should it be put on the
restricted list?

A.  When -- I mean, they're either in possession of
material nonpublic information or they're -- they're --
they want to transact in a way that's -- in the -- in
their - whatever material nonpublic information they
have, if they want to transact in the direction of what
that material nonpublic information -- the way I think --
the way it should work is that the person would go to
counsel and explain the situation.
```

483.    Cohen further explained (*id.* at 347:24-348:12):

```
A. Well, once again, I think, you know, in general, I can
think of many instances when, in possession of material
nonpublic information, you would immediately restrict
yourself.
```

- 145 -

```
Q.  Give me some examples.

A.  The CEO of a company tells you that he's taking over
XYZ tomorrow, I would expect that to be on the restricted
list.

Q.  Any other examples?

A.  Somebody in a -- in a public company tells you that
what [their] earnings are going to be when they report in
two weeks. I would want that immediately restricted.
```

484.    Cohen further stated that employees were presented with recurring situations

involving inside information that did not require consultation with SAC's counsel (*id.* at 304:3-

306:13):

```
[Q.]  It says, "Any employee who believes that he or she
may be in possession of material nonpublic information
should," bullet point 2, "not purchase or sell the
effected security or securities on behalf of the firm,
the employee, or others."

Do you see that?

A.  I see that.

Q.  Once again, that doesn't have any exception to it,
does it?

A.  Yeah, it does.

Q.  Okay. Where?

A.  Right above it.

Q.  Where is that?

A.  "Report the matter immediately to the general
counsel."

If a person has been in that situation before, then, the
way I read this is that he's got the experience to know
how to act and act appropriately in a similar situation.

Q. Okay.

So your interpretation of this paragraph with the three
bullet points is that an employee who believes they're in
possession of material nonpublic information could
purchase or sell securities?

A. Yes.

Q. And they could do that under what circumstances?

A. Some of the circumstances that we discussed today.

Q. Okay.
```

**Even circumstances where they don't go to the general counsel.**

A. **If they've -- if they've been in that situation before and they understand how to act and follow the general intentions of -- of -- of what my general counsel, my compliance wants, yes.**

Q. Okay.

Where does it say that in this paragraph?

It says right here, "Report the matter immediately to the general counsel."

Q. Okay.

**My question was, sometimes you don't even have to go to the general counsel?**

**And you said yes.**

So I want to know where does it say here --

A. **It says right here that -- if the way that I interpret that is if the person has gone to the general counsel previously and understands how to act in a same situation and especially the way -- some of the things we discussed today, in my mind, he understands the intent and -- and desire of the firm and -- and understands what the general counsel is going to say.**

485.    Cohen further explained (*id.* at 261:2-23):

Q. **So it's not the case at S.A.C. if you have material nonpublic information, the only person you're supposed to communicate it to is the general counsel?**

A.   **That would be my preference, okay? And -- but I could see situations like we just discussed where, you know, there may be no need to discuss it with counsel because of the situation we just talked about or other situations.**

Q. Well, you said there may be no need because the person who possesses the information might decide it doesn't matter?

A.   No.

We train our people to -- you know, to be very thoughtful about this. And my preference would be they go to compliance or go to general counsel. **But I could see situations where they would make decisions because they understand that, you know -- or they have enough experience to know that what they were doing is okay.**

486.    Cohen also testified (*id.* at 263:17-24):

```
Q. So there are times when you come into possession of
material nonpublic information and you don't tell the --
the general counsel, right?

A. That's correct.

Q. Because you think you don't have to.

A. Because I know how to conduct myself in the situation.
```

487.    He subsequently added (*id.* at 291:22-24):

```
And so because of the nature of the business we're in,
you can't always get approval.  You have to make a
decision and judgment.
```

      6.     **SAC's Failure to Detect or Discipline Employees for
Insider Trading Further Demonstrates that It Did
Not Maintain an Effective Compliance Program**

488.    The absence of any compliance culture at SAC and Cohen's tacit approval of
illegal insider trading is perhaps best illustrated by a single fact: that notwithstanding its policies
against insider trading and putative compliance program, ***no SAC employee has ever been
discharged or suspended from the firm as a result of insider trading***.

489.    Strikingly, while federal prosecutors have been able to gather enough evidence to
criminally charge eight former SAC employees with insider trading and obtain convictions of all
of them, SAC's internal compliance program has contemporaneously identified ***only one
instance*** where employees suspected of inside trading were subject to discipline – despite real-
time access to internal communications and the ability to directly monitor all trading activity at
the firm.

490.    SAC's internal investigation into use of expert network firm PGR in 2011
provides further strong evidence that "compliance" at SAC was a sham.

491.    In December 2010, as part of an expanding investigation of PGR, news stories
reported that Daniel L. DeVore ("DeVore"), a global supply manager for Dell, was among the
individuals who had provided illegal inside information to investors through PGR.  Azam

Ahmed & Peter Lattman, *5 Accused as Insider Trading Inquiry Broadens*, N.Y. Times, Dec. 16, 2010.

492.    The same article referenced C.B. Lee's role as a cooperating witness in the PGR investigation.  *Id.*  Freeman and Longueuil's use of PGR, discussed above in paragraphs 345 and 346, was alleged a few weeks later in an SEC enforcement action filed on February 3, 2011, *SEC v. Longoria*, No. 11 Civ. 753 (JSR).

493.    According to Horvath, within months of these disclosures, he was interviewed by SAC's compliance department and outside counsel regarding PGR, as well as regarding a second expert network firm operator who was under investigation, John Kinnucan ("Kinnucan"). Steinberg Trial Tr. 1452:6-21.

494.    Amazingly, however, despite Horvath's extensive trading of Dell, the public linkage between PGR and a Dell insider who pled guilty to insider trading, and the compliance department's focus on PGR, *SAC's compliance department never asked Horvath if he obtained information about Dell from PGR*.

495.    The compliance department's lack of oversight is all the more striking because SAC's own database, Tamale, included an entry by Horvath, with the subject line "Dell HDD procurement" and the text "JT PGR guy in Dell HDD procurement."  *Id.* at 1431:3-1432:10. According to a news report in December 2010, DeVore was charged with supplying exactly this information to hedge funds: "Mr. DeVore discussed Dell's notebook and hard drive business, hard disk drive demand, forecasts, pricing and Dell's financial reports . . . ."  Evelyn M. Rusli, *A Look at the New Defendants in the Insider Trading Case*, N.Y. Times, Dec. 16, 2010.

496.    Horvath and Steinberg themselves noted this extraordinary failure by SAC's compliance staff.  In a conversation with Steinberg, Horvath commented "it's odd, they asked me

tons of questions about Primary Global Research and Kinnucan but nothing about Dell." *Id.* at 1453:17-18.  Steinberg, perhaps unsurprised at the compliance department's omission, responded "yeah, they move slow." *Id.* at 1453:19.

497.    The single instance in which SAC's compliance department detected insider trading further illustrates the firm's lack of an effective program and tacit approval of illegal conduct.  On July 27, 2009, a CR Intrinsic portfolio manager was informed by a sell-side healthcare research analyst that his firm was planning to release a negative research report the following day about a public company, Medicis, Inc. ("Medicis").  This information was confirmed by an SAC portfolio analyst, who reported that he had contacted the same sell-side research analyst at the direction of his portfolio manager, and the analyst had told him that the negative report would be published "in the pm" of July 28, 2009.  Thereafter, both portfolio managers unlawfully shorted Medicis before the negative report was released.

498.    Having identified this clear example of unlawful insider trading, SAC chose to signal tolerance for such conduct, imposing fines but allowing both portfolio managers to retain their positions; neither was reported to regulatory agencies.

499.    Similarly, none of the many other references to contacts at public companies discussed in paragraphs 429 to 433 above apparently prompted any internal investigation.

### 7.    SAC Compliance Overlooked Martoma's Insider Trading Despite Multiple Factors Warranting Special Scrutiny

500.    The failure by SAC's compliance unit to detect Martoma's insider trading further reflects SAC's failure to maintain an effective compliance program.[15]

---

[15]    The same day that Cohen, Martoma and Villhauer began liquidating their long positions in Elan and Wyeth securities based on inside information, July 21, 2008, Harvey Pitt, former chairman of the SEC, was giving a presentation on insider trading in SAC's office cafeteria at which Villhauer

*(continued . . .)*

501.     *First*, the sheer size of SAC's investments in Wyeth and Elan, amounting to SAC's *largest* and *fifth largest* positions, respectively out of the more than 1,200 companies in which it was then invested, warranted special scrutiny.

502.     *Second*, both Elan and Wyeth were added to a short list of restricted securities in March 2008, for which "NO INCREASE IN LONG EXPOSURE WITHOUT PRE-APPROVAL OF COMPLIANCE" was permitted.  When Martoma asked if he was "permitted to add back in the future whatever amount I sell post the restriction," he was informed by compliance that "[u]nfortunately, you may not be able to add back whatever you sell.  The protocol would be to ask me on the day you want to buy and depending on the firm's position, your request may be approved or denied."  SAC_ELAN0692081.

503.     *Third*, as CR Intrinsic's then-head heathcare trader testified at trial, Elan holdings in 2007 and 2008 were sufficiently large that they often exceeded SAC's internal caps on position size within a portfolio and the SAC operations team, therefore, had to move shares from portfolio to portfolio to circumvent these caps.  Martoma Trial Tr. 130:23-132:22.

504.     *Fourth*, while expert network firms such as the firms through which Martoma consulted with Gilman and Ross were a recognized source of illegal information as early as 2006, when SAC ostensibly imposed restrictions on their use, SAC evidently failed to monitor their use.  At least seven early consultations between Martoma and Gilman expressly identified the subject of the consultation as "AAB-001 for Alzheimer's Disease."  While Gilman's work on AAB-001 for Elan was public information and made such consultations highly suspicious,

---

*(. . . continued)*

and all analysts and portfolio managers were listed as "required attendees."  GX 595.  *See also* Martoma Trial Tr. 1114:23-1120:14.

Martoma was apparently never questioned by anyone in SAC's compliance department about these contacts.

### 8.    SAC Itself Has Pled Guilty to Insider Trading

505.    On July 23, 2013, a grand jury in this District indicted SAC LP, SAC LLC, CR Intrinsic and Sigma for wire and securities fraud, based on insider trading by Wang, C.B. Lee, Horvath, Freeman, Longueuil, R. Lee and Martoma in more than 20 companies.  The indictment further charged that SAC had adopted the practice of hiring portfolio managers and analysts with networks of contacts likely to have access to inside information, ignoring evidence of insider trading, and maintaining an inadequate and ineffective compliance program.

506.    On November 1, 2013, SAC entered into a plea agreement with the USAO in which each of the defendants agreed to plead guilty to each of the counts in the indictment and pay $1.184 billion in fines and civil forfeiture.  The Court, the Honorable Laura Taylor Swain, conducted a plea allocution on November 8, 2013 and reserved decision on whether to accept the plea.

### ALLEGATIONS CONCERNING THE TIMELINESS OF THE CLAIMS

507.    The SAC Insider Trades constituted a series of related transactions in reliance on the Inside Information provided by Gilman concerning the bapi Phase 2 clinical trial, and the last of such transactions occurred within five years of the date such claims were first asserted in this action.

508.    All claims with respect to the Insider Buying Period arise out of conduct, transactions and occurrences set forth in the original complaint filed in this action on December 21, 2012, and accordingly relate back to such date.

509.    Plaintiffs first learned of the insider trading described herein at or shortly after the time that the SEC and Martoma Criminal Actions were filed, in November 2012, and remained

unaware of Defendants' fraud until such time without any fault or want of diligence or care. Prior to the filing of the SEC and Martoma Criminal Actions, there was no public information from which Plaintiffs could have formed a reasonable basis to believe and allege the elements of an insider trading claim against Defendants.  Accordingly, any statute of limitations governing the claims herein did not begin to run until November 2012.

### DEFENDANTS' UNLAWFUL GAINS AND PREJUDGMENT INTEREST THEREON

#### A.    Damages Methodology

510.    Plaintiffs have calculated damages utilizing the SAC trading data produced to them in this action pursuant to the Order of the Court.

511.    For the Insider Buying Period, damages were calculated using the following methodology: *first*, purchases that increased long positions were identified; *second*, such purchases were matched with later sales of long positions on a last-in first-out ("LIFO") basis; and *third*, proceeds from such matched sales were subtracted from the amounts expended to make such purchases.

512.    For the Insider Selling Period, damages in respect of the July 29 Announcement were calculated using the following methodology: *first*, for long positions, such positions' value as of the market close on July 30, 2008 was subtracted from the proceeds from sales of long positions during the Insider Selling Period; *second*, for short positions, the amounts expended to close such positions on July 30, 2008 (where applicable) or value of such positions as of the close on July 30, 2008 was subtracted from the proceeds from the sales that opened such short positions during the Insider Selling Period; and *third*, for options, the proceeds from closing such positions on July 30, 2008 was subtracted from the cost to open such positions during the Insider Selling Period.

513.    For the Insider Selling Period, damages in respect of the July 31 PML Disclosure were calculated using the following methodology: *first*, the decline in price from the close on July 31, 2008 to August 1, 2008 was calculated ($10.12), and *second*, the net sales of long positions during the Insider Selling Period were multiplied by such price decline.

### B.    SAC's Profits During the Insider Buying Period

514.    The SAC Defendants' profits in respect of the Insider Buying Period, applying the methodology described above, totaled $158,346,018 for the Elan Investor Class and $21,458,705 for the Wyeth Investor Class.

### C.    SAC's Losses Avoided and Profits Gained After Announcement of the Bapineuzumab Phase 2 Trial Results at ICAD on July 29, 2008

515.    Based on Plaintiffs' analysis to date, as a result of the trades conducted during the Class Periods, SAC avoided losses and gained profits in Elan and Wyeth securities as follows, applying the methodology described above, based on the market's reaction to the July 29 Announcement in after-hours trading on July 29 and during the trading day on July 30:

| Nature of Trade | Elan Investor Class | Wyeth Investor Class |
| --- | --- | --- |
| Profits from Short Sales | $56,441,403 | $16,433,679 |
| Profits from Bearish Option Trades | $1,721,102 | |
| Losses Avoided | $154,168,492 | $39,662,350 |
| Total Unlawful Gain | $212,330,997 | $56,096,029 |

### D.    SAC's Losses Avoided in Elan Following the July 31 PML Disclosure

516.    In addition, as set forth above in paragraphs 328 to 338, as a direct result of their illegal sales based on the Inside Information, the SAC Defendants avoided losses suffered by other Elan investors following the July 31 PML Disclosure.  Disclosure of the PML cases drove a 50.5% decline in the trading price of Elan ADRs after hours on July 31 and on August 1, with

- 154 -

Elan ADRs closing down $10.12 on August 1.  Based on the SAC Defendants' July 21-25 sales, applying the methodology described above, the SAC Defendants avoided $106,869,730 in losses associated with the July 31 PML Disclosure.

     E.    **Prejudgment Interest**

517.    Prejudgment interest rates are properly determined by reference to the remedial purpose of the statute involved, and in the case of claims for disgorgement, should be fixed at a level that deprives a defendant of the fruits of their ill-gotten gains.

518.    The prejudgment interest payable under the SEC-SAC Settlement was calculated at the interest rate charged by the Internal Revenue Service for tax underpayments, pursuant to 26 U.S.C. § 6621(a)(2).  Such rate is "the sum of— (A) the Federal short-term rate determined under [other provisions of the Internal Revenue Code], plus (B) 3 percentage points."  *Id.*  This is the rate routinely charged by the SEC on amounts disgorged.  *E.g.*, *SEC v. World Info. Tech., Inc.*, 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008).

519.    Accordingly, the interest rate used to calculate prejudgment interest in the SEC-SAC Settlement was not calculated with reference to SAC's cost of funds or otherwise in a manner designed to achieve disgorgement of the actual time-value of such funds to SAC over the period it has been holding them.[16]

520.    The underpayments rate utilized by the SEC has ranged between 3% and 6% over the relevant period, from July 2008 to the present.  SAC's actual cost of funds is far higher.

---

[16]    Had Defendants not engaged in insider trading with respect to Elan and Wyeth, SAC would have been required to either raise additional capital to compensate for the losses incurred and profits not gained, or, alternatively, operate as a hedge fund with less capital.  The measure of prejudgment interest set forth herein conservatively assumes that SAC could have and would have raised additional capital to replace the profits gained and losses avoided through the insider trading pled herein.  Absent that assumption, the prejudgment interest rate should be increased to reflect SAC's gross investment returns, as such returns would not have been obtained in the absence of Defendants' wrongdoing.

521.    The cost to SAC of investment capital is reflected by the returns payable to its investors, just as the cost of debt financing is reflected by the interest payable to lenders. According to news reports, the annual net returns earned by SAC investors for calendar years 2007 through 2013 were as follows:

| Year | Rate |
|------|------|
| 2007 | 13.0% |
| 2008 | -27.5% |
| 2009 | 28.6% |
| 2010 | 16.0% |
| 2011 | 8.0% |
| 2012 | 13.0% |
| 2013 | 20.1% |

522.    While SAC, like many hedge funds, is financed through a combination of investment capital and debt, the profits obtained and losses avoided through the SAC Insider Trades had the characteristics of investment capital, rather than debt, under both the applicable principles of finance and the law.

523.    The distinction between debt and equity in both finance and law is based on a variety of factors, principally including whether the obligation carries the unconditional right to receive payment at a fixed date or on demand, the power to enforce payment of principal and interest, and priority of the holder's claim in relation to other claimants.  *See, generally, TIFD III-E, Inc. v. United States*, 459 F.3d 220, 232 (2d Cir. 2006).

524.    Unlike debt financing, and particularly the margin financing that most hedge funds employ, the profits gained and losses avoided from the conduct at issue in this action did not carry any right to payment or obtain priority over other claims.  Indeed, the monies obtained through the wrongdoing at issue in this action had greater value and presented lower risk to SAC than even regular investment capital, because investment capital in hedge funds carries the right to redemption at the option of the investor.

525.    In addition, while debt financing, often referred to as "leverage," increases the funds available for investment by the hedge fund borrower, it also increases risk.  According to one industry report, margin calls were a principal source of hedge fund failures in the recent financial crisis.  JPMorgan Chase & Co., *Hedge Funds, Leverage and Counterparty Negotiations* 3 (2008) ("one of the primary factors contributing to recent hedge fund failures has been the demand by counterparties to return capital or to meet margin calls, which forces managers to liquidate their assets in short order").

526.    There is no basis to conclude that, absent the insider trading at issue herein, SAC would have chosen to increase its leverage ratio by replacing the funds illegally obtained with additional debt financing.  Rather, the funds SAC obtained through insider trading were themselves leveraged with additional borrowing.

527.    Cohen has himself acknowledged the risks of excessive borrowing.  In a rare interview, conducted by a fellow hedge fund manager at a conference in February 2011, Cohen explained the importance of avoiding excessive debt.  As reported in a *New York Times* article:

> [Cohen's] lessons from the market tumult in 2008?
> "Leverage, concentration and illiquidity are the three things that can kill you," he said.

Peter Lattman, *SAC Capital's Cohen Opens Up*, N.Y. Times, Feb. 15, 2011.

528.    Accordingly, the investment returns payable to SAC investors during the period that SAC has held the losses unlawfully avoided and profits unlawfully gained represent the actual, market-tested cost of such funds, and any lower rate would permit SAC to retain a portion of its gains from the fraud by obtaining capital at a lower cost than it would have paid in the market.

529.    The prejudgment interest calculations set forth herein apply such investment

returns, compounded daily, to the illegal profits gained and losses avoided set forth above.

### F.    Summary of SAC's Profits Gained and Losses Avoided

530.    A summary of SAC's profits gained and losses avoided through the insider

trading set forth herein, based on Plaintiffs' analysis to date, is as follows:

**ELAN INVESTOR CLASS**

| Source of Gain (Complaint ¶¶) | Principal Amount | Prejudgment Interest | Total |
|---|---|---|---|
| Insider Buying Period Profits (¶ 514) | $158,346,018 | $174,372,828 | $332,718,846 |
| July 29 Announcement (¶ 515) | $212,330,997 | $233,821,835 | $446,152,832 |
| July 31 PML Disclosure (¶ 516) | $106,869,730 | $117,686,427 | $224,556,157 |
| Total | $477,546,745 | $525,881,090 | $1,003,427,835 |

**WYETH INVESTOR CLASS**

| Source of Gain (Complaint ¶¶) | Principal Amount | Prejudgment Interest | Total |
|---|---|---|---|
| Insider Buying Period Profits (¶ 514) | $21,458,705 | $23,630,623 | $45,089,328 |
| July 29 Announcement (¶ 515) | $56,096,029 | $61,773,724 | $117,869,753 |
| Total | $77,554,734 | $85,404,347 | $162,959,081 |

### G.    Martoma's Profits

531.    At the end of 2008, Martoma received a bonus of over $9.3 million that included

a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the

Elan profits in certain SAC LP portfolios.

### H.    Gilman's Profits

532.    Gilman received over $100,000 from GLG for his consultations with Martoma

and others at SAC.  It is presently unknown whether Gilman received additional payments

directly from the SAC Defendants.

## CONTEMPORANEOUS PURCHASES AND SALES

533.    As set forth in their previously-filed certifications, the *Kaplan* Plaintiffs traded Elan ADRs and options thereon contemporaneously (within the meaning of Sections 10(b) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t-1) with and opposite to the SAC Defendants during the Elan Class Period.

534.    As set forth in their previously-filed certifications, the *Birmingham* Plaintiffs traded Wyeth shares contemporaneously (within the meaning of Sections 10(b) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t-1) with and opposite to the SAC Defendants during the Wyeth Class Period.

## CLASS ACTION ALLEGATIONS

### A.    Elan Investor Class

535.    The *Kaplan* Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the Elan Investor Class) consisting of all persons who traded contemporaneously with and opposite to the SAC Defendants during the Elan Class Period.  Excluded from the Elan Investor Class are Defendants herein, the employees, officers and directors of SAC during the Elan Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

536.    The members of the Elan Investor Class are so numerous that joinder of all members is impracticable.  During the Elan Class Period, Elan ADRs were actively traded on the NYSE and over 400,000,000 ADRs were then outstanding.  While the exact number of Elan Investor Class members is unknown to the *Kaplan* Plaintiffs at this time and can be ascertained only through appropriate discovery, the *Kaplan* Plaintiffs believe that there are thousands of members in the proposed Elan Investor Class.  Record owners and other members of the Elan

Investor Class may be identified from records maintained by Elan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

537.    The *Kaplan* Plaintiffs' claims are typical of the claims of the members of the Elan Investor Class, as all members of the Elan Investor Class are similarly affected by Defendants' wrongful conduct in violation of federal law, as complained of herein.

538.    The *Kaplan* Plaintiffs will fairly and adequately protect the interests of the members of the Elan Investor Class and have retained counsel competent and experienced in class and securities litigation.  The *Kaplan* Plaintiffs have no interests antagonistic to or in conflict with those of the Elan Investor Class.

539.    Common questions of law and fact exist as to all members of the Elan Investor Class and predominate over any questions solely affecting individual members of the Elan Investor Class.  Among the questions of law and fact common to the Elan Investor Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Gilman and Ross supplied the Inside Information to the SAC Defendants and whether the SAC Defendants traded Elan ADRs and options thereon while in possession of material, nonpublic information concerning Elan;

(c)    whether the Control Defendants exercised control within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and whether such defendants are entitled to assert the defense of good faith;

(d)    whether the Inside Information was material; and

(e)      the amount by which Defendants profited and avoided losses as a result of the securities law violations alleged herein.

540.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages recoverable by individual Elan Investor Class members may be relatively small, the expense and burden of individual litigation make it impractical for members of the Elan Investor Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

541.      The *Kaplan* Plaintiffs may rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants failed to disclose material, nonpublic information during the Elan Class Period;

(b)      the omissions were material;

(c)      Elan securities traded in an efficient market;

(d)      Elan's ADRs and options were liquid and traded with moderate to heavy volume during the Elan Class Period;

(e)      Elan traded on the NYSE; and

(f)      the *Kaplan* Plaintiffs and other members of the Elan Investor Class purchased and/or sold the applicable Elan securities between the time Defendants failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

542.      Based upon the foregoing, the *Kaplan* Plaintiffs and the members of the Elan Investor Class are entitled to a presumption of reliance upon the integrity of the market.

543.     Additionally, the *Kaplan* Plaintiffs and the members of the Elan Investor Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants breached a duty to disclose material information during the Elan Class Period by trading while in possession of material nonpublic information, as detailed above.

### B.    Wyeth Investor Class

544.     The *Birmingham* Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the Wyeth Investor Class) consisting of all persons who traded contemporaneously with and opposite to the SAC Defendants during the Wyeth Class Period.  Excluded from the Wyeth Investor Class are Defendants herein, the employees, officers and directors of SAC during the Wyeth Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

545.     The members of the Wyeth Investor Class are so numerous that joinder of all members is impracticable.  During the Wyeth Class Period, Wyeth shares were actively traded on the NYSE and over 1.3 billion shares were then outstanding.  While the exact number of Wyeth Investor Class members is unknown to the *Birmingham* Plaintiffs at this time and can be ascertained only through appropriate discovery, the *Birmingham* Plaintiffs believe that there are thousands of members in the proposed Wyeth Investor Class.  Record owners and other members of the Wyeth Investor Class may be identified from records maintained by Wyeth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

546.     The *Birmingham* Plaintiffs' claims are typical of the claims of the members of the Wyeth Investor Class, as all members of the Wyeth Investor Class are similarly affected by Defendants' wrongful conduct in violation of federal law, as complained of herein.

547.     The *Birmingham* Plaintiffs will fairly and adequately protect the interests of the members of the Wyeth Investor Class and have retained counsel competent and experienced in class and securities litigation.  The *Birmingham* Plaintiffs have no interests antagonistic to or in conflict with those of the Wyeth Investor Class.

548.     Common questions of law and fact exist as to all members of the Wyeth Investor Class and predominate over any questions solely affecting individual members of the Wyeth Investor Class.  Among the questions of law and fact common to the Wyeth Investor Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Gilman and Ross supplied the Inside Information to the SAC Defendants and whether the SAC Defendants traded Wyeth shares and options thereon while in possession of material, nonpublic information concerning Wyeth;

(c)     whether the Control Defendants exercised control within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and whether such defendants are entitled to assert the defense of good faith;

(d)     whether the Inside Information was material; and

(e)     the amount by which Defendants profited and avoided losses as a result of the securities law violations alleged herein.

549.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages recoverable by individual Wyeth Investor Class members may be relatively small, the expense and burden of individual litigation make it impractical for members of the Wyeth Investor Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

550.    The *Birmingham* Plaintiffs may rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants failed to disclose material, nonpublic information during the Wyeth Class Period;

(b)    the omissions were material;

(c)    Wyeth securities traded in an efficient market;

(d)    Wyeth's shares and options were liquid and traded with moderate to heavy volume during the Wyeth Class Period;

(e)    Wyeth traded on the NYSE; and

(f)    the *Birmingham* Plaintiffs and other members of the Wyeth Investor Class purchased and/or sold the applicable Wyeth securities between the time Defendants failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

551.    Based upon the foregoing, the *Birmingham* Plaintiffs and the members of the Wyeth Investor Class are entitled to a presumption of reliance upon the integrity of the market.

552.    Additionally, the *Birmingham* Plaintiffs and the members of the Wyeth Investor Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants breached a duty to disclose

material information during the Wyeth Class Period by trading while in possession of material

nonpublic information, as detailed above.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

553.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs 1 through 552 as if fully set forth herein.

554.    This Claim is brought against all Defendants under Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

555.    The information provided by Gilman to Martoma concerning the Phase 2 bapi

trial was, in each case, material and nonpublic.  In addition, the information was, in each case,

considered confidential by Elan, Wyeth and the SMC.

556.    Gilman provided the Inside Information to Martoma in breach of the duty of

confidentiality arising from the fiduciary relationship or similar relationship of trust and

confidence that Gilman owed to Elan, Wyeth, their shareholders, and the SMC, did so with the

expectation of receiving a benefit therefrom, and received such a benefit.  Gilman knew or

should have known that Martoma and other SAC Defendants would trade on the Inside

Information.

557.    Martoma and Cohen knew, recklessly disregarded, or should have known, that

Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and

confidence, to keep the Inside Information confidential, provided such information with the

expectation of receiving a benefit from doing so, and received such a benefit.

558.    Martoma traded Elan and Wyeth securities and provided the Inside Information

that he received from Gilman to the other SAC Defendants named herein and other persons

employed by SAC with the expectation of a receiving benefit from doing so, and received such a benefit.

559.    Cohen traded Elan and Wyeth securities while in possession of the Inside Information that he received from Martoma while knowing or recklessly disregarding that Martoma and Gilman provided such information in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, and with the expectation of receiving a benefit from doing so, and received such a benefit.

560.    By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly, made material omissions.

561.    Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

562.    Plaintiffs purchased and sold securities of Elan and Wyeth contemporaneously with the SAC Defendants' sales and purchases.

563.    The measure of damages for trading while in possession of material nonpublic information under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, is the disgorgement of profits gained and losses avoided by such trading.

564.    During the Insider Buying Period, the SAC Defendants purchased Elan ADRs and Wyeth shares, and traded options thereon, while in possession of Inside Information and gained profits on such transactions in an amount estimated at $179.8 million.  Plaintiffs and the Elan and Wyeth Investor Classes are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

565.     During the Insider Selling Period, the SAC Defendants sold Elan ADRs and Wyeth shares, and traded options thereon, while in possession of Inside Information and gained profits and avoided losses on such transactions in amounts estimated at $268.4 million following the July 29 Announcement and $106.9 million following the July 31 PML Disclosure.  Plaintiffs and the Elan and Wyeth Investor Classes are entitled to disgorgement of such amounts, together with prejudgment interest thereon, net of the amounts disgorged to the SEC in respect of the SAC Insider Trades.

566.     Plaintiffs are further entitled to disgorgement of the amounts by which Martoma and Gilman profited from their participation in the insider trading alleged herein.

567.     By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Elan and Wyeth Investor Classes pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

**SECOND CLAIM**
**For Violations of Section 20A of the Exchange Act**
**(Against All Defendants)**

568.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 567 as if fully set forth herein.

569.     This Claim is brought against all Defendants under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

570.     The information provided by Gilman to Martoma concerning the Phase 2 bapi trial was, in each case, material and nonpublic.  In addition, the information was, in each case, considered highly confidential by Elan, Wyeth and the SMC.

571.     Gilman provided the Inside Information to Martoma in breach of the duty of confidentiality arising from the fiduciary relationship or similar relationship of trust and

confidence that Gilman owed to Elan, Wyeth, their shareholders, and the SMC, did so with the

expectation of receiving a benefit therefrom, and received such a benefit.  Gilman knew or

should have known that Martoma and other SAC Defendants would trade on the Inside

Information.

572.     Martoma and Cohen knew, recklessly disregarded, or should have known, that

Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and

confidence, to keep the Inside Information confidential, provided such information with the

expectation of receiving a benefit from doing so, and received such a benefit.

573.     Martoma traded Elan and Wyeth securities and provided the Inside Information

that he received from Gilman to the other SAC Defendants named herein and other persons

employed by SAC with the expectation of receiving a benefit from doing so, and received such a

benefit.

574.     Cohen traded Elan and Wyeth securities while in possession of the Inside

Information that he received from Martoma while knowing or recklessly disregarding that

Martoma and Gilman provided such information in breach of a fiduciary duty, or obligation

arising from a similar relationship of trust and confidence, and with the expectation of receiving

a benefit from doing so, and received such a benefit.

575.     By virtue of the foregoing, Defendants, in connection with the purchase or sale of

securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or

a facility of a national securities exchange, directly or indirectly, made material omissions.

576.     Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

577.    Plaintiffs contemporaneously purchased and sold securities of the same class as those sold and purchased by the SAC Defendants.

578.    The measure of damages for trading while in possession of material nonpublic information under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, is the disgorgement of profits gained and losses avoided by such trading.

579.    During the Insider Buying Period, the SAC Defendants purchased Elan ADRs and Wyeth shares, and traded options thereon, while in possession of Inside Information and gained profits on such transactions in an amount estimated at $179.8 million.  Plaintiffs and the Elan and Wyeth Investor Classes are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

580.    During the Insider Selling Period, the SAC Defendants sold Elan ADRs and Wyeth shares, and traded options thereon, while in possession of Inside Information and gained profits and avoided losses on such transactions in amounts estimated at $268.4 million following the July 29 Announcement and $106.9 million following the July 31 PML Disclosure.  Plaintiffs and the Elan and Wyeth Investor Classes are entitled to disgorgement of such amounts, together with prejudgment interest thereon, net of the amounts disgorged to the SEC in respect of the SAC Insider Trades.

581.    Plaintiffs are further entitled to disgorgement of the amounts by which Martoma and Gilman profited from their participation in the insider trading alleged herein.

582.    By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Elan and Wyeth Investor Classes pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

**THIRD CLAIM**
**For Violations of Section 20(a) of the Exchange Act**
**(Against the Control Defendants)**

583.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs 1 through 582 as if fully set forth herein.

584.    This Claim is brought against the Control Defendants, SAC LP, SAC LLC, CR Intrinsic, SAC Inc. and Cohen, for control person liability under Section 20(a) of the Exchange Act.

585.    Pursuant to Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

586.    Each of the Control Defendants controlled Martoma by virtue of their function or status and each of the Control Defendants in fact exercised control over Martoma in connection with the SAC Insider Trades.

587.    Each of the other Control Defendants controlled CR Intrinsic by virtue of their function or status and each of the other Control Defendants in fact exercised control over CR Intrinsic in connection with the SAC Insider Trades.

588.    The Control Defendants did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by (i) permitting the SAC Insider Trades to occur with actual knowledge or reckless disregard for whether the persons trading on behalf of

SAC possessed material, nonpublic information, or (ii) failing to adequately supervise Martoma in connection with his acquisition of the Inside Information and trading thereon.

589.     By virtue of the foregoing, the Control Defendants are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to Plaintiffs and the Elan and Wyeth Investor Classes with the Defendants liable under the First and Second Claims above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the *Kaplan* Plaintiffs as representatives of the Elan Investor Class and the *Birmingham* Plaintiffs as representatives of the Wyeth Investor Class;

B.     Requiring Defendants to disgorge the profits gained and losses avoided by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Elan and Wyeth Investor Classes prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

Dated:  New York, New York
          March 7, 2014

SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP

By: _Deborah Clark Weintraub_/EDW

    Deborah Clark-Weintraub
    Joseph P. Guglielmo
    Tom Laughlin
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York  10174
Telephone: (212) 223-6444

Gregg S. Levin
David P. Abel
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina  29464
Telephone: (843) 216-9000

*Co-Lead Counsel for the* Birmingham
*Plaintiffs and the Wyeth Investor Class*

WOHL & FRUCHTER LLP

By: _Ethan Wohl_

    Ethan D. Wohl
    Krista T. Rosen
    Sara J. Wigmore
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004

Marc I. Gross
Tamar A. Weinrib
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York  10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

*Co-Lead Counsel for the* Kaplan *Plaintiffs
and the Elan Investor Class*

## CERTIFICATE OF SERVICE

I, Sara J. Wigmore, do hereby certify that on this 7th day of March, 2014, a copy of the

foregoing Joint Consolidated Amended Class Action Complaint was served by overnight

delivery and by email, upon the following counsel of record:

Daniel J. Kramer
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019

Martin B. Klotz
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York  10019

Laurence A. Silverman
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, New York  10020

Richard M. Strassberg
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018

Roberto M. Braceras
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109


Dated: New York, New York
       March 7, 2014

_____
Sara J. Wigmore