UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID E. KAPLAN, et al., <br><br> Plaintiffs, <br><br> - against - <br><br> S.A.C. CAPITAL ADVISORS, L.P., et al., <br><br> Defendants. | No. 12 Civ. 9350 (VM) (KNF) <br><br> ECF Case |
| BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, et al., <br><br> Plaintiffs, <br><br> - against - <br><br> S.A.C. CAPITAL ADVISORS, L.P., et al., <br><br> Defendants. | No. 13 Civ. 2459 (VM) (KNF) <br><br><br> <u>Oral Argument Requested</u> |

### SAC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS <u>THE JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3020

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8102

*Attorneys for Defendants S.A.C. Capital Advisors,
L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic
Investors, LLC, CR Intrinsic Investments, LLC, S.A.C.
Capital Advisors, LLC, S.A.C. Capital Associates,
LLC, S.A.C. International Equities, LLC, S.A.C. Select
Fund, LLC and Steven A. Cohen (together, "SAC")*

TABLE OF CONTENTS

**Page**

Table of Authorities ....................................................................................................... iii

Preliminary Statement .................................................................................................... 1

Statement of Facts .......................................................................................................... 5

      A.     The SEC Action ................................................................................. 5

      B.     Plaintiffs' Initial Complaints ............................................................ 5

      C.     SAC Settles The SEC Action ........................................................... 6

      D.     Plaintiffs Amend Their Complaints .................................................. 6

      E.     The U.S. Attorney's Charges Against SAC ...................................... 7

      F.     Plaintiffs File Amended Consolidated Class Action Complaints .................... 8

Argument ....................................................................................................................... 9

I.     The Selling Claims Should Be Dismissed ......................................................... 9

      A.     The SEC Settlement Extinguishes The Selling Claims ................................... 9

      B.     The Elan Plaintiffs Cannot Recover Avoided Losses Attributable
            To The Tysabri Disclosure ............................................................... 9

II.    The Buying Claims Should Be Dismissed ....................................................... 12

      A.     The Five-Year Statutes Of Repose Bar Almost All Of The Buying
            Claims ............................................................................................ 12

            1.     The Statutes Of Repose Run From Each Purchase Or Sale .............. 12

            2.     The Buying Claims Were Not Tolled ................................................ 16

            3.     The Buying Claims Do Not Relate Back To The Original
                Complaint ......................................................................... 16

            4.     There Is No Timely 10(b) Predicate For The Buying Claims .......... 17

      B.     Plaintiffs Have Not Alleged Loss Causation For The Buying Claims .......... 18

      C.     Plaintiffs' Buying Claims Rest on Improper Double-Counting ................... 20

III.   Plaintiffs Cannot Recover Prejudgment Interest Based on SAC's Investment
     Returns ............................................................................................................. 21

IV.   The Complaint Should Be Dismissed For Failure To Allege Reliance .................. 24

V.    The Complaint Does Not State A Claim Under Section 20(a) ................................ 25

Conclusion ................................................................................................................... 25

TABLE OF AUTHORITIES

**Page**

CASES

*Affiliated Ute Citizens of Utah* v. *United States*,
    406 U.S. 128 (1972).............................................................................................24

*American Pipe & Construction Co.* v. *Utah*,
    414 U.S. 538 (1974).............................................................................................16

*Arco Capital Corp. Ltd.* v. *Deutsche Bank AG*,
    949 F. Supp. 2d 532 (S.D.N.Y. 2013) ................................................................13

*Arnold* v. *KPMG LLP*,
    334 F. App'x 349 (2d Cir. 2009) ........................................................................13

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009).............................................................................................21

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .................................................................................25

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988).............................................................................................24

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007).............................................................................................23

*Central States Southeast & Southwest Areas Pension Fund* v. *Federal Home
    Loan Mortgage Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ..........................................................................11

*Collier* v. *Aksys Ltd.*,
    2005 WL 1949868 (D. Conn. Aug. 15, 2005) ...................................................19

*Collier* v. *Aksys Ltd.*,
    179 F. App'x 770 (2d Cir. 2005) ........................................................................19

*Donovan* v. *Bierwirth*,
    754 F.2d 1049 (2d Cir. 1985) .............................................................................22

*Dura Pharmaceuticals, Inc.* v. *Broudo*,
    544 U.S. 336 (2005)......................................................................................11, 18

*E & L Consulting, Ltd.* v. *Doman Industries Ltd.*,
    472 F.3d 23 (2d Cir. 2006) ...................................................................................5

*Feiner Family Trust* v. *VBI Corp.*,
    352 F. App'x 461 (2d Cir. 2009) ........................................................................17, 18

*Gerstle* v. *Gamble-Skogmo, Inc.*,
    478 F.2d 1281 (2d Cir. 1973) ..................................................................................22

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    134 S. Ct. 636 (Nov. 15, 2013)................................................................................24

*In re Alcatel Securities Litigation*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) .....................................................................17

*In re Alstom SA Securities Litigation*,
    406 F. Supp. 2d 402 (S.D.N.Y. 2005) .....................................................................15

*In re Bausch & Lomb, Inc. Securities Litigation*,
    941 F. Supp. 1352 (W.D.N.Y. 1996) ......................................................................17

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
    574 F.3d 29 (2d Cir. 2009) ......................................................................................18

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ...............................................................11, 19

*In re Oracle Corp. Securities Litigation*
    627 F.3d 376 (9th Cir. 2010) ...................................................................................19

*Jackson National Life Insurance Co.* v. *Merrill Lynch & Co.*,
    32 F.3d 697 (2d Cir. 1994) ................................................................................17, 18

*Lujan* v. *Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................................19, 20

*McCann* v. *Hy-Vee, Inc.*,
    663 F.3d 926 (7th Cir. 2011) ...................................................................................13

*National Federation of Independent Business* v. *Sebelius*,
    132 S. Ct. 2566 (2012)..............................................................................................20

*Police & Fire Retirement System of Detroit* v. *IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013) ......................................................................................16

*Press* v. *Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000) ......................................................................................5

*Raines* v. *Byrd*,
    521 U.S. 811 (1997)..................................................................................................19

*Roth* v. *Jennings*,
   489 F.3d 499 (2d Cir. 2007) ...................................................................5

*SEC* v. *Contorinis*,
   743 F.3d 296 (2d Cir. 2014) .................................................................21

*SEC* v. *CR Intrinsic Investors, LLC*,
   939 F. Supp. 2d 431 (S.D.N.Y. 2013) ....................................................6

*SEC* v. *First Jersey Securities, Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ..........................................................21, 22

*SEC* v. *MacDonald*,
   699 F.2d 47 (1st Cir. 1983).................................................................22

*Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta*,
   552 U.S. 148 (2008)............................................................................24

*Summers* v. *Earth Island Institute*,
   555 U.S. 488 (2009)............................................................................19

*United States* v. *Chiarella*,
   588 F.2d 1358 (2d Cir. 1978) ..........................................................13, 14

*United States* v. *Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ....................................................2

STATUTES

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ...................................18

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .................. *passim*

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)...................4, 8, 25

Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1 .................... *passim*

Section 804 of the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658(b)....................12, 13, 15

OTHER AUTHORITIES

133 Cong. Rec. S8246 (daily ed. June 17, 1987), 1987 WL 957500 ....................................15

3 BROMBERG & LOWENFELS ON SEC. FRAUD § 6 (2d ed.) .................................................9, 14

DANIEL J. FETTERMAN & MARK P. GOODMAN, DEFENDING CORPS. AND
   INDIVIDUALS IN GOVERNMENT INVESTIGATIONS § 13:29 n.1 ...........................................14

Federal Rule of Civil Procedure 15 ................................................................................16, 17

Federal Rule of Civil Procedure 23 ........................................................................16

*Insider Trading Proscriptions Act of 1988: Hearing Before the Subcomm. on
Sec. of the S. Comm. on Banking, Housing, and Urban Affairs*, 100th
Cong. 40 (1987), 1987 WL 957496..................................................................15

S. 1380, 100th Cong. § 2 (1987), 1987 WL 957499 ............................................14

United States Constitution Article III ..............................................................19, 20

## **Preliminary Statement**

This is a "contemporaneous trader" case.  In it, shareholders of Elan and Wyeth seek damages from defendants, who allegedly possessed material non-public information ("MNPI") concerning Elan and Wyeth's drug bapineuzumab ("bapi"), and were selling stock when plaintiffs were buying or buying stock when plaintiffs were selling.

Damages are significantly restricted in these cases.  The federal securities laws cap plaintiffs' damages at an amount equal to defendants' profit or loss avoided from the unlawful trades.  And where, as here, the SEC obtains disgorgement from defendants, plaintiffs' permitted recovery is diminished, dollar for dollar, by the amounts defendants disgorge.

These limitations exist because contemporaneous traders are not harmed by insider trading.  As the government recently explained:  "an individual who happens to buy or sell securities at the same time as an insider trading defendant is not considered a 'victim'" under the Crime Victims' Rights Act.  In fact, the government disagreed with the claim by plaintiffs in this case that they were victims of SAC's trading, explaining that "[a]ny proximate and direct harm to the purchasers of Elan and Wyeth securities that Class Counsel seeks to represent resulted from the negative drug trial results announced in July 2008 that caused the price of the securities to fall."  Accordingly, "investors who trade without the benefit of inside information are not properly understood as the direct and proximate victims of those who do" and are not harmed by virtue of the fact that they are "denied the opportunity to make the same illegal profits obtained by the defendant."  (Ex. 8.)[1]

---

[1]   Citations in the form of ¶ __ refer to paragraphs of the complaint.  Citations in the form of "Ex. __" refer to exhibits to the Declaration of Jonathan Hurwitz, dated April 28, 2014.  Citations in the form "ECF No. __" refer to docket entries in this district and, unless otherwise noted, this action (No. 12-cv-9350).

It is not surprising then that "Congress has never treated [insider trading] as a fraud on investors, the [SEC] has explicitly opposed any such legislation, and the Supreme Court has rejected any attempt to extend coverage of the securities fraud laws on such a theory." *United States* v. *Gupta*, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012) (Rakoff, J.). Instead, Congress enacted section 20A of the Securities Exchange Act, which permits contemporaneous traders to sue, but limits their damages to disgorgement of defendants' profits and provides that those traders recover nothing if the SEC has obtained that disgorgement.

This then is plaintiffs' dilemma. The SEC sued an SAC entity for selling Elan and Wyeth securities while allegedly in possession of MNPI showing that bapi's clinical trial would fail. The lawsuit addressed sales from July 21, 2008 (after the entity allegedly received MNPI regarding the trial results), to July 29, 2008 (when the trial results were publicly announced) (the "Selling Period"). SAC agreed to settle that lawsuit for $602 million, which includes disgorged profits and losses avoided of $275 million for the conduct alleged by the SEC. Once the settlement becomes final, SAC will have made the disgorgement contemplated under section 20A and plaintiffs' lawsuit will be mooted.

As initially pled, plaintiffs' lawsuits were based on the same Selling Period contained in the SEC lawsuit. But, faced with the fact that the SEC settlement mooted their claim, plaintiffs amended their cases to add claims regarding SAC's purchases of Elan and Wyeth securities for two years before the Selling Period (the "Buying Period"). Plaintiffs now contend that the SEC did not seek enough disgorgement because (a) it did not include claims for the Buying Period, (b) it did not include in the Selling Period the loss avoided by the drop in Elan's stock price two days *after* Elan disclosed the bapi results, when Elan announced disappointing news regarding its drug Tysabri, and (c) it charged too low an interest rate.

2

The amended complaint is based on the notion that the SEC left money on the table.  Plaintiffs justify their continued litigation by explaining that the SEC was not incentivized to recover for *all* of SAC's alleged insider trading and that it did not sue for the full range of unlawful trading or demand full disgorgement of unlawful profits.

Plaintiffs' theory is not remotely plausible.  SAC has been the most closely scrutinized investment firm in history.  The notion that the SEC could not be bothered to investigate broadly and pursue full disgorgement is not credible.

Not only are plaintiffs' claims implausible, but they are legally defective:

(1)     The Selling Period claims should be dismissed because SAC has agreed to disgorge its profit and loss avoided to the SEC.  There is no basis to include the stock drop relating to Tysabri, which occurred two days *after* Elan disclosed the bapi trial results.  In fact, plaintiffs concede that the Tysabri drop had nothing to do with the fraud alleged in the complaint.  This is consistent with the views of the SEC, which did not contend that the Tysabri drop was related to bapi and did not seek disgorgement of the stock drop related to Tysabri; the FBI, which determined that including the Tysabri drop in the calculation of the losses allegedly avoided by SAC would be "an inappropriate way to calculate loss avoidance;" and the prosecutors in the Martoma trial, who argued that the Tysabri drop was a "distraction" unrelated to the drop caused by the bapi disclosures at issue here.  *See* Point I; (Exs. 9 & 10).

(2)     The Buying Period claims should be dismissed for three independent reasons.  First, virtually all of those claims are barred by the five-year statute of repose under sections 10(b) and 20A.  The Buying Period runs until July 18, 2008, but the Elan plaintiffs only first asserted those claims on May 13, 2013.  So the only claims that are not barred relate to trading for the two months from May 13, 2008 to July 18, 2008.  The Wyeth plaintiffs' Buying

Period claims are even narrower.  Those plaintiffs only first asserted them on July 15, 2013, so only four days—July 15-18, 2008—are not barred.  *See* Point II.A.  Second, plaintiffs do not allege a corrective disclosure—and corresponding stock drop—during the Buying Period.  As a result, plaintiffs cannot allege the element of loss causation with respect to those claims.  *See* Point II.B.  Third, plaintiffs' Buying Period claims rely on impermissible double-counting, because they effectively seek to recover the same alleged gains as the Selling Period claims.  *See* Point II.C.

(3)     There also is no basis for the higher interest rate plaintiffs seek.  SAC has agreed to pay interest based on the rate the SEC consistently charges and that courts have consistently approved.  Plaintiffs seek a rate based on the returns SAC generated on its investments, so as to capture the profit allegedly earned from the proceeds of the fraud—but the Second Circuit has rejected that approach.  And plaintiffs' assertion that their rate is required to deprive SAC "of the fruits of their ill-gotten gains" ignores the fact that SAC has already agreed to pay for those alleged gains not just once, but *multiple times*:  in addition to agreeing to pay $602 million to the SEC, SAC agreed to pay an additional $1.2 billion to resolve separate criminal and civil forfeiture proceedings that were based in large part on the same trading.  *See* Point III.

(4)     Plaintiffs' claims also fail because they do not allege reliance, an essential element of all of their claims.  *See* Point IV.

(5)     Finally, plaintiffs' section 20(a) claims should be dismissed because there is no viable predicate violation for those claims.  *See* Point V.

Plaintiffs have had more than a year to try to state a claim.  They have received millions of SAC's documents and numerous letters from SAC explaining why their legal theories

are defective.  Under these circumstances, the complaint not only should be dismissed, but the dismissal should be with prejudice.

## Statement of Facts[2]

**A.    The SEC Action**

On November 20, 2012, the SEC sued CR Intrinsic, one of the SAC defendants. It alleged that, on July 17, 2008, Sidney Gilman, a doctor affiliated with bapi's clinical trial, gave MNPI about the trial to Mathew Martoma, a portfolio manager at CR Intrinsic.  The SEC claimed that, between July 21 and 29, CR Intrinsic and its affiliates sold Elan and Wyeth securities; on July 29, after the close of the market, the companies disclosed the results of the trial; and on July 30, the price of Elan and Wyeth securities dropped.  In total, the SEC alleged that SAC had profits and avoided losses of approximately $275 million.  (Ex. 1 ¶¶ 44-47, 49, 52-53, 56-58.)

**B.    Plaintiffs' Initial Complaints**

Elan and Wyeth shareholders filed lawsuits that essentially copied the SEC's allegations on December 21, 2012, and April 12, 2013, respectively.  (ECF No 1; ECF No. 1, No. 13-cv-2459.)  Counsel in those actions purported to represent persons who purchased Elan and Wyeth securities during the Selling Period and, like the SEC's action, sought disgorgement of SAC's profits and loss avoided.

---

[2]    Solely for purposes of this motion to dismiss, we accept as true the complaint's non-conclusory factual allegations.  *See E & L Consulting, Ltd.* v. *Doman Indus. Ltd.*, 472 F.3d 23, 28 (2d Cir. 2006). In ruling on this motion, the Court may refer to documents incorporated by reference in the complaint, matters of public record, and authentic documents that plaintiffs' claims are based upon, *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007), and should disregard allegations of the complaint that are inconsistent with those documents, *Press* v. *Quick & Reilly, Inc.*, 218 F.3d 121, 128-29 (2d Cir. 2000).  All of the exhibits referenced herein are matters of public record, and many are referenced in the complaint.

Plaintiffs did not allege that they traded directly with SAC or suffered any injury caused by SAC's trading.  Nor could they.  Plaintiffs were open-market traders, and any losses they suffered were caused, not by SAC's trading, but by their decisions to buy Elan and Wyeth securities and the decline in the stock prices when negative news about the bapi drug trial was announced.  Instead, plaintiffs sued under section 20A, claiming they were entitled to damages representing disgorgement of SAC's profits and avoided losses on their trades during the Selling Period.

**C.    SAC Settles The SEC Action**

On March 15, 2013, SAC reached a settlement with the SEC, in which SAC agreed to disgorge $275 million, plus $52 million in prejudgment interest, and to pay a civil penalty of $275 million, for a total of $602 million.  The settlement agreement recited that $275 million represented disgorgement of "the profits gained and losses avoided as a result of the conduct alleged in the Complaint."  (Ex. 2 at 5 ¶ 3.)  It was, as this Court noted, "disgorgement of the entire alleged illegal profits or avoided losses, together with prejudgment interest," for the conduct alleged by the SEC.  *SEC* v. *CR Intrinsic Investors, LLC*, 939 F. Supp. 2d 431, 435 (S.D.N.Y. 2013).

This Court conditionally approved the SEC settlement, pending a ruling by the Second Circuit on the appropriateness of SEC settlements including "no admit/no deny" terms. *Id.* at 444.  In granting conditional approval, the Court noted that it did not "question the adequacy of the monetary terms" of the settlement.  *Id.* at 435.

**D.    Plaintiffs Amend Their Complaints**

After the SEC settlement was announced, SAC wrote to the Court pointing out that the settlement would render plaintiffs' action moot.  (ECF No. 29.)  SAC noted that (a) the trading at issue in these shareholder actions was identical to that covered by the SEC settlement;

(b) plaintiffs' recovery is limited by statute to SAC's gains and avoided losses; and (c) this liability is further diminished, again, by statute, by the amounts of any disgorgement paid to the SEC. (*Id.*)  Accordingly, "full disgorgement to the SEC extinguishes liability in this action and renders this action moot." (*Id.*)

Plaintiffs did not dispute that their damages are limited by SAC's gains or avoided losses, or would be offset by disgorgement to the SEC. (Ex. 3.)  Instead, in an effort to distinguish their claims from the SEC action and avoid having their cases dismissed as moot, the Elan and Wyeth plaintiffs filed amended complaints on May 13, 2013 and July 15, 2013, respectively.  The new complaints not only sought disgorgement for SAC's stock sales in July 2008, but also alleged that SAC unlawfully bought Elan and Wyeth securities between July 1, 2006, and July 18, 2008—a period of two years before the Selling Period.

### E.   The U.S. Attorney's Charges Against SAC

On July 25, 2013, the United States Attorney charged CR Intrinsic and three other SAC entities (two of which are defendants in this case) with wire and securities fraud, and filed civil forfeiture proceedings, based in large part on allegations about trading in Elan and Wyeth during the Selling Period. (*See* ECF No. 1, No. 13-cr-541; ECF No. 1, No. 13-cv-5182.)  On November 4, 2013, the parties announced a resolution of those cases, in which the four SAC entities agreed to plead guilty, pay a criminal fine of $900 million, and pay forfeiture of $900 million less the amount SAC had agreed to pay to the SEC. (Ex. 5 at 2.)  Thus, in total, SAC agreed to pay approximately $1.2 billion over and above the more than $600 million that SAC already agreed to pay to the SEC.  Plaintiffs in this case have asserted that the Elan and Wyeth trading was the "central conduct charged" in the criminal case against SAC, and the "true basis" for the additional $1.2 billion payment. (Ex. 6 at 2, 3.)  On April 10, 2014, Judge Swain approved the proposed resolution and imposed the agreed sentence on the four SAC entities.

Like the SEC, the U.S. Attorney did not allege that SAC was liable for unlawful trading or disgorgement with respect to the Buying Period or for the Tysabri drop, which occurred two days after the bapi results were disclosed.  The U.S. Attorney also did not agree with the assertion by plaintiffs in this action that they were victims of the offenses charged in the indictment, explaining that "Class Counsel cannot establish that the investors they purport to represent were 'directly and proximately harmed' by the charged offenses here" and that "[a]ny proximate and direct harm to the purchasers of Elan and Wyeth securities that Class Counsel seeks to represent" resulted not from SAC's alleged actions, but from "negative drug trial results announced in July 2008 that caused the price of the securities to fall."  (Ex. 8 at 1, 2.)  At the sentencing hearing, plaintiffs chose not to pursue their application to be recognized as victims of the SAC entities, and Judge Swain took no action on their application.

### F.     Plaintiffs File Amended Consolidated Class Action Complaints

On November 26, 2013, plaintiffs filed a Joint Consolidated Class Action Complaint.  On January 7, 2014, Mr. Martoma's criminal trial began.  On February 6, 2014, the jury found Mr. Martoma guilty of two counts of securities fraud (one for insider trading in Elan stock in July 2008, and the second for insider trading in Wyeth stock in July 2008) and one count of conspiracy to commit securities fraud.[3]  Mr. Martoma was not charged with unlawful trading with respect to the Buying Period or Tysabri.

On March 7, 2014, plaintiffs filed a Joint Consolidated Amended Class Action Complaint, asserting claims under sections 10(b), 20A and 20(a) of the Exchange Act.  (ECF No. 127.)  The complaint purports to assert:  (i) Selling Claims, on behalf of traders who sold Elan

---

[3]    Mr. Martoma has moved for a judgment of acquittal or, alternatively, for a new trial.  If that motion is denied, he has stated that he plans to appeal.

and Wyeth securities from July 21 to 29, 2008; and (ii) Buying Claims, on behalf of traders who

bought Elan and Wyeth securities from July 1, 2006 to July 18, 2008.

**Argument**

**I.**     **The Selling Claims Should Be Dismissed**

    **A.**     **The SEC Settlement Extinguishes The Selling Claims**

        Congress imposed strict "[l]imitations on liability" on contemporaneous trader

actions in section 20A.  Damages may not exceed "the profit gained or loss avoided in the

transaction or transactions that are the subject of the violation." 15 U.S.C. § 78t-1(b)(1).  And

the damages imposed "shall be diminished by the amounts, if any, that such person may be

required to disgorge" to the SEC.  15 U.S.C. § 78t-1(b)(2).  As one treatise explained:  "Since all

profits will normally be disgorged in an SEC suit, the express private action may win nothing if

the SEC gets to judgment or consent decree before the private suit is completed."   *See* 3

Bromberg & Lowenfels on Sec. Fraud § 6:397 (2d ed.) (internal citation omitted).

        Plaintiffs seek damages of $268.4 million for trades during the Selling Period

(¶¶ 23, 30), which is $6.5 million less than the amount SAC has agreed to disgorge to the SEC

(¶ 28.)  Because plaintiffs' claims relating to the Selling Period seek amounts that SAC has

already agreed to disgorge to the SEC, those claims should be dismissed.  To the extent that the

SEC determines that contemporaneous traders are the proper recipients of the $275 million paid

by SAC as disgorgement, then it can create a Fair Fund for that purpose.

    **B.**     **The Elan Plaintiffs Cannot Recover Avoided Losses Attributable To The Tysabri Disclosure**

        The Elan plaintiffs claim they may recover "disgorgement" of losses SAC

allegedly avoided resulting from a drop in Elan's ADR price on August 1, 2008, more than two

trading days *after* the bapi trial results were disclosed.  (The Wyeth plaintiffs make no such

9

claim, because Wyeth had no interest in Tysabri, and its stock price did not drop on August 1.)

Because plaintiffs concede that the August 1 drop was not related to bapi, or to any MNPI SAC

allegedly had, but was driven by a negative announcement about Elan's Tysabri drug (¶¶ 25,

328-29), they may not recover those amounts.

      According to the complaint, Elan disclosed the bapi results after the market closed

on July 29, and the "overall market reaction . . . was strongly negative" as Elan's ADRs dropped

41.8% by close on July 30.  (¶¶ 21, 293-94.)  The next day, July 31, Elan's ADRs' price held

steady.  (¶¶ 294, 329.)  Then, after the market closed on July 31, Elan made the Tysabri

disclosure, and the price of Elan's ADRs declined after hours and on August 1.  (¶¶ 328-29.)

      Plaintiffs do not allege that the August 1 price drop, or any further price drop,

related to disclosure of the bapi trial results.  In fact, one section of the complaint is titled "Elan

Drops Sharply Again Based on Negative Safety News Concerning Tysabri Disclosed Two Days

After ICAD" (p. 106, section S), and explains that "Elan announced [on July 31] that it had

confirmed two cases of PML—a rare and usually fatal brain disease—in patients taking Elan's

principal commercially-marketed drug, Tysabri" and that "[t]he July 31 PML disclosure drove a

50.5% decline in the trading price of Elan ADRs in after-hours trading on July 31 and over the

course of the trading day on August 1."  (¶¶ 328-29.)  Thus, the Elan plaintiffs repeatedly admit

that it was news about Tysabri, not bapi, that "drove" the stock drop on August 1.  (¶¶ 25, 329,

516.)

      Plaintiffs were right not to allege that the August 1 stock drop was attributable to

bapi.  The SEC did not contend that the August 1 stock drop had anything to do with the MNPI

SAC allegedly had, or that loss avoided by that stock drop should be disgorged by SAC.

Similarly, when the FBI calculated SAC's allegedly avoided losses for the purpose of Mr.

Martoma's criminal trial, it noted that "[t]he loss avoidance would be much larger" if the Tysabri stock drop were included, but admitted that this would be "an inappropriate way to calculate loss avoidance." (Ex. 9.)  And in the government's summation in that trial, the prosecutor argued that the Tysabri stock drop was a "distraction" and a "mirage," because it occurred two days after the bapi stock drop (after an intervening day in which the price was essentially unchanged) and was caused by a new, wholly unrelated negative disclosure.  (Ex. 10 at 2985:21-2986:22.)

Nevertheless, the Elan plaintiffs contend that SAC is liable for the unrelated August 1 drop because, they speculate, SAC, if it had not had MNPI about bapi, "would have continued to hold" Elan ADRs after the July 29 bapi announcement and through the August 1 Tysabri stock drop.  (¶ 337.)  This speculative allegation does not work.  Plaintiffs cannot recover losses that they suffered from the Tysabri August 1 drop because they do not allege that SAC had any MNPI concerning Tysabri.  As the Supreme Court has made clear, defendants in securities fraud cases can only be liable for losses attributable to their supposed fraud, not "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of [a] lower price." *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 342-43 (2005).  This is because, as the Court explained, private securities fraud actions were intended "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id*. at 345.  And, as the Second Circuit recently held in *Central States, Southeast & Southwest Areas Pension Fund* v. *Federal Home Loan Mortgage Corp.,* 543 F. App'x 72, 76 (2d Cir. 2013) (summary order), a claim must be dismissed if it "does not plausibly allege a causal connection between the drop of the share price and the information revealed in the corrective disclosures."  *See also In re Merrill Lynch & Co.*

*Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (dismissing complaint because plaintiff failed to plead facts showing that stock price decline was caused by alleged corrective disclosure rather than other factors).

It may be that some plaintiffs chose to continue to hold ADRs after Elan disclosed the bapi results on July 29, through the Tysabri disclosure and stock drop on August 1.  And it may be that those plaintiffs suffered additional losses "based on" and "resulting from" the Tysabri disclosure.  However, because the August 1 stock drop caused by the Tysabri disclosure was not related to the fraud charged against SAC, it cannot form part of SAC's allegedly improper gain.

## II.     The Buying Claims Should Be Dismissed

### A.     The Five-Year Statutes Of Repose Bar Almost All Of The Buying Claims

Sections 10(b) and 20A have five-year statutes of repose.  Under 28 U.S.C. § 1658(b), all private securities fraud claims, including claims arising under section 10(b), expire "5 years after [the] violation."  And, under 15 U.S.C. § 78t-1(b)(4), liability under section 20A ends "5 years after the date of the last transaction that is the subject of the violation."  While both Elan and Wyeth shareholders have now asserted claims based on SAC's purchases through July 18, 2008, they only did so recently.  Elan shareholders first asserted those claims on May 13, 2013, so the only timely claims they have are for the two-month period from May 13 to July 18, 2008.  Wyeth shareholders first asserted those claims on July 15, 2013—so the only timely claims they have are for the four-day period from July 15-18, 2008.

### 1.     The Statutes Of Repose Run From Each Purchase Or Sale

Plaintiffs do not make any argument that their section 10(b) claim is timely.  They allege, however, that the Buying Claims are timely as to their section 20A claim because the "SAC Insider Trades constituted a series of related transactions . . . and the last of such

transactions occurred within five years of the date such claims were first asserted in this action."

(¶ 507.)  Plaintiffs argue that the statute of repose does not run from each violation, but runs from

"the last trade effectuating the insider trading *scheme* in which a defendant is alleged to have

engaged."  (ECF No. 112 at 6.)

   But that is not the law.  As plaintiffs apparently recognize, claims under section

10(b) become barred "5 years after [the] ***violation***."  28 U.S.C. § 1658(b) (emphasis added).  The

"violation"—which starts the statute of repose—is no later than the date of the "purchase or sale

. . . transaction."  *Arco Capital Corp. Ltd.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 544

(S.D.N.Y. 2013) (quoting *Arnold* v. *KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009)

(summary order)); *cf. McCann* v. *Hy-Vee, Inc.*, 663 F.3d 926, 930-32 (7th Cir. 2011) (Posner, J.).

   The statute of repose under section 20A is no different.  Claims under that section

become barred "5 years after the date of the last transaction that is the subject of ***the violation***."

15 U.S.C. § 78t-1(b)(4) (emphasis added).  Although plaintiffs contend that the period should

begin after the end of defendants' alleged "scheme," the statute makes no mention of a

"scheme."  *See id.*  And, under the statute, a "transaction" that gives rise to a "violation" is

plaintiffs' purchase or sale of a security.  This is confirmed by section 20A itself, which makes

defendants "liable . . . to any person who, contemporaneously with the purchase or sale of

securities [by the insider] . . . has purchased . . . or sold . . . securities of the same class."  15

U.S.C. § 78t-1(a).  In short, section 20A focuses on plaintiffs' "contemporaneous" stock

purchases or sales—that is what creates liability—not the defendants' alleged "scheme."

   This is also confirmed by the seminal case of *United States* v. *Chiarella*, where

the Second Circuit found that an insider trader could be criminally liable for seventeen separate

willful violations of the Exchange Act, even though he only traded in five stocks based on five

pieces of MNPI, because "[e]ach count of the indictment represents a confirmation slip mailed to [Chiarella] by his broker following a telephoned buy order."  588 F.2d 1358, 1364 n.6 (2d Cir. 1978), *rev'd on other grounds sub nom.*, 445 U.S. 222 (1980).  Leading treatises similarly explain that "[e]ach trade with or tip of MNPI . . . can be a separate criminal violation."  *See* 3 BROMBERG & LOWENFELS ON SEC. FRAUD § 6:370 (2d ed.); DANIEL J. FETTERMAN & MARK P. GOODMAN, DEFENDING CORPS. AND INDIVIDUALS IN GOV'T INVESTIGATIONS § 13:29 n.1 (2012) ("each separate illegal trade[] constitutes a separate 'violation'").  In short, each allegedly unlawful trade gives rise to a violation, and each violation starts the statute of repose clock running for a claim under section 20A.

Plaintiffs themselves acknowledged as much when they believed it served their advantage.  Thus, when plaintiffs filed their unsuccessful motion to be recognized as "victims" in the criminal case against CR Intrinsic, they criticized the U.S. Attorney's drafting of the indictment in that case because, they argued, it improperly "lumped hundreds of trades" together when it should have "charged each individual illegal *trade* as a separate count."  (Ex. 7 at 8-9 (emphasis in original).)  If, as plaintiffs argue, each trade is a separate violation of the statute, then the statute of repose runs from each trade.

The legislative history of section 20A also shows that Congress intended the five-year period to run from the date of the relevant purchase or sale, not from the end of an alleged "scheme."  When the bill proposing section 20A was introduced in the Senate, it stated that the period of limitations for claims under section 20A "shall be the same as that provided in section 21(d)(2)(D)" of the Exchange Act (now section 21A(d)(5)), which in turn specified a period of "5 years after the date of the purchase or sale."  S. 1380, 100th Cong. § 2 (1987), *available at* 1987 WL 957499, at *3.  The persons responsible for drafting the bill, Harvey Pitt and John

14

Olson, reported to the Securities Subcommittee of the Senate Committee on Banking, Housing and Urban Affairs that section 20A "expressly incorporates by reference the five-year limitation period set forth in [section 21(d)(2)(D)]." *Insider Trading Proscriptions Act of 1988: Hearing Before the Subcomm. on Sec. of the S. Comm. on Banking, Housing, and Urban Affairs*, 100th Cong. 40 (1987), *available at* 1987 WL 957496, at *30. The limitations period "is 5 years from the date of the purchase or sale, the same as for civil penalty actions under [section 21(d)(2)(D)]." 133 Cong. Rec. S8246 (daily ed. June 17, 1987), *available at* 1987 WL 957500, at *5 (statement of Sen. Riegle).

Finally, plaintiffs' interpretation of section 20A's statute of repose is at odds with section 804 of the Sarbanes-Oxley Act of 2002. Under section 804, *all* private actions under the securities laws that "involve[] a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than . . . 5 years after *[the] violation*." 28 U.S.C. § 1658(b)(2) (emphasis added). Thus, if—as is not the case—section 20A's statute of repose only runs from some time after the "violation" is committed, that statute is no longer the governing rule after Sarbanes-Oxley. Plaintiffs' section 20A claims would still become barred under Sarbanes-Oxley five years after the violation.[4]

---

[4] This Court has previously held that section 804 of Sarbanes-Oxley does not apply to claims under sections of the securities laws that contain express limitations and repose periods, at least where those claims do not require proof of fraudulent intent. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 414-16, 420 (S.D.N.Y. 2005). *Alstom* did not address Section 20A or any other provision of the securities laws requiring plaintiffs to establish fraudulent intent as an element of their claim. As the Court recognized in *Alstom*, that case involved claims under provisions of the securities laws (specifically, sections 11 and 12(a)(2) of the Securities Act of 1933) that do not require proof of fraud. *Id.* at 413-14. Sarbanes-Oxley is unambiguous in its application to *any* "private right of action that involves a claim of fraud . . . in contravention of . . . the securities laws." 28 U.S.C. § 1658(b).

### 2.      The Buying Claims Were Not Tolled

The complaint attempts to overcome the repose problems by alleging that the claims should be tolled because plaintiffs contend they could not have discovered the alleged fraud before November 2012.  (¶ 509.)  The Second Circuit recently rejected this argument, explaining that statutes of repose are "'absolute' and not subject to equitable tolling."  *Police & Fire Ret. Sys. of Detroit* v. *IndyMac MBS, Inc.*, 721 F.3d 95, 107 (2d Cir. 2013) (citations omitted), *cert. granted sub nom.*, 134 S. Ct. 1515 (Mar. 10, 2014).  Statutes of repose "create[ ] a *substantive* right in those protected to be free from liability after a legislatively-determined period of time."  *Id.* at 106 (citations omitted) (emphasis in original).  They "run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action."  *Id.* at 107 (citations omitted).

### 3.      The Buying Claims Do Not Relate Back To The Original Complaint

Plaintiffs also allege that the Buying Claims should relate back to December 21, 2012, when Elan shareholders first sued, because they "arise out of conduct, transactions and occurrences set forth in the original complaint filed in this action."  (¶ 508.)  This argument fails because Federal Rule of Civil Procedure 15, which provides for relation back, cannot revive claims that would otherwise be barred by a statute of repose.  In *IndyMac*, the Second Circuit considered an almost identical issue and held that Federal Rule of Civil Procedure 23 could not extend a statute of repose under the principle of *American Pipe & Construction Co.* v. *Utah*, 414 U.S. 538 (1974), because that would result in Rule 23 being applied to "abridge, enlarge or modify any substantive right"—which is forbidden by the Rules Enabling Act.  721 F.3d at 109. Rule 15 is no different and cannot be applied to extend a statute of repose either—that would also impermissibly abridge or modify defendants' substantive rights.

Further, even if Rule 15 could apply, plaintiffs' Buying Claims would relate back only if they "arose out of the conduct, transaction, or occurrence set out" in their original complaints.  They don't.  Unlike the Selling Claims, the Buying Claims are asserted on behalf of a different class, for trades during a different time period, relating to SAC's purchases not its sales, and allege that SAC had positive information about bapi not negative information.

Indeed, this Court already has found as much.  When plaintiffs amended their complaint to add the Buying Claims, they resisted sending a new notice to potential class members, arguing that the two complaints were not sufficiently different to warrant a second notice.  (ECF No. 59.)  This Court disagreed, finding that "the amended complaint goes well beyond the original complaint insofar as it's a different class of plaintiffs and a much longer period of time."  (Ex. 4 at 6.)  The Court stated:  "I do not believe that the actions are the same" (*id.*), concluding "[t]here is no debate" that the Buying Claims were "new claims" (ECF No. 60 at 3).  *See, e.g.*, *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 529 (S.D.N.Y. 2005) (dismissing claims as untimely and rejecting relation back argument because "[n]othing in the initial complaint put Defendants on notice that they would be subject to claims" based on statements and transactions made prior to those alleged in an earlier complaint); *In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F. Supp. 1352, 1365-67 (W.D.N.Y. 1996) (holding that amended complaint did not relate back where it "purports to extend the Class . . . period backward" based on alleged misstatements predating those alleged in earlier complaints).

### 4.     There Is No Timely 10(b) Predicate For The Buying Claims

Finally, section 20A claims are only viable if a plaintiff can establish a predicate violation of the Exchange Act.  *See Feiner Family Trust* v. *VBI Corp.*, 352 F. App'x 461, 464 (2d Cir. 2009) (summary order) (citing *Jackson Nat'l Life Ins. Co.* v. *Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994)).

17

Where, as here, plaintiffs' section 10(b) claims are time barred, there is no predicate for asserting section 20A claims.  *See Jackson Nat'l Life*, 32 F.3d at 703-04 (affirming dismissal of section 20A claim based on a violation of the Securities Act of 1933 because "[t]he language of [section 20A is] quite plain" that "a predicate violation of the '34 Act" is required); *see also Feiner Family Trust*, 352 F. App'x at 464 (affirming dismissal of section 20A claim because there was no sufficient primary violation of the Exchange Act).

**B.     Plaintiffs Have Not Alleged Loss Causation For The Buying Claims**

Plaintiffs' Buying Claims should also be dismissed in their entirety for failure to allege loss causation.

The PSLRA is clear:  "In *any* private action arising under this chapter"—which includes sections 10(b) and 20A—"the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4) (emphasis added); *see also Dura*, 544 U.S. at 342-43 (describing the strict loss causation requirements that section 78u-4(b)(4) imposes on private securities plaintiffs attempting to recover damages).

To show that a loss is caused by the specific risk or opportunity concealed by the defendant, a plaintiff must connect the change in stock price to a "corrective disclosure[]" that reveals it.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009).  Here, plaintiffs do not do that.  Plaintiffs concede that the non-public information Gilman allegedly passed to Martoma was "never publicly disclosed during the Class Periods," admitting that "[t]he interim safety data, and the insights Gilman provided regarding efficacy," as well as "[t]he Phase 2 bapi safety data, the PowerPoint presentations prepared for SMC meetings, and Gilman's perspective on them were never publicly disclosed during the Class Periods."  (¶¶ 136, 142.) Absent any such public disclosure, and attendant stock movement, there can be no loss

18

causation.  *See Merrill Lynch*, 568 F. Supp. 2d at 359 ("To establish loss causation, the loss must

be foreseeable and the loss must be caused by the materialization of the concealed risk.")

(quotation marks omitted).  Thus, for example, in *In re Oracle Corp. Securities Litigation*, the

court dismissed both section 10(b) and 20A claims for failure to establish loss causation, since,

"[a]s with their Section 10(b) claim, [Section 20A] Plaintiffs must prove . . . proximate cause

('loss causation')."  627 F.3d 376, 394-95 (9th Cir. 2010).

    Plaintiffs' failure to plead loss causation defeats their section 20A claims for an

additional reason.  Here, plaintiffs' claim under section 20A rests on an alleged predicate

violation of section 10(b).  It is well established, however, that a plaintiff asserting a claim under

section 10(b) must plead loss causation.  Thus, plaintiffs' failure to plead loss causation dooms

not just their section 10(b) claim, but their section 20A claim as well.  *See Collier* v. *Aksys Ltd.*,

2005 WL 1949868, at *17 (D. Conn. Aug. 15, 2005) ("[T]he Court concludes that [plaintiff]'s

Section 10(b) and Rule 10b-5 claims fail because he has not adequately pleaded loss causation,

and [plaintiff]'s Section 20(a) and Section 20A claims fail because he cannot plead a predicate

offense."), *aff'd*, 179 F. App'x 770, 771 (2d Cir. 2006) (summary order) (affirming judgment

"for the reasons stated in the well-reasoned opinion of the district court").

    Any other interpretation of section 20A would put the statute in conflict with the

"case or controversy" requirement of Article III of the United States Constitution.  It is well

settled that "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot

be removed by statute."  *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 496-97 (2009); *accord*

*Raines* v. *Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article

III's standing requirements by statutorily granting the right to sue to a plaintiff who would not

otherwise have standing.").  Article III standing further requires "a causal connection between

the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).  Where plaintiffs concede that they suffered *no* injury as a result of SAC's trading while allegedly in possession of MNPI, plaintiffs are without Article III standing to bring their Buying Claims.

As Chief Justice Roberts recently emphasized, "it is well established that if a statute has two possible meanings, one of which violates the Constitution, courts should adopt the meaning that does not do so."  *Nat'l Fed. of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2593 (2012) (Roberts, C.J., concurring).  Any reading of section 20A that would permit uninjured contemporaneous traders to bring suit would run afoul of Article III and should be rejected on that ground alone.

### C.    Plaintiffs' Buying Claims Rest on Improper Double-Counting

Plaintiffs' Buying claims also rely on improper double-counting by seeking disgorgement of the same amounts twice—first as alleged paper gains on SAC's Elan and Wyeth holdings when prices increased during the Buying Period, and then as alleged avoided losses on the very same holdings when the prices declined during the Selling Period.  This double-counting is illustrated by the specific allegations of plaintiffs' Consolidated Complaint filed May 13, 2013.  Plaintiffs alleged in that pleading that SAC's Elan sales on July 28, 2008 generated over $160 million of Buying Period profits (ECF No. 57 ¶ 265), and then alleged as well that SAC avoided losses of $154 million on the very same shares (*see id.* ¶ 267 (explaining that Selling Period gains were calculated using "trades conducted during the Insider Selling Class Period").).

While Plaintiffs have omitted this detailed explanation of their methodology for computing alleged damages in the current complaint, they still seek to have defendants disgorge the same amounts twice.  (*See* ¶¶ 512, 515.)  This is improper.  Plaintiffs may either count SAC's proceeds from a specific transaction toward its profits, or count them toward a calculation of losses avoided, but cannot do both.  *See* 15 U.S.C. 78t-1(b)(1) ("The total amount of damages imposed under subsection (a) of this section [20A] shall not exceed the profit gained *or* loss avoided in the transaction or transactions that are the subject of the violation.") (emphasis added); *SEC* v. *Contorinis*, 743 F.3d 296, 306 (2d Cir. 2014) ("[T]he amount of disgorgement a court can order from a wrongdoer . . . is set at the maximum of the total gain from the illicit action").

## III.    Plaintiffs Cannot Recover Prejudgment Interest Based on SAC's Investment Returns

Plaintiffs contend that they are entitled to prejudgment interest at a rate that is higher than the one used in the SEC settlement.  (¶¶ 518, 528-30.)  They assert that, as a result, whereas the SEC recovered $52 million in prejudgment interest for the nine-day Selling Period, that amount should have been *$296 million* for that period and *$611 million* for the entire class period.  (¶ 530.)  But plaintiffs have failed to state a plausible claim that the SEC's rate is incorrect.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 680 (2009) (a complaint should be dismissed when the allegations do not "nudge[]" the claim "across the line from conceivable to plausible").

The complaint concedes that the prejudgment rate the SEC charged—the IRS rate for tax underpayments—is "the rate routinely charged by the SEC on amounts disgorged." (¶ 518.)  Indeed, the Second Circuit explained in *SEC* v. *First Jersey Securities., Inc.* that "the IRS underpayment rate . . . reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived

from its fraud.  Accordingly, courts have approved the use of the IRS underpayment rate in connection with disgorgement."  101 F.3d 1450, 1476 (2d Cir. 1996).  We are not aware of any precedent in which the SEC has used any other prejudgment interest rate, any court has questioned the SEC's use of that rate, or any court has imposed any other rate in a section 20A case.

Plaintiffs contend that the SEC should have used an interest rate based on "the investment returns payable to SAC investors during the period that SAC has held the losses unlawfully avoided."  (¶ 528.)  There is no precedent that supports that claim.  In fact, plaintiffs' claim is simply another way of demanding the profits SAC made after the alleged inside information was disclosed, a demand courts have rejected.  For example, in *Donovan* v. *Bierwirth*, the Second Circuit noted that "profit earned subsequent to discovery of the fraud is 'purely new matter.'"  754 F.2d 1049, 1057 (2d Cir. 1985) (quoting *SEC* v. *MacDonald*, 699 F.2d 47, 54 (1st Cir. 1983) (en banc)).  Similarly, in *MacDonald*, the First Circuit observed that "[n]o case supports" holding an alleged insider trader liable for "the profits acquired by the insider's reinvestment of his wrongfully obtained profits."  699 F.2d at 54.  These rules result from "the general recognition of the unfairness to defendants of undue prolongation of the period for calculating damages."  *Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1306 n.27 (2d Cir. 1973).

Here, it makes no difference that plaintiffs characterize their claim as one for prejudgment interest rather than one for additional profit disgorgement, because they still seek what the law does not permit—profits made by SAC after the disclosure of the alleged inside information at issue.  Plaintiffs have therefore failed to show that they have a plausible claim for additional prejudgment interest.  Plaintiffs' generic assertion that a different interest rate might

have been appropriate does not pass muster, because such an assertion would allow *any* plaintiff

seeking to second-guess a determination by the SEC to withstand a motion to dismiss simply by

demanding additional prejudgment interest. *See Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544,

555 (2007) (a plaintiff must "raise a right to relief above the speculative level")

    In this case, plaintiffs' proposed interest rate is particularly unprincipled because,

unlike the IRS rate adopted by the SEC, plaintiffs' rate would vary dramatically in each case

based solely on the amount of unrelated profits that a defendant subsequently made.  A defendant

who made no profits would be liable for no interest, a defendant who made significant profits

would be liable for a high rate of interest, and a defendant who made unrelated losses would

receive a *credit* for interest.  Indeed, in this case, plaintiffs' unprecedented approach would mean

that SAC should receive a prejudgment interest credit of 27.5% in 2008 because of the net

investment losses that it suffered that year.  (¶ 521.)

    Finally, plaintiffs' claim for prejudgment interest also fails because it relies, as

plaintiffs admit, on alleged "'considerations of fairness and the relative equities of the award'

and 'the remedial purpose of the statute involved.'" (Ex. 3 at 3 (citations omitted).)  But those

considerations were already addressed in the numerous decisions in which courts approved the

rate adopted by the SEC; they provide no plausible basis for departing from that rate.  They

certainly provide no basis for departing from the SEC's rate here, where SAC has already paid

several times over for the alleged gains.  SAC agreed to pay to the SEC disgorgement of $275

million and prejudgment interest of $52 million, and also a separate penalty of $275 million, for

a total settlement of $602 million.  SAC then agreed to pay to the USAO a separate criminal fine

of $900 million and additional civil forfeiture of approximately $300 million, based in large part

on the same trading.  *See supra* at 7-8.  In total, SAC has already agreed to pay approximately

$1.8 billion—far in excess of what plaintiffs have alleged SAC's total gains (including prejudgment interest) to be.  (¶ 530.)  In these circumstances, plaintiffs can hardly contend that the payment of yet further amounts—as a windfall gain to plaintiffs who were not injured by SAC—is necessary to promote fairness, equity, or the Exchange Act's remedial purpose.

**IV.      The Complaint Should Be Dismissed For Failure To Allege Reliance**

Claims under section 10(b)—the necessary predicate for a contemporaneous trader 20A action—require plaintiffs to plead and prove reliance.  *See Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 159 (2008) ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.").  The complaint, however, does not allege "eyeball reliance"—*i.e.*, that plaintiffs actually read and relied upon any statement or act by defendants when trading.  The complaint charges, instead, that plaintiffs are relying, in part, on the fraud on the market presumption of reliance from *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988).  (¶¶ 541, 550.)  The Supreme Court, however, is considering whether that judicially-created presumption remains viable.  *See Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 636 (Nov. 15, 2013) (granting certiorari for petition seeking to "overrule or substantially modify" fraud-on-the-market theory).

Plaintiffs also rely on a second judicially-created presumption of reliance on certain material omissions from *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972).  (¶¶ 543, 552.)  The viability of that presumption also is questionable in light of *Halliburton*.  *See, e.g.*, *Basic*, 485 U.S. at 243-45 (relying, in part, on *Affiliated Ute* as a basis for fraud-on-the-market presumption).  Further, even if the *Affiliated Ute* presumption is viable, it requires plaintiffs to show that defendants failed to disclose information they had a duty to disclose.  *See Affiliated Ute*, 406 U.S. at 153 (applying presumption only because defendants had an "affirmative duty" to disclose).  Neither Gilman nor any other defendant is alleged to have

had a duty to disclose non-public information about bapi to the market.  And, in any event, while plaintiffs allege that Gilman owed Elan a duty of confidence (¶ 111), they do not allege that he owed a similar duty to Wyeth.  Accordingly, Wyeth shareholders cannot make an omission claim.

**V.     The Complaint Does Not State A Claim Under Section 20(a)**

Plaintiffs assert a claim against certain so-called "Control Defendants" for "control-person" liability under section 20(a) of the Exchange Act.  (¶¶ 57, 583-89.)  To state a claim under section 20(a), a plaintiff must first adequately allege a predicate violation of the Exchange Act.  15 U.S.C. § 78t(a); *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Because plaintiffs fail to adequately plead such a violation, their control-person claim also must be dismissed.  *Id.*

## Conclusion

For the foregoing reasons, plaintiffs' claims should be dismissed in full and with prejudice.

25

Dated:   New York, New York
        April 28, 2014


PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By:_____
        Daniel J. Kramer
        Michael E. Gertzman
        Audra J. Soloway
        Jonathan H. Hurwitz

1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
dkramer@paulweiss.com
mgertzman@paulweiss.com
asoloway@paulweiss.com
jhurwitz@paulweiss.com

WILLKIE FARR & GALLAGHER LLP

By:_____
        Martin B. Klotz
        Michael S. Schachter
        Sameer Advani

787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8102
mklotz@willkie.com
mschachter@willkie.com
sadvani@willkie.com

*Attorneys for Defendants S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC, S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, S.A.C. Select Fund, LLC and Steven A. Cohen*

.

26