UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| DAVID E. KAPLAN, et al., Individually and on Behalf of All Others Similarly Situated, | : |
|  | : |
| Plaintiffs, | : |
|  | : |
| - against - | : |
|  | : |
| S.A.C. CAPITAL ADVISORS, L.P., et al., | : |
|  | : |
| Defendants. | : |

No. 12 Civ. 9350 (VM) (KNF)

ECF CASE

ORAL ARGUMENT REQUESTED

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, et al., Individually and on Behalf of All Others Similarly Situated, | : |
|  | : |
| Plaintiffs, | : |
|  | : |
| - against - | : |
|  | : |
| S.A.C. CAPITAL ADVISORS, L.P., et al., | : |
|  | : |
| Defendants. | : |

No. 13 Civ. 2459 (VM) (KNF)

ECF CASE

ORAL ARGUMENT REQUESTED

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Telephone: (212) 223-6444

**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
Telephone: (843) 216-9000

*Co-Lead Counsel for the* Birmingham *Plaintiffs and the Wyeth Investor Class*

**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000

**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

*Co-Lead Counsel for the* Kaplan *Plaintiffs and the Elan Investor Class*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ iii

CITATION CONVENTIONS AND DEFINITIONS ................................................. vii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 4

A.      Overview of Defendants' Two-Year Insider Trading Conspiracy in Elan and Wyeth Shares .................................................................................................... 4

B.      SAC's Owner, Cohen, Was Intimately Involved in the Trades at Issue and Received Overtly Inside Information from Martoma and Others ........................ 6

ARGUMENT ............................................................................................................... 8

I.      THE INSIDER SELLING CLAIMS ARE NOT SUBJECT TO DISMISSAL .................. 8

     A.      The SEC Settlement Acts Only as a Set-Off and Does Not "Extinguish" Plaintiffs' Claims ............................................................................................ 8

     B.      The Tysabri Disclosure Occurred Within a "Reasonable Time" After Disclosure of the Inside Information, and the Losses SAC Avoided Are Therefore Subject to Disgorgement .................................................................. 8

          1.      Disgorgement Extends to All Profits Obtained and Losses Avoided from the Illegal Trades and Is Not Limited to Gains Reflecting the Value of the Inside Information ................................................................ 9

          2.      Disgorgement Seeks to Ensure Wrongdoers Do Not Profit and Any Uncertainty in Calculating Disgorgement Falls on the Wrongdoer .......... 11

          3.      A "Reasonable Time" Is Measured by How Long a Reasonable Investor Would Need to Receive, Digest and Act on the News ................ 11

          4.      Determination of a "Reasonable Time" Is an Inherently Factual Inquiry, and the Complaint Provides Ample Basis to Conclude that a Reasonable Time Had Not Elapsed Before the Tysabri Disclosure .................................................................................................. 13

II.      THE INSIDER BUYING CLAIMS ARE NOT SUBJECT TO DISMISSAL .................. 15

     A.      Section 20A's Five-Year Statute of Limitations Runs from the Last Insider Trade and All Claims Were Therefore Timely Pled ............................................ 15

          1.      The Text of Section 20A(b)(4) Is Incompatible with Defendants' Reading ...................................................................................................... 15

          2.      Defendants Cite Legislative History for the Wrong Law ......................... 16

       3.      Sarbanes-Oxley Section 804 Did Not Repeal Section 20A(b)(4)..............17

       4.      The Shorter Limitations Periods for Predicate Violations Do Not Override Section 20A(b)(4) ........................................................................18

       5.      Section 20A(b)(4) Is a Statute of Limitations, Not Repose, and the Discovery Rule Would Make Plaintiffs' Claims Timely, Were There a Need to Invoke It ..........................................................................18

   B.     Loss Causation Is Adequately Pled.........................................................................19

   C.     Buying a Share on Positive Inside Information and Later Selling the Same Share on Negative Inside Information Are Separate Acts that Give Rise to Separate Claims by Different Investors for Distinct Relief ................................19

III.    THE PREJUDGMENT INTEREST RATE IMPOSED SHOULD REFLECT SAC'S MARKET-TESTED COST OF CAPITAL...........................................................20

   A.     The Purpose of Prejudgment Interest in a Disgorgement Case Is to Prevent the Defendant from Benefitting from the Time-Value of Unlawful Gains ...........20

   B.     The SEC's Choice of Rate Does Not Govern in this Private Action.....................21

   C.     Setting a Prejudgment Interest Rate Lower than SAC's Market-Tested Cost of Capital Would Not Accomplish Full Disgorgement.................................23

   D.     The Equities and Public Policy Support the Rate Plaintiffs Seek..........................24

IV.    THE COMPLAINT PLEADS RELIANCE...................................................................25

V.    THE COMPLAINT STATES A CONTROL PERSON CLAIM.....................................25

CONCLUSION............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972)..................................................................................................3, 10, 25

*In re Alstom SA Sec. Litig.,*
406 F. Supp. 2d 402 (S.D.N.Y. 2005)..................................................................................18

*CFTC v. British Am. Commodity Options Corp.,*
788 F.2d 92 (2d Cir. 1986)..................................................................................................11

*Cruz-Miguel v. Holder,*
650 F.3d 189 (2d Cir. 2011)................................................................................................17

*de Kwiatkowski v. Bear, Stearns & Co.,*
No. 96 Civ. 4798 (VM), 2000 WL 729118 (S.D.N.Y. June 6, 2000)....................................21

*Dura Pharms., Inc.* v. *Broudo,*
544 U.S. 336 (2005).............................................................................................................8

*Dura-Wood Treating Co. v. Century Forest Indus., Inc.,*
675 F.2d 745 (5th Cir. 1982) ..............................................................................................14

*Elkind v. Liggett & Myers, Inc.,*
635 F.2d 156 (2d Cir. 1980)..........................................................................1, 2, 9, 11, 12, 13

*Gerstle v. Gamble-Skogmo, Inc.,*
478 F.2d 1281 (2d Cir. 1973)..............................................................................................12

*Janigan v. Taylor,*
344 F.2d 781 (1st Cir. 1965).............................................................................................9, 10

*Johnson v. Aljian,*
490 F.3d 778 (9th Cir. 2007) ..............................................................................................18

*Jones v. UNUM Life Ins. Co. of Am.,*
223 F.3d 130 (2d Cir. 2000)................................................................................................21

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
501 U.S. 350 (1991).............................................................................................................18

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,*
734 F. Supp. 1071 (S.D.N.Y. 1990)......................................................................................8

*In re Livent, Inc. Noteholders Sec. Litig.,*
360 F. Supp. 2d 568 (S.D.N.Y. 2005).............................................................................21, 22

*McGhee v. Joutras*,
No. 94-C-7052, 1995 WL 124131 (N.D. Ill. Mar. 20, 1995) .................................................13

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)............................................................................................................19

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ..............................................................................12, 13

*Morton v. Mancari*,
417 U.S. 535 (1974).............................................................................................................18

*Randall v. Loftsgaarden*,
478 U.S. 647 (1986)..............................................................................................................10

*Schultz v. CFTC*,
716 F.2d 136 (2d Cir. 1983)..................................................................................................12

*SEC v. Contorinis*,
743 F.3d 296 (2d Cir. 2014).......................................................................................10, 11, 20

*SEC v. First Jersey Secs., Inc.*,
101 F.3d 1450 (2d Cir. 1996)............................................................................................11, 21

*SEC v. Ingoldsby*,
No. 88-1001-MA, 1990 WL 120731 (D. Mass. May 15, 1990) ...........................................13

*SEC v. Inorganic Recycling Corp.*,
No. 99 Civ. 10159, 2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002) .......................................11

*SEC v. MacDonald*,
568 F. Supp. 111 (D.R.I. 1983), *aff'd*, 725 F.2d 9 (1st Cir. 1984) .........................................13

*SEC v. MacDonald*,
699 F.2d 47 (1st Cir. 1983) (en banc).............................................................................12, 13

*SEC v. Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972)................................................................................................22

*SEC v. Milligan*,
436 F. App'x 1 (2d Cir. 2011) ..........................................................................................21, 25

*SEC v. Musella*,
748 F. Supp. 1028 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990)..............................22

*SEC v. Rajaratnam*,
822 F. Supp. 2d 432 (S.D.N.Y. 2011)...................................................................................24

*SEC v. Shapiro*,
    494 F.2d 1301 (2d Cir. 1974)......................................................................11, 12, 20

*SEC v. Tome*,
    833 F.2d 1086 (2d Cir. 1987).......................................................................................11

*SEC v. Universal Express, Inc.*,
    646 F. Supp. 2d 552 (S.D.N.Y. 2009), *aff'd*, 438 F. App'x 23 (2d Cir. 2011)......................20

*SEC v. World Info. Tech., Inc.*,
    590 F. Supp. 2d 574 (S.D.N.Y. 2008)..........................................................................21

*SEC v. Wyly*,
    860 F. Supp. 2d 275 (S.D.N.Y. 2012)..........................................................................20

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    495 F.2d 228 (2d Cir. 1974)....................................................................................4, 25

*Short v. Belleville Shoe Mfg. Co.*,
    908 F.2d 1385 (7th Cir. 1990) ............................................................................12, 18, 19

*United States v. Wyly*,
    193 F.3d 289 (5th Cir. 1999) ......................................................................................24

**FEDERAL STATUTES AND RULES**

17 C.F.R. § 201.600(b) ................................................................................................22

28 U.S.C. § 1658(b) ...............................................................................................17, 18

Fed. R. Civ. P. 12(b)(6)...........................................................................................2, 13

Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. No. 100-704 ...............17

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68...............................8

Sarbanes-Oxley Act of 2002, Section 804, Pub. L. No. 107-204 ...........................................17, 18

Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j(b)...........................1, 8, 15, 21

Securities Exchange Act of 1934, Section 20(a), 15 U.S.C. § 78t(a) ......................................3, 25

Securities Exchange Act of 1934, Section 20A,
    15 U.S.C. § 78t-1 ...............................................1, 2, 9, 12, 15, 16, 17, 18, 20, 21

Securities Exchange Act of 1934, Section 20A(a), 15 U.S.C. § 78t-1(a)....................................15

Securities Exchange Act of 1934, Section 20A(b)(1), 15 U.S.C. § 78t-1(b)(1) .............1, 9, 15, 16

Securities Exchange Act of 1934, Section 20A(b)(2), 15 U.S.C. § 78t-1(b)(2) ............8, 16, 22, 24

Securities Exchange Act of 1934, Section 20A(b)(4),
    15 U.S.C. § 78t-1(b)(4) ...........................................................................2, 15, 16, 17, 18, 19

Securities Exchange Act of 1934, Section 21A, 15 U.S.C. § 78u-1 .............................................17

**LEGISLATIVE HISTORY**

Memorandum from SEC Office of the General Counsel to
    Chairman John S.R. Shad (Apr. 12, 1983), *available at* www.sechistorical.org ....................22

*Insider Trading Proscriptions Act of 1987: Hearing Before the S. Subcomm. on Secs.*,
    100th Cong. (1987), *available at* 1987 WL 957496 .................................................................17

S. 1380, 100th Cong. § 2 (1987), *available at* 1987 WL 957499 ...................................................17

133 Cong. Rec. S8246 (daily ed. June 17, 1987), *available at* 1987 WL 957500 .......................17

H.R. Rep. No. 100-910 (1988), *available at* 1988 WL 1096434 ...................................................22

*Insider Trading: Hearing Before the H. Subcomm. on Telecomms. and Fin.*, 100th Cong.
    (1988), *available at* 1988 WL 1096435 .....................................................................................9

**OTHER AUTHORITIES**

Brief for the United States as Amicus Curiae Supporting Neither Party, *Credit Suisse
    Securities (USA) LLC v. Simmonds*, No. 10-1261, 2011 WL 3780721 ...................................19

Robert B. Thompson, *The Measure of Recovery Under Rule 10b-5: A Restitution
    Alternative to Tort Damages*, 37 VAND. L. REV. 349 (1984) ...................................................10

William K. S. Wang & Marc I. Steinberg, *Insider Trading* (3d ed. 2010) ..............................12, 13

## CITATION CONVENTIONS AND DEFINITIONS

Citation Conventions

Citations in the form "¶ __ (p. __)" are to the Joint Consolidated Amended Class Action Complaint.

References to a "Section" are to a section of the Exchange Act, unless otherwise noted.

References to a "Rule" are to the applicable Federal Rule of Civil Procedure.

Definitions

| | |
|---|---|
| bapi | Bapineuzumab, also known by the designation AAB-001, an Alzheimer's disease drug under joint development by Elan and Wyeth |
| Cohen | Defendant Steven A. Cohen |
| Complaint | Joint Consolidated Amended Class Action Complaint [ECF No. 127], as amended by Plaintiffs' proposed loss causation amendments (Wohl Decl. Ex. A) |
| Defendants | S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC, S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, S.A.C. Select Fund, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman |
| Elan | Elan Corporation, plc; Elan American Depositary Receipts are referred to as "shares" |
| Elan Class Period | August 23, 2006 to July 29, 2008 at 4:00 pm EDT |
| Exchange Act | Securities Exchange Act of 1934 |
| Gilman | Defendant Sidney Gilman |
| Hurwitz Decl. | Declaration of Jonathan H. Hurwitz in Support of SAC's Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, dated April 28, 2014 [ECF No. 131] |
| ICAD | International Conference on Alzheimer's Disease medical conference held July 29, 2008 |
| Insider Buying Claims | Claims asserted with respect to Defendants' trades during the Insider Buying Period |

| | |
|---|---|
| Insider Buying Period | August 23, 2006 to July 18, 2008 for the Elan investor class and January 14, 2008 to July 18, 2008 for the Wyeth investor class |
| Insider Selling Claims | Claims asserted with respect to Defendants' trades during the Insider Selling Period |
| Insider Selling Period | July 21, 2008 to July 29, 2008 at 4:00 pm EDT |
| ITSFEA | Insider Trading and Securities Fraud Enforcement Act of 1988 |
| Martin | Kelly Martin |
| Martoma | Defendant Mathew Martoma |
| Plaintiffs | David E. Kaplan, Michael S. Allen, Chi-Pin Hsu, Gary W. Muensterman, Fred M. Ross, City of Birmingham Retirement and Relief System, and KBC Asset Management NV |
| RICO | Racketeer Influenced and Corrupt Organizations Act |
| Ross | Dr. Joel Ross |
| SAC | Defendant S.A.C. Capital Advisors, L.P. together with its affiliates |
| SAC Defendants | S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC, S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, S.A.C. Select Fund, LLC, Steven A. Cohen, and Mathew Martoma |
| SAC Mem. | SAC's Memorandum of Law in Support of Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, filed April 28, 2014 [ECF No. 130] |
| SEC | United States Securities and Exchange Commission |
| SOX | Sarbanes-Oxley Act of 2002 |
| Wohl Decl. | Declaration of Ethan D. Wohl in Opposition to Defendants' Motions to Dismiss the Joint Consolidated Amended Class Action Complaint, dated June 9, 2014 |
| Wyeth Class Period | January 14, 2008 to July 29, 2008 at 4:00 pm EDT |

Lead Plaintiffs in Case No. 12 Civ. 9350, David E. Kaplan, Michael S. Allen, Chi-Pin Hsu, Gary W. Muensterman and Fred M. Ross, and Lead Plaintiffs in Case No. 13 Civ. 2459, City of Birmingham Retirement and Relief System and KBC Asset Management NV, respectfully submit this memorandum of law in opposition to Defendants' motions to dismiss the Joint Consolidated Amended Class Action Complaint [ECF No. 127].[1]

## <u>INTRODUCTION</u>

This case concerns the most profitable insider trading scheme ever uncovered, one for which the tippers have confessed, the direct tippee at SAC has been convicted, and four SAC entities have agreed to pay substantial criminal fines.

Defendants' arguments are limited to the issues of causation, damages and a statute of limitations defense, and each argument either ignores or contradicts controlling Second Circuit decisions and the plain language of Section 20A.  Defendants never even mention the leading Second Circuit case addressing insider trading class action damages, *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir. 1980), which remains the controlling decision for Plaintiffs' Section 10(b) claims and was the source of the disgorgement cap later enacted in Section 20A(b)(1).

In Point I, Defendants argue that they do not have to disgorge the losses SAC avoided when Elan announced negative news regarding the drug Tysabri because "the Tysabri drop had nothing to do with the fraud alleged in the complaint."  SAC Mem. at 3.  But that is irrelevant to calculating disgorgement under Sections 20A and 10(b).  As *Elkind* stated, "a tippee who trades is liable for the entire difference between the price at which he sold and the price the stock reached after the tip became known" and "[b]y trading on tipped information, the tippee takes the

---

[1]     This brief addresses the arguments set forth in SAC's Memorandum of Law in Support of Motion to Dismiss the Joint Consolidated Amended Class Action Complaint [ECF No. 130].  The arguments contained in Defendant Sidney Gilman's Joinder [ECF No. 132] are addressed in Plaintiffs' separate response thereto.

risk that by the time the tip is disclosed the market price may reflect disclosure of information more adverse than the tip and other adverse market conditions."  635 F.2d at 173 n. 29.

*Elkind*'s holding accords with a long line of earlier disgorgement cases and it would be a basic analytical error to engraft tort-based loss causation principles, which focus on the *plaintiff's loss*, onto the law of restitution and unjust enrichment, which focuses on the *defendant's gain*. Point I.B.1 below (at 9).

Under *Elkind*, all gains up to a "reasonable time" after inside information is disclosed must be disgorged, and the relevant question is therefore whether this period had elapsed by the time of the Tysabri disclosure, two days after the bapi clinical trial results were announced. Under the relevant case law, a "reasonable time" is the period investors reasonably took to receive, digest, and act on the information disclosed.  Here, a "reasonable time" had not elapsed, and in any event that is not a proper issue for a Rule 12(b)(6) motion.  Point I.B.3 below (at 11).

In Point II.A, Defendants claim that certain of the Insider Buying Claims are time-barred. This requires accepting their assertion that the phrase "last transaction that is the subject of the violation" in Section 20A(b)(4) refers to the *plaintiff's* "transaction" and that each of the defendant's trades is a separate "violation" of Section 20A – interpretations that conflict with the statute's plain language and would make its disgorgement cap and SEC setoff provisions incoherent.  Defendants also misleadingly cite the legislative history for a different law, and incorrectly assume that Section 20A's time-bar is a statute of repose.  Point II.A below (at 15).

In Point II.C, Defendants contend that the Insider Buying Claims constitute "impermissible double-counting" because they, in some cases, involve the same shares that SAC later sold using inside information.  But the wrongful conduct at issue, the plaintiffs entitled to relief, and the gains themselves are all wholly separate.  Point II.C below (at 19).

In Point III, Defendants argue that the SEC's prejudgment interest rate should apply. Defendants' argument ignores controlling case law, which recognizes that in a disgorgement case, prejudgment interest seeks to deprive wrongdoers of the time-value of their unlawful gains. The rate used in SAC's settlement with the SEC is not binding on Plaintiffs, does not purport to consider the facts at bar, is not the only rate the SEC has used, and is also not the rate ordinarily used in private Exchange Act cases.  Points III.A and III.B below (at 20, 21).

Defendants also misstate the purpose and effect of Plaintiffs' proposed rate when they describe it as seeking "to capture the profit allegedly earned from the proceeds of the fraud" – in fact, Plaintiffs' measure leaves SAC with every dollar of profit it would have generated had it raised the disgorged funds lawfully.  Point III.C below (at 23).

In Point IV, Defendants contest reliance.  This ignores the applicability of *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and is premature.  Point IV below (at 25).

In Point V, Defendants assert that there is no predicate violation for Plaintiffs' Section 20(a) claims.  This argument fails given the arguments above.  Point V below (at 25).

In addition to these legal arguments, Defendants reach far beyond the four corners of the Complaint, citing double-hearsay from FBI agents and offering speculation about litigation decisions made by federal prosecutors and the SEC.  These points seek to obscure the facts: that in executing the most profitable insider trades ever revealed, SAC employees gathered inside information from multiple sources obtained through organized efforts and repeatedly supplied that information to SAC's owner, Cohen, who personally directed many of SAC's illegal trades.

As their lead argument, Defendants ask this Court to adopt their view of what the law should be, contending that dismissal is warranted because "contemporaneous traders are not harmed by insider trading."  SAC Mem. at 1-2.  But, Defendants do not mention that the Second

Circuit rejected this causation argument *forty years ago* in *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974).  As the Second Circuit explained in *Shapiro*, "it would make a mockery of the 'disclose or abstain' rule" to deny a claim to open-market traders, *id.* at 236, and would also "frustrate a major purpose of the antifraud provisions of the securities laws: to insure the integrity and efficiency of the securities markets."  *Id.* at 237.

Defendants' contention that their violations have no victims is thus wrong as a matter of law.  Their parsing of causation also misses the point.  Insider trading is wrong because it constitutes a breach of trust and at its worst, as here, involves organized theft and outright bribery.  Cohen and SAC's other managers may well justify their conduct to themselves based on the view they espouse in their brief – that theirs was a victimless crime – but this is a view at odds with both settled law and basic fairness, and is one this Court should repudiate.

## STATEMENT OF FACTS

### A.   Overview of Defendants' Two-Year Insider Trading Conspiracy in Elan and Wyeth Shares

The insider trading in Elan and Wyeth spanned nearly two years, from August 2006 through July 2008, and was based on inside information concerning the Phase 2 clinical trial of bapi, a potential Alzheimer's disease treatment.  ¶ 5 (p. 3).  Martoma, an SAC portfolio manager, obtained the inside information from two doctors involved in the bapi clinical trial: Sidney Gilman, the chair of the Safety Monitoring Committee that oversaw the clinical trial, and Joel Ross, a doctor who served as principal investigator at one of the treatment sites.  *Id.*

Martoma's access to Gilman and Ross was part of a concerted effort by him to reach insiders that included outreach to over 20 doctors involved in the trial.  ¶¶ 116-22 (pp. 39-40).

Martoma consulted with Gilman and Ross over 40 times between August 2006 and July 2008, and during this period, SAC accumulated positions in Elan and Wyeth worth over $1.3

*billion* based on the positive inside information Gilman and Ross provided – SAC's largest position by far.  ¶¶ 131, 254, 266 (pp. 42, 86, 90).  During the Elan and Wyeth Class Periods, bapi was a principal driver of Elan and Wyeth share prices.  ¶¶ 81-98 (pp. 23-34).

On July 17, 2008, however, Gilman obtained and shared with Martoma the full, highly confidential bapi phase 2 trial results.  After studying the results for three days and extensively questioning Gilman, Martoma determined they were below market expectations and would drive a selloff.  After speaking with Cohen, Cohen and Martoma directed that SAC liquidate its entire position in Elan and Wyeth (except for certain swaps that could not be quickly or quietly unwound) and they then massively shorted both stocks, selling over $995 million in shares in the seven trading days before the Phase 2 results were scheduled to be announced, at 5:00 pm EDT on July 29, 2008, at the ICAD conference.  ¶¶ 16-17 (p. 7).  SAC realized profits and avoided losses by buying, and later selling, on inside information as follows (¶ 530 (p. 158)):

| ELAN INVESTOR CLASS | | | | |
| --- | --- | --- | --- | --- |
| Source of Gain | Principal | Interest | SEC Offset | Total Net of Offset |
| Insider Buying Period Profits | $158,346,018 | $174,372,828 | | $332,718,846 |
| July 29 Announcement | $212,330,997 | $233,821,835 | ($259,663,457) | $186,489,375 |
| July 31 Tysabri Disclosure | $106,869,730 | $117,686,427 | | $224,556,157 |
| Total | $477,546,745 | $525,881,090 | ($259,663,457) | $743,764,378 |

| WYETH INVESTOR CLASS | | | | |
| --- | --- | --- | --- | --- |
| Source of Gain | Principal | Interest | SEC Offset | Total Net of Offset |
| Insider Buying Period Profits | $21,458,705 | $23,630,623 | | $45,089,328 |
| July 29 Announcement | $56,096,029 | $61,773,724 | ($67,111,465) | $50,758,288 |
| Total | $77,554,734 | $85,404,347 | ($67,111,465) | $95,847,616 |

In March 2013, SAC settled with the SEC, agreeing to pay $275 million in disgorgement, $51.8 million in interest, and a 1x civil penalty for the Elan and Wyeth trades.  ¶ 28 (pp. 9-10).

In November 2013, four SAC entities pled guilty to wire and securities fraud and settled civil forfeiture claims, paying $1.184 billion in fines and civil forfeiture based on the trading in Elan, Wyeth, and the securities of twenty other companies.  ¶ 32 (p. 11); Wohl Decl. Ex. B.

In February 2014, a jury convicted Martoma of securities fraud and conspiracy to commit securities fraud in connection with his insider trading in Elan and Wyeth.  ¶ 4 (p. 3).

**B.      SAC's Owner, Cohen, Was Intimately Involved in the Trades at Issue
         and Received Overtly Inside Information from Martoma and Others**

SAC's owner, Cohen, repeatedly received overtly inside information regarding bapi from Martoma and others, and personally directed many of SAC's Elan and Wyeth trades.

A May 2007 email from Martoma to Cohen described Elan and Wyeth's then-nonpublic decision to initiate a Phase 3 trial for bapi as an event certain to occur.  When later announced, the news drove share price increases of 12.6% for Elan and 3.6% for Wyeth.  ¶¶ 176-77 (p. 60).

In October 2007, Martoma predicted to Cohen that the bapi Phase 3 trial would be the "most comprehensive" Alzheimer's program ever, before that was made public.  ¶ 178 (p. 61).

In June 2008, before the "top line" trial results were announced, Martoma assured Cohen:

> Shorts are suggesting that ELN did not present data at the conference b/c it's not good, and they need more time to "dredge" the data to find something positive to say. This is not the case. The database was only recently locked and we are still in the normal time frame for analyzing/checking topline analysis.

Neither the status of the data nor timing of its analysis was public, and Martoma was able to report this information only because he had obtained it from Gilman.  ¶¶ 179-80 (p. 61).

After top line results were publicly announced on June 17, Martoma assured Cohen that the actual results of the trial would be materially different and better.  ¶¶ 181-83 (pp. 61-62).

Cohen accepted Martoma's assessments over the opposition of two other portfolio managers at SAC who urgently challenged Martoma's views about bapi.  ¶¶ 184-96 (pp. 62-66). Among the evidence they presented to Cohen were the negative views of a third doctor who had seen confidential Phase 2 interim data because he was participating in the Phase 3 trial.  ¶ 232 (p. 78).  Presented with a report of what was, on its face, illegal inside information, Cohen raised no concern about its legality; he simply asked a follow-up question.  ¶ 234 (p. 79).

In contrast to the detailed assessments of other issues concerning Elan and Wyeth that Martoma provided in writing to Cohen, Martoma never offered any written explanation of his views on bapi's prospects.  ¶¶ 226-31 (pp. 74-78).  Instead, Martoma repeatedly addressed others' written comments by suggesting he and Cohen speak by phone.  ¶ 230 (pp. 76-77).

Cohen also scheduled a dinner with Elan's CEO, Kelly Martin and Martoma on June 4, 2008, less than two weeks before Elan and Wyeth released the "top line" Phase 2 trial results on June 17.  Before the dinner, Martoma sent Cohen a list of questions for Martin overtly designed to elicit responses helpful to predicting the outcome of the Phase 2 trial.  ¶¶ 236-38 (pp. 80-81).

Cohen and Martoma remained bullish on bapi through the week of July 14-18, 2008, buying more than $40 million in Elan and Wyeth stock just that week.  ¶ 241 (p. 81).

On Sunday, July 20, however, after Martoma returned from his trip to Michigan to meet with Gilman to review the full trial results with him, Martoma emailed Cohen "[i]s there a good time to catch up with you this morning?  It's important."  Cohen replied a short time later and they then spoke for approximately 20 minutes.  ¶¶ 249-50, 253 (pp. 84-86).

The next day, Cohen and Martoma directed SAC's head trader to start selling Elan and Wyeth, but to do so in a way that others at SAC could not see the trades.  This request was highly unusual, and it took SAC's operations team most of the day to set up special accounts.  ¶ 271 (pp. 90-91).  Over the next six trading days, Cohen and Martoma spoke numerous times and Cohen directly supervised the traders selling Elan and Wyeth.  ¶¶ 274-78 (pp. 92-93).

The extraordinary secrecy that Cohen directed continued even after SAC had sold out of its Elan position.  On Sunday, July 27, Cohen emailed his personal healthcare sector research analyst, Edmund Debler, "Between u and me and u can't mention to anyone- i am completely out of eln-."  ¶¶ 19, 284 (pp. 7-8, 95).  Chandler Bocklage, Cohen's self-described "right-hand man"

testified that he found out about the Elan and Wyeth sales in Cohen's trading account only after the fact, the only time that happened in his 12 years at SAC.  ¶ 287 (p. 95).

## ARGUMENT

**I.     THE INSIDER SELLING CLAIMS ARE NOT SUBJECT TO DISMISSAL**

### A.     The SEC Settlement Acts Only as a Set-Off and Does Not "Extinguish" Plaintiffs' Claims

Defendants contend that SAC's payment of the disgorgement gains calculated by the SEC "extinguishes" Plaintiffs' Insider Selling Claims.  SAC Mem. at 9.  As Section 20A(b)(2) makes clear, however, the only effect of SEC disgorgement on a private claim is to provide a set-off.[2]  In addition to disgorgement of the avoided Tysabri losses, Plaintiffs are entitled to prejudgment interest on all losses avoided, and the Insider Selling Claims are also predicate acts for RICO.  SAC's right to a setoff therefore does not warrant dismissal under any analysis.

### B.     The Tysabri Disclosure Occurred Within a "Reasonable Time" After Disclosure of the Inside Information, and the Losses SAC Avoided Are Therefore Subject to Disgorgement

Defendants contend they are not required to disgorge the losses SAC avoided when Elan announced negative news regarding the drug Tysabri two days after ICAD, arguing that "because the August 1 stock drop caused by the Tysabri disclosure was not related to the fraud charged against SAC, it cannot form part of SAC's allegedly improper gain."  SAC Mem. at 11-12.

Defendants' argument states the rule applicable to the *out-of-pocket* measure of damages, *see Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336 (2005); that rule is inapplicable, however, to the *disgorgement* measure of damages that governs here.

---

[2]     This codified the prior law under Section 10(b), which likewise held that a private plaintiff "may attempt to prove the insufficiency of the SEC settlement and recover any difference between actual profits and the amount disgorged to the SEC."  *Litton Indus., Inc.* v. *Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990) (citation omitted).

1.      **Disgorgement Extends to All Profits Obtained and Losses
Avoided from the Illegal Trades and Is Not Limited to
Gains Reflecting the Value of the Inside Information**

The disgorgement measure of damages was adopted for securities class actions seeking

damages for insider trading by *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 171 (2d Cir. 1980).

Section 20A's legislative history, in turn, explicitly cites *Elkind* as the basis for the disgorgement

measure it adopted.  *Insider Trading: Hearing Before the H. Subcomm. on Telecomms. and Fin.*,

100th Cong. (1988), *available at* 1988 WL 1096435, at *21.[3]

In *Elkind*, the Court explicitly rejected the causation argument Defendants make here.

There, the defendant argued that the tippees should be charged with only the avoided losses that

reflected the value of the tip.  635 F.2d at 173 n. 29.  The Court concluded, however, *id.*, that:

> While that approach would make sense if a tippee were held liable for the out-of-
> pocket losses of all plaintiffs, we think that when only a disgorgement measure of
> damages is used, a tippee who trades is liable for the entire difference between the
> price at which he sold and the price the stock reached after the tip became known.
> By trading on tipped information, the tippee takes the risk that by the time the tip
> is disclosed the market price may reflect disclosure of information more adverse
> than the tip and other adverse market conditions.

*Elkind*'s holding is consistent with a long line of cases imposing disgorgement under the

Exchange Act.  Disgorgement was adopted as an Exchange Act remedy by the First Circuit in

the leading case *Janigan v. Taylor*, 344 F.2d 781 (1st Cir. 1965), an insider trading case.  The

First Circuit rejected any limitation tied to the value of the misrepresented information, holding

that even "future accretions not foreseeable at the time of the transfer" were subject to

---

[3]      Like Section 20A(b)(1), disgorgement under *Elkind* operates as a cap.  As a first step, the
plaintiffs' damages under *Elkind* are calculated based on the overall price change from the time of
the contemporaneous trade up to "the time [the plaintiff] learned the tipped information or at a
reasonable time after it became public," 635 F.2d at 172.  As a second step, the tippee's disgorged
gain is then calculated and is "shared pro rata."  *Id.*

If any out-of-pocket-type loss causation requirement applied, it would do so at the first step,
restricting the total damages claimed by the plaintiffs, *before* applying the disgorgement cap.

disgorgement because "the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, *whether foreseeable or not*." *Id.* at 786 (emphasis added).

The Supreme Court adopted *Janigan*'s disgorgement measure in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Citing *Janigan*, the Court held that defrauded sellers should receive fair value for their shares, "except for the situation where the defendant received more than the seller's actual loss.  In the latter case damages are the amount of the defendant's profit."  406 U.S. at 155.  The Supreme Court again endorsed *Janigan* in *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), explaining that disgorgement "aims at preventing the unjust enrichment of a fraudulent buyer, and it clearly does more than simply make the plaintiff whole for the economic loss proximately caused by the buyer's fraud." *Id.* at 663.

The Second Circuit recently reaffirmed the point made in *Randall*, explaining in *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) (an insider trading case), that disgorgement "forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court, even if it exceeds actual damages to the victim."

Defendants' attempt to engraft an out-of-pocket-type loss causation requirement onto the disgorgement measure is thus contradicted by numerous cases.  That approach is also analytically flawed.  As explained in a law review article later extensively cited in *Randall*, 478 U.S. at 659, 662, 666, and 671, the out-of-pocket loss measure is a tort concept that focuses on the *plaintiff's loss*; disgorgement is founded in the law of restitution and unjust enrichment, and focuses on the *defendant's gain*, and courts "must resist the temptation to transfer to restitution the substance of proximate cause developed in tort because the policies that underlie the limitations in each area are entirely different."  Robert B. Thompson, *The Measure of Recovery*

*Under Rule 10b-5: A Restitution Alternative to Tort Damages*, 37 V\AND. L. R\EV. 349, 352, 383 (1984).

### 2. Disgorgement Seeks to Ensure Wrongdoers Do Not Profit and Any Uncertainty in Calculating Disgorgement Falls on the Wrongdoer

As stated by the Second Circuit, "[t]he paramount purpose of enforcing the prohibition against insider trading by ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing." *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987). In furtherance of this objective, "[a]ny risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty," *Contorinis*, 743 F.3d at 305 (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)), and the amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *Id.* (quoting *First Jersey*, 101 F.3d at 1475). Where the fraud is "pervasive," as in this case, courts order disgorgement of all profits stemming from the scheme. *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986); *SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159, 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002).

### 3. A "Reasonable Time" Is Measured by How Long a Reasonable Investor Would Need to Receive, Digest and Act on the News

*Elkind* limits disgorgement to "the amount gained by the tippee as a result of his selling at the earlier date rather than delaying his sale until the parties could trade on an equal informational basis," 635 F.2d at 172, and defines this as "the market price within a reasonable time after public disclosure of the tip . . . ." *Id.* This time limitation is drawn from an earlier Second Circuit decision, *SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974), in which the Court denied an insider trader an offset for post-disclosure market declines that reduced the profits he ultimately realized, holding that "[o]nce public disclosure is made and all investors are trading on an equal footing, the violater should take the risks of the market himself." *Id.* at 1309.

The First Circuit, citing *SEC v. Shapiro*, also later limited insider trading disgorgement for publicly-traded stock to gains accruing within "a reasonable time after the undisclosed information has become public," *SEC v. MacDonald*, 699 F.2d 47, 54 (1st Cir. 1983) (en banc). The "reasonable time" standard has subsequently been applied to private Section 20A cases. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 665 (E.D. Va. 2000) (quoting *MacDonald*); *see also Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1392 (7th Cir. 1990).

To explain why the "reasonable time" limitation applies, *MacDonald* quoted at length from another Second Circuit decision, *Gerstle v. Gamble-Skogmo, Inc.*, as follows:

> The reason for this, in the case of marketable securities, is obvious. Once the seller has discovered the fraud, he can protect against further damage by replacing the securities and should not be allowed to profit from a further appreciation . . . .

699 F.2d at 53 (quoting *Gerstle*, 478 F.2d 1281, 1306 n. 27 (2d Cir. 1973)).

The "reasonable time" standard is therefore based on mitigation-of-damages principles. *See also Schultz v. CFTC*, 716 F.2d 136 (2d Cir. 1983). As one treatise explains, *MacDonald* and *Elkind* adopt a "cover measure" of damages that "imposes on the plaintiff the obligation to mitigate damages by reversing his/her trade within a 'reasonable' time after curative disclosure." William K. S. Wang & Marc I. Steinberg, *Insider Trading* 254 (3d ed. 2010).

Unlike the analysis of stock price reactions in an out-of-pocket damages case, where a price reaction is used to quantify the value of the information disclosed based on economic analysis, the factfinder in an insider trading case must measure a "reasonable time" by evaluating when it was *reasonable* for a *plaintiff* to have acted by selling or buying after the inside information was disclosed. As Professors Wang and Steinberg explain, a court applying *Elkind* and *MacDonald*'s "cover measure," "is likely to select a later deadline" than under the out-of-pocket measure because while "the market price may adjust fairly quickly to an announcement,"

"ordinary investors must find out about the announcement, absorb it, overcome any reluctance to realize 'paper' losses, and raise additional funds to reverse their transactions." *Id.* at 257-58.

While market data is relevant and, in the absence of "other material events during the period in question" may be the "best indicator" of when a reasonable time has elapsed, doubts regarding the question "are to be resolved against the defrauding party." *MacDonald*, 699 F.2d at 55.  In some cases, a single day or less may constitute a "reasonable time," *e.g.*, *Elkind*, 635 F.2d at 173; in other insider trading cases, courts have recognized significantly longer periods, as did the district court in *MacDonald* after remand.  *SEC v. MacDonald*, 568 F. Supp. 111, 112 (D.R.I. 1983) (roughly two weeks), *aff'd*, 725 F.2d 9 (1st Cir. 1984).  *See also SEC v. Ingoldsby*, No. 88-1001-MA, 1990 WL 120731 (D. Mass. May 15, 1990) (nine days).

### 4.   Determination of a "Reasonable Time" Is an Inherently Factual Inquiry, and the Complaint Provides Ample Basis to Conclude that <u>a Reasonable Time Had Not Elapsed Before the Tysabri Disclosure</u>

The issue of what constitutes a "reasonable time" is inherently fact intensive and unsuitable for disposition on a Rule 12(b)(6) motion.  As explained in *In re MicroStrategy, Inc. Securities Litigation*, 115 F. Supp. 2d 620, 665 (E.D. Va. 2000) (citation omitted):

> The length of this reasonable time period varies with the circumstances of each case, therefore, for it is dependent on when the defrauded sellers or buyers reasonably should have digested the disclosed information and have taken steps to protect their interests.  In this regard, the determination of when a reasonable time has lapsed is highly fact-intensive and is typically unsuitable for threshold disposition.

*Accord McGhee v. Joutras*, No. 94-C-7052, 1995 WL 124131, at *2 (N.D. Ill. Mar. 20, 1995) (insider trading case; noting that the filing of a Rule 12(b)(6) motion on the issue of "reasonable time" was not appropriate since "the subject is clearly one for factual presentation and analysis").

Here, there is extensive evidence to support the conclusion that a "reasonable time" had not elapsed by the time of the Tysabri announcement, 48 hours after ICAD.  *First*, there is a

substantial question whether the relevant inside information had even been disclosed by the time of the Tysabri announcement, and whether a "reasonable time" had therefore begun to run.  As pled in the Complaint, Martoma had extensive discussions with Gilman between the time he received the full trial results and ICAD.  ¶¶ 131, 248-251 (pp. 43, 83-85).  In contrast, Gilman's presentation at ICAD lasted 13 minutes.  ¶ 293 (p. 97).

*Second*, even if Martoma were implausibly deemed to have learned nothing material beyond the contents of the 13-minute ICAD presentation in his hours of discussions with Gilman, Elan's own personnel described Gilman's presentation as "confusing" and "unclear," ¶ 302 (pp. 99-100), and analysts and reporters described the data presented as "ambiguous" "unclear" "confounding" and "confusing at least."  ¶¶ 296-299, 307 (pp. 98-99, 113).  Accordingly, there is, at the least, a genuine question whether it was "reasonable" for public investors to digest that information and act within 48 hours.

*Third*, the view of leading analyst firms that the market had far overreacted after ICAD, ¶¶ 320-23 (pp. 103-05), also supports the conclusion that it was reasonable for investors to wait for the market to correct, rather than lock in losses.  *See Dura-Wood Treating Co. v. Century Forest Indus., Inc.*, 675 F.2d 745, 754 (5th Cir. 1982) (plaintiff in contract case "covered within a reasonable time" where the product's price was "high" and the market "volatile" and therefore "waiting to determine whether a decrease in market price might occur was not unreasonable").

*Finally*, holding that a "reasonable time" elapsed before the Tysabri disclosure would not effectuate full disgorgement here because the documents show that Cohen and Martoma themselves assumed the market reaction would be less substantial.  ¶ 327 (pp. 105-06).  Had the SAC Defendants not sold on inside information before ICAD, they, like Plaintiffs, would thus likely have made the same decision to hold in expectation of a price recovery.

II.   **THE INSIDER BUYING CLAIMS ARE NOT SUBJECT TO DISMISSAL**

A.   **Section 20A's Five-Year Statute of Limitations Runs from the Last Insider Trade and All Claims Were Therefore Timely Pled**

1.   **The Text of Section 20A(b)(4) Is Incompatible with Defendants' Reading**

Section 20A(b)(4) states:

No action may be brought under this section more than 5 years after the date of the last transaction that is the subject of the violation.

Plaintiffs' complaints undisputedly pled the Insider Buying Claims within five years of Defendants' last insider trades in Elan and Wyeth.  Accordingly, if "the violation" under Section 20A is SAC's series of insider trades in Elan and Wyeth, all Section 20A claims are timely.[4]

Defendants propose, however, that the word "transaction" refers to "plaintiffs' purchase or sale of a security," SAC Mem. at 13, that each illegal trade by SAC is a separate "violation" of Section 20A, and that the statute therefore runs from "Each Purchase Or Sale." *Id.* at 12.

The plain language of Section 20A contradicts both parts of Defendants' analysis.

"Transaction" Can Only Mean a Defendant's Unlawful Trade.  *First*, the claim that "transaction" refers to "plaintiffs' purchase or sale of a security" is not plausible on its face: the conduct constituting "the violation" of the Exchange Act is the *defendant's* trade; Section 20A(a) simply confers standing on contemporaneous traders.  Thus, the "transactions" that are the "*subject* of the violation" for the purposes of Section 20A(b)(4) are necessarily the Defendants'.

*Second*, Defendants' reading would make two other provisions of Section 20A incoherent: (1) Section 20A(b)(1) – the disgorgement cap – limits damages to "the profit gained or loss avoided in the *transaction or transactions* that are the subject of the violation."  There is,

---

[4]      As Defendants do not appear to dispute, *see* SAC Mem. at 12, Plaintiffs have also asserted timely Section 10(b) claims running from May 13, 2008 for Elan and July 15, 2008 for Wyeth.

of course, no "profit gained or loss avoided" in the plaintiffs' transactions; the phrase necessarily

refers to the *defendant's* transactions; and (2) Section 20A(b)(2) – the SEC setoff provision –

provides a setoff for amounts disgorged to the SEC "relating to the same *transaction or*

*transactions*."  An SEC case necessarily concerns the *defendant's* trades, not a private plaintiff's.

      <u>Related Insider Trades Constitute a Single "Violation."</u>  Defendants' contention that each

illegal trade constitutes a separate "violation" of Section 20A also is contradicted by the statute's

text.  *First*, on its face, the phrase "last transaction" in Section 20A(b)(4) indicates that multiple

trades can be "the subject of *the* violation."  *Second*, Section 20A(b)(1) confirms this reading,

stating that damages "shall not exceed the profit gained or loss avoided in the transaction *or*

*transactions* that are the subject of *the violation*."  *Third*, the criminal procedure rule that

Defendants cite, SAC Mem. at 13-14, does not support their reading.  While prosecutors *can*

charge each illegal trade as a separate count, they are not required to, as the indictments of both

Martoma and SAC establish.  *See* Wohl Decl. Ex. C, at 11-13 and Ex. D, at 1-39.[5]

## 2.      <u>Defendants Cite Legislative History for the Wrong Law</u>

      To support their argument, Defendants misleadingly cite legislative history from a

different law.  SAC Mem. at 14-15.  Defendants address a June 1987 draft of a proposed "Insider

Trading Proscriptions Act of 1987" (which they mistitle as "of 1988"), *id.* at 15, which would

have added a new Section 16A broadly codifying the law of insider trading and providing a

private right of action in subsection (f).  The proposed provision stated that "[t]he period of

limitations for the commencement of any action under this subsection shall be the same as that

---

[5]     Plaintiffs have nowhere suggested otherwise.  In *United States v. S.A.C. Capital Advisors,*
*L.P.*, No. 13 Cr. 541 (LTS), they objected to prosecutors lumping together "hundreds of trades
directed by multiple individual wrongdoers in the securities of numerous separate companies based
on information from disparate sources" in a single count – thereby allowing SAC to plead guilty
without specifically admitting the conduct charged.  *See* Hurwitz Decl. Ex. 7 at 8-9.

provided in Section 21(d)(2)(D) of this Title [the Insider Trading Sanctions Act]."  1987 WL

957496, at *55; 1987 WL 957499, at *3; 1987 WL 957500, at *7.

The statute actually enacted 17 months later, Public Law No. 100-704, the Insider

Trading and Securities Fraud Enforcement Act of 1988 (ITSFEA), was different in numerous

respects, including, as indicated above, its employment of entirely different language for the

limitations provision at issue.[6]

### 3.    Sarbanes-Oxley Section 804 Did Not Repeal Section 20A(b)(4)

Finally, Defendants contend that SOX Section 804, which enacted 28 U.S.C. § 1658(b),

supersedes the express statute of limitations in Section 20A.  SAC Mem. at 15.  As this Court has

explained, however, "nothing in either the statutory framework of 28 U.S.C. § 1658 or the

legislative history of Sarbanes-Oxley show a clear intent to overrule express limitations periods

stated in the securities laws" and "repeals by implication are not favored . . . . The intention of

---

[6]     Read in its entirety, ITSFEA further refutes Defendants' analysis.  ITSFEA added Section
20A and also relocated the SEC's insider trading civil penalty authority from Section 21(d)(2) to new
Section 21A.  Section 21A(d)(5), as enacted by ITSFEA, in fact provides exactly the "5 years after
the date of purchase or sale" limitations period that Defendants advocate, and a comparison of
Sections 20A(b)(4) and 21A(d)(5) is instructive (text precisely as enacted, in relevant part):

| Section 20A(b)— | Section 21A(d)— |
|---|---|
| (4) STATUTE OF LIMITATIONS.—No action may be brought under this section more than 5 years after the date of the last transaction that is the subject of the violation. | (5) STATUTE OF LIMITATIONS.—No action may be brought under this section more than 5 years after the date of the purchase or sale. |

ITSFEA thus shows that Congress knew how to legislate the five year limitations period
"from each purchase or sale" that Defendants advocate, and in Section 20A Congress pointedly did
not.  Giving the limitations period in Section 20A the same meaning as the limitations period in
Section 21A would thus violate the principle of statutory construction that when "Congress 'uses
certain language in one part of the statute and different language in another, the court assumes
different meanings were intended.' "  *Cruz-Miguel v. Holder*, 650 F.3d 189, 196 (2d Cir. 2011)
(quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 711 n.9 (2004)).

the legislature to repeal must be clear and manifest."  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d

402, 416, 420 (S.D.N.Y. 2005) (quoting *Watt v. Alaska,* 451 U.S. 259, 266-67 (1981)).[7]

### 4. The Shorter Limitations Periods for Predicate Violations Do Not Override Section 20A(b)(4)

Defendants also contend that the shorter limitations period governing the predicate

Exchange Act violations should control.  SAC Mem. at 17-18.  This precise argument, however,

was considered at length and rejected by the Ninth Circuit in *Johnson v. Aljian*, 490 F.3d 778,

783 (9th Cir. 2007), and neither of the cases cited by Defendants addresses the limitations issue

at all.

### 5. Section 20A(b)(4) Is a Statute of Limitations, Not Repose, and the Discovery Rule Would Make Plaintiffs' Claims Timely, Were There a Need to Invoke It

Because all claims are timely without the discovery rule, we note only briefly that the

discovery rule would also render all of Plaintiffs' Section 20A claims timely.[8]

---

[7]     In addition, Section 20A(b)(4) continues to govern because there is no conflict with SOX Section 804.  *First*, "the violation" under Section 20A consists of the defendant's illegal "transaction or transactions," and because Plaintiffs' claims were asserted within five years of "the violation," they would be timely even if 28 U.S.C. § 1658(b) controlled.  *Second*, the language of 28 U.S.C. § 1658(b) is permissive ("may be brought"), so while there is a conflict with other, more restrictive limitations provisions, there is no conflict with provisions like Section 20A's that are, if anything, more expansive.  Each of these interpretations avoids an unnecessary conflict, and so is preferred over any alternative that creates a conflict.  *See Morton v. Mancari,* 417 U.S. 535, 551 (1974) ("when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective").

[8]     Defendants call Section 20A(b)(4) a statute of repose but cite no authority.  In *Short v. Belleville Shoe Manufacturing Co.*, 908 F.2d 1385, 1391 (7th Cir. 1990), Judge Easterbrook observed that Section 20A "appears to be an ordinary statute of limitations," noting that "[t]he language is in the traditional form of a statute of limitation," and there was no legislative history "indicating that it is more potent than the usual variety."

While the Solicitor General took the position in *Short* and later in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 355 (1991), that Section 20A(b)(4) was a statute of repose, he has more recently argued that it is a statute of limitations, explaining that "[t]here is a good reason that Congress designed Sections 16(b) and 20A as statutes of limitations. Both statutes use 'a measure of damages that the passage of time does not affect' – namely, the profits realized by

*(continued . . .)*

- 18 -

B.      **Loss Causation Is Adequately Pled**

The SAC Defendants have advised that they will not press the loss causation arguments at pages 18-20 of SAC's brief on the present motions; Mr. Martoma has not responded.

C.      **Buying a Share on Positive Inside Information and Later Selling the Same Share on Negative Inside Information Are Separate Acts that Give Rise to Separate Claims by Different Investors for Distinct Relief**

Defendants also argue that disgorgement of Insider Buying Period profits and Insider Selling Period avoided losses constitutes "improper double-counting" because "the very same shares" are involved in both transactions.  SAC Mem. at 20-21.[9]  In fact, there is no duplication because the wrongful conduct, the investors harmed, and the gains attributable to the trades in each period are all separate and distinct.

With respect to the Insider Buying Period, SAC is liable for *buying* Elan and Wyeth shares in reliance on *positive* inside information, it is liable to investors who contemporaneously *sold* during this period, and its disgorgement gains are its unrealized *profits*, based on the price the shares reached a reasonable time after the positive information became public.

With respect to the Insider Selling Period, SAC is liable for *selling* Elan and Wyeth shares in reliance on *negative* inside information, it is liable to investors who contemporaneously *purchased* during this period, and its disgorgement gains are the *losses* it *avoided*.

---

(*. . . continued*)

the insider from the covered transaction."  Brief for the United States as Amicus Curiae Supporting Neither Party, *Credit Suisse Securities (USA) LLC v. Simmonds*, No. 10-1261, at 28, 2011 WL 3780721, at *28 (quoting *Short*, 908 F.2d at 1392).

Since Section 20A(b)(4) is, in fact, a regular statute of limitations, Plaintiffs' claims are timely because the limitations period did not begin running until November 2012 and Plaintiffs "remain[ed] in ignorance of [the fraud] without any fault or want of diligence or care on [their] part," *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010) (citation omitted). ¶ 509 (pp. 152-53).

[9]      In fact, a substantial portion of Plaintiffs' Insider Buying Period damages are from shares sold during the Insider Buying Period and therefore do not involve "the very same shares" at all.

- 19 -

Defendants offer no good reason why the fact that it was the "very same shares" that were traded illegally twice should change the amount of disgorgement attributable to each wrongful trade, and there is none:  SAC would be liable to contemporaneous sellers for the very same profits on its unlawful purchases had its later sales been untainted, and would be liable to contemporaneous buyers for the very same avoided losses had its shares been acquired lawfully.

Defendants perversely seek to immunize SAC's illegal Insider Buying Period profits because SAC later realized actual profits in a sale transaction tainted with inside information.  As *SEC v. Shapiro* makes clear, however, later market developments after inside information becomes public do not provide the set-off for which Defendants advocate.  494 F.2d at 1309.[10]

## III.  THE PREJUDGMENT INTEREST RATE IMPOSED SHOULD REFLECT SAC'S MARKET-TESTED COST OF CAPITAL

### A.  The Purpose of Prejudgment Interest in a Disgorgement Case Is to Prevent the Defendant from Benefitting from the Time-Value of Unlawful Gains

The purpose of prejudgment interest in a disgorgement case, "like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws."  *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y. 2009) (Lynch, J.) (citation omitted), *aff'd*, 438 F. App'x 23 (2d Cir. 2011).  It thereby seeks to "restore the defendant . . . to the position he or it would have been in absent any wrongdoing," *SEC v. Wyly*, 860 F. Supp. 2d 275, 283 (S.D.N.Y. 2012) (Scheindlin, J.), and is necessary "to

---

[10]     Defendants cite Section 20A, SAC Mem. at 21, but the statute actually forecloses SAC's argument.  Section 20A makes a defendant liable for "purchasing or selling" on inside information and caps damages at the "profit gained or loss avoided in the transaction or transactions that are the subject of the violation;" Defendants' interpretation would improperly engraft a further limitation, based on whether the profit gained or loss avoided in a given transaction arose with respect to a share that had been previously or subsequently illegally traded a second time.

Defendants also cite *SEC v. Contorinis*, 743 F.3d 296, 306 (2d Cir. 2014), but that case did not address this issue at all.

ensure that the defendant does not profit from obtaining the time-value of any unlawful profits earned," *SEC v. World Info. Tech., Inc.*, 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008).

The choice of prejudgment interest rate is "confided to the district court's broad discretion," *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996).  Inherent in that grant of discretion is the recognition that there is no single correct rate, and that a court should perform an "assessment of the evidence" and reach a conclusion "within the range of permissible decisions." *SEC v. Milligan*, 436 F. App'x 1, 2 (2d Cir. 2011).  In setting an appropriate rate, a court "may take into account the rate of interest that the defendant would have had to pay to borrow the money it withheld from the plaintiff." *In re Livent, Inc. Noteholders Sec. Litig.*, 360 F. Supp. 2d 568, 572 (S.D.N.Y. 2005) (quoting *Jones v. UNUM Life Ins. Co. of Am.,* 223 F.3d 130, 139 (2d Cir. 2000)).[11]

As this Court has recognized, prejudgment interest is an integral "component of full compensation" for the plaintiff. *de Kwiatkowski v. Bear, Stearns & Co.*, No. 96 Civ. 4798 (VM), 2000 WL 729118, at *2 (S.D.N.Y. June 6, 2000) (citing *Loeffler v. Frank*, 486 U.S. 549 (1988)).

### B.    The SEC's Choice of Rate Does Not Govern in this Private Action

Defendants invite the Court to forego the normal fact-intensive prejudgment interest analysis and instead use the SEC's rate, SAC Mem. at 21, but there is no basis to deem that rate binding on Plaintiffs or conclusive as a matter of law, and there are good reasons that the Court should not deem it even persuasive on the present facts.

First, Congress' express purpose in enacting Section 20A was to abrogate decisions restricting private Section 10(b) insider trading claims, recognizing that "private rights of action

---

[11]    More generally, the relevant factors are "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Livent*, 360 F. Supp. 2d at 571 (quoting *Jones*, 223 F.3d at 139).

have traditionally served as an important supplement to the Commission's enforcement of the federal securities laws."  H.R. Rep. No. 100-910 (1988), *available at* 1988 WL 1096434, at *19.

Congress directly addressed the interaction between SEC and private cases by providing the limited setoff in Section 20A(b)(2), and the Court should not afford the SEC's case broader preclusive effect than Congress legislated, particularly because the civil penalties enacted in 1984 diminish the SEC's need to pursue full disgorgement.[12]

Second, the SEC's rate does not purport to reflect its assessment of what is appropriate in *this* case – it is rather a rate the SEC broadly applies by regulation.  *See* 17 C.F.R. § 201.600(b).

Finally, while SAC states that "[w]e are not aware of any precedent in which the SEC has used any other prejudgment interest rate," SAC Mem. at 22, this is incorrect, and SAC has itself previously relied on such a case in addressing the specific issue of prejudgment interest – *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) (*see* Wohl Decl. Ex. E, at 3).  *Manor* imposed interest on disgorgement "at the New York legal rate," *id.* at 1104-05, and Judge Wood also selected the New York rate in *SEC v. Musella*, 748 F. Supp. 1028, 1043 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990), an insider trading decision that has been widely cited on the issue of prejudgment interest, including by this Court in *Livent*, 360 F. Supp. 2d at 571.

As the Court noted in *Livent*, the New York rate has also frequently been used in private Exchange Act cases, *see* 360 F. Supp. 2d at 571, and was the rate the Court ultimately selected there.  *Id.* at 573.  Here, even the New York rate would add substantial prejudgment interest, approximately $120 million (through December 2013), based on the principal sum disgorged to the SEC.

---

[12]     The SEC specifically made this point in accepting what it regarded as a restrictive definition of disgorgement in the 1984 legislation.  *See* Memorandum from SEC Office of the General Counsel to Chairman John S.R. Shad, at 3 (Apr. 12, 1983), *available at* www.sechistorical.org.

**C.     Setting a Prejudgment Interest Rate Lower than SAC's Market-
<u>Tested Cost of Capital Would Not Accomplish Full Disgorgement</u>**

As noted above, prejudgment interest should be set at a level that reflects the time-value
of the illicit gains to SAC and restores it to the position it would have occupied absent the fraud.

Here, SAC makes money by raising capital from investors and using that money to make
investments.  The amount SAC pays to outside investors for the use of their funds represents the
arm's length, market-tested cost of those funds to it.  The amount SAC retains after paying
outside investors represents its profits.  The rate Plaintiffs propose, ¶¶ 517-29 (pp. 155-58),
would require SAC to disgorge the same amount that it would have paid outside investors for the
same money.  It does *not* require SAC to disgorge the additional amounts that represent its
profits.  Using any lower rate would leave SAC with a benefit from its insider trading – the use
of funds at a below-market rate.

Defendants claim this rate is a "way of demanding the profits SAC made after the alleged
inside information was disclosed," SAC Mem. at 22.  They are wrong.  Defendants' argument
confuses the gross investment returns SAC generated – in the range of 20% to 50% annually –
with the net returns it contractually agreed to pay investors, after deducting management fees,
which are the returns set forth in the Complaint.  ¶ 521 (p. 156).  By seeking only the net returns
that would have been payable to investors had SAC raised the money lawfully, Plaintiffs'
measure would leave SAC with the hundreds of millions of dollars in profits it would have
earned if it had not engaged in insider trading and instead lawfully raised new investment capital.

Defendants deem Plaintiffs' measure "unprincipled" because it would "vary
dramatically" based on market performance.  SAC Mem. at 23.  But where disgorged funds are
used as investment capital, as here, the amount that the defendant has agreed to pay third parties
for the use of those funds is the best measure of what they are worth.  Investment capital

commands far higher returns than bank loans because it bears the risk of market losses – as

SAC's own negative 27.5% return in 2008 shows.  ¶ 521 (p. 156).  It is only by paying the higher

returns reflected in the market-rate for such funds that disgorgement is actually achieved.

> ### D.      The Equities and Public Policy Support the Rate Plaintiffs Seek

Defendants also argue that "fairness and the relative equities of the award" entitle SAC to

a lower rate, citing the civil penalty, civil forfeiture, and criminal fines SAC has agreed to pay.

SAC Mem. at 23-24.  SAC's other payments, however, do not warrant a discount here.

*First*, in light of the express set-off provided by Congress in Section 20A(b)(2), it would

be inappropriate to engraft a further judge-made setoff.

*Second*, SAC's payments to the government do not warrant special solicitude because

each represents a fraction of the financial exposure SAC faced from the conduct charged.  The

SEC agreed to accept a 1x civil penalty, far short of the 3x penalty imposed in other cases.  *E.g.*,

*SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 436 (S.D.N.Y. 2011).  Likewise, the money laundering

claims against SAC created the risk that *all* SAC's assets – principally comprised of Cohen's $9

to $10 billion fortune – could be forfeited.  *See United States v. Wyly*, 193 F.3d 289, 303 (5th

Cir. 1999) ($4 million business forfeited based on $175,000 money laundering offense).

SAC also argues that Plaintiffs' request for full disgorgement "would allow any plaintiff

seeking to second-guess a determination by the SEC to withstand a motion to dismiss simply by

demanding additional prejudgment interest."  SAC Mem. at 23.  However, SAC's premise, that it

is entitled to complete peace because it negotiated a "no admit, no deny" settlement with the

SEC, ignores the Congressionally-mandated role for private insider trading actions.  SAC's

specter of follow-on private litigation is also illusory.  Most insider trading cases are too small to

make a private suit viable; the recent crackdown in this District has, to our knowledge, yielded

only two other investor cases.

SAC made a tactical decision to settle piecemeal; sound public policy does not support rewarding it for maximizing litigation churn and the attendant burdens on the Court and parties.

Another consideration also militates against leniency.  Among the factors the Second Circuit has endorsed when imposing prejudgment interest is the defendant's "refusal to accept responsibility for his unlawful conduct."  *SEC v. Milligan*, 436 F. App'x 1, 3 (2d Cir. 2011). Here, SAC has been steadfast in denying fault for anything more than employing a few "bad apples."  As SAC stated immediately after its guilty plea (Wohl Decl. Ex. F, at 1):

> We take responsibility for the handful of men who pleaded guilty and whose conduct gave rise to SAC's liability. The tiny fraction of wrongdoers does not represent the 3,000 honest men and women who have worked at the firm during the past 21 years. SAC has never encouraged, promoted or tolerated insider trading.

## IV.  THE COMPLAINT PLEADS RELIANCE

SAC argues that the Complaint should be dismissed for failure to plead reliance, citing the pending *Halliburton* appeal.  SAC Mem. at 24.  However, Plaintiffs also rely on *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), *see* ¶¶ 543, 552, which provides a presumption of reliance, and assessing any impact of *Halliburton* is now premature.[13]

## V.  THE COMPLAINT STATES A CONTROL PERSON CLAIM

Defendants challenge Plaintiffs' Section 20(a) claims for failure to adequately plead predicate violations, SAC Mem. at 25, and this argument fails for the reasons set forth above.

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions in their entireties.

---

[13]    SAC's claim that "[n]either Gilman nor any other defendant is alleged to have had a duty to disclose non-public information about bapi to the market," SAC Mem. at 24-25, is without merit; the duty to "disclose or abstain" from trading is, of course, the foundational basis for insider trading liability.  *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974). Contrary to SAC's assertion, SAC Mem. at 25, the Complaint *does* allege that Gilman owed a duty of confidence to Wyeth.  ¶¶ 556, 571 (pp. 165, 167-68).

Dated:   New York, New York
         June 9, 2014

**SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP**

By: *Deborah Clark Weintraub* /EDW
    Deborah Clark-Weintraub
    Joseph P. Guglielmo
    Tom Laughlin
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York  10174
Telephone: (212) 223-6444

Gregg S. Levin
David P. Abel
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina  29464
Telephone: (843) 216-9000

*Co-Lead Counsel for the* Birmingham
*Plaintiffs and the Wyeth Investor Class*

Respectfully submitted,

**WOHL & FRUCHTER LLP**

By: *Ethan Wohl*
    Ethan D. Wohl
    Krista T. Rosen
    Sara J. Wigmore
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004

Marc I. Gross
Tamar A. Weinrib
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York  10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

*Co-Lead Counsel for the* Kaplan *Plaintiffs
and the Elan Investor Class*