UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID E. KAPLAN, et al.,<br><br>        Plaintiffs,<br><br>    - against -<br><br>S.A.C. CAPITAL ADVISORS, L.P., et al.,<br><br>        Defendants. | No. 12 Civ. 9350 (VM) (KNF) |
| BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, et al.,<br><br>        Plaintiffs,<br><br>    - against -<br><br>S.A.C. CAPITAL ADVISORS, L.L.C., et al.,<br><br>        Defendants. | No. 13 Civ. 2459 (VM) (KNF) |

**SAC'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3020

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8102

*Attorneys for Defendants S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC, S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, S.A.C. Select Fund, LLC and Steven A. Cohen*

**TABLE OF CONTENTS**

**Page**

Table of Authorities ...................................................................................................................... ii
Preliminary Statement.................................................................................................................... 1
Argument ....................................................................................................................................... 2
      I.      Plaintiffs Cannot Recover The Unrelated Tysabri Stock Drop ............................... 2
      II.     Plaintiffs' Buying Claims Are Barred By The Statutes Of Repose ........................ 5
            A.      Plaintiffs' Section 10(b) Claims Are Barred............................................... 5
            B.      Plaintiffs' Section 20A Claims Are Barred ................................................ 5
      III.    Plaintiffs Have Not Stated A Claim For Increased Interest .................................... 9
Conclusion ................................................................................................................................... 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Affiliated Ute Citizens of Utah* v. *United States*,
  406 U.S. 128 (1972) ........................................................................................................... 4

*In re Alstom SA Securities Litigation*,
  406 F. Supp. 2d 402 (S.D.N.Y. 2005) ................................................................................. 8

*Donovan* v. *Bierwirth*,
  754 F.2d 1049 (2d Cir. 1985) ........................................................................................... 10

*Elkind* v. *Liggett & Myers, Inc.*,
  635 F.2d 156 (2d Cir. 1980) ...................................................................................... 2, 3, 5

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  134 S. Ct. 636 (U.S. Nov. 15, 2013) ................................................................................. 10

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  2014 WL 2807181 (U.S. June 23, 2014) .......................................................................... 10

*Jackson National Life Insurance Co.* v. *Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir. 1994) ................................................................................................. 8

*Janigan* v. *Taylor*,
  344 F.2d 781 (1st Cir. 1965) .............................................................................................. 4

*Johnson* v. *Aljian*,
  490 F.3d 778 (9th Cir. 2007) .............................................................................................. 8

*Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*,
  501 U.S. 350 (1991) ........................................................................................................... 7

*In re MicroStrategy, Inc. Securities Litigation*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................................. 4

*Randall* v. *Loftsgaarden*,
  478 U.S. 647 (1986) ........................................................................................................... 4

*SEC* v. *Citigroup Global Markets, Inc.*,
  2014 WL 2486793 (2d Cir. June 4, 2014) .......................................................................... 9

*SEC* v. *Contorinis*,
  743 F.3d 296 (2d Cir. 2014) ............................................................................................... 4

*SEC* v. *Ingoldsby*,
  1990 WL 120731 (D. Mass. May 15, 1990) .................................................................. 3

*SEC* v. *MacDonald*,
  699 F.2d 47 (1st Cir. 1983) .......................................................................... 4, 9, 10

*SEC* v. *Shapiro*,
  494 F.2d 1301 (2d Cir. 1974) ...................................................................................... 4

*SEC* v. *Wyly*,
  788 F. Supp. 2d 92 (S.D.N.Y. 2011) ........................................................................... 7

*Short* v. *Belleville Shoe Manufacturing Co.*,
  908 F.2d 1385 (7th Cir. 1990) ................................................................................. 3, 7

**Statutes**

Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1 ............................. *passim*

Section 21A of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-1 .................................... 8

Section 804 of the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658(b) ..................................... 6, 8

**Other Authorities**

17 C.F.R. § 201.600(b) ........................................................................................................... 9

CIS/Annual 1988 Legislative Histories of U.S. Public Laws, Public Law 100-704 ...................... 7

Legislative History for the Insider Trading Proscriptions Act of 1987, *available at*
  1987 WL 957496 ........................................................................................................ 7

Legislative History for the Insider Trading and Securities Fraud Enforcement Act
  of 1988, *available at* 1988 WL 1096439 ..................................................................... 7

WILLIAM K.S. WANG & MARC I. STEINBERG, INSIDER TRADING (3d ed. 2010) .............................. 5

## Preliminary Statement

Plaintiffs' opposition brief sets up numerous straw men. In this reply we focus on what this motion is really about.

First, there is no dispute that Defendants have agreed to pay $1.2 billion to the Department of Justice and $602 million to the SEC based principally on their trading in Elan and Wyeth. Under any rational analysis, this is several times the profit Defendants made and the loss they avoided on those trades. This case, then, is not needed to make sure that Defendants have not profited from their trading. Defendants have paid for their Elan and Wyeth trades many times over.

Second, contrary to Plaintiffs' assertion, SAC's defense is not premised on the notion that insider trading is a "victimless crime." We simply note that the Plaintiffs in this case are not victims. Plaintiffs do not deny that the U.S. Attorney opposed their application in the criminal proceeding on the grounds that Plaintiffs (who did not transact with Defendants, but traded contemporaneously with them) are not victims of Defendants' conduct. And the U.S. Attorney's position is supported by several cases we and they cited, including a recent decision by Judge Rakoff (Br. 1-2), none of which Plaintiffs address in their response.

Third, even Plaintiffs concede they are not entitled to recover damages from Defendants. They simply have a limited private right of action under § 20A to seek disgorgement of Defendants' trading profits (or loss avoided) if, and only if, this Court concludes that Defendants did not provide enough disgorgement. Nothing more.

The question presented by this motion then is whether Plaintiffs' arguments that Defendants' disgorgement was too low are based on well pleaded facts that support credible legal theories. As we show in our motion, and in this reply, Plaintiffs' argument that Defendants must pay more is based on (a) inclusion of an unrelated stock drop occurring days after the

MNPI was publicly disclosed; (b) assertion of additional claims that are clearly barred by the statutes of repose; and (c) a novel demand for a rate of interest the SEC has never imposed and courts have held improper—and fails as a matter of law.

At the end of the day, Plaintiffs' recourse does not lie in pursuing overbroad and legally defective claims. Rather, their recovery lies in petitioning the Court to share in part of the $602 million SAC will pay the SEC on or before August 4. That process is underway (the SEC has indicated that it will submit a briefing schedule) and, as a matter of law, it is there that Plaintiffs should seek relief.

## Argument

### I.     Plaintiffs Cannot Recover The Unrelated Tysabri Stock Drop

Plaintiffs demand recovery for Elan's $10.12 stock drop on August 1, 2008 (¶¶ 328-29, 334), even though they concede that (a) the stock drop from the bapi announcement occurred on July 29 and 30 (¶ 294)—two trading days earlier—and (b) Defendants did not have any MNPI relating to Tysabri. (Br. 10.) Not surprisingly, no case supports this result.

The case Plaintiffs principally rely upon—*Elkind* v. *Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir. 1980)—explains why it would be improper to allow Plaintiffs to recover for the unrelated Tysabri drop. In *Elkind*, the Second Circuit stated that recovery should be limited to the damage "actually caused in fact by the defendant's wrongdoing," *id.* at 171, and warned that courts should not award "windfall recoveries," *id.*, or "exorbitant damages, out of all proportion to the wrong committed," *id.* at 170. Accordingly, the *Elkind* court held that where the MNPI was disseminated on the morning of July 19, damages were to be measured by the stock price at the close of the market that same day, *id.* at 173—not several days later, and not after a wholly unrelated stock drop. Plaintiffs note that *Elkind* warned that defendants "take[] the risk that *by the time* the [MNPI] is disclosed the market price may reflect disclosure of

2

information more adverse than the [MNPI]," *id.* at 173 n.29 (emphasis added), but *Elkind* did not hold that defendants are liable for unrelated stock drops days *after* the MNPI is disclosed.

*Short* v. *Belleville Shoe Manufacturing Co.*, 908 F.2d 1385 (7th Cir. 1990), which Plaintiffs also cite, is similar. In *Short*, the court noted that § 20A(b)(1) provides that the "total amount of damages . . . shall not exceed the [insider's] profit gained or loss avoided in the transaction or transactions that are the subject of the violation." *Id.* at 1392. Those damages are defined as "the difference between the price the insider realizes and the market price of the securities after the news is released." *Id.* Under *Short*, including an unrelated stock drop after the MNPI is disclosed is an improper windfall as it would subject defendants to damages that exceed their "gain or loss avoided" from "the subject of the violation." Indeed, the court did not grant any such damages to Short. It granted no damages at all. *Id.* at 1392-93.

A third case Plaintiffs rely upon—*SEC* v. *Ingoldsby*, 1990 WL 120731 (D. Mass. May 15, 1990)—also shows why Plaintiffs' claim must be dismissed. In *Ingoldsby*, the court noted that the "disgorgement figure [must] reasonably approximate[] the amount of unjust enrichment." *Id.* at *4. The court held that disgorgement should be calculated based on the stock price several days after disclosure of the MNPI, but only because the news at issue was not "spectacular," involved "a relatively small company with limited media attention," had small "price and volume" movements during the relevant period[1] and, importantly, "no evidence exists of any other material event during this time frame to account for the" movement in stock price. *Id.* at *5.

The allegations in the Complaint do not come close to meeting the factors noted in *Ingoldsby*. Plaintiffs in this case allege that the ICAD conference was a "widely anticipated

---

[1] The total trading volume the day before defendant traded was 1,600 shares, or about $3,600 in market value. *See id.* at *4 & n.1, n.2.

3

event" (¶ 20), "crucial" to the future of Elan (¶ 88), and the subject of widespread analyst and media coverage (¶¶ 296-323); the results were "significantly adverse" (¶ 330); and "the price of Elan ADRs dropped sharply in after-hours trading on July 29 and over the course of the trading day on July 30, closing at $19.63, down 41.8% from its $33.75 close on July 29." (¶ 21.) The stock <u>actually</u> <u>increased</u> on July 31 (*see* ¶¶ 21, 329), and the Complaint does not allege any stock drop relating to the bapi news after July 30, 2008. Most importantly, there was a later, unrelated, material event, as the price drop in Elan shares on August 1 was caused *solely* by the intervening Tysabri announcement, which had nothing to do with the ICAD results. (Br. 10.)

       Plaintiffs have not cited any case where a court allowed recovery for an unrelated stock drop after the MNPI was disclosed.[2] All of the cases indicate that such a recovery would exceed defendants' "gain or loss avoided" from "the subject of the violation" and constitute a windfall. That is why the DOJ and the SEC each determined that there was no basis to include the Tysabri drop in SAC's gain. (Br. 10-11.)

       Recognizing they have a problem, Plaintiffs weakly suggest that some of the MNPI about the bapi trial may not have been disclosed at ICAD on July 29. But neither the Complaint nor Plaintiffs' brief identifies any MNPI that was withheld and later disclosed that led

---

[2] Plaintiffs cite *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974), but *Shapiro* did not construe § 20A as it was decided 14 years *before* § 20A was enacted. In *Shapiro*, the defendant was required to disgorge profits made on trades until the MNPI was disclosed on February 18, and the court found that defendant's trade on that <u>same day</u> took place before investors had an opportunity to receive and react to the disclosures. *Id.* at 1307 & n.4. The court did not order disgorgement of profits after the MNPI was disclosed on February 18—and certainly not days later, after an unrelated material event and stock movement. Similarly, none of the other cases Plaintiffs cite required a defendant to disgorge based on unrelated post-disclosure stock drops, and they also are irrelevant because they either predate § 20A, *see Janigan v. Taylor*, 344 F.2d 781 (1st Cir. 1965); *SEC v. MacDonald*, 699 F.2d 47, 53 (1st Cir. 1983) (en banc), or concerned entirely unrelated issues, *see SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014) (considering whether defendant was liable to disgorge benefits that accrued to third parties); *Randall v. Loftsgaarden*, 478 U.S. 647 (1986) (non-insider trading case); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) (same). In *In re MicroStrategy, Inc. Securities Litigation*, 115 F. Supp. 2d 620 (E.D. Va. 2000), the court held that a defendant may be liable for stock drops after a press release allegedly revealed part of the MNPI only because the press release itself was misleading, and plaintiffs alleged that the MNPI was not fully revealed until later disclosures. *See id.* at 641, 664-66. The court did not hold the defendant liable for stock drops after the MNPI had been fully disclosed. Indeed, it warned against "extending the cut-off date for measuring damages" past the price "upon the full public disclosure of previously withheld information." *Id.* at 665.

to a stock drop, all of which is necessary to state a claim. *See Elkind*, 635 F.2d at 173 n.29. On the contrary, the Complaint states that the ICAD announcement included "the full Phase 2 trial results" and "publicly disclosed the negative Inside Information concerning bapi that the SAC Defendants received." (Wohl Ex. A ¶ 515(a).)

Plaintiffs also argue that the unrelated Tysabri stock drop should be included because they needed several days after the MNPI was disclosed to decide whether to sell their stock. But Plaintiffs admit that, under § 20A, "[t]he measure of damages . . . is the disgorgement of [defendants'] profits gained and losses avoided" from the MNPI, not plaintiffs' trading loss after the MNPI is disclosed and after a later, unrelated price drop. (Complaint ¶¶ 563, 578; *see* Pl. Br. 10.) Because § 20A focuses on defendants' profits rather than plaintiffs' loss, the length of time that plaintiffs had to consider the MNPI and "mitigate" their damages is not relevant to defendants' disgorgement calculation. Even the book Plaintiffs rely upon emphasizes that, with respect to disgorgement, there is an "overall recovery ceiling of the insider trading profit" (WILLIAM K.S. WANG & MARC I. STEINBERG, INSIDER TRADING 256 (3d ed. 2010)), so unrelated stock drops cannot be included where they increase the recovery beyond defendants' trading profits.

## II. Plaintiffs' Buying Claims Are Barred By The Statutes Of Repose

### A. Plaintiffs' Section 10(b) Claims Are Barred

Plaintiffs do not attempt to defend their § 10(b) claims as timely. Those claims should be dismissed for the reasons in our opening brief. (*See* Br. 12-18.)

### B. Plaintiffs' Section 20A Claims Are Barred

Section 20A provides that claims may not be brought "more than 5 years after the date of the last transaction that is the subject of the violation." 15 U.S.C. § 78t-1(b). Thus, the five-year statute runs as soon as "the violation" is complete. It is no different than the statute for

Plaintiffs' concededly untimely § 10(b) claims, which bars claims "5 years after [the] violation." 28 U.S.C. § 1658(b)(2).

### 1. The Statute Runs From Each Purchase Or Sale Of Stock

Plaintiffs assert—without citing any authority—that their § 20A claims are timely because "related insider trades constitute a single 'violation,'" and that violation was only completed in July 2008. (*See* Pl. Br. 16.) No court has ever adopted this approach. And, as our opening brief showed, the law is clear that *each* allegedly unlawful trade constitutes a separate "violation," and therefore starts the statute of repose clock for that trade. (Br. 13–14.) Indeed, Plaintiffs criticized the Government for not "charg[ing] each individual illegal *trade* as a separate count." (*See* Br. 14; Hurwitz Ex. 7 (emphasis in original).)

Plaintiffs urge the Court to depart from these well-settled principles because "multiple trades can be 'the subject of *the* violation.'" (Pl. Br. 15-16 (emphasis in original).) But nothing in § 20A purports to alter the well-established meaning of a violation—a single trade—and other parts of § 20A confirm that meaning. Section 20A(a) creates liability based on "*the* purchase or sale of securities that is *the* subject of [the] violation." And it makes a defendant who violates the Exchange Act through insider trading liable to any person who "has purchased (where such violation *is based on a sale of securities*) or sold (where such violation *is based on a purchase of securities*) . . . ." 15 U.S.C. § 78t-1(a) (emphases added).

Plaintiffs also argue that, as used in § 20A, the phrase "last transaction that is the subject of the violation" references a "transaction" by a defendant, not by a plaintiff. (Pl. Br. 15-16.) This is both wrong for the reasons discussed in our opening brief, and irrelevant. (Br. 13.) Even if § 20A references a defendant's "transaction," the five-year clock stills run from each "violation," *i.e.*, each trade by the defendant.

6

Legislative history also supports Defendants' view. Plaintiffs argue that Defendants "cite legislative history for the wrong law" because they relied on legislative history for the Insider Trading Proscriptions Act of 1987 ("ITPA"). (Pl. Br. 16-17.) But the contemporaneous trader private right of action that ultimately became § 20A was initially proposed as part of ITPA. Although ITPA was not enacted, the right of action was incorporated in the Insider Trading and Securities Fraud Enforcement Act of 1988 ("ITSFEA"), which enacted § 20A the following year.[3] The ITPA Senate hearings that we cited—which show that § 20A's repose period was intended to be "5 years after the date of the purchase or sale" (Br. 14-15)—are expressly part of the legislative history of both ITPA *and* ITSFEA.[4]

Finally, Plaintiffs cite *Short*, 908 F.2d at 1391, to argue that the discovery rule should apply because § 20A(b)(4) is a statute of limitations, not repose. (Pl. Br. 18 n.8.) Plaintiffs fail to mention that one year after *Short*, the Supreme Court recognized § 20A's time bar as a "statute of repose" in its landmark decision holding equitable tolling inapplicable to statutes of repose. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 355 (1991). As Judge Scheindlin recently observed, "no court has ever applied the discovery rule or equitable tolling doctrines" to § 20A's time bar. *SEC v. Wyly*, 788 F. Supp. 2d 92, 113 (S.D.N.Y. 2011).

In short, there is no basis in the statute, the case law, or the legislative history for Plaintiffs' argument that the statute of repose is triggered by the last of a "series" of violations. Instead, the repose period runs from the end of each violation, and bars Plaintiffs' claims.

---

[3] *Compare* 1987 WL 957496 (A&P), at *54-55 (June 17, 1987) (contemporaneous trader private right of action in ITPA), *with* 1988 WL 1096439 (A&P), at *6 (Aug. 2, 1988) (introducing nearly identical right of action in ITSFEA).

[4] *See* CIS/Annual 1988 Legislative Histories of U.S. Pub. Laws, Pub. Law 100-704, at 867, 870 (listing ITPA hearings and debates, as well as the ITPA bill itself (S. 1380), among ITSFEA's legislative history).

### 2. The Buying Claims Are Barred By Sarbanes-Oxley

Even if Plaintiffs' claims were timely under § 20A, they would still be barred by Sarbanes-Oxley, which introduced a five-year statute of repose applicable to "private right[s] of action that involve[] a claim of fraud." 28 U.S.C. § 1658(b). This is the same statute that applies to Plaintiffs' § 10(b) claims, which they concede are time-barred. Plaintiffs argue that § 1658(b) does not apply to § 20A because there was no clear Congressional intent that it should do so. (Pl. Br. 17-18.) But § 1658 is clear. It applies to any claim that "involves a claim of fraud," which includes Plaintiffs' claims in this case.[5]

### 3. The Buying Claims Are Barred For Lack Of A Predicate Violation

Plaintiffs' § 20A claims also should be dismissed because they fail to plead a timely predicate violation. (Br. 17-18.) As the Second Circuit stated in *Jackson National Life Insurance Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994), "the language of [§ 20A is] quite plain" that "a predicate violation" is required. Plaintiffs' opposition relies on the Ninth Circuit's contrary decision in *Johnson v. Aljian*, 490 F.3d 778, 783 (9th Cir. 2007), but never explains why this Court should follow *Johnson* rather than this Circuit's decision in *Jackson* (Pl. Br. 18) and ignores the arguments in our opening brief showing why the result in *Johnson* is unpersuasive. (Br. 17-18.)

---

[5] Plaintiffs' other attempts to avoid § 1658(b) are futile. (*See* Pl. Br. 17-18, 18 n.7.) First, Plaintiffs cite *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 402, 414-16, 420 (S.D.N.Y. 2005), but ignore the fact that *Alstom* did not address § 20A or any other section that required proof of fraud. (Br. 15 n.4.) Second, Plaintiffs argue that there was only one "violation" during the two-year class period, but cite no authority to support their claim; as discussed above, it is wrong. Third, Plaintiffs' suggestion that § 1658(b) is "permissive" because it says "may be brought" rather than "must be brought" is baseless. That would mean that an untimely claim would never be barred by § 1658(b)—a timely claim would simply be "permitted" by it. This "permissive" language is standard in many statutes of repose, including § 20A itself, and it does not mean that filing within the repose period is optional. 15 U.S.C. § 78t-1(b)(4); *see also, e.g.*, 15 U.S.C. § 78u-1(d)(5) (Section 21A).

8

### III.   Plaintiffs Have Not Stated A Claim For Increased Interest

Finally, Plaintiffs do not deny that the interest rate the SEC imposed on SAC's disgorgement (a) is the same rate it has imposed in every disgorgement case for the past 25 years and (b) has never been overturned by any court.  As the Second Circuit recently noted in *SEC v. Citigroup Global Markets, Inc.*, 2014 WL 2486793, at *9 (2d Cir. June 4, 2014), "the S.E.C.'s decisions on discretionary matters of policy," such as settlement terms, "merit[] significant deference."

Plaintiffs concede that the interest rate adopted by the SEC is "a rate the SEC broadly applies by regulation." (Pl. Br. 22.)  Specifically, 17 C.F.R. § 201.600(b) states that "[i]nterest on the sum to be disgorged shall be computed at the underpayment rate of interest."  Plaintiffs also concede that the SEC invariably recovers prejudgment interest at that rate.  Plaintiffs scoured the case law and identify two disgorgement cases that imposed higher interest (*see* Pl. Br. 22)—but they are 25 and 40 years old, and both predated the SEC's regulation on prejudgment interest.  Further, in each case, the court applied the "New York legal rate" of interest (typically reserved for damages actions)—but Plaintiffs do not even seek that rate in this case.  *See id.*

Plaintiffs' only argument as to why the SEC abused its discretion is that the prejudgment interest rate should have been based on profits SAC subsequently made on unrelated investments.  But the cases are clear that a plaintiff may not recover unrelated profits that a defendant made with the proceeds of insider trading.  As the court noted in *SEC v. MacDonald*, 699 F.2d 47, 54 (1st Cir. 1983), "[n]o case supports" holding an alleged insider trader liable for "the profits acquired by the insider's reinvestment of his wrongfully obtained

9

profits." *See also Donovan* v. *Bierwirth*, 754 F.2d 1049, 1057 (2d Cir. 1985) ("profit earned subsequent to discovery of the fraud is 'purely new matter.'").[6]

## Conclusion

Plaintiffs' claims against SAC should be dismissed.[7] Their relief, if any, should come from an application to share in the $602 million SAC will pay the SEC.

Dated:   New York, New York
         June 26, 2014

| PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP | WILLKIE FARR & GALLAGHER LLP |
|---|---|
| By: /s/ Daniel J. Kramer<br>Daniel J. Kramer<br>Michael E. Gertzman<br>Audra J. Soloway<br>Jonathan H. Hurwitz | By: /s/ Martin B. Klotz<br>Martin B. Klotz<br>Michael S. Schachter<br>Sameer Advani |
| 1285 Avenue of the Americas<br>New York, New York 10019<br>(212) 373-3020<br>dkramer@paulweiss.com<br>mgertzman@paulweiss.com<br>asoloway@paulweiss.com<br>jhurwitz@paulweiss.com | 787 Seventh Avenue<br>New York, New York 10019<br>(212) 728-8102<br><br>mklotz@willkie.com<br>mschachter@willkie.com<br>sadvani@willkie.com |

*Attorneys for the SAC Defendants*

---

[6] Plaintiffs try to avoid these cases by arguing that they are not seeking to recover SAC's profits, but rather its "cost of capital" or "net returns." They concede, however, that SAC's "cost of capital" *is* the profits that it made on other investments, less management fees. (¶¶ 517-530; Pl. Br. 23-24.) It makes no difference whether Plaintiffs describe their claim as a claim for "gross investment returns," "net investment returns" or a percentage of profits—or as a claim for additional disgorgement or prejudgment interest. No matter what Plaintiffs label it, it is still an impermissible attempt to recover based on SAC's subsequent profits.

[7] Our opening brief argued that Plaintiffs' claims should be dismissed for failure to plead reliance in light of the Supreme Court's grant of certiorari in *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 636 (U.S. Nov. 15, 2013). Because of the Supreme Court's subsequent decision in *Halliburton*, SAC withdraws its reliance arguments without prejudice to raising them at a later stage in the litigation. *See Halliburton Co.* v. *Erica P. John Fund, Inc.*, 2014 WL 2807181 (U.S. June 23, 2014).