USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/14/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

DAVID E. KAPLAN, et al.,

                Plaintiffs,

  -against-

S.A.C. CAPITAL ADVISORS, L.P., et al.,

                Defendants.

                            12-cv-9350 (VM)

------------------------------------------X

BIRMINGHAM RETIREMENT AND RELIEF
SYSTEM, et al.

                Plaintiffs,

                            13-cv-2459 (VM)

  -against-

                            **DECISION AND ORDER**

S.A.C. CAPITAL ADVISORS, L.P., et al.,

                Defendants.

------------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Lead Plaintiffs in Case No. 12-cv-9350, David E. Kaplan, et al., individually and on behalf of a putative class of investors in Elan Corporation securities ("Elan Investor Class"), together with Lead Plaintiffs in Case No. 13-cv-2459, City of Birmingham Retirement and Relief System, et al., individually and on behalf of a putative class of investors in Wyeth securities ("Wyeth Investor Class") (collectively, "Plaintiffs"), filed this Joint Consolidated Amended Class Action Complaint (the "CAC") against defendants S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC, S.A.C. Capital Associates, LLC,

S.A.C. International Equities, LLC, S.A.C. Select Fund, LLC, and Steven Cohen ("Cohen") (collectively, "SAC Defendants"); defendant Mathew Martoma ("Martoma"); and defendant Sidney Gilman ("Gilman").

In Plaintiffs' three-count CAC (Dkt. No. 128), Count One asserts violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); Count Two alleges violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 ("Section 20A"); and Count Three alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"). Defendants moved to dismiss all counts of the CAC (see Dkt. Nos. 129, 132, 134),[1] and the parties have fully briefed the motions.[2] For the reasons discussed below, the

---

[1] Martoma's motion to dismiss (Dkt. No. 134) merely joins SAC's motion and does not present any additional arguments. Gilman's motion to dismiss (Dkt. No. 132) joins SAC's motion while also presenting individual arguments.

[2] The Court has reviewed the parties' filings in this matter: SAC's Memorandum of Law in Support of Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, dated April 28, 2014 ("SAC's Motion") (Dkt. No. 130); Defendant Sidney Gilman's Joinder in Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, dated April 28, 2014 ("Gilman's Motion") (Dkt. Nos. 132, 133); Defendant Mathew Martoma's Notice of Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, dated April 28, 2014 (Dkt. No. 134); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Joint Consolidated Amended Class Action Complaint, dated June 9, 2014 ("Plaintiffs' Opposition") (Dkt. No. 138); Plaintiffs' Response to Defendant Sidney Gilman's Joinder in Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, dated June 9, 2014 ("Plaintiffs' Gilman Opposition") (Dkt. No. 140); SAC's Reply in Further Support of Its Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, dated June 26, 2014 ("SAC's Reply") (Dkt. No. 141); and Defendant Sidney Gilman's Joinder in Reply in Further Support of Motion to Dismiss the Joint Consolidated Amended Class Action Complaint, dated June 26, 2014 ("Gilman's Reply") (Dkt. No. 143).

Defendants' motions to dismiss are GRANTED in part and DENIED in part.

## I.   BACKGROUND

The facts below are taken from the CAC, and the documents cited on relied upon therein. Except where specifically quoted, no further reference to these documents will be made. The Court accepts these facts as true for the purposes of ruling on the motions to dismiss. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008).

### A.   ELAN AND WYETH'S BAPINEUZAMAB CLINICAL TRIALS

The allegations in this suit concern what has been called the most profitable insider trading scheme ever uncovered. Defendant S.A.C. Capital Advisors, L.P., together with its affiliates (collectively, "SAC"), illegally gained profits and avoided losses of $555 million by trading Elan Corporation and Wyeth securities while in possession of material, nonpublic information. The inside information at issue concerned the clinical trials of bapineuzumab ("bapi"), a drug designed to treat Alzheimer's disease developed jointly by Elan and Wyeth. Martoma, an employee of SAC, cultivated relationships with two doctors -- Gilman and Joel Ross -- who were supervising bapi's clinical trials, using these relationships to mine for news regarding the status of the trials.

B.   UNDERLINE(BUYING PERIOD CLAIMS (AUGUST 2006-JULY 18, 2008))

Between August 2006 and July 18, 2008 (the "Buying Period"),
Martoma obtained confidential information from Gilman and Ross
regarding the safety and efficacy of bapi and the conduct of the
clinical trials. Plaintiffs allege that Martoma reported
information he obtained, which during this period reflected a
positive outlook for bapi's success, to Cohen, SAC's founder, CEO,
and owner. Based on the information Martoma provided, SAC greatly
increased its holdings in Elan and Wyeth between August 2006 and
July 18, 2008, ultimately accumulating positions in Elan and Wyeth
of $336 million and $900 million respectively. During this period,
SAC profited an estimated $158,346,018 from its Elan investments
and $21,458,705 from its Wyeth investments.

C.   SELLING PERIOD CLAIMS (JULY 19-JULY 29)

Beginning in July 2008, the bapi trials began to reflect a
negative outlook on the drug's ultimate success. Gilman, who had
been selected to publicly present the results of the most recent
bapi trials on July 29, obtained access to these results during
the week of July 14-18. While the market had anticipated that the
results would show clear efficacy signals for the drug that might
pave the way for early FDA approval, the results instead showed
inconsistent efficacy signals -- a disappointing outcome for
investors. On July 17, 2008 -- twelve days before he was to reveal
the results to the public -- Gilman disclosed them to Martoma.

- 4 -

Armed with news of the less-than-positive results, Martoma reported his pessimism regarding bapi's future to Cohen. According to Plaintiffs, between July 19 and July 27 ("the Selling Period") leading up to Gilman's presentation, Cohen, with Martoma's assistance, sold off SAC's entire long position on Elan and all its stock in Wyeth. In addition, during this period SAC purchased short options on Elan and Wyeth -- in effect betting that Elan and Wyeth shares would tumble. Plaintiffs assert that Cohen ensured these trades were made secretly -- to the extent that even other traders at SAC were kept in the dark regarding the liquidation of the Elan and Wyeth positions.

On July 29, Elan and Wyeth announced the results of the bapi trials, followed by Gilman's presentation analyzing them. The market reacted negatively to the news, with share prices of both Wyeth and Elan falling sharply until market close on July 30. Because SAC had liquidated its long positions in Elan and Wyeth and purchased short positions in the companies before July 29, SAC avoided losses of an estimated $194 million on the long positions and obtained an estimated $73 million profit on its short bets, based on the July 30 market decline. Still, while market observers agreed that the July 29 news was less favorable than expected, their assessments of the trial results varied, with some interpreting the data as strongly negative while others viewed it as cautiously positive.

D.   <u>TYSABRI DROP</u>

More bad news was to come for Elan shareholders, this time regarding Elan's main commercially-marketed drug, Tysabri. On July 31, Elan announced that two patients treated with Tysabri had contracted progressive multifocal leukoencephalopathy, a rare and frequently fatal disease. Following this disclosure, Elan's shares declined a further fifty percent by market close on August 1. Because SAC had already sold off its Elan holdings, it avoided an additional $106.9 million loss based on the August 1 market decline.

E.   <u>GOVERNMENT ENFORCEMENT ACTIONS</u>

The scheme as described above has been the subject of multiple government enforcement actions. The United States Securities and Exchange Commission ("the SEC") brought an enforcement action against SAC,[3] Martoma, and Gilman, entitled <u>SEC v. CR Intrinsic Investors, LLC</u>, No. 12-CV-8466 (S.D.N.Y), ("SEC Action"), concerning SAC's liquidation of its long positions and purchase of short options in Wyeth and Elan between July 17 and July 29, 2008. On November 16, 2012, Gilman and the SEC reached a settlement based on Gilman's agreement to disgorge $186,781 and pay prejudgment interest in the amount of $48,087. On March 15, 2013, the SEC and SAC reached a settlement ("SEC-SAC Settlement") in which SAC agreed

---

[3] Specifically, SAC's affiliates CR Intrinsic Investors, LLC; S.A.C. Capital Advisors, LLC; S.A.C. Capital Associates, LLC; S.A.C. International Equities, LLC; and S.A.C. Select Fund, LLC.

to disgorge $275 million, plus $52 million in prejudgment interest, and to pay a civil penalty of $275 million, for a total payment of $602 million.

In addition, the United States Attorney brought criminal charges, United States v. S.A.C. Capital Advisors, L.P., 13-CR-541 (S.D.N.Y.), and initiated civil forfeiture proceedings, United States v. S.A.C. Capital Advisors, L.P., 13-CR-5182 (S.D.N.Y.) ("SAC Criminal Action") against SAC. On November 4, 2013, SAC pled guilty to wire and securities fraud, and agreed to pay $1.184 billion in fines and civil forfeiture. The United States Attorney also brought criminal charges against Martoma, United States v. Martoma, 12-CR-973 (S.D.N.Y.) ("Martoma Criminal Action"). On February 6, 2014, a jury convicted Martoma of securities fraud and conspiracy to commit securities fraud in connection with insider trading in Elan and Wyeth.

F.   PLAINTIFFS' CLAIMS

The Plaintiffs in this action consist of two groups, the Elan Investor Class and the Wyeth Investor Class. The Elan Investor Class is composed of all persons who traded Elan American Depositary Receipts ("ADRs") and other related options contemporaneously with and opposite to SAC during the period of August 23, 2006 to 4:00 P.M Eastern Daylight Time on July 29, 2006 ("Elan Class Period"), while the Wyeth Investor Class is composed of all persons who traded Wyeth common stock and related options

contemporaneously with and opposite to SAC during the period of
January 14, 2008 to 4:00 P.M. Eastern Daylight Time on July 29,
2008 ("Wyeth Class Period").

Plaintiffs allege that, by trading contemporaneously with SAC
while SAC was in possession of insider information, they suffered
damages as defined in Section 20A, Section 10(b), and Rule 10b-5.

## II.   LEGAL STANDARD

A.   STANDARD OF REVIEW UNDER RULE 12(B)(6)

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face.'"   Ashcroft v. Iqbal, 556
U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.
544, 570 (2007)).   This standard is met "when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged."
Id.   A court should not dismiss a complaint for failure to state
a claim if the factual allegations sufficiently "raise a right to
relief above the speculative level."   Twombly, 550 U.S. at 555.
The task of the court in ruling on a motion to dismiss is to
"assess the legal feasibility of the complaint, not to assay the
weight of the evidence which might be offered in support thereof."
In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574
(S.D.N.Y. 2005) (internal quotation marks omitted).   The court
must accept all well-pleaded factual allegations in the complaint

as true, and draw all reasonable inferences in the plaintiff's favor. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

## III. **DISCUSSION**

A.   DISGORGEMENT SETOFF UNDER SECTION 20A

SAC first argues that the disgorgement it paid in the SEC-SAC Settlement extinguishes Plaintiffs' claims for damages in relation to the drop in Wyeth and Elan share prices on July 29 and July 30, 2008 ("July 29-30 Drop"). Section 20A, which governs liability to contemporaneous traders for insider trading, limits damages to "the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." 15 U.S.C. § 78t-1(b)(1). Further, the total amount of damages imposed under 20A "shall be diminished by the amounts . . . that such person may be required to disgorge" to the SEC "relating to the same transaction or transactions." 15 U.S.C. § 78t-1(b)(2). SAC disgorged $275 million to the SEC as part of the SEC-SAC Settlement in relation to the July 29-30 Drop, thus any damages awarded under Section 20A regarding the July 29-30 Drop would be diminished by $275 million. SAC argues that, because Plaintiffs only seek damages of $268.4 million relating to the July 29-30 drop -- $6.5 million less than the disgorgement amount -- their claims regarding the July 29-30 drop should be dismissed.

SAC's argument is without merit. While any damages Plaintiffs can collect for the July 29-30 drop will be diminished by disgorgement from the SEC-SAC settlement, "plaintiff may attempt to prove the insufficiency of the SEC settlement and recover any difference between actual profits and the amount disgorged to the SEC." Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc., 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990) (internal quotation marks omitted) (discussing disgorgement under Section 10(b)). Here, Plaintiffs' CAC estimates SAC's gains from to the July 29-30 drop, but it acknowledges that the figures are "[b]ased on Plaintiffs' analysis to date," and represent a "minimum" estimation. (CAC at ¶ 30.) Thus, the Court cannot rule at the motion to dismiss stage that SAC's gains from the July 29-30 drop were necessarily less than the amount SAC disgorged to the SEC. See McGhee v. Joutras, No. 94 C 7052, 1995 WL 124131, at *2 (N.D. Ill. Mar. 21, 1995) ("It is universal doctrine that the amount claimed in an ad damnum is not part of a plaintiff's substantive allegations for purposes of deciding the sufficiency of a cause of action.").

SAC's contention amounts to a novel and curious proposition. Because Plaintiffs' preliminary statement of damages set forth in the complaint is favorable to Defendants in relation to the amount of SAC's disgorgement, SAC seeks to hold Plaintiffs to their estimation without an opportunity for them to gather evidence with which to establish a more precise amount based on a fully

documented record. This theory is flawed on at least two accounts. Plaintiffs' appraisal of damages at the pleading stages is just that, an estimate, not mathematical fact. Second, SAC's contention presupposes that the amount of its disgorgement under the SEC settlement is an absolute benchmark, giving it the status of scientific truth. But, by what authority is this Court to find that the SAC disgorgement is incontestably accurate and not open to question by other interested persons? That amount was not determined through a public adversarial proceeding; it was negotiated by SAC and the SEC in private and presented to the Court as a settlement agreement. What is to say that the profits and losses assumptions and computations SAC and the SEC relied upon in reaching an accord are necessarily correct?

For the same reasons, the Court cannot at this stage dismiss Plaintiffs' claims against Gilman. As part of the SEC Action, Gilman agreed to disgorge $186,781 to the SEC, plus prejudgment interest in the amount of $48,087. While these sums will be deducted from any amount Gilman is found to owe under Section 20A, granting Gilman's motion to dismiss at this point would preclude Plaintiffs from any attempt to show that Gilman's settlement with the SEC insufficiently included all Gilman's profits related to the scheme. Thus, Gilman's motion to dismiss is denied.

B.   TYSABRI DROP

SAC next argues that Plaintiffs' claims for damages regarding the drop in Elan's value subsequent to the Tysabri disclosure should be dismissed. As discussed in supra section I.D., following the July 29-30 drop in Wyeth and Elan's shares due to the announcement of clinical results on July 29, Elan's value took a further tumble on July 31 and August 1 when it disclosed problems with its signature drug, Tysabri. SAC argues that, because the Tysabri drop was not attributable to any misconduct on SAC's part, it should not be required to disgorge losses avoided and profits gained due to this drop.

SAC's arguments are inappropriate at this stage in the proceedings. As discussed above, damages in an action under Section 20A are capped at the insider's profits gained or losses avoided based on the inside information. Profits and losses are measured by determining "the difference between the price the insider realizes and the market price of the securities . . . a reasonable time after the inside information ha[s] been disseminated -- that is, after the market and defrauded sellers and buyers have had a reasonable time to digest the information." In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 665 (E.D. Va. 2000) (internal quotation marks omitted) ("MicroStrategy Litigation"). The question here, therefore, is whether the Tysabri drop occurred before "the market and defrauded sellers and buyers" had a

"reasonable amount of time" to digest the information from the June 29 disclosure.

The determination of the "reasonable amount of time period" is not properly made at the motion to dismiss phase. The time period's length "varies with the circumstances of each case[;] . . . it is dependent on when the defrauded sellers or buyers reasonably should have digested the disclosed information and have taken steps to protect their interests." Id. As such, it is a "highly fact-intensive inquiry" that "is typically unsuitable for threshold disposition." Id; see also McGhee, 1995 WL 124131, at *2 (denying a motion to dismiss regarding a determination of reasonable amount of time because "the subject is clearly one for factual presentation and analysis").

SAC argues that allowing Plaintiffs to collect damages based on a market event wholly unrelated to the alleged insider trading would represent an improper windfall recovery for the Plaintiffs, such that the Court should, at this stage, dismiss Plaintiffs' claims regarding the Tysabri drop. This argument was rejected by the Second Circuit in Elkind v. Liggett & Myers, Inc., 635 F.2d 156 (2d Cir. 1980). In Elkind, the defendants traded on inside information, and -- similar to the instant case -- once the corrective disclosure became public, the stock fell further than might have been expected due to factors independent of the inside information. Id. at 173 n.12. The defendants argued that they

should not be liable for losses due to factors outside their control. The Court held that "when only a disgorgement measure of damages is used, a tippee who trades is liable for the entire difference between the price at which he sold and the price the stock reached after the tip became known." Id. While the Elkind defendants were not necessarily responsible for the increased losses to the plaintiffs, "[b]y trading on tipped information, the tippee takes the risk that by the time the tip is disclosed the market price may reflect disclosure of information more adverse than the tip and other adverse market conditions." Id.

Similarly, in this case SAC had no knowledge of the impending Tysabri drop when it liquidated its position in Elan. Still, by trading on inside information, SAC assumed the risk that other independent factors could compound the decrease in share value following the disclosure of the bapi results. See Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965) ("[T]here can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."); see also S.E.C. v. Contorinis, 743 F.3d 296, 305 (2d Cir. 2014) (internal quotation marks omitted) ("Any risk of uncertainty in calculating disgorgement should fall upon the

wrongdoer whose conduct created that uncertainty."); S.E.C. v. MacDonald, 699 F.2d 47, 55 (1st Cir. 1983) ("[D]oubts are to be resolved against the defrauding party.").

SAC attempts to distinguish Elkind from the current case, to no avail. It asserts that Elkind held defendants responsible for independent market events that occurred after the defendants traded on insider information but before the corrective disclosure, while in the current case the independent market event, the Tysabri drop, occurred after the corrective disclosure. (SAC's Reply at 2-3). SAC fails to explain why this difference should dictate a different result. If the Tysabri drop occurred before Plaintiffs had a reasonable amount of time to react to the July 29 report, then it is irrelevant whether the drop occurred before or after the bapi disclosure because in either case Plaintiffs would not have had sufficient time to act in order to avoid suffering further losses. See MicroStrategy Litigation, 115 F. Supp. 2d at 665 (explaining that the "cut-off date for measuring damages" extends a reasonable time after disclosure to allow defrauded purchasers and sellers "to protect their interests by buying replacement or selling held shares upon full public disclosure of previously withheld information").

Here, Plaintiffs have sufficiently alleged that the Tysabri drop occurred before investors had a reasonable period of time to react to the July 29 bapi disclosure. That assertion raises a

question of fact that cannot be resolved at the pleading stage and should survive a motion to dismiss. In the CAC, Plaintiffs allege that analysts and reporters characterized the July 29 bapi disclosure as ambiguous, unclear, confounding, and confusing. (CAC at ¶ 296-99, 307.) Given this ambiguity, it is far from clear that it was reasonable for investors to digest the information and act within forty-eight hours, before the August 1 Tysabri drop. See McGhee, 1995 WL 124131, at *2 (declining to hold that "the next day's market price always freezes the measure of damages"); S.E.C. v. Ingoldsby, Civ. A. No. 88-1001-MA, 1990 WL 120731, at *5 (D. Mass. May 15, 1990) (determining nine days to be a reasonable period of time after corrective disclosure); S.E.C. v. MacDonald, 568 F. Supp. 111, 113 (D.R.I. 1983) (between sixteen and twenty days).

C.   BUYING CLAIMS UNDER SECTION 20A ARE NOT TIME-BARRED

SAC argues unpersuasively that many of Plaintiffs' claims under Section 20A are time-barred. For the purposes of ruling on this motion, the Court will assume that actions under Section 20A are governed by the statute of repose found in Section 804 of the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658(b)(2) ("Section 804").[4] In the CAC, the Elan Investor Class asserts claims on

---

[4] Plaintiffs argue that Section 804 does not govern actions under Section 20A because Section 20A has its own specific statute of limitations. The parties also differ as to whether the time bar in Section 20A is a statute of limitations or a statute of repose. Because the Court's analysis assumes that Plaintiffs' claims are not barred under Section 804's more restrictive statute of repose,

behalf of persons who traded contemporaneously with and opposite
to SAC beginning on August 23, 2006 until July 29, 2008, and the
Wyeth Investor Class asserts claims for its respective traders
beginning January 14, 2008 and ending on July 29, 2008. The Elan
Investor Class first brought it claims on May 13, 2013, and the
Wyeth Investor Class on July 15, 2013. Because Section 804 has a
five-year statute of repose, SAC argues that the Elan Investor
Class can bring claims regarding trades only as to those that
occurred on or after May 13, 2008, five years before it brought
suit. Similarly, SAC argues that the Wyeth Investor Class's claims
are limited to trades that occurred beginning on July 15, 2008. If
SAC were correct, the Elan Investor Class's claims for the buying
period would be limited to the period between May 13 and July 29,
2008, and the Wyeth Investor Class's respective time period would
be from July 15 to July 29, 2008. SAC's argument is predicated on
its assertion that each individual trade that SAC performed with
inside information <u>must</u> constitute a separate violation for
purposes of calculating the applicable deadline under the statute
of repose.

Analysis of Section 804 and Section 20A reveals that SAC's
argument is without merit. Section 804 states that a private right
of action that involves a claim of fraud "in contravention of a

---

it need not determine either whether Section 20A's time bar actually governs,
or whether Section 20A's time bar is a statute of limitations or a statute of
repose.

regulatory requirement concerning the securities laws" may not be brought later than "5 years after such violation." 28 U.S.C. § 1658(b). The question, therefore, turns on the definition of "violation." The wording of Section 20A makes it clear that a "violation" can constitute a series of trades. Under subsection (b)(1) of Section 20A, the total amount of damages cannot exceed the profit gained or loss avoided "in the transaction <u>or</u> <u>transactions</u> that <u>are</u> the subject of the violation." 15 U.S.C. § 78t-1(b)(1) (emphasis added). Thus, Section 20A contemplates that various transactions can make up one violation. Further, SAC's reading of Section 20A that each transaction must be its own violation would yield nonsensical results in light of Section 20A's time bar, which bans causes of action brought "more than 5 years after the date of the last transaction that is the subject of the violation." <u>Id.</u> at § 78t-1(b)(4). Here, then, the "violation" for the purposes of Section 804's five-year statute of repose is the series of trades made by SAC in Elan and Wyeth while possessing inside information. As such, the statute of repose did not begin to run until July 29, 2008, the last date that SAC traded in Elan and Wyeth based on inside information.

SAC's arguments referencing the text of Section 20A are unavailing. SAC points to subsection (a) of Section 20A, which creates liability based on "the purchase or sale of securities that is the subject of the violation," <u>id.</u> at § 78t-1. But nothing

in this statement limits "purchase or sale" to one "purchase or sale"; to the contrary, "purchase or sale," especially when qualified by the phrase that follows these words -- "that is subject of the violation" -- could refer to any number of purchases or sales. SAC also highlights language later in subsection (a) making a defendant who has participated in insider trading liable to any person who "has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." Id. While in this instance the language denotes that a violation could entail a singular purchase or sale, there is nothing in this provision that necessarily limits a violation to one purchase or sale so as to negate the later language explicitly referring, in a more apt context, to a violation as constituting one or multiple transactions.

SAC next argues that, because criminal charges may be brought for each trade, and that therefore each trade can constitute a violation, it follows that each trade must constitute a separate violation. This argument is immediately self-defeating. While individual trades can be brought as individual violations even though based on the same inside information, the Government may also bring charges covering such a series of trades as one violation. As SAC is clearly aware, both SAC and Martoma were indicted on criminal charges encompassing many of the illegal

- 19 -

trades included in this action, and while the Government could have brought each individual trade as a separate violation, it elected not to. (See SAC Criminal Action, Dkt. No. 1; Martoma Criminal Action, Dkt. No. 61). That multiple insider trades can be charged as one violation in a criminal action further supports the contention that a violation under Section 20A can encompass multiple trades. Had the Government adopted SAC's reading and charged each of SAC's trades as a separate violation, a number that theoretically could total dozens or even hundreds of criminal offenses each individually punishable, SAC in all likelihood would have advanced arguments urging that the statute should not be applied so as to produce such impractical and draconian results.

D.   STATUTE OF REPOSE UNDER SECTION 10(b) AND RULE 10b-5

SAC argues, and Plaintiffs do not dispute in their opposition, that Plaintiffs' claims under Section 10(b) and Rule 10b-5 stemming from transactions that occurred outside the five-year statute of repose are time-barred. SAC is correct. Section 804 provides the statute of repose for Section 10(b) and Rule 10b-5 -- "5 years after such violation." 28 U.S.C. § 1658(b). A violation under Section 10(b) and Rule 10b-5 occurs "on the dates the parties have committed themselves to complete the purchase or sale of transaction." Arco Capital Corp., Ltd. v. Deutsche Bank AG, 949 F. Supp. 2d 532, 544 (S.D.N.Y. 2013) (quoting Arnold v. KPMG LLP, 334 F. App'x 349, 351 (2d Cir. 2009)). Unlike Section 20A, which

- 20 -

indicates that a violation can include multiple transactions, a violation of Section 10(b) and Rule 10b-5 occurs at each transaction for the purpose of calculating the repose date. Thus, any claim under Section 10(b) and Rule 10b-5 relating to a sale or purchase of securities that occurred outside the five-year statute of repose is time-barred. Here, Elan Investor Class claims relating to transactions made before May 13, 2008 and Wyeth Investor Class claims relating to transactions made before July 15, 2008, and filed under Section 10(b) and Rule 10b-5, are dismissed.

SAC further presses that any claim under Section 20A becomes not viable if the underlying Rule 10(b) violation is time-barred. This proposition takes the argument a step too far. SAC is correct that, in order to state a claim under Section 20A, a plaintiff must allege a predicate violation of the Securities Exchange Act of 1934. See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir. 1994). SAC is incorrect, though, in arguing that the predicate violation's statute of repose governs the Section 20A claim. As the Ninth Circuit held in Johnson v. Alijian, 490 F.3d 778, 781 (9th Cir. 2007), while Section 20A requires an underlying violation of the Exchange Act, "[n]owhere do we find in the statute such modifying terms as 'viable,' 'actionable,' or 'timely.'" Thus, to state a claim under Section 20A, a plaintiff need only allege conduct that violates the

Exchange Act; whether such action would itself be time-barred is irrelevant.

The Second Circuit did not hold to the contrary in Jackson, 32 F.3d at 704, as SAC contends. In Jackson, the Second Circuit held that a violation of the Securities Act of 1933 cannot serve as a predicate violation for a Section 20A claim. It is thus inapplicable to the current case, where Plaintiffs allege a violation of the Exchange Act of 1934 as required by Section 20A.

E.   DOUBLE-COUNTING ARGUMENT

SAC argues that including both Buying Claims and Selling Claims in the calculation of SAC's profits gained and losses avoided under Section 20A constitutes "improper double-counting" because the securities that SAC bought during the buying period were the same securities it sold during the selling period. This argument is wholly without merit. Section 20A limits damages to "the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." SAC profited when it originally purchased a Wyeth or Elan security based on inside information, and then it later avoided losses when it sold a Wyeth or Elan security based on different inside information. That the second, separate fraudulent transaction may have involved the same security as the first fraudulent transaction does not insulate SAC from responsibility for damages resulting from both illegal transactions.

F.    PREJUDGMENT INTEREST

SAC seeks to dismiss Plaintiffs' claims for prejudgment interest at a rate higher than that used in the SEC-SAC Settlement. SAC's argument that the SEC's standard rate of prejudgment interest is binding on this Court, for which SAC provides no legal support, is meritless. It echoes SAC's argument, rejected above, that Plaintiffs and the Court are bound by the disgorgement of gains computation SAC and the SEC arrived at in their settlement agreement. In the SEC-SAC Settlement, the SEC and SAC agreed that prejudgment interest would be calculated at the IRS rate for tax underpayments, a rate that "reflects what it would have cost to borrow the money from the government . . . ." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2nd Cir. 1996).

As discussed above, supra Section III.A., in claims under Section 20A, damages are limited to profits gained and losses avoided based on the defendant's unlawful acts. Including prejudgment interest in the profits gained and losses avoided calculation "is necessary to capture the full measure of the defendant's ill-gotten gains" because "a defendant has use of the unlawful profits from the time of the wrongdoing until entry of judgment." S.E.C. v. Universal Express, Inc., 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009), aff'd 438 F. App'x 23 (2d Cir. 2011). Thus, "[a]n award of prejudgment interest . . . is appropriate to ensure that the defendant does not profit from obtaining the time-value

- 23 -

of any unlawful profits earned . . . ." <u>S.E.C. v. World Info.</u>
<u>Tech., Inc.</u>, 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008).

SAC has no grounds to argue that this Court is bound by the
SEC and SAC's agreed-upon rate to calculate prejudgment interest.
The determination of the prejudgment interest rate is "confided to
the district court's broad discretion." <u>First Jersey Sec., Inc.</u>,
101 F.3d at 1476 (internal quotation marks omitted). Courts may
adopt "a variety of approaches to determining the interest rate
applicable to awards of prejudgment interest, since no federal
statute governs which rate should apply to prejudgment interest
awards." <u>In re Livent, Inc. Noteholders Sec. Litig.</u>, 360 F. Supp.
2d 568, 571 (S.D.N.Y. 2005) ("<u>Livent</u>"). Plaintiffs' CAC alleges
that the IRS underpayment rate does not capture the "time-value"
of SAC's unlawful gains, and SAC has provided no support for its
contention that the Court is bound by this rate. Thus, a question
of fact remains regarding the calculation of the applicable
prejudgment interest rate, which cannot be determined at this stage
in the proceedings.

SAC further argues that, even if the Court is not bound by
the IRS underpayment rate, it should dismiss Plaintiffs' claim for
prejudgment interest based on investment returns payable to SAC
investors. According to SAC, using investment returns as the
prejudgment rate of interest violates the principle that "profits
acquired by the insider's reinvestment of his wrongfully obtained

profits" constitute "purely new matter." S.E.C. v. MacDonald, 699
F.2d 47, 54 (2d Cir. 1983). Plaintiffs respond that investment
returns constitute the price that SAC has to pay to borrow money
from its investors. As such, it represents the "time-value" of the
SAC's illicit gains. Plaintiffs contend that SAC's business relies
on raising money from investors, and the rate at which SAC
compensates its investors for the use of their money is represented
by the investment returns. SAC's profits, in contrast, are the
management fees and revenues it retains after paying the investors.

The Court is persuaded that Plaintiffs have sufficiently
stated a claim that investment returns represent an acceptable
rate of prejudgment interest. Courts are permitted to "take into
account the rate of interest that the defendant would have had to
pay to borrow the money it withheld from the plaintiff" when
determining the prejudgment interest rate. Livent, 360 F. Supp. 2d
at 572 (quoting Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130,
139 (2d Cir. 2000)). Plaintiffs make a plausible argument that
investor returns constitute the price SAC pays to borrow money.
Thus, the Court cannot at this stage in the proceedings dismiss
Plaintiffs' claim for prejudgment interest at a rate based on
investment returns.[5]

---

[5] SAC moved to dismiss Plaintiffs' claims under Section 20(a) based on the
argument that Plaintiffs failed to allege a viable claim under the Exchange
Act. Because the Court finds that Plaintiffs have adequately stated a claim
under Section 20A, SAC's motion to dismiss Plaintiffs' claims under Section
20(a) is denied.

## IV.   ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion to dismiss the complaint of Plaintiffs herein (Dkt. No. 129) filed by defendants S.A.C. Capital Advisors, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC, S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, S.A.C. Select Fund, LLC, and Steven Cohen is **GRANTED** as to Count One with regard to those transactions by the Elan Investor Class that occurred before May 13, 2008 and those transactions by the Wyeth Investor Class that occurred before July 15, 2013; and **DENIED** as to all other claims; and it is further

**ORDERED** that the motion to dismiss the complaint of Plaintiffs herein (Dkt. No. 134) filed by defendant Mathew Martoma is **DENIED**; and it is finally

**ORDERED** that the motion to dismiss the complaint of Plaintiffs herein (Dkt. No. 132) filed by defendant Sidney Gilman is **DENIED**.

**SO ORDERED.**

Dated:    New York, New York
          August 13, 2014

Victor Marrero
U.S.D.J.

- 26 -