UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAVID E. KAPLAN, et al., Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiffs,

             - against -

S.A.C. CAPITAL ADVISORS, L.P., et al.,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 12 Civ. 9350 (JGK) (KNF)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
FIRST *DAUBERT* MOTION: TO EXCLUDE CERTAIN EXPERT
TESTIMONY AND OPINIONS OF PROFESSOR ALLEN FERRELL**

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

-and-

865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000

**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000

**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

*Attorneys for Plaintiffs and Class Counsel*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF REPORTS ..................................................... 1

SUMMARY OF THE CASE ....................................................................................... 4

ARGUMENT ........................................................................................................... 5

The Legal Standard Governing *Daubert* Motions ............................................... 5

I.  SUBSTANTIALLY ALL OF PROFESSOR FERRELL'S OPENING REPORT, EVALUATING COHEN'S TRADING IN ELAN AND WYETH, SHOULD BE EXCLUDED ........................................................................................... 7

  A.  Professor Ferrell's Opinions Are Not the "Product of Reliable Principles and Methods" .................................................................. 7

  B.  Professor Ferrell's Opinions Do Not Reflect "Scientific, Technical, or Other Specialized Knowledge" and Instead Constitute Assessments of Stock Trades and Other Events That Jurors Could Readily Evaluate for Themselves ................................................................................... 9

  C.  Professor Ferrell Is Not Qualified to Present the Opinions He Offers, Either by Academic Training or Practical Experience .......................... 10

  D.  Professor Ferrell Improperly Offers Opinions Regarding Parties' Motives and States of Mind ................................................................ 11

  E.  Portions of the Opening Report Constitute Improper Factual Narrative and Argumentation ............................................................................. 13

  F.  Summary of Matters that Plaintiffs Do Not Seek to Exclude ............... 14

II.  THE OPINIONS IN PROFESSOR FERRELL'S JANUARY 22, 2016 REBUTTAL REPORT CONCERNING DISGORGEMENT (POINTS IV AND V) SHOULD BE EXCLUDED ............................................................... 15

  A.  Professor Ferrell's Opinion that Certain Losses Avoided Should Not Be Included in the Disgorgement Amount Conflicts with the Court's Prior Ruling in This Case and Is Not the Product of Reliable Principles or Methods .............................................................................................. 15

    1.  Professor Ferrell's Opinion Directly Conflicts with a Ruling of the Court .................................................................................... 15

    2.  Professor Ferrell's Opinion Is Not the Product of Reliable Principles or Methods from the Field of Economics ................... 16

  B.  Professor Ferrell's Opinion that the Disgorgement Amount Should Be Reduced by SAC's Cost of Capital Conflicts with Applicable Law ................... 17

III.   CERTAIN OPINIONS IN PROFESSOR FERRELL'S AUGUST 27, 2015
       DECLARATION AND NOVEMBER 18, 2015 SUPPLEMENTAL
       DECLARATION REGARDING THE DETERMINATION OF "REASONABLE
       TIME" SHOULD BE EXCLUDED ..................................................................................19

       A.    Background Regarding the Issue of "Reasonable Time" .......................................19

       B.    "Reasonable Time" Is an Objective Measure and Professor Ferrell's
             Opinions to the Contrary Should Be Excluded as Contrary to Law ......................22

       C.    Professor Ferrell's Opinion Disputing that Trading Volume Is Relevant to
             the Determination of "Reasonable Time" Should Be Excluded as Contrary
             to Law ..................................................................................................................24

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  2015 WL. 5003528 (S.D.N.Y. Aug. 20, 2015)................................................................13

*AstraZeneca LP v. Tap Pharm. Prods., Inc.*,
  444 F. Supp. 2d 278 (D. Del. 2006)................................................................12

*Bazile v. City of New York*,
  215 F. Supp. 2d 354 (S.D.N.Y. 2002)................................................................8

*Berk v. St. Vincent's Hosp. and Med. Ctr.*,
  380 F. Supp. 2d 334 (S.D.N.Y. 2005)................................................................6

*CIT Group/Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*,
  815 F. Supp. 2d 673 (S.D.N.Y. 2011)................................................................6

*Cave v. Saxon Mortg. Servs., Inc.*,
  2015 WL. 6153754 (E.D. Pa. Oct. 20, 2015)................................................................16

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011)................................................................23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)................................................................1, 6, 7

*Elkind v. Liggett & Myers, Inc.*,
  635 F.2d 156 (2d Cir. 1980)................................................................20, 22

*FTC v. Bronson Partners, LLC,* 654 F.3d 359, 375 (2d Cir. 2011)), *aff'd*, 639 F. App'x
  752 (2d Cir.), *cert. denied*, 136 S. Ct. 2429 (2016)................................................................18

*In re Fosamax Prod. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................................................12

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)................................................................8

*Gerstle v. Gamble-Skogmo, Inc.*,
  478 F.2d 1281 (2d Cir. 1973)................................................................20

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
  40 F. Supp. 3d 332 (S.D.N.Y. 2014)................................................................16, 19, 20, 25

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ....................................................................22

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ............14

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
    2015 WL. 5459662 (S.D.N.Y. Sept. 16, 2015) ................................................13

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................19, 22, 24, 25

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) ...........................................................................6

*In re Novatel Wireless Sec. Litig.*,
    846 F. Supp. 2d 1104 (S.D. Cal. 2012) ..........................................................16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ...................................................................................23

*Park W. Radiology v. CareCore Nat. LLC*,
    675 F. Supp. 2d 314 (S.D.N.Y. 2009) ............................................................11

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010) ............................................................11

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............................................10, 11, 13

*SEC v. Amerindo Inv. Advisors Inc.*,
    2014 WL. 2112032 (S.D.N.Y. May 6, 2014), *aff'd*, 639 F. App'x 752 (2d Cir.),
    *cert. denied*, 136 S. Ct. 2429 (2016) ...............................................................18

*SEC v. Aronson*,
    2015 WL. 10792021 (S.D.N.Y. Aug. 24, 2015) ..............................................18

*SEC v. MacDonald*,
    699 F.2d 47 (1st Cir. 1983) .......................................................................20, 24

*SEC v. Shapiro*,
    494 F.2d 1301 (2d Cir. 1974) .........................................................................20

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) .......................................................11, 17

*SEC v. Universal Exp., Inc.*,
    438 F. App'x 23 (2d Cir. 2011)............................................................17

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................14

*Snyder v. Wells Fargo Bank, N.A.*,
    2012 WL. 4876938 (S.D.N.Y. Oct. 15, 2012) ................................13

*Sys. Dev. Integration, LLC v. Computer Scis. Corp.*,
    886 F. Supp. 2d 873 (N.D. Ill. 2012) ..............................................16

*Troublé v. Wet Seal, Inc.*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001) ..............................................8

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)..............................................................6

*United States v. Newkirk*,
    2016 WL. 1659149 (S.D.N.Y. Apr. 19, 2016)................................10

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004)................................................................11

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)................................................................5

*United States v. Whitman*,
    555 F. App'x 98 (2d Cir. 2014)....................................................8, 10

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL. 408137 (S.D.N.Y. Feb. 22, 2005)..................................22

*In re Xerox Corp. Sec. Litig.*,
    746 F. Supp. 2d 402 (D. Conn. 2010) ............................................12

## MISCELLANEOUS

William M. Cready & David N. Hurtt, *Assessing Investor Response to Information
    Events Using Return and Volume Metrics* ........................................21

William K. S. Wang & Marc I. Steinberg, *Insider Trading* (3d ed. 2010)..............................20, 21

## RULES AND REGULATIONS

Federal Rule of Evidence 403 ................................................................................................3

Federal Rule of Evidence 702 ...................................................................2, 5, 6, 8, 11

Federal Rule of Evidence 702(a) ...........................................................................2, 9

Federal Rule of Evidence 702(c) ...........................................................................2, 7

Federal Rule of Evidence 1006 ...............................................................................14

Plaintiffs and Class Representatives Chi Pin Hsu, Gary W. Muensterman and Fred M. Ross respectfully submit this memorandum of law in support of their first *Daubert* motion, to exclude certain testimony and opinions of Professor Allen Ferrell.

## INTRODUCTION AND SUMMARY OF REPORTS

Defendants have offered the testimony of five proposed expert witnesses in this action: Professor Allen Ferrell on matters of finance, Paul Atkins and Marianne Smythe on compliance, and other experts on the drug bapineuzumab, its clinical trials, and the calculation of disgorgement damages.  Plaintiffs, in this motion, seek to exclude certain testimony and opinions offered by Professor Ferrell and, in a companion motion, seek to exclude Mr. Atkins' testimony.

—————————————————

Professor Ferrell, a financial economist and law professor retained on behalf of Defendants, has submitted a total of four reports and declarations in this matter; Plaintiffs move to exclude substantially all of his principal report and portions of his three other submissions, as summarized immediately below:

Expert Report of Professor Allen Ferrell, dated
December 4, 2015 (the "Opening Report") (Ex. A[1])

In his Opening Report, Professor Ferrell addresses the trading activity of Defendant Steven A. Cohen ("Cohen") in the securities of Elan Corporation, plc ("Elan") and Wyeth, and opines that the jury should draw particular inferences about Cohen's state of mind from that trading.  Prof. Ferrell sets forth as his "principal conclusion" that "Cohen's trading in Elan and

---

[1]    Citations in the form "Ex. __" are to Exhibits to the accompanying Declaration of Chad Johnson in Support of Plaintiffs' First *Daubert* Motion: to Exclude Certain Expert Testimony and Opinions of Professor Allen Ferrell, dated September 12, 2016 ("Johnson Declaration").

Wyeth securities does not establish that he knowingly traded based on Inside Information.  There are multiple aspects of Cohen's trading that support the inference that he was not knowingly trading based on Inside Information."  Opening Report ¶ 11.  In support, Prof. Ferrell analyzes selected portions of Cohen's trading in Elan and Wyeth and asserts that each "does not establish" that Cohen "knowingly traded based on Inside Information" (¶¶ 13, 17, 18, 23, 25, 47), or "does not support the inference" that Cohen was "knowingly trading based on Inside Information" (¶¶ 17, 19, 22) or "supports the inference" that Cohen was "not knowingly trading based on Inside Information" (¶¶ 30, 37, 43).

With the limited exceptions discussed below in Point I.F (at 14), all of the opinions in the Opening Report should be excluded.  Rather than reflect an analysis applying objective criteria informed by relevant expertise, substantially all of the opinions in the report consist of assertions by Professor Ferrell about the inferences that the jury should draw about Cohen's state of mind, without any foundation in his academic or other professional training.  At his deposition, Professor Ferrell declined to identify any criteria that guided his analysis, maintaining that his opinions were simply based on "the facts and circumstances."  This type of "I know it when I see it" analysis is not an acceptable basis for expert testimony under Federal Rule of Evidence ("Rule") 702.

Professor Ferrell's opinions therefore should be excluded for five reasons.  *First*, they are not "the product of reliable principles and methods," and thus fail to comply with Rule 702(c).

*Second*, they do not reflect "scientific, technical, or other specialized knowledge," as required by Rule 702(a), and instead consist of factual inferences that jurors could draw for themselves without the assistance of an expert.

*Third*, Professor Ferrell lacks relevant qualifications to draw inferences about insider trading from the review of trading activity – he acknowledged that there is no relevant academic literature, and he does not possess any other relevant professional experience.

*Fourth*, the Opening Report consists of opinions regarding Cohen's motives and state of mind that are not permissible topics for expert testimony.

*Fifth*, portions of the Opening Report constitute improper factual narrative that simply summarizes deposition testimony and other factual matter, and makes arguments that are properly left to counsel.

An annotated version of the Opening Report, identifying Plaintiffs' grounds for exclusion of each substantive paragraph, is set forth in Exhibit B to the accompanying Johnson Declaration.

Rebuttal Report of Professor Allen Ferrell, dated
January 22, 2016 (the "Rebuttal Report") (Ex. C)

Plaintiffs seek to exclude two opinions in the Rebuttal Report. *First*, Professor Ferrell's opinion that "it is inappropriate to include as part of [disgorgement damages] the losses avoided from sales during the Insider Selling Period of Elan ADRs that were purchased during the Insider Buying Period," Rebuttal Report ¶ 8, should be excluded because it (i) directly conflicts with the Court's ruling at the motion to dismiss stage, and (ii) is not the "product of reliable principles and methods" from the field of economics.

*Second*, Professor Ferrell's opinion that the disgorgement amount should be reduced by SAC's cost of capital, *id.* ¶ 13, should be excluded because "cost of capital" is not within the limited category of costs that properly may be deducted in calculating disgorgement.

Declaration of Professor Allen Ferrell, dated August 27, 2015 (the "Declaration") (Ex. D) and Supplemental Declaration of Professor Allen Ferrell, dated November 18, 2015 (the "Supplemental Declaration") (Ex. E)

Finally, Plaintiffs seek to exclude Point VII of Professor Ferrell's Declaration and Point III of his Supplemental Declaration, which address the means of assessing when investors had a "reasonable time" to digest inside information – an issue relevant to the calculation of disgorgement damages. These opinions should be excluded because (1) they incorrectly assume that "reasonable time" is a subjective concept, in contravention of controlling case law; and (2) they argue that trading volume should be deemed irrelevant to determining whether a "reasonable time" has elapsed, which is also contrary to law.

## SUMMARY OF THE CASE

This is an insider trading class action against Cohen, S.A.C. Capital Advisors, L.P., and certain affiliates (collectively, the "SAC Defendants"), and Mathew Martoma ("Martoma"), on behalf of investors in Elan who traded contemporaneously with and opposite to Defendants. Plaintiffs assert claims under Sections 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934. As set forth in Plaintiffs' Joint Consolidated Second Amended Class Action Complaint (ECF No. 162) ("Compl."), the illegal trading at issue spanned nearly two years, from August 2006 through July 2008, and was based on inside information concerning the Phase 2 clinical trial of bapineuzumab ("bapi"), a potential Alzheimer's disease treatment jointly developed by Elan and Wyeth. Compl. ¶ 5. Martoma, a portfolio manager employed by the SAC Defendants, obtained the inside information from two doctors involved in the clinical trial. *Id.* Both doctors entered into non-prosecution agreements; Martoma was convicted of insider trading after a jury trial in February 2014; the SAC Defendants settled a related SEC enforcement action in March 2013, paying $275 million in disgorgement, interest, and a 1x civil penalty. *Id.* ¶ 28. A related class

action on behalf of Wyeth investors settled in 2015 for $10 million – representing "close to 50% of likely recoverable damages (excluding pre-judgment interest)," ECF No. 294, at 23.

Between August 2006 and July 2008, Martoma consulted with the insider doctors over 50 times, and the SAC Defendants accumulated Elan ADRs worth over $350 million.  Compl. ¶¶ 7, 131, 156.  In this period, Elan's stock price more than doubled, principally due to bapi.  *Id.* ¶¶ 86-92.

On July 17, 2008, one of the doctors obtained and shared with Martoma the full, highly confidential bapi Phase 2 trial results.  *Id.* ¶ 13.  Martoma flew to Michigan to review the results at length with the doctor, and determined they were below market expectations and would drive a selloff.  *Id.* ¶¶ 14-16.  Martoma then spoke with Cohen, who directed that the SAC Defendants liquidate their entire position in Elan and Wyeth (except for certain swaps that could not be quickly or quietly unwound) and then massively shorted both stocks, selling shares worth over $995 million in the seven trading days before the Phase 2 results were scheduled to be announced on July 29, 2008, at the ICAD medical conference.  *Id.* ¶¶ 16-17, 19.

Unlike a typical securities fraud class action, damages in this case are capped at Defendants' gain (consisting of profits obtained and losses avoided) – the "disgorgement measure" – plus prejudgment interest.  As calculated by Plaintiffs' accounting expert, the SAC Defendants realized profits of over $125 million on purchases of Elan from August 22, 2006 through June 17, 2008; they later realized profits on short positions and avoided losses of over $225 million from their sales of Elan in the period July 21-29, 2008.

## ARGUMENT

### The Legal Standard Governing *Daubert* Motions

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Courts evaluate compliance with Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) by conducting a "three-step inquiry," *Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 349 (S.D.N.Y. 2005).

*First*, the court must evaluate whether the expert is "qualified as an expert by knowledge, skill, experience, training or education." *Id.* (quoting Rule 702).

*Second*, the court must examine "the validity of the expert's methodology," with reference to "the non-exhaustive four-factor list in *Daubert*." *Id.* at 350. "This inquiry tests 'whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been or could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation.'" *Id.* (quoting *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005)). To be admissible, an expert's opinions may not be based on "subjective belie[f] or unsupported speculation." *CIT Group/Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*, 815 F. Supp. 2d 673, 676 (S.D.N.Y. 2011) (quoting *Daubert*, 509 U.S. at 590).

*Third*, "the Court must review the relevance of the proposed expert's testimony to determine whether the conclusions it draws will aid the factfinder in answering the questions at issue in the case." *Berk*, 380 F. Supp. 2d at 350. While "expert testimony may help a jury understand unfamiliar terms and concepts" in complex securities cases, "[i]ts use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

I.  **SUBSTANTIALLY ALL OF PROFESSOR FERRELL'S OPENING REPORT, EVALUATING COHEN'S TRADING IN ELAN AND WYETH, SHOULD BE EXCLUDED**

Substantially all of the Opening Report should be excluded on the four separate grounds set forth in Points I.A though I.D below.  Portions are also subject to exclusion for the reasons set forth in Point I.E.  Portions not challenged by Plaintiffs are identified in Point I.F.

A.  **Professor Ferrell's Opinions Are Not the "Product of Reliable Principles and Methods"**

With the limited exceptions discussed in Point I.F below (at 14), all of the opinions in the Opening Report are subject to exclusion because they are not "the product of reliable principles and methods," and therefore fail to comply with Rule 702(c) and *Daubert*, 509 U.S. at 593-94.

Indeed, Professor Ferrell's Opening Report offers *no* principles or methods to guide his analysis.  Rather, throughout his report, he simply identifies particular trading that did or did not occur, and declares that it "does not support" an inference that Cohen traded illegally or "does not establish" that he did so, or "supports" or is "consistent with" an inference that he did not. *See* ¶¶ 11, 12, 13, 17, 18, 19, 22, 23, 25, 30, 37, 43, 47.

Asked at his deposition to offer criteria guiding his analysis, Professor Ferrell repeatedly stated that he could not, explaining that a determination whether trading "established" or "was consistent with" insider trading would depend on the "facts and circumstances" of a given case, and that he could not even identify particular facts or circumstances that would be relevant in the absence of a specific fact pattern:

> Q.  Under what circumstances would trading in a security establish that someone knowingly traded on inside information?
>
> A.  It would depend on the facts and circumstances.  So I would either think about that, given that I focused on the facts and circumstances here. So I don't have a ready hypothetical in mind.
>
> Q.  Can you envision any situation in which trading in a security would establish that someone knowingly traded on inside information?

A.   As I said, I don't have a ready hypothetical in mind, given that I was analyzing the facts and circumstances in this case.

Q.   Under what circumstances would trading in a security support the inference that someone was knowingly trading based on inside information?

A.   So that's a very broad question.  It would depend on what the allegations are and what the facts and circumstances show in terms of inferences that one might make based on that.

Q.   Can you give an example of circumstances that would support the inference that someone was knowingly trading based on inside information?

A.   So again, it would depend on what the allegations of what the inside information is and what -- and then the relationship of the trading to those allegations.

So I would -- it's an incomplete hypothetical.  I would need to know more about what the allegations of inside information were in order to . . . construct a hypothetical.

Deposition of Professor Allen Ferrell, dated March 3, 2016 ("Ferrell Dep."), Ex. F at 231:19-

233:2 (objections omitted).

Professor Ferrell's opinions thus amount to pure *ipse dixit* that do not even attempt to

comply with Rule 702, and "nothing in either *Daubert* or the Federal Rules of Evidence requires

a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit*

of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Opinions like Professor

Ferrell's, lacking any objective basis, are routinely excluded.  *See United States v. Whitman*, 555

F. App'x 98, 102 (2d Cir. 2014) (upholding exclusion of a comparative analysis of trades in an

insider trading case where the expert had not used "any objective methods to choose parameters

to identify comparable trades," but rather had simply "made a 'judgment'" as to how similar

trades should be identified); *Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 303 (S.D.N.Y. 2001)

(proposed expert on consumer confusion in women's clothing brand trademark infringement

case excluded where it was "hard to determine what methodology, if any" he used); *Bazile v.

City of New York*, 215 F. Supp. 2d 354, 365 (S.D.N.Y. 2002) (rejecting expert on discriminatory

motive of police internal investigation where expert "[did] not rely upon any theory related to discriminatory motivations, nor are there any standards which control the operation of his opinions").

**B.    Professor Ferrell's Opinions Do Not Reflect "Scientific, Technical, or Other Specialized Knowledge" and Instead Constitute Assessments of Stock Trades and Other Events That Jurors Could Readily Evaluate for Themselves**

The opinions in the Opening Report should also be excluded because – where the grounds for them can be identified – they do not reflect "scientific, technical, or other specialized knowledge," as required by Federal Rule of Evidence 702(a), and instead consist of simple inferences that the jury could readily draw without the assistance of an expert.

For example, Professor Ferrell begins his discussion of trading activity by noting that Cohen did not hold a position in Wyeth before the first corrective disclosure identified by Plaintiffs, and then opines that "[i]t would have been in SAC's financial interest to hold a long position in Wyeth if Cohen had knowingly possessed positive, Inside Information about the [announcement]."  Opening Report ¶ 17.  Professor Ferrell similarly observes that Cohen reduced his holdings of Elan ADRs before the announcement and increased them after and "[i]t would have been in SAC's financial interest to increase their long position in Elan before the [a]nnouncement rather than after, if Cohen had knowingly possessed positive, Inside Information about the [] announcement."  *Id.*  These opinions (based on selective extracts from a trading pattern that reflects extensive well-timed buying and selling) are premised on the simplistic proposition that an investor with positive inside information would buy stock before the news is announced rather than after – an argument that a lawyer can easily make and a juror can easily understand without expert testimony.

The balance of the report contains similar inferences that do not reflect expertise or call for expert presentation. *E.g.*, ¶ 19 (the fact that Cohen traded Wyeth long while Martoma shorted it – during a roughly two-month period in late 2007 – "does not support the inference that Cohen was trading based on the alleged Inside Information he received from Martoma"); ¶ 24 (the fact that Cohen both bought and sold Wyeth shares in 2008 before the June 17 disclosure of inside information is "consistent with Cohen having views about Wyeth that are unrelated to Inside Information"); ¶ 27 (same, regarding Elan).

"Opinions" such as these, which are in truth nothing more than readily understandable lawyers' arguments cloaked in the fancier garb of expert opinion, are subject to exclusion for that reason. *See Whitman*, 555 F. App'x at 102 (insider trading case, expert was properly barred from drawing comparisons between certain trades where "the jury could make the relevant comparisons without expert aid"); *United States v. Newkirk*, 2016 WL 1659149, at *2 n.1 (S.D.N.Y. Apr. 19, 2016) (excluding expert analysis in a fraud case where "the financial transactions and loans at issue in the present case . . . are simple and easily comprehensible to jurors hearing only lay testimony"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (expert testimony inadmissible where it concerns "lay matters which a jury is capable of understanding and deciding without the expert's help") (citation omitted).

### C.   Professor Ferrell Is Not Qualified to Present the Opinions He Offers, Either by Academic Training or Practical Experience

Further evidence that Professor Ferrell's purported expert opinions are merely lawyers' arguments, and an independent reason to exclude them, is that nothing in Professor Ferrell's background qualifies him as an expert on what does and does not support an inference of trading on inside information.

To determine whether a witness is properly "qualified as an expert by knowledge, skill, experience, training, or education" under Rule 702, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 328 (S.D.N.Y. 2009) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

Here, Professor Ferrell acknowledged that he has not studied patterns of insider trading as part of his academic work, Ferrell Dep. at 233:14-234:6, and indeed he is not aware of any academic literature on that topic. *Id.* at 236:9-237:20.  In addition, Professor Ferrell lacks relevant experience that might qualify him – he has apparently never been employed trading stocks, and he acknowledged at his deposition that he had no knowledge of what considerations the SEC or other market regulators use to identify suspect trades. *Id.* at 273:3-274:7.

In light of his lack of relevant academic or professional experience, Professor Ferrell's status as a financial economist and law professor do not give him a basis to offer expert opinions regarding the correct inferences to draw about insider trading from particular stock trades. *See SEC v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) (rejecting finance expert who "intend[ed] to opine about what information would and would not matter to CDO investors" but had "no education, expertise, or experience in this area upon which to make such a statement"); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 268 (S.D.N.Y. 2010) (expertise in jewelry industry did not qualify expert to address department store's reasons for not buying particular jewelry).

### D.   Professor Ferrell Improperly Offers Opinions Regarding Parties' Motives and States of Mind

The Opening Report also improperly offers opinions regarding inferences that should be drawn concerning Cohen's and other parties' motives and state of mind.  These topics are outside the permitted scope of expert testimony. *See In re Rezulin*, 309 F. Supp. 2d at 547 ("Inferences

about the intent or motive of parties or others lie outside the bounds of expert testimony."); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 415 (D. Conn. 2010) (same); *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) ("Expert witnesses are not permitted to testify . . . regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred."); *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ("To the extent Merck's motion seeks to preclude Dr. Parisian from testifying as to the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials, it is GRANTED. Dr. Parisian conceded at the hearing that her regulatory expertise does not give her the ability to read minds.").

Professor Ferrell's "principal conclusion," and many of his supporting opinions, state that particular trades or other events "do[] not establish that [Cohen] knowingly traded based on Inside Information" or "support the inference that he was not knowingly trading based on Inside Information," or "do[] not support the inference that he was knowingly trading based on Inside Information."  Opening Report ¶¶ 11, 12, 13, 17, 18, 19, 22, 23, 25, 30, 37, 43.  These statements are all improper opinions regarding what the jury should infer about Cohen's state of mind.

It would be appropriate – if the complexity of the trades were sufficient to warrant any expert opinion – for Professor Ferrell to testify as to whether Cohen or other Defendants received an economic benefit or detriment from a given trade.  But the inference to be drawn from any such fact – *i.e.*, whether it does or does not constitute evidence that a defendant was knowingly trading on inside information – is exclusively for the jury.  Professor Ferrell's proposal to testify that particular trading "does not establish" or "does not support the inference" that Cohen was "knowingly trading based on Inside Information" is an attempt to tell the jury what inferences they should draw from the facts.  Even if he was qualified to provide the jurors expert advice on

that subject (which, for the reasons discussed above, he is not), allowing him to do so would

invade the province of the jury.  *See In re Rezulin*, 309 F. Supp. 2d at 547 ("[t]he question of

intent is a classic jury question and not one for the experts") (citation omitted).

Professor Ferrell also offers other improper opinions regarding parties' motives and states

of mind.  He opines that the plaintiffs in the related, now-settled class action on behalf of Wyeth

investors "implicitly acknowledge that a majority of the value of SAC's bapi-related positions

heading into the June 17, 2008 Phase 2 Announcement were not attributable to Inside

Information," Opening Report ¶ 22, and repeatedly refers to the Defendants' massive shorting of

Elan and Wyeth stock in the days before the July 29 ICAD disclosure as a "hedged" position, *id.*

¶¶ 30, 35, 37 – despite acknowledging that he had no basis for knowing why Defendants made

those trades.  Ferrell Dep. at 277:17-278:3.  All of these opinions are also properly excluded.

E.    **Portions of the Opening Report Constitute
      Improper Factual Narrative and Argumentation**

Portions of Professor Ferrell's Opening Report also constitute improper factual narrative

that "is properly presented through percipient witnesses and documentary evidence" and

argument that "supplant[s] the role of counsel in making argument at trial," *In re Rezulin*, 309 F.

Supp. 2d at 541, 551.  *See also Anderson News, L.L.C. v. Am. Media, Inc.*, 2015 WL 5003528, at

*2 (S.D.N.Y. Aug. 20, 2015) ("experts who 'merely recit[e] what is on the face of a document

produced during discovery' 'do no more than that which the finder of fact could him or herself

do,' and such experts' reports 'may be precluded on this basis alone.'"); *Snyder v. Wells Fargo

Bank, N.A.*, 2012 WL 4876938, at *4 (S.D.N.Y. Oct. 15, 2012) (excluding portion of report that

"consist[ed] largely of rehashing and characterizing testimony"); *Luitpold Pharm., Inc. v. Ed.

Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *3 (S.D.N.Y. Sept. 16,

2015) ("Acting simply as a narrator of the facts does not convey opinions based on an expert's

knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to fulfill *Daubert's* most basic requirements.").

For example, Professor Ferrell offers a summary of purely factual testimony regarding what another trader told Cohen, Opening Report ¶¶ 20, 45, a list of news events affecting the broader economy, *id.* ¶ 44, and a summary of stock analyst commentary on Elan.  *Id.* ¶ 46.

Professor Ferrell also asserts that "Plaintiffs fail to explain" particular trading activity. *Id.* ¶¶ 25, 36, 39.  This type of argumentation is the province of counsel, and is properly excluded on this basis.  *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) ("no expert may supplant the role of counsel in making argument at trial"); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) (same), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

### F.    Summary of Matters that Plaintiffs Do Not Seek to Exclude

In light of the legal principles set forth above, Plaintiffs do not seek exclusion for the following matters in the Opening Report (but not any inferences to be drawn therefrom): (1) the amount and meaning of the "annualized standard deviation" calculations in paragraph 28; (2) the net exposure computations in paragraphs 31-34; (3) the explanation of options trade economics in paragraph 39 and the discussion of dark pools and algorithmic trading in paragraph 40; and (4) any testimony by Professor Ferrell needed to lay a foundation pursuant to Rule 1006 for tables, chart and other data summaries contained in the report.

II.     **THE OPINIONS IN PROFESSOR FERRELL'S JANUARY 22, 2016
        REBUTTAL REPORT CONCERNING DISGORGEMENT
        (POINTS IV AND V) SHOULD BE EXCLUDED**

   A.     **Professor Ferrell's Opinion that Certain Losses Avoided
          Should Not Be Included in the Disgorgement Amount Conflicts
          with the Court's Prior Ruling in This Case and Is Not the
          Product of Reliable Principles or Methods**

Plaintiffs bring claims on behalf of both sellers of Elan ADRs (who traded opposite

Defendants while they were buying on positive inside information during the period August 23,

2006 through June 17, 2008, the Insider Buying Period), and buyers of Elan securities (who

traded opposite Defendants while they were selling on negative inside information during the

period July 21-29, 2008, the Insider Selling Period).  A substantial number of the Elan ADRs

that Defendants sold during the Insider Selling Period had been originally purchased during the

Insider Buying Period.

In Point IV of his Rebuttal Report, Professor Ferrell opines that "it is inappropriate to

include as part of the Disgorgement Amount the losses avoided from sales during the Insider

Selling Period of Elan ADRs that were purchased during the Insider Buying Period," Rebuttal

Report ¶ 8.  This opinion should be excluded because it (i) conflicts with the Court's ruling at the

motion to dismiss stage and (ii) is not the "product of reliable principles and methods."

   1.     **Professor Ferrell's Opinion Directly
          Conflicts with a Ruling of the Court**

In their motion to dismiss, Defendants made precisely the same argument now presented

by Professor Ferrell, and it was rejected by the Court:

> SAC argues that including both Buying Claims and Selling Claims in the
> calculation of SAC'S profits gained and losses avoided under Section 20A
> constitutes "improper double-counting" because the securities that SAC
> bought during the buying period were the same securities it sold during the
> selling period. *This argument is wholly without merit.* Section 20A limits
> damages to "the profit gained or loss avoided in the transaction or
> transactions that are the subject of the violation."  SAC profited when it

originally purchased a Wyeth or Elan security based on inside information, and then it later avoided losses when it sold a Wyeth or Elan security based on different inside information. *That the second, separate fraudulent transaction may have involved the same security as the first fraudulent transaction does not insulate SAC from responsibility for damages resulting from both illegal transactions.*

*Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 343-44 (S.D.N.Y. 2014) (emphases added).

At his deposition, Professor Ferrell acknowledged he was familiar with the Court's ruling, and did not attempt to reconcile his opinion with it.  Instead, he stated simply that "I'm making an economic argument, and if it's not legally relevant, it's not legally relevant."  Ferrell Dep. at 145:1-3.  Because Professor Ferrell's opinion conflicts with the law, it is inadmissible. *See Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 879 (N.D. Ill. 2012) ("Expert opinions that are contrary to law are inadmissible."); *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104 (S.D. Cal. 2012) (loss causation analysis excluded where expert used the wrong legal standard); *Cave v. Saxon Mortg. Servs., Inc.*, 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20, 2015) (where portions of expert report were "contrary to [the Court's] prior rulings" they were "*per se* unreliable and inadmissible under *Daubert*").

### 2. Professor Ferrell's Opinion Is Not the Product of Reliable Principles or Methods from the Field of Economics

Professor Ferrell's opinion should also be excluded because it is not the "product of reliable principles and methods" from the field of economics.  At his deposition, Professor Ferrell acknowledged that there was nothing in the academic literature to support his argument, and instead, he was simply presenting what he termed a "point of logic":

Q . . . Professor Ferrell, is there anything in the academic literature that supports the analysis that you've just provided with respect to setting the disgorgement amount?

A.  Is there an article I can point to?  No.

> I view this point as simply a point of logic.  That is, when we think about disgorgement, I would think we would need to think about what actually happened versus what should have happened according to the allegation.  So I can't think of a cite that makes this specific point, but anyway.
>
> So I view it as just a point of logic.

Ferrell Dep. at 141:10-21.

> Professor Ferrell then explained his "logic":
>
> So if the purchase was unlawful, then -- and then there's unlawful sale for that share, then I would not include losses avoided because in the but-for world, you would never have had that position.  And therefore in the but-for world, you would have avoided those losses as well.  And so there's no delta, there's no difference between the but-for world and the actual world.

*Id.* at 142:13-20.  *See also* Rebuttal Report ¶ 8.

An opinion such as this – the purported application of "logic," uninformed by any recognized principle in the witness's field of expertise and instead guided by the "expert's" opinion that it is appropriate to postulate a counterfactual hypothetical in which a first illegal act had not occurred and therefore a second illegal act might not have occurred – is not admissible. Rather, such purported "'economic logic' is simply a form of inadmissible ipse dixit."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013).

### B.  Professor Ferrell's Opinion that the Disgorgement Amount Should Be Reduced by SAC's Cost of Capital Conflicts with Applicable Law

Professor Ferrell also argues that Plaintiffs' accounting expert overstated Defendants' unlawful profits because "his calculations do not take into account SAC's cost of capital." Rebuttal Report ¶ 13.  The opinion should be excluded because it is contrary to law.

In calculating disgorgement, illegal gains are measured by trading profits, subject to a narrow deduction for "direct transaction costs" – such as brokerage commissions – that "plainly reduce the wrongdoer's actual profit."  *SEC v. Universal Exp., Inc.*, 438 F. App'x 23, 26 (2d Cir. 2011).  Even deducting "direct transaction costs" is within the court's discretion, *id.*, and such

deductions are an exception to the general rule that costs associated with an unlawful scheme cannot be deducted.  *See SEC v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *5 (S.D.N.Y. May 6, 2014) ("In making the disgorgement calculation, the proper focus is revenues, not profits. . . .  Defendants 'are not entitled to deduct costs associated with committing their illegal acts.'") (quoting *FTC v. Bronson Partners, LLC,* 654 F.3d 359, 375 (2d Cir. 2011)), *aff'd*, 639 F. App'x 752 (2d Cir.), *cert. denied*, 136 S. Ct. 2429 (2016); *SEC v. Aronson*, 2015 WL 10792021, at *2 (S.D.N.Y. Aug. 24, 2015) (rejecting the defendant's claim that certain out-of-pocket costs should be deducted, noting that "it is well established that defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts") (quoting *Bronson Partners,* 654 F.3d at 375).

Here, the "cost" that Professor Ferrell opines should be deducted is not an actual, out-of-pocket cost at all.  Rather, it is money that Defendants received from the illegal trades *and kept*. *See* Ferrell Dep. at 152:16-21 (Q: . . . Who is that 31.2 million that you argue should be deducted, who is that money being paid to?  A.  It's not being paid to anybody.").  It represents money that Defendants "would have received if [they] had invested the same capital over the same period in a financial security that had the same financial risk."  Rebuttal Report ¶ 13.  *See also* Ferrell Dep. at 154:3-7 ("Q.  And so that 31.2 million represents income that would have been generated from an alternative investment, had the investment in Elan not been made.  A. You can think about it that way.").

As a matter of law, Defendants' hypothetical profits from the lawful investments they might have made had they not engaged in insider trading are not a proper deduction from the profits they actually generated from the unlawful trades that they actually made, and Professor Ferrell's opinion to the contrary should be excluded.

III.   **CERTAIN OPINIONS IN PROFESSOR FERRELL'S AUGUST 27, 2015 DECLARATION AND NOVEMBER 18, 2015 SUPPLEMENTAL DECLARATION REGARDING THE DETERMINATION OF "REASONABLE TIME" SHOULD BE EXCLUDED**

In Point VII of Professor Ferrell's Declaration (Ex. D ¶¶ 25-29) and Point III of his Supplemental Declaration (Ex. E ¶¶ 7-10), Professor Ferrell opines on the proper means of assessing when investors had "reasonable time" to digest inside information that has been released to the market, an issue that is relevant to calculating Defendants' disgorgement amount. These opinions should be excluded because (1) they assume that "reasonable time" is a subjective concept, which conflicts with controlling case law; and (2) they argue that trading volume is irrelevant to determining whether a "reasonable time" has elapsed, which is also contrary to law.  Point VI of the Rebuttal Report, which incorporates these opinions by reference, should also accordingly be excluded in relevant part.

A.   **Background Regarding the Issue of "Reasonable Time"**

In its decision on Defendants' motions to dismiss, the Court explained the relevance of "reasonable time" to the "disgorgement measure" of damages applicable in this case:

> Profits and losses are measured by determining "the difference between the price the insider realizes and the market price of the securities a *reasonable time* after the inside information has been disseminated – that is, after the market and defrauded sellers and buyers have had a reasonable time to digest the information."

*Kaplan*, 40 F. Supp. 3d at 339 (quoting *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 665 (E.D. Va. 2000)) (ellipses and alteration in *Kaplan* omitted, emphasis added).

The measurement of "reasonable time" is highly relevant in this case because a second negative announcement regarding a different Elan drug, Tysabri, two days following the disclosure of the full bapi Phase 2 trial results on July 29, 2008 precipitated a further 50.5% decline in the price of Elan ADRs.

At the motion to dismiss stage, Defendants argued that the disgorgement measure should not include the Tysabri-related price decline as a matter of law, because it resulted from a separate announcement.  The Court rejected this argument, noting that it was squarely foreclosed by the Second Circuit's ruling in *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir. 1980):

> SAC argues that allowing Plaintiffs to collect damages based on a market event wholly unrelated to the alleged insider trading would represent an improper windfall recovery for the Plaintiffs, such that the Court should, at this stage, dismiss Plaintiffs' claims regarding the Tysabri drop.  This argument was rejected by the Second Circuit in *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156 (2d Cir. 1980).  In *Elkind,* the defendants traded on inside information, and – similar to the instant case – once the corrective disclosure became public, the stock fell further than might have been expected due to factors independent of the inside information.  *Id.* at 173 n. 12.  The defendants argued that they should not be liable for losses due to factors outside their control.  The Court held that "when only a disgorgement measure of damages is used, a tippee who trades is liable for the entire difference between the price at which he sold and the price the stock reached after the tip became known."  *Id.*  While the *Elkind* defendants were not necessarily responsible for the increased losses to the plaintiffs, "[b]y trading on tipped information, the tippee takes the risk that by the time the tip is disclosed the market price may reflect disclosure of information more adverse than the tip and other adverse market conditions."  *Id.*

*Kaplan*, 40 F. Supp. 3d at 340.

As Plaintiffs explained in their motion to dismiss opposition brief, *see* ECF No. 138, at 12, unlike an out-of-pocket damages case, where the price reaction quantifies the value of the information disclosed, the "reasonable time" measure applicable here is based on mitigation-of-damages principles, which originated with the Second Circuit's decisions in *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974) and *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1306 n.27 (2d Cir. 1973), and were later articulated in the leading decision on the issue, *SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983) (en banc).  A leading treatise, William K. S. Wang & Marc I. Steinberg, *Insider Trading* (3d ed. 2010), describes *MacDonald* and *Elkind* as adopting a "cover measure" of damages, and explains that a court applying the "cover measure" is "likely to

select a later deadline" than under the out-of-pocket measure because while "the market price may adjust fairly quickly to an announcement," "ordinary investors must find out about the announcement, absorb it, overcome any reluctance to realize 'paper' losses, and raise additional funds to reverse their transactions." *Id.* at 254, 257-58.

The issue of "reasonable time" was subsequently addressed at length by the parties' financial experts in connection with briefing on class certification.  In his Declaration, submitted in opposition to class certification, Professor Ferrell opined that "[t]o my knowledge, there is no recognized method in economics for assessing on a class-wide basis when the Elan Buyer Class reasonably should have digested the information in the July 29 ICAD Announcement" and "the amount of time that it would reasonably take to digest the information would depend on [each investor's] individual facts and circumstances . . . ." Declaration ¶ 17.  Defendants argued that such individualized issues precluded class certification.  ECF No. 217, at 13-18.

In response, Plaintiffs submitted a rebuttal declaration (the "Jarrell Rebuttal Declaration," dated October 27, 2015) by the financial economist retained on their behalf, Professor Gregg A. Jarrell, which relied principally on an analysis of trading volume to opine that, in all likelihood, investors continued to react to the July 29 bapi announcement for at least three days.  Ex. G ¶ 5.

As Professor Jarrell explained, there is a large economic literature analyzing trading volume.  Ex. G ¶¶ 19-33.  One academic paper explains that while price reaction is the most relevant metric for some economic questions, "[i]f the question of interest is whether information directly affects trading decisions . . . , then the associated design should use trading volume-metrics."  Jarrell Rebuttal Declaration ¶ 25 (quoting William M. Cready & David N. Hurtt, *Assessing Investor Response to Information Events Using Return and Volume Metrics*, 77 Accounting Rev. 891, 892 (2002)).  Consistent with the academic literature, both *MacDonald*

and *In re MicroStrategy* state that "in determining what was a reasonable time," a court "should consider the *volume* and price at which [the] shares were traded following disclosure, insofar as they suggested the date by which the news had been fully digested and acted upon by investors." 699 F.2d at 55, 115 F. Supp. 2d at 665.

### B.   "Reasonable Time" Is an Objective Measure and Professor Ferrell's Opinions to the Contrary Should Be Excluded as Contrary to Law

At class certification, the Court considered Defendants' argument that "a determination of damages will require a determination of how much time each investor would have reasonably needed to digest the disclosure that came out of the ICAD conference on June 29, 2008." *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015). It held the issue did not need to be definitively resolved at that stage, but also that it was "not persuaded that determination of the time by which an investor would have reasonably needed to digest the relevant disclosures requires a subjective, individualized assessment." *Id.*

The issue is now ripe, both because it governs the admissibility of Professor Ferrell's opinions, and because it controls the scope of proof at trial: if the standard is objective, then proof is properly presented at the trial in January; were it subjective, it should be reserved for a later phase. *See In re WorldCom, Inc. Sec. Litig.*, 2005 WL 408137, at *1 (S.D.N.Y. Feb. 22, 2005).

As a matter of law, Defendants are incorrect that "reasonable time" is measured on a subjective, individualized basis. *First*, their position is contrary to binding authority: the "reasonable time" standard was first formulated and applied by the Second Circuit *in a class action – Elkind –* and the circuit court's decision made a uniform, class-wide "reasonable time" determination as part of its decision upholding a judgment in favor of the previously-certified class. 635 F.2d 156, 173 (2d Cir. 1980). *Elkind* is controlling and dispositive.

- 22 -

*Second*, use of an objective "reasonable time" standard conforms to the widespread use of objective, "reasonable investor" standards for other elements under the Exchange Act.  As the Supreme Court recently reconfirmed, "whether a statement is 'misleading' depends on the perspective of a *reasonable investor*: The inquiry (*like the one into materiality*) is *objective*." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015) (emphasis added).  Likewise, the statute of limitations begins to run for Exchange Act claims "when . . . a *reasonable investor* conducting such a timely investigation would have uncovered the facts constituting a violation."  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011) (emphasis added).  Professor Ferrell offers a menu of factors that might vary from investor to investor, Declaration ¶¶ 25-28, but a similar list could be compiled concerning materiality, falsity, and, most directly, the timing of when an investor had "uncovered the facts constituting a violation."  The ability to make such a list provides no basis to depart from the objective standards applied to similar issues under the Exchange Act.

*Third*, the purpose and use of the "reasonable time" measure support an objective test. "Reasonable time" is used to calculate the *defendant's gain* for purposes of the *disgorgement amount*, and there is no coherent reason why the calculation of the defendant's *gain* should turn on each *plaintiff's* individual circumstances.[2]

Accordingly, Professor Ferrell's opinion that "the amount of time that it would reasonably take to digest the information would depend on [each investor's] individual facts and circumstances," Declaration ¶ 17 & ¶¶ 25-29, should be excluded as contrary to law and also

---

[2]   Any plaintiff here who was fortunate enough to sell before the Tysabri disclosure would not, of course, have any claim for damages from the subsequent decline.

under Rule 403 because it would be highly confusing to the factfinder to hear expert testimony that no single "reasonable time" exists if their task is to select a single "reasonable time."

**C.   Professor Ferrell's Opinion Disputing that Trading Volume Is Relevant to the Determination of "Reasonable Time" Should Be Excluded as Contrary to Law**

In his Supplemental Declaration in opposition to class certification, Professor Ferrell responds to the Jarrell Rebuttal Declaration (presenting an analysis of trading volumes) with two "principal additional conclusions": (i) that Professor Jarrell's reliance on trading volume is incorrect because "[a]t most, an analysis of trading activity would only show the period of time during which investors traded in response to the release of information, not when investors in general (let alone members of the proposed Elan Buyer Class) digested or reasonably should have digested the information released," and (ii) that the volume data does not, in his opinion, support Professor Jarrell's conclusion.  Supplemental Declaration ¶ 6.

Plaintiffs do not object to admission of Professor Ferrell's second principal additional conclusion and his associated analysis, Supplemental Declaration Point IV, ¶¶ 11-22.  Professor Ferrell's first conclusion, however, should be excluded as contrary to law.

*First*, Professor Ferrell's analysis should be excluded because, as noted above, both *MacDonald* and *In re MicroStrategy* expressly hold trading volume to be relevant to the issue of "reasonable time," and his criticism of Professor Jarrell's use of volume data to analyze the issue of "reasonable time" is therefore contrary to law.

*Second*, Professor Ferrell's analysis sidesteps the relevant legal question.  As indicated above, his opinion is expressly premised on drawing a distinction between when investors "traded in response to the release of information" and when they "digested or reasonably should have digested the information released."  *See also* Supplemental Declaration ¶¶ 7, 8, 9, 10 (each distinguishing between "trading" on and "digesting" the relevant information).  The Court's

- 24 -

decision in this case, and the decision in *In re MicroStrategy*, however, specifically define "reasonable time" as when investors "reasonably should have digested the disclosed information *and have taken steps to protect their interests*," which they then define to mean "buying replacement or selling held shares upon full public disclosure of previously withheld information."  40 F. Supp. 3d at 340 (quoting *In re MicroStrategy*, 115 F. Supp. 2d at 665) (emphasis added).  The caselaw thus expressly equates "reasonable time" with the act of trading, and Professor Ferrell's contention that "digesting" information may occur at a different time from "trading" on it – whether or not true – is legally irrelevant.

## CONCLUSION

For the reasons set forth above, the Court should exclude the following testimony and opinions of Professor Ferrell:

In his Opening Report, dated December 4, 2015 – all except the calculations in paragraphs 28 and 31-34, the explanatory matter in paragraphs 39 and 40, and any foundation for the accompanying tables, charts and other data;

In his Rebuttal Report, dated January 22, 2016 – Points IV, V and VI;

In his Declaration, dated August 27, 2015 – Point VII; and

In his Supplemental Declaration, dated November 18, 2015 – Point III.

Dated:  New York, New York
        September 12, 2016

Ethan D. Wohl
Krista T. Rosen
Sara J. Wigmore
**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, New York  10022
Telephone: (212) 758-4000

Marc I. Gross
Michele S. Carino
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York  10016
Telephone: (212) 661-1100

Respectfully submitted,

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: _____
       Kevin S. Reed
       Chad Johnson
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone: (212) 849-7000

-and-

William C. Price (admitted *pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California  90017
Telephone: (213) 443-3000

*Attorneys for Plaintiffs and Class Counsel*